1          UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF LOUISIANA
2

3    ****************************************************************

4    BROTHERS PETROLEUM, LLC

5                              CIVIL ACTION NO. 17-6713 "J"
     VERSUS                    NEW ORLEANS, LOUISIANA
6                              TUESDAY, SEPTEMBER 24, 2019, 8:30 A.M.

7

     WAGNERS CHEF, LLC,
8    JADALLAH ENTERPRISES, LLC,
     AHMED 1, LLC, WAGNER WORLD,
9    LLC, EMPIRE EXPRESS, LLC,
     AND LNV CORPORATION

10

     ****************************************************************

11
                                **DAY 2**
12            TRANSCRIPT OF JURY TRIAL PROCEEDINGS
          HEARD BEFORE THE HONORABLE CARL J. BARBIER
13               UNITED STATES DISTRICT JUDGE

14

     APPEARANCES:

15

16   FOR THE PLAINTIFF:        JOSEPH VINCENT DIROSA, JR.
                               ATTORNEY AT LAW
17                             329 NORTH WOODLAWN AVENUE
                               METAIRIE, LA  70001

18

19   FOR THE DEFENDANTS:       ELKINS, PLC
                               BY:  THOMAS M. BEH, ESQUIRE
20                             201 ST. CHARLES AVENUE, SUITE 4400
                               NEW ORLEANS, LA  70170

21

22   OFFICIAL COURT REPORTER:  CATHY PEPPER, CRR, RMR, CCR
                               500 POYDRAS STREET, ROOM B-275
23                             NEW ORLEANS, LA  70130
                               (504) 589-7779
24                             Cathy_Pepper@laed.uscourts.gov

25   PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.  TRANSCRIPT
     PRODUCED BY COMPUTER-AIDED TRANSCRIPTION.

                         *OFFICIAL TRANSCRIPT*

08:19:46

1 **I N D E X**

2

3 <u>PAGE</u>

4

5 OPENING STATEMENTS BY MR. DIROSA.................... 69

6 OPENING STATEMENTS BY MR. BEH....................... 75

7 **IMAD "EDDIE" HAMDAN**................................ 81

8 DIRECT EXAMINATION BY MR. DIROSA.................... 82

9 CROSS-EXAMINATION BY MR. BEH........................ 88

10 REDIRECT EXAMINATION BY MR. DIROSA.................. 101

11 **STEVEN LONGO**...................................... 104

12 DIRECT EXAMINATION BY MR. DIROSA.................... 104

13 CROSS-EXAMINATION BY MR. BEH........................ 108

14 **CONNIE KLEINDORF**.................................. 111

15 DIRECT EXAMINATION BY MR. DIROSA.................... 112

16 CROSS-EXAMINATION BY MR. BEH........................ 131

17 REDIRECT EXAMINATION BY MR. DIROSA.................. 149

18 LUNCHEON RECESS..................................... 158

19 **JADALLAH SAED**..................................... 160

20 DIRECT EXAMINATION BY MR. DIROSA.................... 161

21 CROSS-EXAMINATION BY MR. BEH........................ 213

22 REDIRECT EXAMINATION BY MR. DIROSA.................. 255

23 **NASHAT HAIDER**..................................... 273

24 DIRECT EXAMINATION BY MR. BEH....................... 273

25 CROSS-EXAMINATION BY MR. DIROSA.................... 282

*OFFICIAL TRANSCRIPT*

1    **DAVID SEWELL**........................................ 290

2    DIRECT EXAMINATION BY MR. BEH........................ 290

3    CROSS-EXAMINATION BY MR. DIROSA...................... 300

4    REDIRECT EXAMINATION BY MR. BEH...................... 308

5    **IMAD "EDDIE" HAMDAN**................................ 309

6    DIRECT REBUTTAL EXAMINATION BY MR. DIROSA............ 309

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*OFFICIAL TRANSCRIPT*

**P-R-O-C-E-E-D-I-N-G-S**

M O R N I N G   S E S S I O N

TUESDAY, SEPTEMBER 24, 2019

(COURT CALLED TO ORDER)


08:19:46    3
08:19:46    4
08:19:46    5
08:19:46    6

THE DEPUTY CLERK:  All rise.

THE COURT:  Good morning, everyone.

VOICES:  Good morning, Your Honor.

THE COURT:  We'll bring the jury in a couple of minutes.  I wanted to go over a couple of things.

Have a seat, everybody.

We're on the record in open court, but the jury is not present.  This is in Civil Action 17-6713, Brothers Petroleum, LLC versus Wagners Chef, LLC and others.

I think Perry just gave y'all copies of the rulings on all the exhibits that were objected to.  I know you just got them, but just in the event you want to take a glance at them.  I don't know if it's going to affect your opening statements or not, but I already said you obviously can't refer to anything until I rule on it or anything that I've sustained the objection to.

I understand there was a request to sequester the witnesses in this case; is that correct?

MR. DIROSA:  Yes.

08:22:06 1      THE COURT:  So I'm going to order that the witnesses be

08:22:12 2 sequestered.  Obviously, each side can have a company

08:22:18 3 representative present; but, otherwise, you should instruct

08:22:21 4 your witnesses to remain outside the courtroom until they are

08:22:24 5 called to testify, and to refrain from discussing their

08:22:27 6 testimony with anyone before or after they testify, with the

08:22:32 7 exception of they are free to discuss their testimony with

08:22:36 8 counsel.  Okay.

08:22:37 9      I believe I indicated 15 or 20 minutes for

08:22:43 10 opening statements?

08:22:45 11      MR. DIROSA:  I suppose.

08:22:45 12      THE COURT:  Is that right?

08:22:46 13      MR. BEH:  That's good.

08:22:49 14      THE COURT:  Perry, did you just e-mail them the legal

08:22:55 15 instructions?  We don't have to talk about that now, but the

08:22:58 16 legal instructions and verdict form, just in case, when you all

08:23:02 17 have a chance to look at those, any final objections or issues.

08:23:07 18      Okay.  One thing that occurred to me this morning

08:23:11 19 when I was looking at this is, in the pretrial order, at

08:23:14 20 pages 17 through 19, there are a number of uncontested material

08:23:18 21 facts.

08:23:19 22      Usually, what I do is, at some point, I read

08:23:22 23 those or have you read those to the jury.  We can give it to

08:23:26 24 them in writing, or we can just read it to them.  But I want

08:23:29 25 you all, when you have a chance, before we do that, to take a

08:23:31 1    look at them.  I know there are several -- some, at least, that

08:23:37 2    are going to be irrelevant because we've eliminated the damages

08:23:40 3    aspect of this case insofar as the jury is concerned, okay.

08:23:56 4              Anybody have any other questions before we bring

08:23:59 5    the jury in?

08:24:00 6              MR. DIROSA:  Yes, sir, I do.

08:24:04 7              Again, I haven't looked at the jury instructions

08:24:07 8    or the jury form, but one of the elements of Unfair Fair Trade

08:24:16 9    Practices Act has to do with -- what, unethical and all of

08:24:19 10   those things.  It says:  Or substantially injurious to -- in

08:24:27 11   this case, Brothers Petroleum.

08:24:29 12             So I'm not sure how the Court wants to handle the

08:24:32 13   notion of -- while we're not assigning damages or assessing

08:24:37 14   damages, it seems likes that is an essential element, the fact

08:24:44 15   that it is substantially injurious.

08:24:48 16             So, I mean, the only way I can think is to say

08:24:52 17   that the --

08:24:53 18             THE COURT:  Well, this is in the jury instructions.  It

08:24:56 19   says -- one part of it, on page 10 -- "A trade practice is

08:25:02 20   unfair when it offends public policy and is immoral, unethical,

08:25:09 21   oppressive, unscrupulous or substantially injurious to

08:25:12 22   competitors."

08:25:13 23             So, it seems like it's just one -- you know, a

08:25:18 24   lot of words there, but I think they are trying to convey to

08:25:22 25   the jury, in the best way the statute can, the types -- it's

*OFFICIAL TRANSCRIPT*

08:25:26  1   more than just simple negligence or something like that --

08:25:29  2              MR. DIROSA:  Exactly.

08:25:29  3              THE COURT:  -- or just simple breach of contract.

08:25:30  4              MR. DIROSA:  But how do we convey -- or how do I

08:25:33  5   convey --

08:25:34  6              THE COURT:  Convey what?

08:25:34  7              MR. DIROSA:  -- to the jury that this is substantially

08:25:37  8   injurious to my client, if we're not going into the element of

08:25:41  9   damages?  I'm not sure --

08:25:44 10              THE COURT:  I think the version of the proposed verdict

08:25:48 11   form is your suggestion, right?

08:25:50 12              MR. DIROSA:  Yes, sir.

08:25:51 13              THE COURT:  We just adopted that.  I mean, I don't have

08:25:53 14   any problem.

08:25:53 15              Are you suggesting we need to add something else

08:25:55 16   to the interrogatories or what?

08:25:58 17              MR. DIROSA:  Well, I guess that's my question.

08:26:04 18              THE COURT:  Well, here is my question.  We haven't

08:26:08 19   talked about this.  I mean, you all agreed that we're not going

08:26:12 20   to try damages here.  You've already tried damages.  There was

08:26:16 21   a jury trial in state court that found there was a breach of

08:26:20 22   contract, and they determined the amount of the damages.  I

08:26:23 23   understand that's subject to appeal, I assume.  So it's not a

08:26:27 24   final final judgment.

08:26:28 25              But have you all discussed or thought about what

08:26:34 1 aspect, if any, of what has gone on in state court should be

08:26:40 2 told to this jury? Because they might wonder why we're not

08:26:46 3 asking them to determine damages, in other words.

08:26:48 4     MR. BEH: Well, I mean, I was going to be very upfront

08:26:51 5 with that, to say exactly that. The breach of contract claim

08:26:55 6 between Brothers and Wagners Chef has been resolved in a

08:27:00 7 separate proceeding that's going in state court, and a damages

08:27:04 8 amount has been awarded.

08:27:06 9     MR. DIROSA: And it was substantial? I mean, it was

08:27:11 10 substantial.

08:27:12 11     MR. BEH: It was substantial, but I disagree that that

08:27:15 12 is a sufficient basis for a finding of an unfair trade

08:27:20 13 practice.

08:27:21 14     THE COURT: Well, I mean, it seems to me you could

08:27:22 15 argue, Mr. DiRosa, that it's substantially injurious. I don't

08:27:31 16 think you need a dollar amount.

08:27:32 17     MR. DIROSA: I'm not looking for a dollar amount.

08:27:35 18     THE COURT: I think your argument would be, this has

08:27:39 19 been substantially injurious because your client -- the

08:27:41 20 contract was breached years ago, and you haven't been paid.

08:27:44 21 They owe you, and you haven't been paid, without getting into a

08:27:50 22 dollars amount, I guess, you know.

08:27:52 23        You could say, it's already been determined that

08:27:53 24 there was -- in state court -- you're okay with that?

08:27:53 25     MR. DIROSA: There was a breach --

*OFFICIAL TRANSCRIPT*

08:27:56 1    THE COURT:  There was a breach of contract, and damages
08:27:58 2  were assessed, without going into dollar amounts.  How about
08:28:01 3  that?
08:28:01 4    MR. DIROSA:  Yes.  I'm not asking to go into dollar
08:28:04 5  amounts, but just to say it was a substantial amount.
08:28:08 6    THE COURT:  Well, it seems to me, if they find that --
08:28:12 7  well, I don't know what to tell you.  I can't draft your
08:28:16 8  argument for you.
08:28:16 9    MR. DIROSA:  Let's say I'm just addressing it up front
08:28:21 10  that I'll probably say that there was a determination of
08:28:27 11  damages, and it was a substantial sum.  That's it.
08:28:30 12    THE COURT:  Let's leave it at that, okay.
08:28:34 13      Mr. Beh, are you okay with that?
08:28:36 14    MR. BEH:  Yes, I guess so.
08:28:37 15    THE COURT:  Okay.  After we do opening, we'll go right
08:28:42 16  into the first witness.  I've got a witness list.
08:28:46 17      Mr. Hamdan is going to be your first witness, the
08:28:49 18  owner of Brothers?
08:28:50 19    MR. DIROSA:  Yes, sir.
08:28:51 20    THE COURT:  You're going to try to take them in the
08:28:53 21  order that they are listed here?  Hamdan, Longo, Kleindorf,
08:28:59 22  Sewell and Saed?
08:29:02 23    MR. DIROSA:  Saed.  Then Sewell may be called, or he
08:29:08 24  may be a rebuttal witness.
08:29:10 25    THE COURT:  Well, okay.

*OFFICIAL TRANSCRIPT*

08:29:10  1          MR. DIROSA:  I think they have listed Sewell also.

08:29:14  2          THE COURT:  All right.  Well, just remember my rule

08:29:16  3   about rebuttal witnesses.  If it's really a substantive part of

08:29:20  4   your claim, you can't wait to say, I'm going to hold that back

08:29:23  5   for rebuttal.

08:29:23  6          MR. DIROSA:  Right.

08:29:23  7          THE COURT:  You have to call them in your case, unless

08:29:26  8   it's truly only rebuttal to their evidence.

08:29:29  9          MR. DIROSA:  I understand.

08:29:30 10          THE COURT:  Just keep that in mind because I've seen

08:29:33 11   lawyers get tripped up on that, okay?

08:29:35 12          MR. DIROSA:  Yes.

08:29:36 13          THE COURT:  Anything else?

08:29:36 14              I'll step off the bench.  I'll be back in in

08:29:41 15   about two minutes.  We'll bring the jury in, and we'll go right

08:29:46 16   into opening, okay.

08:29:47 17          THE DEPUTY CLERK:  All rise.

08:29:51 18          THE COURT:  Let's just put on the record now, all the

08:29:53 19   unobjected-to exhibits are admitted without any further

08:29:57 20   foundation.  All the contested exhibits, with respect to which

08:30:03 21   I overruled the objection, are also admitted, okay.

08:30:06 22          MR. DIROSA:  As --

08:30:08 23          THE COURT:  Now, you'll have to renumber the contested

08:30:13 24   ones -- maybe you don't have to renumber them.  They were all

08:30:18 25   sequential, right?

                              *OFFICIAL TRANSCRIPT*

08:30:19 1        MR. BEH:  Yes, sir.

08:30:20 2        MR. DIROSA:  They were.  I can move them in the bench

08:30:21 3  book.

08:30:21 4        THE COURT:  You don't have to renumber them.  There

08:30:24 5  will be some missing numbers, though, when we send them to the

08:30:27 6  jury, but that's okay.

08:30:28 7        MR. DIROSA:  Will they get a bench book?

08:30:30 8        THE COURT:  Usually, I send a bench book in there with

08:30:35 9  the exhibits that have been admitted.  They also have -- you

08:30:38 10  all are going to have the exhibits on a disc or something?

08:30:42 11        MR. BEH:  I certainly can, Your Honor.  I obviously

08:30:45 12  don't have it prepared yet.

08:30:46 13        THE COURT:  Because if you all can have that before the

08:30:49 14  jury goes out to deliberate, they have a screen and a player in

08:30:52 15  the jury room.  They can also play the electronic version.

08:30:55 16        MR. DIROSA:  I can bring a disc.

08:30:57 17        MR. BEH:  A thumb drive, would that be sufficient?

08:30:57 18        THE COURT:  Yes, I think so.

08:31:00 19        MR. BEH:  I mean, I can give them a computer.

08:31:02 20        THE COURT:  Right, Gail?

08:31:02 21        THE DEPUTY CLERK:  Yes.

08:31:05 22        THE COURT:  No, we don't have to give them a computer.

08:31:08 23  I said a disc, thumb drive, whatever the current technology is.

08:31:12 24  But I know they can play it in the jury room now.

08:31:14 25        MR. DIROSA:  As things go on, are some of these rulings

*OFFICIAL TRANSCRIPT*

08:31:18 1 regarding evidence subject to being reurged?

08:31:22 2         THE COURT: Probably not. No, I'm just kidding.

08:31:25 3             You can reurge them if you want, but, you know,

08:31:27 4 we looked at all of these.

08:31:27 5         MR. DIROSA: I got it.

08:31:30 6         THE COURT: Now, I say that with this caveat.

08:31:32 7 Sometimes, during a trial, you know what happens. One side

08:31:35 8 that objected to somebody else's evidence will do something to

08:31:37 9 open a door to evidence that was otherwise not admissible. I'm

08:31:42 10 not precluding that possibility. Okay?

08:31:47 11         MR. DIROSA: Okay.

08:31:48 12         THE COURT: But don't ask me just to revisit for no

08:31:51 13 good reason.

08:31:52 14         MR. DIROSA: I understand.

08:31:52 15         MR. BEH: Understood, understood.

08:31:54 16         THE COURT: All right. I'll be back in a couple

08:31:56 17 minutes.

08:34:16 18         (WHEREUPON, at 8:31 a.m., the Court took a recess.)

08:37:35 19         THE DEPUTY CLERK: All rise.

08:37:36 20         THE COURT: Hold the jury for a second.

08:37:45 21             Good morning, again. I neglected to have counsel

08:37:47 22 introduce -- since I wasn't here yesterday -- are these your

08:37:47 23 clients, I assume?

08:37:47 24         MR. DIROSA: Yes, sir.

08:37:51 25         THE COURT: Why don't you go ahead and do that, if you

*OFFICIAL TRANSCRIPT*

08:37:52 1    would.

08:37:52 2            MR. DIROSA:  This is Imad Hamdan.  He goes by Eddie,

08:37:58 3    Eddie Hamdan.

08:37:58 4            THE COURT:  Good morning.

08:37:58 5            MR. HAMDAN:  Good morning, Your Honor.

08:37:58 6            MR. DIROSA:  This is Jadallah Saed.

08:38:00 7            THE COURT:  Good morning.

08:38:00 8            MR. SAED:  Good morning.

08:38:02 9            THE COURT:  These gentlemen in the back of the

08:38:04 10   courtroom, are they witnesses?

08:38:05 11           MR. DIROSA:  No, sir.

08:38:06 12           THE COURT:  No?  Okay.

08:38:08 13               We can bring in the jury.

08:38:14 14           THE COURT SECURITY OFFICER:  All rise.

08:38:16 15           (WHEREUPON, at 8:38 a.m., the jury panel enters the

08:38:38 16   courtroom.)

08:38:38 17           THE COURT:  Good morning, ladies and gentlemen.

08:38:38 18           JURORS:  Good morning.

08:38:40 19           THE COURT:  Please be seated.

08:38:45 20               I am, obviously, not Judge van Meerveld, who was

08:38:49 21   here yesterday, so I'll introduce myself.

08:38:51 22               My name is Carl Barbier.  I'm the District Judge

08:38:55 23   assigned to handle this case.  Because it was not possible for

08:39:00 24   me to be present yesterday, in order to start the part of this

08:39:04 25   trial on time, Judge van Meerveld was kind enough to help us

08:39:09 1  out by doing the jury selection yesterday.

08:39:12 2          So I think she gave you all some preliminary

08:39:15 3  instructions, correct, after you were selected?

08:39:18 4          They were sworn, right, Gail?

08:39:20 5      THE DEPUTY CLERK:  Yes, sir.

08:39:21 6      THE COURT:  All right.  Good.

08:39:23 7          I want to just make sure I have everybody in line

08:39:27 8  here.

08:39:29 9          Juror Number 1.  Ma'am, you're Lisa

08:39:31 10 Butler-Richardson?

08:39:33 11     JUROR NUMBER 1:  Yes.

08:39:34 12     THE COURT:  All right.  Number 2, Bradley Bordelon?

08:39:37 13     JUROR NUMBER 2:  Yes, sir.

08:39:38 14     THE COURT:  Good morning.

08:39:40 15     JUROR NUMBER 2:  Good morning.

08:39:41 16     THE COURT:  Number 3, Samantha Meyer?

08:39:43 17     JUROR NUMBER 3:  Yes.

08:39:43 18     THE COURT:  Good morning.

08:39:44 19     JUROR NUMBER 3:  Good morning.

08:39:44 20     THE COURT:  Number 4, Susan Perry?

08:39:46 21     JUROR NUMBER 4:  Yes, sir.

08:39:46 22     THE COURT:  Good morning to you.

08:39:47 23         Number 5, Patricia Becnel?

08:39:49 24     JUROR NUMBER 5:  Yes.

08:39:50 25     THE COURT:  All right.

*OFFICIAL TRANSCRIPT*

08:39:51 1          Number 6, Donna Catalano?

08:39:55 2        JUROR NUMBER 6:  Yes.

08:39:56 3        THE COURT:  Number 7, Lisa Dufrene?

08:39:59 4        JUROR NUMBER 7:  Yes.

08:39:59 5        THE COURT:  Number 8, Raquel Ferguson?  I almost called

08:39:59 6 you Rachel.

08:40:07 7          All right.  Well, thanks, again, for being here

08:40:09 8 and being on time.  The one thing about a trial like this is

08:40:13 9 everyone, all of us, all of them, all of you, me, the staff,

08:40:17 10 everyone has to be on time so that we can start on time.  If

08:40:20 11 one person is missing, it delays everybody.  So I appreciate

08:40:23 12 your effort to get here on time.

08:40:26 13          We're going to go now into the first phase of

08:40:30 14 this trial, which is called opening statements by the

08:40:33 15 attorneys.

08:40:34 16          This is not part of the evidence in the case.

08:40:37 17 The evidence -- I don't know if Judge van Meerveld went over

08:40:42 18 this with you yesterday -- the evidence consists of live

08:40:46 19 witnesses from the witness stand, exhibits, or physical

08:40:48 20 documents, maybe, that are introduced into evidence, and

08:40:51 21 sometimes there will be stipulations of fact.  So those are the

08:40:54 22 types of evidence that you will hear or see in this case.

08:40:57 23          So what the lawyers say is not evidence; however,

08:41:00 24 it is, nonetheless, important because it's their opportunity

08:41:04 25 now to give you a preview of what they think the evidence will

*OFFICIAL TRANSCRIPT*

08:41:08 1  show and why their side should or should not prevail.

08:41:12 2  At the end of the case, they'll get a final

08:41:15 3  opportunity to attempt to convince you of their cause.

08:41:18 4  So, Mr. DiRosa, you may proceed.

08:41:27 5  OPENING STATEMENTS

08:41:27 6  BY MR. DIROSA:

08:41:28 7  Good morning.  My name is Joe DiRosa.

08:41:33 8  THE COURT:  Mr. DiRosa, excuse me, you can swivel that

08:41:35 9  podium if you'd like.  The whole thing swivels.  It's probably

08:41:37 10  helpful if you pull the microphones a little towards the

08:41:40 11  middle.  There you go.  Don't have to be right that close,

08:41:42 12  maybe, but -- there you go.  Okay.  Go ahead.

08:41:48 13  MR. DIROSA:  Again, my name is Joe DiRosa.  I represent

08:41:51 14  Brothers Petroleum, who is the plaintiff in the case.  My

08:41:54 15  client is Eddie Hamdan, who is a hundred percent owner of

08:41:58 16  Brothers Petroleum.

08:41:58 17  This case revolves essentially or initially

08:42:02 18  around a contract that Brothers Petroleum had with one of

08:42:08 19  Mr. Jadallah Saed's companies.  That company was Wagners Chef.

08:42:13 20  That contract provided that Brothers Petroleum

08:42:16 21  would supply motor fuel, gasoline, diesel fuel to Wagners Chef.

08:42:23 22  In exchange, Wagners Chef could advertise itself as an Exxon

08:42:27 23  gas station.  Brothers Petroleum would go to the refinery, pick

08:42:32 24  up Exxon gas, deliver it to Wagners Chef.  Of course, there was

08:42:39 25  a charge for those services.  Brothers Petroleum made a profit

*OFFICIAL TRANSCRIPT*

08:42:44  1    off of the gasoline that it sold to Wagners Chef.

08:42:49  2            That contract required that Wagners Chef purchase

08:42:52  3    1.8 million gallons of gas every year under the contract.  That

08:43:00  4    contract ran through -- the initial period of the contract runs

08:43:03  5    through 2026.  Then, there is an additional five-year extension

08:43:08  6    that Brothers Petroleum can opt into, so it can run as far as

08:43:13  7    2031.

08:43:13  8            Well, Wagners Chef decided they did not want this

08:43:18  9    contract anymore.  So, in July of 2014, Wagners Chef filed suit

08:43:26 10    against Brothers Petroleum.

08:43:29 11            Nine months, roughly, go by.  There is not a

08:43:33 12    single favorable ruling for Wagners Chef in that litigation.

08:43:38 13    But, on April 13, 2015, Wagners Chef sends a notice to

08:43:44 14    Brothers Petroleum saying we're not going to buy gas from you

08:43:47 15    anymore.  We're not going to honor the contract anymore.

08:43:50 16            So Brothers Petroleum, naturally, sues

08:43:55 17    Wagners Chef, saying, well, you have an obligation to buy

08:44:02 18    gasoline from us at least through 2026, and probably through

08:44:07 19    2031.  That's a substantial loss to our company, not having

08:44:11 20    these sales and the profit we're making off of these sales, and

08:44:16 21    so we're suing you.

08:44:17 22            Now, at the time -- as this goes on, Wagners Chef

08:44:26 23    continues not to buy gas.  They don't buy gas in April, May,

08:44:29 24    June, July, August, September, October of 2015.

08:44:33 25            Then, the case gets to the Fifth Circuit Court of

*OFFICIAL TRANSCRIPT*

08:44:37 1  Appeal.  The Court of Appeal in the Fifth Circuit rules that,

08:44:41 2  Wagners Chef, you are bound by this contract.  You have to

08:44:45 3  comply -- you are bound by this contract.  It's binding on you.

08:44:49 4  That's November 5th of 2015.

08:44:51 5        So does Wagners Chef say, well, maybe I got to

08:44:57 6  wise up here and start buying gas?  No.  They don't buy gas in

08:45:01 7  November or December of 2015.  They don't buy gas in January,

08:45:06 8  February, March, April of 2015 -- of 2016.  They will just not

08:45:14 9  buy gas.  They don't care what the Court of Appeals said.

08:45:17 10        In May of 2016, we go back to the trial court.

08:45:20 11  This is in Civil District Court up the street.  There is a

08:45:24 12  ruling from the judge there that Wagners Chef consents to.

08:45:28 13  They agree to the entry of this ruling.  That ruling says, you

08:45:33 14  have breached the contract, and I'm ordering you, the judge is

08:45:39 15  ordering you -- the court -- to comply with all of the terms

08:45:42 16  and conditions of the contract.  Another strike.

08:45:46 17        Do they get the picture?  No.  They don't buy gas

08:45:52 18  in May.  They don't buy gas in June.  They don't buy gas in

08:45:57 19  July.  They don't buy gas in August.

08:46:00 20        Finally, in September, they start to buy gas

08:46:03 21  again.  Then, in November, they send a letter to Brothers

08:46:08 22  saying, look, we're out of business.  We're not buying any

08:46:11 23  more.  We just -- you're stuck.

08:46:15 24        So Brothers is pursuing its lawsuit against

08:46:21 25  Wagners Chef.  Now, at the time -- and this is according to

08:46:25 1   Mr. Saed's application for a loan with the bank, and we'll get

08:46:29 2   to that -- Wagners Chef at the time sells two million gallons

08:46:33 3   of gasoline every year.  In fact, in excess of two million

08:46:38 4   gallons of gasoline.

08:46:39 5         Now, at the cheapest gas price, that's four

08:46:44 6   million dollars.  You can't buy gas for less than two dollars a

08:46:48 7   gallon; so, if everything they sell is regular gas, no premium,

08:46:52 8   no -- that's four million dollars in sales a year.

08:46:54 9         They tell the bank, when he applies for the loan,

08:46:57 10   we've got at least a million and a half in sales inside the

08:47:01 11   store, convenience store sales.  We've got also three subleases

08:47:05 12   on this property that we have -- that we have under lease, the

08:47:10 13   master lease.  We have subleases.  That brings in another

08:47:16 14   $288,000 a year.  So that's $5,788,000.

08:47:19 15         So Brothers Petroleum is thinking, well, okay,

08:47:22 16   I'll just keep pursuing this lawsuit.  When I get to the end,

08:47:26 17   and I've got what my substantial damages are, there's assets

08:47:33 18   there for me to enforce it.

08:47:35 19         But Mr. Saed has a plan.  At this point in time,

08:47:45 20   Wagners Chef has gas sales, store sales, subleases.  He forms a

08:47:51 21   company called Jadallah Enterprises.  Now, he formed this

08:47:53 22   company back a year ago, on April 23rd of 2015.  Ten days after

08:47:59 23   he told Brothers, I'm not buying gas from you anymore, he forms

08:48:04 24   Jadallah Enterprises.

08:48:05 25         They have nothing.  They don't do any business.

They have not opened -- they don't have any income.  They don't have any expenses.  They do nothing for over a year.

He also forms a company called Ahmed 1.  Same thing.  They have nothing.

So, on July 8th --

You have to sit outside.

On July the 8th, by this time Mr. Saed has applied to First National Bank of Commerce and gotten approval for a $2.9 million loan in the name of Wagners Chef.  They have a lease with an option to purchase the property that they are on.  So they are going to go purchase the property.  They are telling the bank, we're going to go purchase the property, and we'll own it.

So, on July 8th of 2016, Wagners Chef cancels its lease.  It doesn't get any money for this.  It just cancels it. It cancels its option to purchase.  It cancels -- it has no written lease.

Why does it do that?  Because it wants to move all of the assets that Brothers Petroleum could go after that it has, it wants to move it somewhere else, so that Brothers Petroleum cannot enforce its contract, essentially, and cannot recover its damages.

On that date, the real estate is sold to Mr. Saed's other company, Jadallah Enterprises.  Wagners Chef gave up the right to buy it, but it pushed it off to

*OFFICIAL TRANSCRIPT*

08:50:00 1    Jadallah Enterprises, so now they own the real estate.

08:50:04 2            Then Jadallah Enterprises leases the entirety of

08:50:09 3    the real estate to Ahmed 1, his other company, which was formed

08:50:12 4    three days earlier.  So now Wagners Chef has nothing.  The real

08:50:21 5    estate is in the name of Jadallah Enterprises.  The leases are

08:50:24 6    in the name of Ahmed 1.  Ahmed 1 is collecting the sublease

08:50:30 7    money.  It's leasing the property out.

08:50:34 8            Then, in November, Wagners Chef signs a deal

08:50:46 9    where they -- they are going to try to tell you that they sold

08:50:51 10   this million dollar business to another company called Empire

08:50:58 11   Express for $107,000.  This business that had $288,000 coming

08:51:03 12   in just in leases alone, that sold four million dollars of

08:51:07 13   gasoline, that sold one-and-a-half million dollars in the

08:51:10 14   store, they are selling the right to do business there to

08:51:18 15   Empire Express for $107,000, $50,000 and a thousand dollars a

08:51:26 16   month.

08:51:26 17           Why does it do that?  So that there will be no

08:51:29 18   money left for Brothers Petroleum to come after Wagners Chef

08:51:36 19   for.

08:51:37 20           So, now, the situation is -- and the reason

08:51:39 21   Mr. Saed's name is at the top of this is because he controls

08:51:42 22   all three of those companies.  So this is a conspiracy of three

08:51:45 23   companies that ends up in one man's head.

08:51:47 24           At the end of all of these transactions,

08:51:50 25   Wagners Chef has nothing.  Jadallah Enterprises has the real

08:51:56 1  estate.  Ahmed 1 has the four subleases.  There is nothing for

08:52:03 2  Brothers Petroleum.

08:52:03 3          So he -- that's why he never bought gas.  When

08:52:07 4  the courts were telling him, you got to honor this contract,

08:52:15 5  when the courts were telling him, you've breached the contract,

08:52:17 6  I'm ordering you to honor the contract, that's why he wasn't

08:52:19 7  doing anything, because he had this plan in mind.

08:52:21 8          That's what this case is about.  We are saying

08:52:24 9  that is an unfair trade practice, to set up these other

08:52:29 10 corporations, move everything out of the corporation that's in

08:52:34 11 trouble, so you can deny us the right to go after it for

08:52:38 12 damages, and shift it all over to your other corporations.

08:52:41 13         You took the money from your left pocket, you put

08:52:44 14 it in your right pocket, so Brothers Petroleum could not get at

08:52:50 15 it.

08:52:50 16         Thank you.

08:52:51 17     THE COURT:  All right.  Mr. Beh.

08:52:56 18              OPENING STATEMENTS

08:52:56 19 BY MR. BEH:

08:53:05 20         Good morning, ladies and gentlemen.  My name is

08:53:08 21 Tom Beh.  I represent the defendants in the case, who are

08:53:12 22 Wagners Chef, Jadallah Enterprises and Ahmed 1.

08:53:16 23         First of all, I want to say thank you for serving

08:53:19 24 as a jury in this case.  I know it's inconvenient, but it is a

08:53:25 25 critical part of our judicial system.  You are the finders of

*OFFICIAL TRANSCRIPT*

08:53:30 1  fact.  You are the ones who make the determinations of what

08:53:33 2  happened and what the impact is.  The Judge will instruct you

08:53:38 3  on what the law is, but then you are the ones who apply that

08:53:42 4  law to the facts.

08:53:44 5      So I would ask that you please pay close

08:53:48 6  attention, not to what Mr. DiRosa says, not even to what I say,

08:53:52 7  but to what the witnesses say and what the documents say.  What

08:53:56 8  they are going to show is that what Mr. DiRosa deems a

08:54:01 9  conspiracy was nothing of the sort.  This was business being

08:54:05 10 done.  This was a company that was purchasing real estate and

08:54:12 11 trying to do what it needed to do to make money.

08:54:17 12     There is nothing wrong with that.  That is what

08:54:19 13 is -- that's allowable under Louisiana law, and there is

08:54:23 14 absolutely nothing, no basis for their claims in this case.

08:54:28 15     Now, the general background, as Mr. DiRosa said,

08:54:31 16 it's true.  There was a contract between Brothers and

08:54:34 17 Wagners Chef.  We'll get into the details of that during the

08:54:40 18 testimony, but there was a contract.  What there wasn't was a

08:54:44 19 contract between Brothers and Jadallah Enterprises or a

08:54:48 20 contract between Brothers and Ahmed 1.

08:54:51 21     It's also true that Wagners Chef went out of

08:54:56 22 business in November of 2016.  It wasn't some scandal.  It

08:55:02 23 wasn't some conspiracy.  It was a company going out of

08:55:05 24 business.  It happens all the time.

08:55:09 25     Brothers did, in fact, file suit.  Brothers has

08:55:14 1 been given an award.  Brothers has a judgment against

08:55:16 2 Wagners Chef.  So the breach of contract claims, that is not

08:55:20 3 before you.  That's what was resolved up the street in state

08:55:26 4 court.

08:55:26 5         What is in front you is whether the actions of my

08:55:29 6 clients constitute an unfair trade practice.  The Court will

08:55:33 7 instruct you on what the definition of that is under Louisiana

08:55:36 8 law, but I can tell what you it's not.  It's not a breach of

08:55:41 9 contract.  It requires much, much more than that.  So, again,

08:55:46 10 listen to the evidence.

08:55:46 11         So, as Mr. DiRosa acknowledged, what's trying to

08:55:58 12 be done here, Brothers is trying to take a breach of contract

08:56:04 13 claim against Wagners Chef and extend it to parties who were

08:56:07 14 never a party to that contract, were never even in existence at

08:56:12 15 the time the contract was formed.

08:56:14 16         So what we've got is we've got four companies

08:56:15 17 that are involved in this case.  My clients are Wagners Chef,

08:56:18 18 Jadallah Enterprises, and Ahmed 1, all of which are

08:56:22 19 single-member LLCs.

08:56:24 20         On the other side of the table, we've got

08:56:28 21 Brothers, which is also a single-member LLC.  Under Louisiana

08:56:32 22 law, a limited liability company, just like a corporation or

08:56:35 23 other business forms, is separate, separate from its ownership,

08:56:40 24 and it's separate from other companies.

08:56:41 25         So, now, the other thing I want y'all to keep in

08:56:46 1    mind as you're listening to the evidence in this case is that

08:56:50 2    Brothers bears the burden of proof in this case.  They're the

08:56:52 3    ones who have to prove to you, from what's said on the witness

08:56:57 4    stand and the exhibits, that they are entitled to a judgment.

08:57:04 5         Brothers must produce evidence.  It can't do

08:57:07 6    conjecture or speculation or this is what we think.  They have

08:57:11 7    to put on evidence to support their claims.

08:57:15 8         So I want you to listen closely to what actually

08:57:18 9    happened, not how Brothers characterizes it.  Your job is to go

08:57:23 10   beyond the argument, beyond the spin, and look at the actual

08:57:28 11   facts.  Your decision has to be based on those facts alone.

08:57:32 12        So the claims that are at issue all stem from

08:57:37 13   five transactions.  There was Jadallah Enterprises bought a

08:57:44 14   piece of real estate where Wagners Chef had operated its gas

08:57:49 15   station in July of 2008.

08:57:52 16        There was a cancellation of the lease.  Again,

08:57:56 17   not something nefarious, not something sinister.  A lease gets

08:58:01 18   canceled.  When the landlord sells the property, the landlord

08:58:07 19   can't lease it to anybody anymore.  If I've got a piece of

08:58:08 20   property and I lease it to somebody, and then I sell it, that

08:58:11 21   lease isn't valid anymore.  That's what the cancellation was

08:58:15 22   about.

08:58:15 23        MR. DIROSA:  Let me make an objection.

08:58:17 24        THE COURT:  Wait, no.

08:58:18 25        Go ahead.  Go ahead, Mr. Beh.

*OFFICIAL TRANSCRIPT*

08:58:21 1          MR. BEH:  Thank you, Your Honor.

08:58:23 2              Then, after Jadallah Enterprises purchases the

08:58:28 3  property, it leases it to Ahmed 1.  That all happens in July of

08:58:34 4  2016.

08:58:36 5              In November of 2016, Wagners Chef closes.  It

08:58:41 6  goes out of business.  We'll show you why.  It wasn't some

08:58:44 7  grand scheme.  It was losing money.  It was not economically

08:58:49 8  viable.  That's why it closed.

08:58:52 9              After it closed, or contemporaneous, there were

08:58:59 10  two other transactions.  Wagners Chef sells all of its assets

08:59:02 11  to another company, Empire Express; and, Ahmed 1 leases the

08:59:07 12  property to Empire Express, so that it can continue to do

08:59:12 13  business in that location.  That's it.

08:59:17 14              It's a couple leases, a sale of a property, and

08:59:19 15  the sale of some assets.  There is no unfair trade practice

08:59:24 16  there.

08:59:25 17              So, as you're listening to the evidence, I want

08:59:28 18  you to keep a few points in mind.  The first one, I've already

08:59:32 19  mentioned.  There is no contract.  There is no duty by

08:59:37 20  Jadallah Enterprises to Brothers or Ahmed 1 to Brothers.  The

08:59:43 21  only contract that's in place in this case is between

08:59:47 22  Wagners Chef and Brothers.

08:59:48 23              The breach of contract claims have been resolved.

08:59:53 24  Those were pending in state court.  Those are not before you.

08:59:57 25  So, despite the fact that there is no contract between

*OFFICIAL TRANSCRIPT*

09:00:02 1  Jadallah Enterprises and Brothers or Ahmed 1 and Brothers,

09:00:07 2  that's who Brothers wants you to enter a judgment against.

09:00:12 3          Second critical point, they are going to make a

09:00:16 4  big deal about the ownership of this property.  Wagners Chef

09:00:19 5  never owned the property.  Let me say that again.  Wagners Chef

09:00:23 6  never owned the property.

09:00:27 7          The property was leased to Wagners Chef by its

09:00:32 8  prior owner, a company called Wagner World.  Similar name to

09:00:37 9  Wagners Chef, but no relation.

09:00:38 10          Now, Wagners Chef did have an option to buy it.

09:00:42 11  An option is an opportunity.  It's not a commitment.  But what

09:00:47 12  it doesn't do is it doesn't make Wagners Chef able to buy the

09:00:51 13  property.  If Wagners Chef can't exercise it, the option has no

09:00:57 14  value.  So, again, Wagners Chef never owned this property.  It

09:01:00 15  can't shuffle something away to protect it if it doesn't own

09:01:04 16  it.

09:01:05 17          Next thing, the sale of the property happened in

09:01:09 18  July of 2016.  As Mr. DiRosa acknowledged, Wagners Chef bought

09:01:17 19  gas and operated its business before the sale and after the

09:01:24 20  sale at the same property.  Wagners Chef bought and sold

09:01:28 21  gasoline, it operated its convenience store before the sale of

09:01:34 22  the property to Jadallah Enterprises and after the sale of the

09:01:38 23  property to Jadallah Enterprises.

09:01:39 24          The sale itself had no impact on Wagners Chef's

09:01:42 25  operations.  In fact, Wagners Chef continued to operate for the

*OFFICIAL TRANSCRIPT*

09:01:50  1   rest of July, August, September, October, and half of November,

09:01:55  2   before it went out of business. Then, when it did go out of

09:02:02  3   business, it sold its assets to another company, again, Empire

09:02:06  4   Express, who then it operated on the same property.

09:02:12  5             Simply stated, ladies and gentlemen, there is no

09:02:15  6   unfair trade practice that took place in this case. I want you

09:02:19  7   to listen to the evidence, but keep that in mind. That's

09:02:24  8   where -- Brothers has the burden to prove to you an action that

09:02:30  9   qualifies as an unfair trade practice.

09:02:32 10             The Judge will instruct on you what that means,

09:02:34 11   but I will tell you, it's a very narrow, narrow area of the

09:02:41 12   law, and it is not a breach of contract.

09:02:44 13             So I would suggest that after you listen to the

09:02:48 14   evidence, I'll have another opportunity to address you in

09:02:51 15   closing argument. I thank you for your service and your time.

09:02:55 16           THE COURT: All right. Thank you.

09:02:57 17           Mr. DiRosa, you may call your first witness.

09:02:59 18           MR. DIROSA: I call Eddie Hamdan.

09:03:18 19           THE COURT: All right. Mr. Hamdan, come forward, sir.

09:03:18 20           THE DEPUTY CLERK: Raise your right hand. Do you

21   solemnly swear the testimony you are about to give will be the

22   truth, the whole truth and nothing but the truth, so help you

23   God?

24           THE WITNESS: Yes, ma'am.

25                     **IMAD "EDDIE" HAMDAN**

                        ***OFFICIAL TRANSCRIPT***

1    was called as a witness and, after being first duly sworn by

2    the Clerk, was examined and testified on his oath as follows:

3         THE DEPUTY CLERK:  Please have a seat.  State your

4    name, and spell it for the record.

09:03:25  5         THE WITNESS:  Imad Hamden, I-M-A-D, H-A-M-D-A-N.  I go

09:03:29  6    by Eddie.

09:03:30  7                    DIRECT EXAMINATION

09:03:30  8    BY MR. DIROSA:

09:03:33  9    Q.    Mr. Hamdan, are you affiliated with Brothers Petroleum?

09:03:35 10    A.    Yes.

09:03:36 11    Q.    What is your position with Brothers Petroleum?

09:03:38 12    A.    CFO.

09:03:39 13    Q.    Did Brothers Petroleum have a contract to supply Exxon gas

09:03:45 14    to Wagners Chef?

09:03:45 15    A.    Yes.

09:03:45 16    Q.    Do you know how long that contract was for?

09:03:52 17    A.    15 -- 20 years; 15 and 5.

09:03:57 18    Q.    How do you mean, 15 and 5?

09:04:00 19    A.    We have 15 years straight, plus five option that we

09:04:04 20    exercise.

09:04:05 21    Q.    Do you know when the 15 years expired?

09:04:07 22    A.    In 2026.

09:04:09 23    Q.    So the five-year option, had you exercised it, or had you

09:04:14 24    had the ability to exercise it, would have brought the contract

09:04:17 25    through 2031?

*OFFICIAL TRANSCRIPT*

09:04:19 1    A.    Correct.

09:04:19 2    Q.    Under this contract, what are the basics of the contract,

09:04:25 3    as simple as you can put it?

09:04:26 4    A.    We brand the site Exxon.  We make sure that Exxon approved

09:04:33 5    the site and the branding, the decals.  We install things to

09:04:40 6    ensure the product that's in there is quality for Exxon.  That

09:04:45 7    way, we keep checking it.

09:04:47 8          After we do that and they approve it, we start

09:04:50 9    delivering the site fuel.  We use third parties sometime to

09:04:54 10   deliver it, so we'll dispatch fuel from the refinery to the

09:04:57 11   site as needed.  We install a system in there that tells us

09:05:00 12   when the fuel is needed, so...

09:05:03 13   Q.    Did that contract require that Wagners Chef purchase a

09:05:15 14   minimum number of gallons of fuel per year?

09:05:18 15   A.    Yes.

09:05:18 16   Q.    What was that minimum?

09:05:21 17   A.    A million and eight.

09:05:22 18   Q.    Up until this lawsuit was filed in 2014, did the operator

09:05:30 19   of that gas station ever have a problem purchasing 1.8 million

09:05:39 20   gallons of gas per year?

09:05:40 21   A.    No, sir.

09:05:40 22   Q.    During the year that the lawsuit was filed, 2014, during

09:05:44 23   that entire calendar year, was the operator of that gas

09:05:48 24   station, which was Wagners Chef, able to purchase a minimum of

09:05:53 25   1.8 million gallons of gas?

*OFFICIAL TRANSCRIPT*

09:05:55 1    A.    Yes.

09:05:55 2    Q.    I'm going to show you an e-mail and ask if you were

09:06:04 3    provided with a copy of this e-mail.  This is from Mr. Beh,

09:06:08 4    representing Wagners Chef.

09:06:12 5          Were you provided with a copy of that e-mail?

09:06:14 6    A.    Yes.

09:06:15 7    Q.    Okay.

09:06:15 8          MR. BEH:  Joe, can you, when you put up an exhibit,

09:06:20 9    just identify what number it is?

09:06:21 10          THE COURT:  Yes, that's a good idea.  Thank you.

09:06:37 11          MR. DIROSA:  This is Exhibit Number 4.

09:06:27 12    EXAMINATION BY MR. DIROSA:

09:06:42 13    Q.    You were advised by this e-mail that Wagners Chef would no

09:06:46 14    longer accept deliveries of gasoline under the current terms

09:06:50 15    that are stated in the contract, correct?

09:06:52 16    A.    Yes.

09:06:52 17    Q.    Okay.  Let me go back to the contract, which is Exhibit 1.

09:07:06 18    This is page 4 of that contract.

09:07:08 19          If you see, Number 3, it says:  Distributor may

09:07:16 20    furnish to retailer invoices and statements of retailer's

09:07:19 21    account on a monthly basis.  All invoices and statements

09:07:23 22    rendered to the retailer -- that's Wagners Chef -- by the

09:07:27 23    distributor -- that's you -- during any month are conclusively

09:07:32 24    presumed to be true and correct after 30 days, unless, within

09:07:35 25    those 30 days, the retailer, Wagners Chef, delivers to you, the

09:07:40  1    distributor, a written exception setting forth the item or

09:07:45  2    items questioned and the basis therefor.

09:07:49  3         From the beginning of this contract in 2011 until

09:07:54  4    April the 13th of 2015, did any -- did you receive any notice

09:08:00  5    that there was anything wrong with the quality of the gas that

09:08:06  6    was delivered to that gas station?

09:08:07  7    A.    No.

09:08:07  8    Q.    Did you receive any notice, any written notice, that there

09:08:11  9    was anything wrong with the price being charged for the gas

09:08:15 10    that was delivered to the gas station?

09:08:16 11    A.    No, sir.

09:08:17 12         MR. BEH:  Your Honor, can I enter an objection?  May we

09:08:20 13    approach?

09:08:20 14         THE COURT:  No.

09:08:21 15         Keep going, Mr. DiRosa.

09:08:22 16    EXAMINATION BY MR. DIROSA:

09:08:30 17    Q.    Show you Exhibit 5.  On November the 5th of 2015, in the

09:08:44 18    Court of Appeals for the Fourth Circuit, in the case -- in the

09:08:52 19    contract case, there was a ruling from the Fourth Circuit on

09:08:59 20    November 5th of 2015, that said:  Judgment --

09:09:04 21         THE COURT:  Wait a minute.  What's that exhibit number?

09:09:07 22         MR. DIROSA:  Number 5.

09:09:09 23         THE COURT:  That's unobjected?

09:09:11 24         MR. DIROSA:  Yes, sir.

09:09:12 25         THE COURT:  Okay.  Go ahead.

*OFFICIAL TRANSCRIPT*

09:09:13  1          MR. DIROSA:  1 through I think it's 23 are unobjected.

09:09:13  2          THE COURT:  Go ahead.

09:09:18  3          MR. DIROSA:  How did that happen?  Is that you?

09:09:25  4          THE COURT:  If you touch it, you'll put a mark on it.

09:09:27  5  EXAMINATION BY MR. DIROSA:

09:09:31  6  Q.    The Court of Appeal ruled:  Judgment is rendered in favor

09:09:34  7  of Brothers Petroleum and against Wagners Chef, decreeing that

09:09:38  8  the contract for sale of Exxon branded motor fuel is binding

09:09:45  9  and enforceable against Wagners Chef.

09:09:48 10          From April 13th until this ruling was handed down,

09:09:53 11  did Wagners Chef purchase any gasoline from Brothers?

09:09:56 12  A.    No.

09:09:56 13  Q.    After this ruling was handed down, did Wagners Chef

09:10:01 14  purchase any gasoline from Brothers in November or December of

09:10:07 15  2015?

09:10:08 16  A.    No.

09:10:08 17  Q.    In January, February, March, and April of 2016, following

09:10:16 18  this ruling, did Wagners Chef purchase any gasoline from

09:10:22 19  Brothers?

09:10:22 20  A.    No.

09:10:22 21  Q.    I'm going to show you another judgment.  This is from the

09:10:28 22  Civil District Court for the Parish of Orleans in the same

09:10:32 23  contract lawsuit.

09:10:35 24          This judgment was signed on the 12th day of May,

09:10:40 25  2016.  This judgment says that -- in the second paragraph:

*OFFICIAL TRANSCRIPT*

09:10:48 1    Wagners Chef has notified the Court that it has no opposition

09:10:53 2    to the entry of a judgment granting to plaintiff -- granting to

09:10:59 3    Brothers Petroleum the specified relief.  It is ordered,

09:11:03 4    adjudged and decreed that there be judgment herein in favor of

09:11:07 5    Brothers Petroleum, and against Wagners Chef, decreeing that

09:11:12 6    Wagners Chef has breached the contract on file in these

09:11:16 7    proceedings, and ordering specific performance by Wagners Chef

09:11:20 8    of all of the terms and conditions of the contract.

09:11:23 9            So this is May 12th of 2016.  Did Wagners Chef buy

09:11:29 10   any gas from Brothers after this ruling in May of 2016?

09:11:32 11   A.   No.

09:11:32 12   Q.   Did they buy any gas from Brothers in June, July or August

09:11:37 13   of 2016?

09:11:41 14   A.   No.

09:11:41 15   Q.   Did they give you any reason, did they give you any

09:11:51 16   written notice why they weren't buying gas from you?

09:11:54 17   A.   No.

09:11:54 18   Q.   Sometime in September of 2016, did Wagners Chef begin to

09:12:10 19   buy gas again from Brothers Petroleum?

09:12:12 20   A.   Yes, they did.

09:12:13 21   Q.   Okay.  Two months later, on November 15th of 2016, were

09:12:22 22   you provided with this letter -- or, actually, the letter is

09:12:28 23   directed to Brothers Petroleum.

09:12:30 24   A.   Yes.

09:12:30 25   Q.   Okay.  That letter placed Brothers Petroleum on notice

*OFFICIAL TRANSCRIPT*

09:12:36 1   that:  Wagners Chef has sold its assets effective today to

09:12:41 2   Empire Express.  As a consequence, Wagners Chef is no longer

09:12:45 3   operating the gas station and convenience store at the property

09:12:48 4   at 4601 Chef Menteur Highway and 4301 Louisa Street in

09:12:55 5   New Orleans.

09:13:06 6           Has Wagners Chef, since the date of that letter,

09:13:10 7   purchased any fuel from Brothers Petroleum?

09:13:12 8   A.   No.

09:13:13 9   Q.   Were you awarded a judgment for damages, for a substantial

09:13:22 10  amount of damages, in the Civil District Court case that we've

09:13:26 11  referred to earlier?

09:13:27 12  A.   Yes.

09:13:28 13          MR. DIROSA:  I have no other questions.

09:13:41 14          THE COURT:  Mr. Beh.

09:13:41 15                    CROSS-EXAMINATION

09:13:46 16  BY MR. BEH:

09:13:46 17  Q.   Good morning, Mr. Hamdan.

09:13:46 18  A.   Good morning.

09:15:22 19  Q.   The property that we're talking about at 4601 Chef

09:15:28 20  Menteur, or I guess it's 4301 Louisa, was never owned by

09:15:34 21  Wagners Chef, was it?

09:15:36 22  A.   I'm sorry?

09:15:37 23  Q.   The property that we're talking about here, where

09:15:41 24  Wagners Chef operated its convenience store and gas station,

09:15:45 25  was never owned by Wagners Chef?

*OFFICIAL TRANSCRIPT*

09:15:49 1  A.   No.  They had the option to buy.

09:15:50 2  Q.   That's not my question, sir.

09:15:53 3  A.   Oh, I'm sorry.

09:15:53 4  Q.   Did they own the property?

09:15:55 5  A.   No.

09:15:55 6  Q.   They never owned the property, in fact, correct?

09:15:58 7  A.   No.  No, they never did.

09:16:00 8  Q.   They leased it from Wagner World, which is a separate

09:16:04 9  entity, correct?

09:16:05 10  A.   I think so.

09:16:06 11  Q.   Okay.

09:16:09 12  A.   I can't remember the company that they leased it from.

09:16:12 13  Sorry.

09:16:12 14  Q.   But Brothers Petroleum never owned that property?

09:16:17 15  A.   No, sir.

09:16:17 16  Q.   Brothers Petroleum never had a leasehold interest in that

09:16:23 17  property?

09:16:24 18  A.   No, sir.

09:16:24 19  Q.   All right.  Now, we've talked a little bit about the

09:16:33 20  contract.  The contract was originally entered into by

09:16:43 21  Wagners Chef in 2011; is that correct?

09:16:45 22  A.   Yes, sir.

09:16:47 23  Q.   At the time it was originally entered into, Wagners Chef

09:16:51 24  was owned by Omar Hamdan and Fatmah Hamdan, correct?

09:17:00 25  A.   I'm not sure exactly if it's Omar Hamdan or Fatmah, I'm

*OFFICIAL TRANSCRIPT*

09:17:03 1   not sure, but one of them.

09:17:03 2   Q.   Omar Hamdan is your brother?

09:17:05 3   A.   Correct, yes.

09:17:07 4   Q.   Fatmah Hamdan is your sister-in-law?

09:17:12 5   A.   Correct.

09:17:12 6   Q.   Now, the lease that was entered into between Wagners Chef

09:17:57 7   and Wagner World for the property -- and I'm going to show

09:18:04 8   you --

09:18:11 9          THE COURT:  Gail, will you turn the document camera on

09:18:15 10  for him.  There it is.

09:18:17 11  EXAMINATION BY MR. BEH:

09:18:20 12  Q.   -- it's the lease with an option to buy effective the 15th

09:18:22 13  day of November, 2013, between Wagner World and Wagners Chef,

09:18:26 14  correct?

09:18:30 15  A.   You're asking me to read this?

09:18:31 16  Q.   I'm asking you if I correctly read that first sentence?

09:18:34 17  A.   Yes.  Yes.

09:18:35 18          THE COURT:  Did you give that exhibit number?  I'm

09:18:44 19  sorry.

09:18:45 20          MR. BEH:  That's Exhibit Number 2, Your Honor.

09:18:47 21          THE COURT:  Okay.

09:18:47 22  EXAMINATION BY MR. BEH:

09:18:50 23  Q.   I'm going to show you another page of that same exhibit.

09:18:59 24  This is page 22 of Exhibit Number 2, which says:  It is

09:19:06 25  expressly understood and agreed that this lease and the

*OFFICIAL TRANSCRIPT*

09:19:10 1 covenants contained in it are for the sole benefit of landlord

09:19:15 2 and tenant, their successors and assigns, and that all rights

09:19:24 3 of action for any breach or any covenant contained in this

09:19:29 4 lease are reserved to those parties.

09:19:31 5        Did I read that correctly, sir?

09:19:33 6 A.   Yes, sir.

09:19:33 7 Q.   So the only parties that have any rights under this lease

09:19:37 8 are the landlord and the tenant, correct?

09:19:41 9        THE COURT:  Wait one second.

09:19:41 10        MR. DIROSA:  Let me object.  I don't think -- he's not

09:19:46 11 a party to this lease.  He's not a lawyer.  He's not here to

09:19:49 12 interpret the lease.

09:19:50 13        THE COURT:  I sustain that objection.

09:19:51 14 EXAMINATION BY MR. BEH:

09:20:20 15 Q.   Now, during your testimony and your discussion with

09:20:23 16 Mr. DiRosa, you indicated that Wagners Chef was buying gasoline

09:20:28 17 from Brothers beginning in September of 2016; is that correct?

09:20:33 18 A.   Correct.

09:20:33 19 Q.   They bought gas in September.  They bought gas in October,

09:20:39 20 did they not, 2016?

09:20:43 21 A.   September -- yeah.

09:20:43 22 Q.   They bought gas for the first half of November of 2016?

09:20:48 23 A.   Yes, sir.

09:20:48 24 Q.   So, are you aware that there was a sale of the property

09:20:54 25 where the gas station was located in July of 2016, from

*OFFICIAL TRANSCRIPT*

09:21:01  1   Wagner World to Jadallah Enterprises?

09:21:03  2   A.    No, sir.

09:21:03  3   Q.    You're not aware that there was a sale of the property?

09:21:07  4   A.    I wasn't notified.  Nobody sent me anything.

09:21:09  5   Q.    Are you aware today that there was a sale of the property?

09:21:13  6   A.    Oh, today, yeah.  I mean -- I'm sorry, you're asking me --

09:21:15  7   I'm sorry, I thought you were asking me from that time, no.

09:21:20  8   Q.    So after the sale of the property, Wagners Chef continued

09:21:24  9   to operate its convenience store on the property, correct?

09:21:28 10   A.    I'm sorry?

09:21:28 11   Q.    After the sale of the --

09:21:30 12   A.    I don't know when the sale took -- I just can't answer

09:21:34 13   that.  You never -- I'm sorry.

09:21:36 14   Q.    I'm going to show you a document, which we've previously

09:21:59 15   marked as Exhibit Number 10, which is an act of cash sale

09:22:10 16   showing a sale of the property from Wagner World to

09:22:13 17   Jadallah Enterprises.

09:22:16 18   A.    It's hard to see.  I'm sorry.

09:22:29 19   Q.    Here is the signature page on that document, which shows

09:22:35 20   that it was done and passed on the 8th day of July, 2016.  Do

09:22:41 21   you see that?

09:22:41 22   A.    Correct.  Yes, sir.

09:22:42 23   Q.    So I'll represent to you that's the date that the sale

09:22:45 24   took place.

09:22:47 25        MR. DIROSA:  Let me just object.  Which sale is he

*OFFICIAL TRANSCRIPT*

09:22:49  1  referring to?  Because I think, earlier, he was referring to

09:22:51  2  the sale to Empire Express and --

09:22:54  3       THE COURT:  I think this is the first sale, right?

09:22:57  4       MR. BEH:  This is the sale of the real estate from

09:23:00  5  Wagner World to Jadallah Enterprises.

09:23:02  6       THE COURT:  That's what you understood?

09:23:03  7       THE WITNESS:  Yes, sir.

09:23:04  8  EXAMINATION BY MR. BEH:

09:23:05  9  Q.  So, we've now established that that sale, the sale of the

09:23:08 10  real estate to Jadallah Enterprises, took place on July 8,

09:23:12 11  2016.

09:23:13 12  A.  Correct.

09:23:13 13  Q.  On July 9th, was Wagners Chef operating its

09:23:20 14  convenience store?

09:23:21 15  A.  Yes.

09:23:22 16  Q.  Was Wagners Chef selling gasoline?

09:23:25 17  A.  Yes.

09:23:26 18  Q.  For the rest of July of 2016, was Wagners Chef operating a

09:23:35 19  gas station and a convenience store on that property?

09:23:41 20  A.  Yes.

09:23:42 21  Q.  Was it operating in August of 2016?

09:23:44 22  A.  Yes.

09:23:45 23  Q.  Was it operating in September of 2016?

09:23:50 24  A.  I think so, yes.

09:23:50 25  Q.  In fact, in September of 2016, it was buying gas from

09:23:55  1  Brothers Petroleum, correct?

09:23:55  2  A.    Correct.  That's what I was saying.

09:23:55  3          THE COURT REPORTER:  I'm sorry, I didn't hear you.

09:23:55  4          THE WITNESS:  I'm sorry.

09:24:01  5          THE COURT:  Maybe you can sit up closer or pull the

09:24:05  6  microphone towards you.

09:24:06  7          THE WITNESS:  Yes.  I'm sorry.  This is better.

09:24:06  8  EXAMINATION BY MR. BEH:

09:24:06  9  Q.    So I believe my question was:  In October of 2016, was

09:24:23  10  Wagners Chef operating its convenience store and selling

09:24:28  11  gasoline at the property on Louisa Street?

09:24:32  12  A.    I'm not sure what they were doing at that time, but they

09:24:37  13  started back in September of 2016, buying fuel from us.

09:24:40  14  Q.    Correct.  And they bought it in September, and they bought

09:24:44  15  it in October?

09:24:44  16  A.    Right.

09:24:45  17  Q.    They bought it for the first half of November?

09:24:47  18  A.    Right.

09:24:47  19  Q.    So the sale of the property from Wagner World to

09:24:52  20  Jadallah Enterprises did not prevent Wagners Chef from

09:24:57  21  operating its gas station and convenience store, correct?

09:25:03  22  A.    Again, I'm not understanding you.

09:25:04  23  Q.    The sale of the property from Wagner World to

09:25:13  24  Jadallah Enterprises, which you all are claiming constitutes an

09:25:18  25  unfair trade practice, did not impact or prevent Wagners Chef

09:25:24 1   from continuing to operate its convenience store at the

09:25:28 2   property?

09:25:29 3   A.   You're asking me what did it do?

09:25:31 4   Q.   I'm asking you if the sale prevented Wagners Chef from

09:25:36 5   operating its convenience store?

09:25:39 6   A.   No.

09:25:39 7   Q.   Did it prevent Wagners Chef from selling gasoline?

09:25:45 8   A.   No.  No.

09:25:45 9   Q.   How about -- now, there was in place a lease between

09:25:51 10  Wagner World and Wagners Chef, are you aware of that,

09:25:54 11  pertaining to that property on Louisa Street?

09:25:58 12  A.   No, I don't think so.

09:25:58 13  Q.   You're not aware of that?

09:26:00 14  A.   I don't recall, sir.

09:26:01 15  Q.   Are you aware that there was a cancellation of a lease

09:26:06 16  between Wagner World and Wagners Chef that took place in July

09:26:09 17  of 2016?

09:26:11 18  A.   Through litigation and stuff like that.  I can't remember.

09:26:14 19  Q.   Well, my question to you is:  Did the cancellation of the

09:26:19 20  lease between Wagner World and Wagners Chef prevent

09:26:25 21  Wagners Chef from operating its business on Louisa Street?

09:26:31 22  A.   No.  Just -- can I keep going or --

09:26:35 23  Q.   You answered my question, sir.

09:26:35 24  A.   Oh, okay.

09:26:40 25  Q.   Also, Jadallah Enterprises entered into a subsequent lease

*OFFICIAL TRANSCRIPT*

09:26:45 1    with Ahmed 1.  Are you aware of that?

09:26:48 2    A.    No.

09:26:48 3    Q.    But if -- let me ask you to assume something.  Assume that

09:26:55 4    Jadallah Enterprises leased the property on Louisa Street to a

09:27:01 5    company called Ahmed 1 on July 8, 2016.  Assume that.

09:27:09 6            The fact that Wagners Chef continued to operate its

09:27:13 7    business after that lease means that that lease didn't prevent

09:27:19 8    Wagners Chef from operating its business, correct?

09:27:22 9    A.    I kind of lost you.  You're all over the place.  I'm

09:27:26 10   sorry.

09:27:29 11   Q.    Are you aware that one of the claims that your company has

09:27:34 12   asserted against my clients is that the entry into a lease

09:27:39 13   between Jadallah Enterprises and Ahmed 1 constituted an unfair

09:27:46 14   trade practice?

09:27:46 15   A.    Yes.

09:27:47 16   Q.    So you are aware that that lease exists?

09:27:52 17   A.    Yeah.  I mean -- I told you, I'm not aware -- you're

09:27:55 18   asking me about --

09:27:55 19   Q.    I'm trying to --

09:27:57 20   A.    -- three or four different companies all at one time.  If

09:28:00 21   you could show me exhibits, it'd probably be better, so I could

09:28:03 22   remember which one you're asking me or which one is what.

09:28:06 23   Q.    Sir, right now, I'm just asking you questions.

09:28:06 24   A.    Yes.

09:28:09 25   Q.    So you're aware that there was a lease entered into

*OFFICIAL TRANSCRIPT*

09:28:12 1   between Jadallah Enterprises and Ahmed 1 for the Louisa Street

09:28:16 2   property in July of 2016?  Yes or no.

09:28:23 3   A.    I think -- I can't -- I can't -- I can't recall which

09:28:27 4   one's lease is which one.  Do you have a copy of it, maybe?  I

09:28:34 5   can see which one is it.

09:28:35 6   Q.    Well, let me just ask you this.

09:28:35 7   A.    Yes, sir.

09:28:37 8   Q.    On July 9, 2016, was Wagners Chef operating its

09:28:44 9   convenience store?

09:28:45 10  A.    Yes.

09:28:46 11  Q.    Was Wagners Chef selling gasoline?

09:28:51 12  A.    On July?  Yeah.

09:28:52 13        MR. BEH:  Am I doing something wrong?

09:29:25 14        THE COURT:  What are you trying to switch to, a laptop?

09:29:25 15        MR. BEH:  Yeah.  I was just trying to --

09:29:29 16        THE COURT:  Can you switch him over, Gail?

09:29:40 17            There you go.

09:29:41 18  EXAMINATION BY MR. BEH:

09:30:05 19  Q.    Mr. Hamdan, I'm going to show you a document which has

09:30:08 20  been marked as Exhibit 23.

09:30:19 21        Sorry.  I'm just learning this system, so I apologize

09:30:22 22  for my --

09:30:24 23        This shows that in -- which this is a document that

09:30:30 24  Brothers Petroleum prepared.  Are you familiar with this

09:30:32 25  document?

*OFFICIAL TRANSCRIPT*

09:30:33 1  A.   Yes, sir.

09:30:33 2  Q.   This document shows that Brothers sold one million four

09:30:41 3  thousand gallons of gasoline to Brothers -- or to Wagners Chef

09:30:47 4  going back to January of 2015, correct?

09:30:50 5  A.   Correct.

09:30:50 6  Q.   In September of 2016, Brothers sold 132,238 gallons of

09:31:00 7  gasoline from -- was sold by Brothers to Wagners Chef; is that

09:31:00 8  correct?

09:31:08 9  A.   Yes, sir.

09:31:08 10  Q.   In October of 2016, Brothers sold 168,000 gallons of

09:31:18 11  gasoline to Wagners Chef?

09:31:19 12  A.   Yes, sir.

09:31:20 13       THE COURT:  So, Mr. Beh, what point are you trying to

09:31:22 14  get to with all of this?  That's what I don't understand.  I

09:31:25 15  don't think the witness does either.

09:31:25 16       MR. BEH:  Your Honor, the point --

09:31:28 17       THE COURT:  The document is in evidence.  It shows what

09:31:29 18  it shows.  I don't think anybody is disputing these numbers.

09:31:32 19  So what point are you trying to get to?

09:31:36 20       MR. BEH:  The point I'm trying to get to, Your Honor,

09:31:38 21  is three of the transactions that are at issue in this case

09:31:41 22  took place in July of 2016.

09:31:41 23       THE COURT:  Okay.

09:31:44 24       MR. BEH:  After that, Wagners Chef continued to operate

09:31:47 25  and continued to buy gas.

*OFFICIAL TRANSCRIPT*

09:31:49 1    THE COURT:  So the documents show that.  I don't know
09:31:50 2  that that's in dispute.  So I think we ought to just move on.
09:31:54 3    MR. BEH:  I can move on, Your Honor.
09:31:56 4    THE COURT:  Okay.
09:31:57 5  EXAMINATION BY MR. BEH:
09:32:12 6  Q.   Mr. Hamdan, you're not contending that the mere fact that
09:32:17 7  Jadallah Saed opened additional limited liability companies is
09:32:23 8  an unfair trade practice, are you?
09:32:25 9    MR. DIROSA:  I'm going to object.  I think asking him
09:32:28 10  to interpret the law --
09:32:30 11    MR. BEH:  I'm asking him what claims --
09:32:32 12    THE COURT:  I overrule that objection.  He can answer
09:32:33 13  that.
09:32:34 14    THE WITNESS:  Go ahead.
09:32:34 15  EXAMINATION BY MR. BEH:
09:32:36 16  Q.   Sir, my question is:  Is Brothers Petroleum contending
09:32:39 17  that the fact that Jadallah Saed opened Jadallah Enterprises,
09:32:45 18  LLC, and Ahmed 1, LLC, to operate businesses, are you
09:32:51 19  contending that that, in and of itself, is an unfair trade
09:32:55 20  practice?
09:32:57 21  A.   The reason he waited until he purchased the property,
09:33:01 22  because he could only create his own lease to a new company if
09:33:04 23  he owns the company -- if he owns the property.
09:33:07 24          So, after that, he had to keep going until he get his
09:33:11 25  occupational license and everything else, to switch it to new

*OFFICIAL TRANSCRIPT*

09:33:15 1   companies, and then sell it to some -- act like he sell it to

09:33:19 2   somebody else, and go and dismantle the other old company.

09:33:25 3   Yes, I do.

09:33:25 4        MR. BEH: Your Honor, I move to strike that as

09:33:28 5   nonresponsive.

09:33:29 6        THE WITNESS: You asked me --

09:33:31 7        THE COURT: No, I think it was responsive to your

09:33:33 8   question him. Go ahead.

09:33:33 9   EXAMINATION BY MR. BEH:

09:33:34 10   Q. So your contention is the mere fact of opening --

09:33:36 11        THE COURT: No, he answered the question. Ask another

09:33:38 12   question. Okay. Don't keep asking the same question.

09:33:40 13   EXAMINATION BY MR. BEH:

09:33:46 14   Q. Mr. Hamdan, isn't it true that you have opened

09:33:49 15   approximately 50 limited liability companies?

09:33:52 16   A. Yes.

09:33:54 17   Q. So you have 50 limited liability companies?

09:33:58 18   A. I have more than 50, maybe a hundred.

09:34:00 19   Q. So for your purposes --

09:34:03 20        THE COURT: Mr. Beh, so we don't confuse the jury here,

09:34:07 21   in fairness, I don't think anybody is contending that the mere

09:34:12 22   opening of an LLC, in and of itself, is an unfair trade

09:34:15 23   practice. I don't think that's the allegation here, if that

09:34:19 24   was your question.

09:34:19 25        MR. BEH: That was my --

*OFFICIAL TRANSCRIPT*

09:34:21 1       THE COURT:  That was your question, but no one is

09:34:24 2   contending that, and that's not what the jury should be --

09:34:27 3   should be inferred to the jury.

09:34:30 4           The question is what was the intent of doing what

09:34:32 5   was done and the timing and so forth and the effect of it.

09:34:35 6   That's what's at issue in this case, so the jury is clear what

09:34:38 7   the issues are in this case, okay.  It's not the mere fact that

09:34:42 8   somebody opens a new company.  That, of course, is not an

09:34:45 9   unfair trade practice.

09:34:46 10          So, go ahead, Mr. Beh.

09:34:47 11      MR. BEH:  Well, Your Honor, my only point --

09:34:49 12      THE COURT:  No, I don't want argument.  Go ahead and

09:34:52 13  ask another question, if you have one.

09:34:57 14      MR. BEH:  I've got no further questions right now,

09:34:58 15  Your Honor.

09:35:00 16      THE COURT:  Mr. DiRosa, any redirect?

09:35:04 17      MR. DIROSA:  Yes, sir.

09:35:05 18                  REDIRECT EXAMINATION

09:35:06 19  BY MR. DIROSA:

09:35:06 20  Q.   Just a couple of questions to correct something.

09:35:10 21          I think Mr. Beh asked you if Fatmah Hamdan was your

09:35:16 22  sister; is that correct?

09:35:16 23  A.   Yes, sir.

09:35:17 24  Q.   Or is she your sister-in-law?

09:35:23 25  A.   She's a sister-in-law.  Ex-sister-in-law.

                      *OFFICIAL TRANSCRIPT*

09:35:26 1    Q.    She was married to Omar?

09:35:26 2    A.    Yes.

09:35:28 3    Q.    Your brother?

09:35:29 4    A.    Yes.

09:35:29 5    Q.    Then, subsequent to them owning the company, did

09:35:34 6    Wagners Chef become owned a hundred percent by Mr. Bob Harvey?

09:35:40 7    A.    Yes, sir.

09:35:40 8    Q.    Then Mr. Bob Harvey sold that hundred percent interest to

09:35:49 9    Mr. Jadallah Saed, correct?

09:35:50 10    A.    Well, we did business with Mr. Bob Harvey, and then he

09:35:55 11    sold to Jadallah Saed.

09:35:56 12    Q.    For a time, you were able to do business with Mr. Saed,

09:36:03 13    correct?

09:36:03 14    A.    Yes, sir. Yes, sir.

09:36:05 15    Q.    Mr. Beh wanted to establish that after these transactions

09:36:13 16    took place on July the 8th, on July 9th, Wagners Chef was still

09:36:17 17    operating and still selling gasoline, correct?

09:36:20 18    A.    Correct.

09:36:20 19    Q.    Was it buying gasoline from Brothers under the contract?

09:36:26 20    A.    No. On 2016?

09:36:31 21    Q.    2016. The transactions take place on July the 8th of

09:36:35 22    2016 --

09:36:35 23    A.    Correct.

09:36:36 24    Q.    -- cancellation of the lease, the sale, the lease to

09:36:42 25    Ahmed 1.

*OFFICIAL TRANSCRIPT*

09:36:43 1      So Wagners Chef is still in business on July 9th?

09:36:46 2  A.   Yes.  Yes.

09:36:47 3  Q.   But did they start buying gas from Brothers on July 9th

09:36:54 4  again?  The day after these transactions took place?

09:36:58 5  A.   Yes.

09:36:58 6  Q.   Did they start buying gas in July?

09:37:02 7  A.   Yes.  July?  No, I'm sorry.

09:37:07 8  Q.   Do you know of anything that prevented them from honoring

09:37:16 9  the contract and buying gas in July of 2016?

09:37:19 10  A.   No, sir.

09:37:19 11  Q.   Do you know of anything that prevented them from buying

09:37:22 12  gas and honoring the contract in August of 2016?

09:37:25 13  A.   No, sir.

09:37:35 14      MR. DIROSA:  I don't have any other questions.  Thank

09:37:38 15  you.

09:37:38 16      THE COURT:  Thank you, sir.  You can step down.

09:37:38 17      THE WITNESS:  Thank you.

09:37:40 18      THE COURT:  Call your next question.

09:37:41 19      MR. DIROSA:  We call Steven Longo.

09:37:47 20      THE COURT:  Steven Longo, please.

09:37:50 21          You can go back to counsel table.

09:37:53 22      MR. DIROSA:  Judge, can we approach the bench for a

09:37:54 23  second?  It's about a witness.

09:38:25 24      (WHEREUPON, at this point in the proceedings, there was

09:38:25 25  a conference held at the bench outside the presence of the

*OFFICIAL TRANSCRIPT*

09:38:50 1    court reporter.)

2    THE DEPUTY CLERK:  Raise your right hand.  Do you

3    solemnly swear the testimony which you are about to give will

4    be the truth, the whole truth and nothing but the truth, so

5    help you God?

6    THE WITNESS:  I do.

7    **STEVEN LONGO**

8    was called as a witness and, after being first duly sworn by

9    the Clerk, was examined and testified on his oath as follows:

10    THE DEPUTY CLERK:  Please have a seat.  State your

11    name, and spell it for the record.

09:38:58 12    THE WITNESS:  Steven Longo, S-T-E-V-E-N, L-O-N-G-O.

09:39:01 13    DIRECT EXAMINATION

09:39:08 14    BY MR. DIROSA:

09:39:08 15    Q.    Mr. Longo, by whom are you employed?

09:39:23 16    A.    Brothers Petroleum.

09:39:23 17    Q.    What is your position with Brothers Petroleum?

09:39:27 18    A.    I'm the chief financial officer.

09:39:29 19    Q.    Are you familiar with the contract that Brothers Petroleum

09:39:33 20    had or - has or had with Wagners Chef?

09:39:36 21    A.    Yes, I am.

09:39:37 22    Q.    We've already looked at a fuel summary which is in

09:39:49 23    evidence.  That correctly reflects the amount of gas that -- at

09:40:06 24    least through mid-November of '16, that Wagners Chef purchased

09:40:11 25    from Brothers Petroleum under this contract?

*OFFICIAL TRANSCRIPT*

| | |
|---|---|
| 09:40:14 1 | A.    This reflects our business records of fuel sold, yes. |
| 09:40:18 2 | Q.    That would be from January of '15 through November of '16, |
| 09:40:22 3 | approximately -- what is that -- 22 and a half months? |
| 09:40:26 4 | A.    Correct. |
| 09:40:27 5 | Q.    In April of 2015, Wagners Chef notified Brothers that they |
| 09:40:54 6 | would no longer purchase fuel under the contract? |
| 09:40:57 7 | A.    Correct. |
| 09:40:57 8 | Q.    Do you know if there was a balance due at that time -- |
| 09:41:01 9 | A.    Yes. |
| 09:41:02 10 | Q.    -- from Wagners Chef? |
| 09:41:04 11 | MR. BEH:  Your Honor, I'm going to enter an objection. |
| 09:41:06 12 | I don't know the relevance of this, considering we're not going |
| 09:41:09 13 | into damages in this case. |
| 09:41:11 14 | THE COURT:  I sustain that objection. |
| 09:41:13 15 | EXAMINATION BY MR. DIROSA: |
| 09:41:30 16 | Q.    In November 2016, Wagners Chef again stopped purchasing |
| 09:41:42 17 | fuel from Brothers Petroleum, correct? |
| 09:41:45 18 | A.    Yes, that's correct. |
| 09:41:45 19 | Q.    Has Wagners Chef purchased any fuel from Brothers |
| 09:41:50 20 | Petroleum after mid-November of 2016? |
| 09:41:55 21 | A.    No, they have not. |
| 09:41:55 22 | Q.    Okay.  What is the manner in which Wagners Chef would pay |
| 09:42:03 23 | for fuel when fuel was delivered to the station? |
| 09:42:08 24 | A.    They would pay via check. |
| 09:42:10 25 | Q.    Via a check? |

*OFFICIAL TRANSCRIPT*

09:42:12 1   A.    Yes.  Or ACH.

09:42:14 2   Q.    What is ACH?

09:42:15 3   A.    Automatic clearinghouse.  It's a draft from a bank account

09:42:19 4   that we would draft their account.

09:42:21 5   Q.    When Wagners Chef stopped buying fuel in mid-November of

09:42:26 6   2016, did Brothers Petroleum attempt to draft that account for

09:42:32 7   the monies that were due to it for fuel that had already been

09:42:37 8   delivered to Wagners Chef?

09:42:38 9   A.    Yes.

09:42:38 10   Q.    I'm going to show you -- this is Exhibit 46.

09:42:55 11        Okay.  This is from November 17th of 2016, for

09:43:12 12   Wagners Chef.  Does that show any monies that were not paid --

09:43:18 13   any invoices that were not paid due to insufficient funds in

09:43:22 14   their account?

09:43:23 15   A.    Those show two attempted ACH's that were returned

09:43:26 16   insufficient funds.

09:43:27 17   Q.    Those are two different ACH's?

09:43:30 18   A.    Correct.

09:43:31 19   Q.    All right.  The amounts are what?

09:43:34 20   A.    The first one was for $32,279.72.  The second was for

09:43:41 21   $29,903.66.

09:43:43 22   Q.    I'm going to show you another distribution entry list.

09:43:55 23   This is dated November 21st of 2016.  What is that document?

09:44:02 24   A.    That is another ACH that was returned insufficient funds

09:44:07 25   in the amount of $11,166.20.

09:44:12 1    Q.   Let me show you one more document.  This is from

09:44:23 2    November 22nd of 2016.

09:44:26 3            What is that document?

09:44:27 4    A.   That document is another ACH that was returned

09:44:31 5    insufficient funds in the amount of $21,859.69.

09:44:36 6            THE COURT:  You know, you're putting these documents up

09:44:39 7    on the screen, but I don't think you're identifying the exhibit

09:44:42 8    numbers.

09:44:42 9            MR. DIROSA:  24.  I think it was 24.

09:44:50 10            I'm sorry.  46.  46.

09:44:53 11            THE COURT:  All of them are from 46, all these several

09:44:57 12    documents?

09:44:58 13            MR. DIROSA:  Yes, sir.

09:44:58 14            Isn't that correct?

09:45:14 15            THE COURT:  You did start off saying that you were

09:45:17 16    going to put up Exhibit 46.

09:45:21 17            MR. DIROSA:  Oh, I'm sorry, that's 45.  I've got them

09:45:23 18    in reverse.  That's 45.

09:45:26 19            THE COURT:  45.

09:45:27 20            MR. DIROSA:  These three documents are Exhibit 45.

09:45:29 21            THE COURT:  None are from 46?

09:45:31 22            MR. DIROSA:  Correct.

09:45:32 23            THE COURT:  So all of these are from 45.  Just so the

09:45:41 24    record will be straight.

09:45:42 25            MR. DIROSA:  Yes.

*OFFICIAL TRANSCRIPT*

09:45:42  1    EXAMINATION BY MR. DIROSA:

09:45:42  2    Q.   Since these NSF, nonsufficient funds, were processed, has

09:45:48  3    Wagners Chef paid any monies towards the balances that are due

09:45:54  4    on those accounts?

09:45:54  5    A.   There has been no payment whatsoever.

09:45:57  6         MR. DIROSA:  I don't have any other questions.  Thank

09:46:01  7    you.

09:46:01  8                          CROSS-EXAMINATION

09:46:03  9    BY MR. BEH:

09:46:03 10    Q.   Mr. Longo, this is Exhibit Number 23, which I believe you

09:46:29 11    just identified in your conversation with Mr. DiRosa; is that

09:46:33 12    correct?

09:46:33 13    A.   Yes.

09:46:36 14         THE COURT:  Just so we're clear with this, can you show

09:46:40 15    us the top of that document?

09:46:45 16         MR. BEH:  This is fuel gallons sold, January of '15

09:46:49 17    through the end of '16.

09:46:51 18         THE COURT:  Thank you.

09:46:53 19    EXAMINATION BY MR. BEH:

09:46:53 20    Q.   This shows 132,000 gallons of gasoline that was sold by

09:46:58 21    Brothers to Wagners Chef, correct?

09:47:02 22    A.   In September of 2016?

09:47:04 23    Q.   In September of 2016.

09:47:05 24    A.   Yes.

09:47:05 25    Q.   All of that gas was paid for, correct?

*OFFICIAL TRANSCRIPT*

09:47:08  1    A.    Yes.

09:47:08  2    Q.    It also shows 168,000 gallons in October of 2016; is that

09:47:17  3    correct?

09:47:17  4    A.    That shows 168,000, yes.

09:47:17  5          THE COURT REPORTER:  Speak into the microphone.

09:47:17  6          THE WITNESS:  I'm sorry.

09:47:24  7          Yes, that shows 168,000 gallons sold in October

09:47:25  8    of 2016.

09:47:26  9    EXAMINATION BY MR. BEH:

09:47:26 10    Q.    That gasoline was all paid for, correct?

09:47:30 11    A.    A majority portion of that, yes.

09:47:32 12    Q.    So, the three ACH's you just identified, those were for

09:47:39 13    three specific days in November of 2016?

09:47:41 14    A.    Those were billed -- billed dates, ACH drafts on that

09:47:45 15    date, correct.

09:47:45 16    Q.    But the rest for September and for the vast majority of

09:47:49 17    October, Brothers was paid, correct?

09:47:52 18    A.    Brothers was paid, but there were still outstanding

09:47:56 19    balances for fuel delivered in October and November.

09:48:00 20    Q.    Correct.

09:48:05 21          MR. BEH:  No further questions, Your Honor.

09:48:06 22          THE COURT:  Okay.

09:48:07 23          Any redirect?

09:48:08 24          MR. DIROSA:  No, sir.

09:48:09 25          THE COURT:  Okay, you can step down.

*OFFICIAL TRANSCRIPT*

```
09:48:11   1          THE WITNESS:  Thank you.

09:48:12   2          THE COURT:  Okay.  Ladies and gentlemen, we're going to

09:48:15   3   take about a 10 or 15-minute recess now.

09:48:18   4              So, please, if you haven't already done so, it's

09:48:22   5   a good idea to write your name somewhere on that book, so they

09:48:25   6   don't get confused.  Leave them on your chair seat or under

09:48:30   7   your chair.  They will be there when you return.

09:48:34   8              At the end of the case when you go deliberate, of

09:48:36   9   course, we'll let you take your notes into the jury room with

09:48:38  10   you, okay, but for now I want you to leave them in the

09:48:41  11   courtroom.

09:48:41  12              All right.  The court security officer will

09:48:44  13   escort you back to the jury room.  We'll be back in about

09:48:47  14   15 minutes.

09:48:48  15          THE COURT SECURITY OFFICER:  All rise.

09:48:49  16          (WHEREUPON, at 9:48 a.m., the jury panel leaves the

09:49:24  17   courtroom.)

09:49:24  18          THE COURT:  All right.  Mr. DiRosa, can you see if you

09:49:24  19   can get that witness here?

09:49:24  20          MR. DIROSA:  Yes.

09:49:25  21          THE COURT:  Okay.  All right.  The court stands in

09:49:26  22   recess.

09:49:27  23          (WHEREUPON, at 9:49 a.m., the Court took a recess.)

10:13:22  24          THE COURT:  Is the witness here?

10:13:23  25          MR. DIROSA:  Yes.
```

*OFFICIAL TRANSCRIPT*

10:13:25 1          THE COURT:  What's the lady's name?

10:13:27 2          MR. DIROSA:  Ms. Kleindorf.

10:13:40 3          THE COURT:  You can bring her in.

10:13:45 4               We can go ahead and bring in the jury.

10:13:47 5          THE COURT SECURITY OFFICER:  All rise.

10:13:48 6          (WHEREUPON, at 10:13 a.m., the jury panel enters the

10:14:05 7     courtroom.)

10:14:05 8          THE COURT:  All right, ladies and gentlemen, please be

10:14:07 9     seated.

10:14:10 10              Mr. DiRosa, you can call your next witness.

10:14:12 11         MR. DIROSA:  Connie Kleindorf.

12         THE DEPUTY CLERK:  Raise your right hand.  Do you

13     solemnly swear the testimony which you are about to give will

14     be the truth, the whole truth and nothing but the truth, so

15     help you God?

16         THE WITNESS:  Yes.  Yes.

17                         **CONNIE KLEINDORF**

18      was called as a witness and, after being first duly sworn by

19      the Clerk, was examined and testified on her oath as follows:

20         THE DEPUTY CLERK:  Please have a seat.  State your

21     name, and spell it for the record.

10:14:31 22        THE WITNESS:  Connie Kleindorf, C-O-N-N-I-E,

10:14:36 23    K-L-E-I-N-D-O-R-F.

10:14:40 24        THE COURT:  Ma'am, if you would either pull yourself

10:14:42 25    up, or you can pull that microphone up closer to you, too.  You

*OFFICIAL TRANSCRIPT*

10:14:46  1    don't have to be right on top of it, but just about like that
10:14:49  2    would be good.  Thank you.
10:14:50  3                         DIRECT EXAMINATION
10:14:52  4    BY MR. DIROSA:
10:14:52  5    Q.    Ms. Kleindorf, were you employed by the First National
10:15:04  6    Bank of Commerce in 2016?
10:15:06  7    A.    Yes.
10:15:06  8    Q.    Or FN -- what did they go by?
10:15:06  9    A.    It was First NBC.
10:15:08 10    Q.    First NBC.  Okay.
10:15:08 11    A.    Yes.
10:15:10 12    Q.    What was your position with First NBC in 2016?
10:15:15 13    A.    I was a commercial relationship manager.
10:15:17 14    Q.    Which means what?
10:15:18 15    A.    I managed business checking accounts, serviced business
10:15:22 16    loans, and I was a lender with up to $250,000 in loan
10:15:27 17    authority.
10:15:27 18    Q.    Okay.
10:15:28 19    A.    That was my limit.
10:15:29 20    Q.    Did you also have duties as an account officer?
10:15:34 21    A.    Yes.
10:15:34 22    Q.    Okay.  During 2016, did you have an occasion to process
10:15:39 23    the loan, to evaluate and process the loan application of
10:15:45 24    Wagners Chef that was submitted by Jadallah Saed?
10:15:49 25    A.    Yes.

***OFFICIAL TRANSCRIPT***

| | | |
|---|---|---|
| 10:15:50 | 1 | Q. What was the purpose of the loan application? What was he |
| 10:15:52 | 2 | applying to do? |
| 10:15:55 | 3 | A. The purpose was to refinance -- he had a lease/purchase |
| 10:16:01 | 4 | agreement, and he wanted to exercise his option to purchase the |
| 10:16:05 | 5 | property. |
| 10:16:05 | 6 | Q. Okay. That lease/purchase agreement would have been in |
| 10:16:09 | 7 | favor of Wagners Chef? |
| 10:16:12 | 8 | A. Yes. |
| 10:16:12 | 9 | Q. In connection with that application, did Mr. Saed submit a |
| 10:16:21 | 10 | financial statement in February of 2016? |
| 10:16:23 | 11 | A. Yes. |
| 10:16:26 | 12 | Q. Would that be this document dated February 1, 2016? |
| 10:16:53 | 13 | A. Yes. |
| 10:16:54 | 14 | Q. That is from Exhibit 7. |
| 10:17:01 | 15 | At that time, he told -- he advised that he had a |
| 10:17:05 | 16 | closely held investment or stock which was worth one million |
| 10:17:11 | 17 | five hundred thousand dollars; is that correct? |
| 10:17:12 | 18 | A. That's what it says, yes. |
| 10:17:14 | 19 | Q. This is -- Mr. Saed filled this out, correct? |
| 10:17:19 | 20 | A. Yes. |
| 10:17:19 | 21 | Q. Let me just make sure. |
| 10:17:30 | 22 | So that would be his signature at the end? |
| 10:17:36 | 23 | A. I would assume, yes, but I would not have witnessed him |
| 10:17:39 | 24 | sign it. |
| 10:17:39 | 25 | Q. Okay. I understand. |

*OFFICIAL TRANSCRIPT*

He represents and warrants, as the first sentence says of this application, in order to induce the above named bank to grant or extend loans for which I am directly or contingently liable, I hereby represent and warrant the above information to be true and correct.

A.   That's -- yes.

Q.   Then, in connection with this closely held investment or stock, it says, H.  That would be a schedule in this; would it not be?

A.   Yes.

Q.   If we get to schedule H, it shows that the million five hundred thousand that he is talking -- he is referencing in this application is Wagners Chef, LLC, correct?

A.   Correct.  Yes.

THE COURT:  What's the date of that again, Mr. DiRosa?

MR. DIROSA:  It's dated February 1st of '16, but it's signed February the 3rd.

THE COURT:  Okay.  I was just trying to get the timeframe.

EXAMINATION BY MR. DIROSA:

Q.   In connection with that application, did he also submit a copy of a 2015 partnership tax return?

I'm going to show you a 2015 partnership tax return for -- I'm sorry -- Wagners Chef 2015 partnership tax return.

That shows -- do you see the date at the bottom,

10:19:34 1    March 1st of 2016, and that shows a profit of 55,000 -- or

10:19:43 2    $55,216?

10:19:45 3    A.    That's accurate, yes.

10:19:46 4         THE COURT:  What's that exhibit number?

10:19:49 5         MR. DIROSA:  This is also part of Number 7, in globo.

10:19:52 6         THE COURT:  Part of the same exhibit, okay.

10:19:55 7         MR. DIROSA:  Yes, sir.

10:19:55 8    EXAMINATION BY MR. DIROSA:

10:19:56 9    Q.    Did he also submit to you a business plan for

10:20:07 10   Wagners Chef -- a business plan for Wagners Chef in connection

10:20:16 11   with that loan application?

10:20:18 12   A.    Yes.  Yes.

10:20:20 13   Q.    I'm going to show you, as part of the business plan, this

10:20:36 14   statement about the company.  It says:  The store sells an

10:20:42 15   average of six thousand gallons of fuel per day.  The alcohol,

10:20:48 16   tobacco, deli and general grocery items are currently sold in

10:20:55 17   the convenience store at a rate of more than six thousand

10:20:57 18   dollars in sales a day.

10:21:01 19        That information would not have come from the bank,

10:21:04 20   would it?

10:21:04 21   A.    No, sir.

10:21:04 22   Q.    That would have come from Mr. Saed?

10:21:07 23   A.    Correct.

10:21:07 24   Q.    Then, Mr. Saed says, about labor:  Wagners Chef employs

10:21:14 25   two to three people a year -- year-round as needed to do the

*OFFICIAL TRANSCRIPT*

10:21:19 1  day-to-day tasks of the store.

10:21:21 2        It was your understanding the store was open 24 hours

10:21:23 3  a day, seven days a week?  Or did you know?

10:21:27 4  A.   I wouldn't know that.  But, you know, it's a C store,

10:21:33 5  convenience store.  I wouldn't know the hours of operation.

10:21:36 6  Q.   Now, also, in this business plan, there are this list of

10:21:46 7  is assumptions.  This would also be information provided by

10:21:53 8  Mr. Saed, correct?

10:21:54 9  A.   Yes.

10:21:54 10  Q.   Mr. Saed advised the bank that, per management, payroll is

10:22:04 11  $13,000 per month, correct?

10:22:05 12  A.   That's what it says, yes.

10:22:09 13  Q.   Then, per industry data, payroll expenses are 17 percent

10:22:13 14  of payroll total?  That would be FICA, Medicare, whatever they

10:22:20 15  are on this.

10:22:22 16  A.   (Witness nods head affirmatively.)

10:22:22 17  Q.   Per management, the fuel profit for each gallon of gas is

10:22:28 18  a minimum of eight cents a gallon.

10:22:30 19        This is also information that was provided to you by

10:22:36 20  Mr. Saed, correct?

10:22:40 21  A.   Correct, yes.

10:22:41 22  Q.   Were these documents employed in evaluating the loan

10:22:45 23  application of Wagners Chef that had been submitted to First

10:22:52 24  NBC Bank?

10:22:52 25  A.   The business plan, we would have reviewed it, so yes.

*OFFICIAL TRANSCRIPT*

10:22:56 1    Q.   Okay.  So all of those documents, the application, the tax

10:23:02 2    return, the business plan, would have been part of this loan

10:23:06 3    package that would be used to evaluate whether you were going

10:23:10 4    to grant this loan or not?

10:23:11 5    A.   It was part of the loan package because he submitted the

10:23:14 6    business plan.

10:23:15 7    Q.   Did Mr. Saed also provide -- well, based on the

10:23:42 8    information provided by Mr. Saed on behalf of Wagners Chef, did

10:23:47 9    you prepare an interoffice memo dated April 6, 2016, to be

10:23:54 10   presented to the pre-review committee of the First NBC Bank?

10:24:00 11   A.   Yes.

10:24:00 12   Q.   Is that a copy of that memo?

10:24:04 13   A.   Correct.  Yes.

10:24:04 14   Q.   What is the purpose of a pre-review committee memo?

10:24:13 15   A.   The purpose is, before we -- they created this pre-review

10:24:17 16   committee at the bank because we were bogging down the credit

10:24:25 17   analysts with every loan request.  They wanted to review -- the

10:24:29 18   committed wanted to review the request before it got to the

10:24:32 19   credit analysis department to see if it was, indeed, an

10:24:36 20   investment the bank wanted to participate in.

10:24:39 21        So they would either pass at this committee and say,

10:24:42 22   no, thank the customer, you know, for allowing us to have the

10:24:46 23   opportunity, but we're going to pass on this loan request; or,

10:24:49 24   they'd say, yes, move forward, you know, and send it to the

10:24:52 25   credit department for a full underwriting analysis.

10:24:55 1    Q.   So it would have been sort of a prescreening kind of an

10:24:58 2    idea?

10:24:58 3    A.   Yes, just a summary.  Yes, correct.

10:25:00 4    Q.   In that summary, under this lease with option to purchase,

10:25:08 5    part of the lease payments were going to pay off the purchase

10:25:13 6    price of the property, correct?

10:25:17 7    A.   I'm sorry, could you rephrase that?

10:25:19 8    Q.   He had a lease with option to purchase?

10:25:23 9    A.   Yes.

10:25:23 10   Q.   As part of that lease, every time you paid -- you made a

10:25:26 11   lease payment, a part of that lease payment went to pay off the

10:25:31 12   purchase price of the building?

10:25:33 13   A.   Correct.  Correct.

10:25:33 14   Q.   Mr. Saed advised you that approximately 200,000 in equity

10:25:42 15   thus far under the lease/purchase agreement.

10:25:44 16         So Wagners Chef, by paying on this lease, had already

10:25:48 17   accrued 200,000 towards the purchase price of this property?

10:25:54 18   A.   Yes.  Yes.

10:25:56 19   Q.   Did Mr. Saed provide you with a prior appraisal that had

10:26:02 20   been done on the property?

10:26:02 21   A.   I don't remember, but I have to assume it's yes, because I

10:26:09 22   have those values in there.  It says:  Subject to a new

10:26:12 23   appraisal.  This was the most recent appraisal by Murphy dated

10:26:17 24   3/11/15 on this document.

10:26:19 25         I could not get that from Murphy Appraisal, so the

*OFFICIAL TRANSCRIPT*

10:26:24 1    customer would have had to provide that to me.

10:26:25 2    Q.   But that appraisal was a year old?

10:26:27 3    A.   Yes.

10:26:28 4    Q.   So you had to order a new appraisal?

10:26:30 5    A.   Correct.

10:26:30 6    Q.   So that appraisal, the one from a year before, showed what

10:26:34 7    for the real estate leased value?

10:26:39 8    A.   The lease fee, fee simple, in the -- as a gas station, the

10:26:46 9    MVTAB.

10:26:47 10   Q.   That's the real estate and -- I get this confused.

10:26:53 11   A.   The real estate value.  Then the value of the business

10:26:56 12   would be --

10:26:56 13   Q.   Of the business itself.

10:26:56 14   A.   Yes.  Yes.

10:26:57 15   Q.   So the combined value, between the real estate and the

10:27:00 16   business, was $3,630,000?

10:27:03 17   A.   Correct.

10:27:04 18   Q.   Now, in connection with this pre-review committee

10:27:19 19   document, did you also prepare -- or have prepared a cash flow

10:27:26 20   analysis?

10:27:26 21   A.   Yes.

10:27:27 22   Q.   What is the purpose of the cash flow analysis?

10:27:32 23   A.   Basically, the cash flow analysis tells us the debt

10:27:36 24   service coverage, assuming we did the loan.  We do add-backs.

10:27:42 25   For example, he was paying Wagners Chef monthly lease payments.

*OFFICIAL TRANSCRIPT*

So, if he purchases the property, those lease payments will go towards the mortgage note, rather than paying -- and so we do add-backs.

They had some other rental expense, and then the net operating income of the gas station, which is the 55,216.

Q.   But the gas station also had other income coming from subleases, correct?

A.   Yes.  Real estate leased income, yes.  Yes.

Q.   So the total cash flow for any one month would have been what amount?

A.   I can't really say.  But looking at this sheet, it's -- the total -- the net income available to service the debt was $385,267.

Q.   Then, in order to pay the debt monthly -- or is that yearly?

A.   That's annual.

Q.   Annual.

A.   Then the proposed monthly -- excuse me -- the annualized debt service would be 206.  When you divide the available cash flow of 385 by 206, you get the 1.87, debt service coverage.

THE COURT:  Not divide.  You mean subtract, right?

THE WITNESS:  No, you divide it.

MR. DIROSA:  For that percentage?

THE WITNESS:  It's a percentage.  It's a ratio.  1.87.
The policy of the bank was anything over, I believe, 1.25 times

10:29:16 1   is sufficient for us.

10:29:18 2   EXAMINATION BY MR. DIROSA:

10:29:18 3   Q.   So this would have been sufficient for the bank to proceed

10:29:23 4   with this loan?

10:29:24 5   A.   Correct.  That's why we moved forward, yes.

10:29:27 6   Q.   Based on this analysis, after the cash came in and the

10:29:32 7   loan was paid out, there would have been approximately $178,939

10:29:38 8   left over?

10:29:39 9   A.   Correct.  For every dollar in debt he would have, he had

10:29:46 10  $1.87 to pay it back, so to speak.

10:29:48 11  Q.   Oh, that's the 1.87?

10:29:50 12  A.   Yes, yes.

10:29:51 13  Q.   So did this -- in April of 2016, did this seem like a

10:30:02 14  viable business to you?

10:30:03 15  A.   Yes.

10:30:05 16  Q.   This went before the pre-review committee.  Did they

10:30:11 17  decide to proceed --

10:30:13 18  A.   Yes.

10:30:13 19  Q.   -- on the basis of that?

10:30:15 20  A.   Correct.

10:30:15 21  Q.   So after that was done, was a second appraisal done on the

10:30:26 22  property?

10:30:27 23  A.   Yes.

10:30:28 24  Q.   This is a portion of Exhibit 8 from the same Murphy

10:30:43 25  Appraisal Services.  This is June 16th of 2016.

*OFFICIAL TRANSCRIPT*

10:30:47 1    What did that show for the value of the property and

10:30:52 2 the business?

10:30:54 3 A.    Three million eight hundred thousand.

10:30:57 4 Q.    So that would have been adequate for funding for this

10:31:02 5 loan?

10:31:03 6 A.    Correct.  Yes.

10:31:03 7 Q.    Let me show you a credit memorandum which is dated

10:31:43 8 May 18th of 2016.  It's in the name of Wagners Chef.

10:31:58 9    This is your signature that appears at the bottom,

10:31:58 10 correct?

10:32:03 11 A.    Yes.

10:32:03 12 Q.    So you had approved the loan up to this point in time, is

10:32:11 13 what that indicates, correct?

10:32:13 14 A.    No.

10:32:13 15 Q.    I mean, you had approved it to move forward?

10:32:17 16 A.    Right.  Correct.  I prepared the package to move forward,

10:32:20 17 yes.  Correct.

10:32:21 18 Q.    So you prepared this particular packet?

10:32:23 19 A.    Yes.

10:32:24 20 Q.    In assessing this loan and the viability of this loan,

10:32:29 21 what was the primary source for repayment of that loan?

10:32:33 22 A.    Cash flow from the gas station, store and leased income.

10:32:38 23 Q.    Of Wagners Chef?

10:32:41 24 A.    Correct.  Yes.

10:32:42 25 Q.    At this point in time, did you even know that there was an

**OFFICIAL TRANSCRIPT**

10:32:55 1    entity called Jadallah Enterprises?

10:33:00 2    A.    No.

10:33:00 3    Q.    I'm going to show you -- this is Exhibit 20.  This is the

10:33:14 4    articles of organization for -- from the secretary of state,

10:33:19 5    for -- the name of this limited liability company is

10:33:22 6    Jadallah Enterprises.

10:33:25 7            It's signed by Jadallah Saed, as the manager.  It's

10:33:30 8    dated April 22, 2015.  So that would have been a year before he

10:33:35 9    even applied for this loan, correct?

10:33:37 10   A.    Yes.  Looking at that, yes.

10:33:40 11   Q.    He never even mentioned to you that this company existed?

10:33:43 12   A.    I don't remember that.

10:33:45 13   Q.    But had he mentioned it, that probably would have been

10:33:51 14   somewhere in this file, that this company had income or

10:33:53 15   assets --

10:33:54 16   A.    Yes.

10:33:55 17   Q.    -- by which you could evaluate?

10:33:57 18   A.    Yes.

10:33:57 19   Q.    All right.  Prior to -- let me see.  Prior to your signing

10:34:13 20   off on the credit memorandum that we just looked at -- let me

10:34:22 21   make sure I got my dates in order -- prior to your signing off

10:34:25 22   on May 25th of 2016, was there a credit analysis prepared for

10:34:31 23   the bank?

10:34:32 24   A.    Yes.

10:34:33 25   Q.    That was -- the borrower's name on that credit analysis is

10:34:39 1  Wagners Chef, correct?

10:34:42 2  A.    Correct.

10:34:42 3  Q.    That is dated May 23rd, 2016, two days before you signed

10:34:49 4  off on this credit memorandum?

10:34:55 5  A.    Yes.

10:34:55 6  Q.    The risk rating justification, what is that?

10:35:03 7  A.    In the industry, it just gives some industry risk.  They

10:35:10 8  compare the industry to the borrower at hand.

10:35:14 9  Q.    It shows -- I'm sorry?

10:35:18 10  A.    Also, they have risk and mitigation.

10:35:23 11  Q.    All right.  At this time, the main source of income for

10:35:29 12  this loan would have been what?

10:35:32 13  A.    The main source of income was the income from

10:35:38 14  Wagners Chef, LLC.

10:35:41 15  Q.    Okay.  Had Jadallah Enterprises had any income that had

10:35:46 16  any bearing on this loan, would you have expected to see that

10:35:49 17  in there also?

10:35:50 18  A.    Yes.  It would have been in this analysis.

10:35:53 19  Q.    Okay.  Then, under mitigation, it says:  The company's

10:36:01 20  rent expense will be replaced by the new FNBC loan, lower

10:36:07 21  monthly principal and interest payments, thus further improving

10:36:11 22  the cash flow for the business.

10:36:13 23  A.    Yes.

10:36:13 24  Q.    So, essentially, that means the loan is cheaper than what

10:36:20 25  the lease is costing them?

10:36:21 1   A.   Yes.

10:36:22 2   Q.   The borrower -- again, that's Wagners Chef -- shows 84,000

10:36:28 3   in cash balance as of December 31st of 2015?

10:36:31 4   A.   Yes.

10:36:32 5   Q.   All of these would have been significant factors, correct?

10:36:38 6   A.   Yes.

10:36:38 7   Q.   As far as rental income, based on what Mr. Saed provided,

10:36:47 8   did it show that there were three subleases?

10:36:51 9   A.   Yes.

10:36:52 10  Q.   Okay.  That the first sublease would have been SAG Beauty?

10:36:59 11  A.   Yes.

10:37:00 12  Q.   That was how much per month?

10:37:03 13  A.   Nine thousand per month.

10:37:04 14  Q.   For a total of 108,000 per year, correct?

10:37:08 15  A.   Correct.  Yes.

10:37:08 16  Q.   The second would have been -- the second sublease was to a

10:37:08 17  company called?

10:37:16 18  A.   Emad Wireless.

10:37:16 19  Q.   That was how much a month?

10:37:17 20  A.   Six thousand a month.

10:37:19 21  Q.   That would have been a total of?

10:37:22 22  A.   72,000 annually.

10:37:24 23  Q.   The third sublease on the property was for how much?

10:37:31 24  A.   RePlay, nine thousand a month.

10:37:32 25  Q.   A total of?

*OFFICIAL TRANSCRIPT*

10:37:33 1    A.    108,000 annually.

10:37:35 2    Q.    So based on the leases that were provided -- or the

10:37:38 3    subleases that were provided by Mr. Saed, he indicated that

10:37:42 4    Wagners Chef would be receiving $288,000 a year in rental

10:37:49 5    income?

10:37:49 6    A.    Yes.

10:37:50 7    Q.    As far as the income statement in this credit analysis,

10:38:15 8    what does it show as the income statement and cash flow

10:38:20 9    analysis?

10:38:25 10   A.    I'm sorry, what is your question?

10:38:28 11   Q.    What does this show as far as income statement and cash

10:38:33 12   flow analysis?

10:38:33 13   A.    Okay.  This particular page is the personal analysis of

10:38:39 14   him personally.  It shows assets of 1,777,398,000 and total

10:38:51 15   liabilities of 93,500.  His net worth was one million -- I'm

10:39:03 16   sorry, I don't have my glasses on -- one million six -- I can't

10:39:08 17   read it.  I can get my glasses.

10:39:11 18       THE COURT:  Looks like 1,683,898.

10:39:17 19       THE WITNESS:  Correct.  Yes, that's what it shows.

10:39:17 20   EXAMINATION BY MR. DIROSA:

10:39:19 21   Q.    But what does it show -- if you see, towards the bottom,

10:39:20 22   the second paragraph from the bottom, income statement cash

10:39:23 23   flow --

10:39:23 24   A.    Oh, the cash flow -- Mr. Saed's main source of income is

10:39:27 25   the operation of our borrower, Wagners Chef.  He successfully

10:39:31  1    operated the business since January 1, 2014.  With this

10:39:34  2    purchase of the property, his cash flow will further improve,

10:39:37  3    as the debt payment is less than the existing lease payments.

10:39:40  4    Q.   So, the borrower, through all of this process, has always

10:39:48  5    been Wagners Chef, correct?

10:39:50  6    A.   Yes.

10:39:50  7    Q.   The entity that's going to pay off this loan and generate

10:39:58  8    the income sufficient to meet the loan obligation is

10:40:02  9    Wagners Chef, correct?

10:40:05 10    A.   Yes.

10:40:05 11    Q.   Now, was Mr. Saed notified by a letter dated June 1st of

10:40:27 12    2016, that his proposal for a loan was approved?

10:40:35 13              THE COURT:  What's your exhibit number?

10:40:37 14              MR. DIROSA:  I'm sorry.  This is also part of Exhibit 7

10:40:39 15    still.

10:40:40 16              THE COURT:  Okay.

10:40:43 17              THE WITNESS:  That's, like, not a yes or a no answer,

10:40:46 18    but it's like, yes, that's a terms and conditions letter.

10:40:46 19    EXAMINATION BY MR. DIROSA:

10:40:46 20    Q.   Okay.  Saying?

10:40:51 21    A.   It discusses the terms of the offer that we are offering

10:40:54 22    him.

10:40:55 23    Q.   Okay.  Who is the borrower?

10:40:58 24    A.   Wagners Chef, LLC.

10:40:59 25    Q.   Okay.  Is there any mention in this of an entity called

*OFFICIAL TRANSCRIPT*

10:41:04 1    Jadallah Enterprises, LLC?

10:41:07 2    A.    No, sir.

10:41:07 3    Q.    To your knowledge, at this point in time,

10:41:11 4    Jadallah Enterprises didn't even exist, to your knowledge?

10:41:14 5    A.    Not to my knowledge.

10:41:15 6    Q.    Okay.  The company called Ahmed 1 didn't even exist, to

10:41:19 7    your knowledge?

10:41:20 8    A.    No.

10:41:20 9    Q.    Okay.  Then the guarantors are Jadallah Saed and it says

10:41:26 10   RE entity to be formed.  What is that?

10:41:30 11   A.    What that means is when a customer purchases real estate,

10:41:35 12   we don't require, but a lot of times customers want to create

10:41:39 13   an LLC or a business name for liability purposes for the real

10:41:47 14   estate.  So that's their option.

10:41:50 15   Q.    So this wasn't a requirement of the bank?

10:41:53 16   A.    No.

10:41:54 17   Q.    This was Mr. Saed's idea?

10:42:00 18   A.    Well, it would have been a conversation that we had.  It's

10:42:03 19   just a free-flowing conversation.  Like, oh, you know, I want

10:42:08 20   to make a purchase, and I may put in it a real estate holding

10:42:11 21   name that -- yes.

10:42:13 22   Q.    All right.  But if the bank had said, look, we're not

10:42:18 23   making this loan unless you form a real estate holding company

10:42:22 24   and put in it their name, there would be something in this file

10:42:24 25   that would show that?

10:42:25 1   A.   Yes.

10:42:25 2   Q.   It would be contained in this letter; would it not?  That

10:42:32 3   the bank was insisting that a real estate holding company be

10:42:36 4   formed?

10:42:36 5   A.   Correct.  It would be in this letter if it was a

10:42:39 6   requirement, but it's never a requirement of the bank in

10:42:42 7   banking.

10:42:42 8   Q.   Had Wagners Chef just gone forward and purchased the

10:42:46 9   property in their name, would that have been a problem for the

10:42:49 10   bank?

10:42:50 11   A.   No.  Not at all.  No.

10:42:51 12   Q.   I'm sorry.  That loan, the amount of that loan was --

10:42:58 13   what?

10:43:00 14   A.   It was approved up to $2,900,000.

10:43:03 15   Q.   Based upon Wagners Chef's income, correct?

10:43:11 16   A.   Yes.

10:43:11 17   Q.   Okay.  Then this, I find -- I don't know -- it's also a

10:43:31 18   letter from First NBC Bank from you, dated June 1, 2016.  It

10:43:37 19   says pretty much the same thing, correct?

10:43:39 20   A.   Yes.

10:43:39 21   Q.   This is to whom it may concern?

10:43:42 22   A.   Correct, yes, yes.

10:43:42 23   Q.   That the application -- First NBC Bank has approved the

10:43:47 24   loan for the above purchase?

10:43:49 25   A.   Yes.

| | | |
|---|---|---|
| 10:43:49 | 1 | Q. Do you know of any requirement through this process where |
| 10:44:07 | 2 | the bank required that Wagners Chef cancel its lease, the lease |
| 10:44:14 | 3 | purchase that it had? |
| 10:44:18 | 4 | Do you understand my question? I'm sorry. |
| 10:44:21 | 5 | A. We would never have required the customer to cancel -- no, |
| 10:44:26 | 6 | I don't understand your question. Would you repeat it? |
| 10:44:28 | 7 | Q. There was a lease/purchase that was forming the basis of |
| 10:44:33 | 8 | this entire loan package, correct? |
| 10:44:36 | 9 | A. Well, he had the lease purchase, and he wanted to exercise |
| 10:44:38 | 10 | his option to purchase the real estate. |
| 10:44:42 | 11 | Q. Okay. |
| 10:44:42 | 12 | A. So we came to the bank to borrow the funds. |
| 10:44:46 | 13 | Q. Just to be clear, that lease purchase was in favor of |
| 10:44:49 | 14 | Wagners Chef? |
| 10:44:50 | 15 | A. Correct. Yes. |
| 10:44:50 | 16 | Q. So the bank made no requirement at all that Wagners Chef |
| 10:44:56 | 17 | cancel that lease purchase? |
| 10:45:00 | 18 | A. Well, it's not a yes or a no. Because once we execute the |
| 10:45:10 | 19 | sale, then the lease would be canceled. |
| 10:45:13 | 20 | Q. Okay. But prior to the execution of the sale -- wait. |
| 10:45:18 | 21 | All right. Let me back up. |
| 10:45:22 | 22 | If you -- if you had -- if this loan had gone |
| 10:45:25 | 23 | forward, and the sale had gone forward, where Wagners Chef |
| 10:45:31 | 24 | acquired the property, then you would have expected that that |
| 10:45:35 | 25 | lease purchase would have been canceled, correct? |

*OFFICIAL TRANSCRIPT*

10:45:37 1  A.   Yes.

10:45:37 2  Q.   Okay.  Was there any requirement of the bank that

10:45:42 3  Wagners Chef cancel the lease/purchase without acquiring the

10:45:46 4  property?

10:45:47 5  A.   No.

10:45:47 6  Q.   That wouldn't have made any sense, would it?

10:45:50 7  A.   That would have nothing to do with the bank.

10:45:53 8  Q.   Okay.  Was this involvement in June your last involvement

10:46:24 9  with this loan, to your knowledge?

10:46:29 10  A.   The last involvement would have been the date we closed.

10:46:32 11  Q.   Okay.  You went to the closing?

10:46:35 12  A.   Yes.

10:46:36 13  Q.   So --

10:46:45 14       MR. DIROSA:  I don't have any other questions.

10:46:48 15       THE COURT:  All right.

10:46:49 16          Mr. Beh.

10:46:50 17       MR. BEH:  Yes, sir.

10:46:50 18                          CROSS-EXAMINATION

10:46:52 19  BY MR. BEH:

10:46:52 20  Q.   Ms. Kleindorf, good morning.

10:47:38 21  A.   Hi.

10:47:39 22  Q.   A couple quick questions for you.  You just mentioned

10:47:42 23  something with Mr. DiRosa, and I just want to explore it a

10:47:45 24  little bit.

10:47:46 25       You indicated that it's pretty -- I believe you

**OFFICIAL TRANSCRIPT**

10:47:48 1   indicated that it's pretty common practice for somebody buying

10:47:51 2   real estate to form a separate company to hold the real estate,

10:47:55 3   separate from any of its other businesses; is that correct?

10:47:58 4   A.   Yes.

10:47:58 5   Q.   So is that pretty standard in the real estate market, from

10:48:03 6   your experience?

10:48:03 7   A.   Yes.

10:48:04 8   Q.   So that's not anything nefarious; that's just a standard

10:48:08 9   practice?

10:48:09 10   A.   Yes.

10:48:09 11   Q.   I want to look at a couple documents here.

10:48:31 12         Now, you had gone through a series of memos that you

10:48:35 13   had created regarding this property and -- or this loan

10:48:45 14   application.

10:48:45 15         Excuse me for scrolling through this.  This is what

10:48:52 16   happens when it's got a 300-page exhibit.

10:48:53 17         THE COURT:  All that you're scrolling through is part

10:48:57 18   of that same Exhibit 7?

10:48:58 19         MR. BEH:  Yes, sir.

10:49:00 20         THE COURT:  I didn't realize it was that voluminous.

10:49:03 21         Mr. DiRosa, when you're referring to that, you

10:49:05 22   really ought to give a page number too.  Because if somebody

10:49:09 23   has got to look for the document you had, they've got to scroll

10:49:14 24   through all these documents, you know.

10:49:15 25         Well, both of you should do that, give a page

*OFFICIAL TRANSCRIPT*

10:49:17 1  number, you know.

10:49:17 2          MR. DIROSA:  Yes, sir.  Yes, sir.

10:49:18 3          THE COURT:  Is this gentleman a witness who just walked

10:49:20 4  in?

10:49:20 5              Okay.  All right.  Go ahead.

10:49:24 6  EXAMINATION BY MR. BEH:

10:49:25 7  Q.    Ms. Kleindorf, we're now looking at this letter, the terms

10:49:27 8  and conditions for loan request letter, which is dated June 1,

10:49:32 9  2016, correct?

10:49:34 10 A.    Yes.

10:49:34 11 Q.    Now, my appreciation is that this letter is not a

10:49:40 12 commitment to make a loan; this is just -- these are -- this is

10:49:43 13 a proposal for further discussions?

10:49:45 14 A.    Yes.

10:49:46 15 Q.    Okay.  If you look down here, am I correct that one of the

10:49:53 16 requirements under this is that a -- it says:  Collateral, a

10:50:00 17 valid first multiple indebtedness mortgage on property being

10:50:04 18 purchased?

10:50:04 19 A.    Yes.

10:50:04 20 Q.    So that would be a requirement before the bank would enter

10:50:09 21 into this loan?

10:50:10 22 A.    Yes.

10:50:13 23 Q.    Does the bank use pretty much standard form agreements for

10:50:17 24 mortgages and guarantees?

10:50:17 25 A.    They are standard LaserPro documents, yes.

                    *OFFICIAL TRANSCRIPT*

Q.   Those are pretty standard in the lending industry?

A.   Industry, correct.

Q.   Just so you and I -- let's try not to talk over each other.  I do it, as well, so, let's -- but so those are standard documents?  The loan agreements and the mortgages?

A.   Yes.

Q.   So this loan was going to be made -- at this time, the concept was it was going to be made to Wagners Chef, LLC, and the guarantors would be Jadallah Saed and the real estate entity to be formed --

A.   Yes.

Q.   -- correct?

     Okay.  Let me show you another document, which has previously been marked as Exhibit 11, which is a multiple indebtedness mortgage.

     Is that -- does that appear to be pretty much the standard form?

A.   Yes.

Q.   Were you aware of any tax liens that had been put in place as to Wagners Chef as of the time of this application?

A.   No.  No.

Q.   So looking through this document, which we've marked as Exhibit 11 -- right now, I'm on page -- it's Bates numbered page 426, where it says:  Representations and warranties.

     If you look at subsection D there, it says, you know,

| | |
|---|---|
| 10:52:10 1 | except as previously disclosed to mortgagee in writing -- |
| 10:52:13 2 | The mortgagee is the bank, correct? |
| 10:52:19 3 | A.   Yes. |
| 10:52:19 4 | Q.   -- mortgagor -- who is whoever is mortgaging the |
| 10:52:23 5 | property -- |
| 10:52:23 6 | A.   Yes. |
| 10:52:24 7 | Q.   -- represents and warrants as follows. |
| 10:52:26 8 | And number D is -- number D -- subsection D is:  The |
| 10:52:30 9 | security rights and interest granted here under this mortgage |
| 10:52:34 10 | will at no time became subordinate or junior to any security |
| 10:52:40 11 | rights, interests, liens or claims of, or in favor of any |
| 10:52:45 12 | person, firm, corporation, or other entity. |
| 10:52:47 13 | Did I read that correctly? |
| 10:52:48 14 | A.   Yes. |
| 10:52:49 15 | Q.   So to qualify under that representation, the mortgagee -- |
| 10:52:55 16 | or the mortgagor, the person giving the mortgage to the bank, |
| 10:53:01 17 | has to say that there is no prior security interest that could |
| 10:53:05 18 | attach to that property? |
| 10:53:06 19 | A.   Yes. |
| 10:53:06 20 | Q.   Then, if we continue to scroll down on this -- this is, |
| 10:53:16 21 | again, the mortgage standard form that the bank required -- do |
| 10:53:20 22 | you see where it talks about taxes and liens? |
| 10:53:23 23 | A.   Yes. |
| 10:53:24 24 | Q.   It says:  The following provisions relating to the taxes |
| 10:53:27 25 | and liens on the property are part of this mortgage. |

10:53:30 1          Is that correct?

10:53:32 2     A.    Yes.

10:53:32 3     Q.    Then it says:  Payment.  Mortgagor -- which, again, is the

10:53:36 4     borrower -- shall promptly pay or cause to be paid when due,

10:53:41 5     all taxes, local and special assessments and government and

10:53:45 6     other charges, as well as all public and/or private utility

10:53:49 7     charges of every type and description that may from time to

10:53:53 8     time be imposed, assessed and levied against the mortgaged

10:53:58 9     property or the mortgagor.

10:54:01 10          Did I read that correctly?

10:54:02 11    A.    Yes.

10:54:03 12    Q.    So, again, if there is a lien that is out there that

10:54:07 13    attaches to the mortgagor, the borrower in this case, that

10:54:14 14    would not be possible unless -- they would have to pay off that

10:54:17 15    lien; is that correct?

10:54:18 16    A.    Yes.

10:54:19 17    Q.    All of these terms, from my general experience, are not

10:54:24 18    really subject to negotiation between the lender and the

10:54:27 19    borrower.  It's pretty much, sign the mortgage as it is, or you

10:54:32 20    don't get the money; is that correct?

10:54:33 21    A.    Yes.

10:54:33 22    Q.    Ms. Kleindorf, I'm going to show you another exhibit,

10:55:17 23    which is previously marked as Exhibit 58, which is -- it says:

10:55:32 24    Notice of state tax assessment and lien addressed to

10:55:38 25    Wagners Chef.

*OFFICIAL TRANSCRIPT*

10:55:38 1    Do you see that?

10:55:38 2 A.    Yes.

10:55:39 3 Q.    That indicates that there is a tax lien in the amount of

10:55:48 4 $438,161 as of the date this was filed, correct?

10:55:52 5 A.    That's what it says, yes.

10:55:54 6 Q.    That was for the tax period ending May 31, 2013?

10:56:00 7 A.    Yes.

10:56:01 8 Q.    Then there is another sales tax lien for the period ending

10:56:06 9 November 30, 2013, in the amount of $47,000, correct?

10:56:14 10 A.    Yes.

10:56:15 11 Q.    So under those provisions that we had just looked at, this

10:56:20 12 would have had to have been cleared up before Wagners Chef

10:56:23 13 could validly sign the mortgage; is that correct?

10:56:29 14 A.    Can I --

10:56:29 15 Q.    Yes, please.

10:56:30 16 A.    The closing attorney would have had to clear these items

10:56:33 17 for the bank prior to the act of sale.

10:56:36 18 Q.    If they couldn't be cleared, the act of sale wouldn't go

10:56:39 19 through?

10:56:39 20 A.    Absolutely not.  It would not go through.

10:56:42 21 Q.    So if we go back to -- so if we go back to the terms and

10:57:07 22 conditions that y'all were discussing in your June 1, 2016,

10:57:13 23 letter, it also says, under special conditions:  Other terms

10:57:29 24 and conditions that are normal in transactions similar to the

10:57:33 25 one outlined herein will be included in the closing

*OFFICIAL TRANSCRIPT*

1  requirements.

2       Am I correctly reading that that's saying, this is a

3  general outline, but there may be other requirements not stated

4  in this letter?

5  A.   Yes, sir.

6  Q.   Then, it also says:  This proposal is subject to final

7  review and approval by First NBC Bank of the final negotiated

8  contracts and commitments.

9  A.   Yes.

10  Q.   So, again, there was still more work that needed to be

11  done on this, but this was the initial proposal so y'all could

12  figure out what the terms were going to be?

13  A.   Yes.

14  Q.   In the end, there was some changes made to this loan prior

15  to it being actually closed; is that correct?

16  A.   Yes.

17  Q.   In fact, let's go back -- again, we're on Exhibit 7.  On

18  page 2 is an interoffice memorandum dated July 5, 2016.  Is

19  that your signature on that?

20  A.   Yes, sir.

21  Q.   This indicates that there is -- the prior approval was for

22  the borrower to be Wagners Chef, LLC, and the guarantor to be

23  Jadallah K. Saed; is that correct?

24  A.   Yes.

25  Q.   Then that was changed to the borrower would be a new

10:59:00 1 entity to be formed?

10:59:01 2 A.   Yes.

10:59:01 3 Q.   Then it would be guaranteed by Wagners Chef,

10:59:07 4 Jadallah Saed, and new entity to be formed for real estate

10:59:11 5 holding company?

10:59:11 6 A.   Yes.

10:59:12 7 Q.   So, as of that -- so both of those changes were approved

10:59:16 8 by the bank?

10:59:16 9 A.   Yes.

10:59:17 10 Q.   Okay.  So not only do we now have -- is that two separate

10:59:22 11 entities, I'm presuming, the borrower being a new entity, and

10:59:25 12 then one of the guarantors being a new entity?

10:59:28 13 A.   Yes.

10:59:29 14 Q.   That's not unusual to have changes in the names and the

10:59:38 15 identities of entities in real estate transactions, correct?

10:59:41 16 A.   Yes.

10:59:41 17 Q.   It's not unusual?  It happens rather often?

10:59:44 18 A.   It happens often.

10:59:46 19 Q.   Just like having a separate -- forming a separate LLC to

10:59:50 20 be a real estate holding company is not an unusual event in the

10:59:54 21 world of real estate transactions?

10:59:56 22 A.   That's correct.

10:59:56 23 Q.   All right.  Now, as part of the closing on this

11:00:17 24 transaction -- well, first of all, what date -- do you recall

11:00:21 25 when the transaction closed, the closing of this one?

*OFFICIAL TRANSCRIPT*

| | | |
|---|---|---|
| 11:00:27 | 1 | A. No. |
| 11:00:27 | 2 | Q. Well, let's look at a couple things. |
| 11:00:29 | 3 | A. It would be the mortgage. |
| 11:00:31 | 4 | Q. Right. First off, let's look at the act of cash sale. |
| 11:00:50 | 5 | So this is the act of cash sale. |
| 11:00:52 | 6 | MR. BEH: This is Exhibit Number 10, Your Honor. |
| 11:00:52 | 7 | EXAMINATION BY MR. BEH: |
| 11:00:54 | 8 | Q. It's between -- where Wagner World is selling the property |
| 11:00:58 | 9 | to Jadallah Enterprises; is that correct? |
| 11:01:00 | 10 | A. Yes. |
| 11:01:02 | 11 | Q. So this is the transaction that was financed through the |
| 11:01:06 | 12 | loan that was given by First NBC Bank? |
| 11:01:08 | 13 | A. Yes. |
| 11:01:09 | 14 | Q. That was dated -- signed on July 7th by Wagner World, and |
| 11:01:22 | 15 | then July 8th by Jadallah Enterprises, correct? |
| 11:01:26 | 16 | A. Yes. |
| 11:01:28 | 17 | Q. Now, are you -- do you participate in the filing of real |
| 11:01:34 | 18 | estate documents into the public record? |
| 11:01:36 | 19 | A. Not at all. |
| 11:01:36 | 20 | Q. Are you familiar with that concept at all? |
| 11:01:39 | 21 | A. I'm a notary. |
| 11:01:40 | 22 | Q. So you understand that when you're dealing with real |
| 11:01:44 | 23 | estate, especially for things like the sale of real estate, |
| 11:01:46 | 24 | that needs to then be filed into the public record? |
| 11:01:49 | 25 | A. Yes. |

*OFFICIAL TRANSCRIPT*

11:01:49 1    Q.    If you look at the bottom of this page, this indicates

11:01:57 2    that -- the stamp here says the Honorable Dale N. Atkins, Clerk

11:02:06 3    of Civil District Court.  That indicates that this was filed in

11:02:10 4    the public record, correct?

11:02:10 5    A.    Yes.

11:02:11 6    Q.    This says it was filed at 2:21:37 p.m., correct?

11:02:20 7    A.    Yes.

11:02:20 8    Q.    So that was the sale document.

11:02:25 9          Then, if we go and look at -- this is the mortgage

11:02:32 10   document that we previously looked at.  The mortgage lists the

11:02:37 11   borrower is Ahmed 1; the mortgagor, meaning the property owner,

11:02:43 12   as Jadallah Enterprises; correct?

11:02:44 13   A.    Yes.

11:02:44 14   Q.    This is giving the bank a mortgage interest in the real

11:02:53 15   estate as security for the loan; is that correct?

11:02:56 16   A.    Yes.  Yes.

11:02:56 17   Q.    Would the bank have considered making this loan without a

11:03:01 18   mortgage on the property?

11:03:02 19   A.    No.

11:03:02 20   Q.    Because that's the primary security to the bank?

11:03:07 21   A.    Yes.

11:03:08 22   Q.    Again, this was also filed into the public record at

11:03:22 23   2:21:39 p.m.  So that's a couple seconds after the act of cash

11:03:27 24   sale.

11:03:27 25   A.    (Witness nods head affirmatively.)  Yes.

*OFFICIAL TRANSCRIPT*

Q.    There is another document that you talked about with
Mr. DiRosa, which is the act of cancellation of lease.  Do you
recall that conversation?  You were talking about --

A.    Yes.

Q.    -- he was asking why you would cancel the lease?

A.    The lease, yes, yes.

Q.    I believe you had indicated that -- well, you'd have to
cancel the lease after the sale, because the landlord under
this lease now no longer has an interest in the property; is
that correct?

A.    Yes.

Q.    If you look on this document, it was also filed into the
public record, at 2:21 p.m. and 38 seconds?

A.    Yes.

Q.    So it was filed after the act of cash sale.  I mean, they
were filed at the same time, but it's first the cash sale, then
the cancellation of the lease?

A.    Yes.

Q.    As you said, that's required at that point because --

A.    They're moving targets, and everything happens
simultaneously.

Q.    Right.  But if Wagner World, the seller of the property,
has sold it, it can't have a lease on it anymore?

A.    Yes.

Q.    Now, also, I believe we looked and there -- on that -- on

Exhibit 7, we looked at this, and we've got several guarantors:
Wagners Chef, Jadallah K. Saed, and the new entity to be
formed; is that correct?

A.   Yes.

Q.   So then, if we come down -- here is another document.
It's called Assignment of Leases and Rents.  Is that a standard
document?

A.   Yes.  When --

Q.   Go ahead, please.

A.   Yes.  When we have real estate that the cash flow involved
is tenant income, we do an assignment of lease and rents, so
that if something happens, the bank can collect those rents and
put towards the loan payment, in the event of a default or
situation such as that.

Q.   Gotcha.  So, in this case, you've got Jadallah Enterprises
is pledging all -- or assigning all of its leases and rents
collected on the property to First NBC as further security for
the loan?

A.   Yes.  Yes.

        THE COURT:  There is some water there, if you need it.

        THE WITNESS:  Thank you.

EXAMINATION BY MR. BEH:

Q.   Then, here is a similar document.  Again, it's -- these
are both dated July 8, 2016, the same date as the
transaction --

11:07:22 1    A.    Yes.

11:07:22 2    Q.    -- we're talking about.

11:07:24 3          This is an assignment of leases by Ahmed 1 to First

11:07:30 4    NBC.  Same thing?

11:07:31 5    A.    Same thing, yes, sir.

11:07:33 6    Q.    Do you recall if Wagners -- never mind.  There it is.

11:08:20 7          Here is another document, which is also -- this is a

11:08:25 8    commercial guaranty by Wagners Chef in favor of First NBC Bank;

11:08:33 9    is that correct?

11:08:33 10   A.    Yes.

11:08:33 11   Q.    So now, as collateral for this loan, you've got the

11:08:37 12   mortgage on the property, which is -- the property is going to

11:08:41 13   be owned by Jadallah Enterprises; is that correct?

11:08:43 14   A.    Yes.  Yes.

11:08:43 15   Q.    You've got the pledge of collateral -- or pledge of rents

11:08:50 16   and leases by Jadallah Enterprises, you've got the same by

11:08:54 17   Ahmed 1, and you've got a guaranty by Wagners Chef?

11:09:01 18   A.    Yes.

11:09:02 19   Q.    So when the loan finally closed, that has all been bundled

11:09:07 20   together as the security for the loan?

11:09:10 21   A.    Yes.

11:09:10 22   Q.    So if you were looking back at your analysis, the credit

11:09:13 23   analysis that you had done previously, all of that is still

11:09:18 24   there, as far as the underlying -- the cash flow from

11:09:23 25   Wagners Chef is there because it's a guarantor.  You've got the

11:09:26  1    rents and leases that's still there because of Ahmed 1 and

11:09:31  2    Jadallah Enterprises.  Is that all correct?

11:09:33  3    A.   That's correct, yes.

11:09:34  4    Q.   As we said before, the formation of Jadallah Enterprises

11:09:40  5    or the use of Jadallah Enterprises as a holding company just

11:09:43  6    for the real estate is not unusual at all in the real estate

11:09:47  7    world?

11:09:47  8    A.   Correct.

11:09:47  9    Q.   Now, as part of your credit file, we were looking at some

11:10:42 10    tax returns.  I'll get there eventually.

11:11:01 11         Okay.  This is the tax returns for Wagners Chef for

11:11:06 12    the tax year of 2015, correct?

11:11:09 13    A.   Yes.

11:11:10 14    Q.   This was what you reviewed as part of your underwriting?

11:11:15 15    A.   Yes.

11:11:16 16    Q.   This shows that this was prepared by Mr. Sewell, and it's

11:11:24 17    dated March 1, 2016.

11:11:27 18    A.   Yes.

11:11:28 19    Q.   It shows an income of $4,322,000.

11:11:28 20    A.   Yes.

11:11:40 21    Q.   I'm going to leave off the last three digits.

11:11:40 22         That's correct?

11:11:44 23    A.   Yes.

11:11:44 24         THE COURT:  What exhibit are you on now?

11:11:48 25         MR. BEH:  I'm on Exhibit 7, Your Honor.  It's page 205.

**OFFICIAL TRANSCRIPT**

11:11:51 1          THE COURT:  Okay.

11:11:51 2  EXAMINATION BY MR. BEH:

11:11:54 3  Q.   So, then, you've got the gross receipts, gross revenue,

11:12:00 4  that's every dollars coming in.  Then you've got expenses going

11:12:04 5  out, correct?

11:12:05 6  A.   Yes.

11:12:05 7  Q.   This showed, at the end, an ordinary business income of

11:12:10 8  $55,000?

11:12:12 9  A.   Yes.

11:12:12 10 Q.   Now, you had also looked at -- you looked at some

11:12:23 11 financial statements that Mr. Saed had produced, which showed a

11:12:30 12 $1.5 million valuation on the property -- or on the business;

11:12:36 13 is that correct?

11:12:36 14 A.   Yes.

11:12:36 15 Q.   Now, he also produced to you all this, which is --

11:12:41 16         MR. BEH:  Your Honor, this is, again, Exhibit 7,

11:12:46 17 page 217.

11:12:46 18 EXAMINATION BY MR. BEH:

11:12:49 19 Q.   -- which shows you the property that's owned by

11:12:54 20 Wagners Chef; is that correct?

11:12:58 21 A.   Yes.  Yes.

11:12:59 22 Q.   Because this is the depreciation detail, right?

11:13:02 23 A.   That's their tax return, yes.

11:13:04 24 Q.   Right.  Okay.  This is part of the tax return.

11:13:07 25         If you look at this, it's got a camera system, some

**OFFICIAL TRANSCRIPT**

11:13:11  1  improvements.  Then it's got a $1.5 million valuation, and it

11:13:17  2  just says goodwill.  Do you see that?

11:13:21  3  A.    Yes.

11:13:21  4  Q.    Now, goodwill is an accounting concept.  Are you familiar

11:13:26  5  with the concept of goodwill?

11:13:27  6  A.    Not enough to speak about it.

11:13:30  7  Q.    Okay.  But you were aware that that's where -- that was --

11:13:36  8  the breakdown of the value of Wagners Chef was shown in this,

11:13:42  9  and a substantial part of it was based on goodwill?

11:13:47 10  A.    I would not have looked at this.  Our credit analyst would

11:13:53 11  have reviewed this.

11:13:53 12  Q.    Okay.

11:13:54 13  A.    But I would have reviewed the personal financial statement

11:13:57 14  that was -- he valued it at one-and-a-half million.

11:14:01 15  Q.    But he also provided this documentation to the bank --

11:14:04 16  A.    To support it.

11:14:06 17  Q.    -- to support it and to show where it came from.

11:14:12 18        Then, if we look -- so that's the -- so the 2015 tax

11:14:22 19  returns showed an income of $55,000.  I'm trying to get back up

11:14:30 20  there.  There we go.

11:14:32 21        Right?

11:14:34 22  A.    Yes.

11:14:34 23  Q.    It says:  Ordinary business income.

11:14:36 24        Now, there still may be costs and other things coming

11:14:39 25  out of that; but that's -- for that -- the ordinary business

11:14:42 1    income, that's the amount that was presented to you --

11:14:45 2    A.    Yes.

11:14:45 3    Q.    -- as the justification for the loan?

11:14:48 4         Then, if we go down a few more, was -- 2015 wasn't

11:15:04 5    the only tax year that tax returns were provided for the bank

11:15:09 6    by Mr. Saed?

11:15:11 7    A.    That's correct.

11:15:11 8    Q.    Right.  I've just pulled up the 2014 tax returns.

11:15:15 9    A.    Yes.

11:15:15 10   Q.    This shows -- again, we've got gross sales receipts of

11:15:23 11   4.7 million, but then we've got ordinary business income of

11:15:29 12   34,000.

11:15:30 13   A.    Yes.

11:15:30 14   Q.    Is that correct?

11:15:32 15   A.    Correct.

11:15:32 16   Q.    Again, that one was -- is dated November 5, 2015.

11:15:40 17   A.    Yes.

11:15:41 18   Q.    So, that was all the -- that was -- all of what we've just

11:15:49 19   gone through was information that was provided to the bank as

11:15:52 20   part of the underwriting process, correct?

11:15:56 21        Or as part of the loan application process?  Let me

11:15:59 22   put that it way.

11:16:00 23   A.    That's not all.  There was additional information

11:16:03 24   provided.

11:16:03 25   Q.    Correct.  Correct.  But what we've looked at, everything

*OFFICIAL TRANSCRIPT*

11:16:07 1  in Exhibit 7 is from the bank, correct?

11:16:10 2  A.   Yes.

11:16:10 3  Q.   So I want to go back a little bit.  The tax lien that we

11:16:30 4  looked at a little while ago and the representations that are

11:16:34 5  in the mortgage that we looked at, that there is no prior

11:16:37 6  encumbrances, and that all taxes have been or will be paid.

11:16:41 7       If the tax lien was still outstanding, those

11:16:46 8  representations could not be made, correct?

11:16:48 9  A.   Correct.

11:16:48 10  Q.   Without the signing of the mortgage, the loan wouldn't

11:16:55 11  happen?

11:16:55 12  A.   Correct.

11:16:55 13  Q.   But if the owner of the property was not Wagners Chef, but

11:17:03 14  was Jadallah Enterprises, that tax lien wouldn't apply; is that

11:17:09 15  correct?

11:17:09 16  A.   I can't answer that.

11:17:10 17  Q.   That's fair.

11:17:13 18       MR. BEH:  That's all the questions I have right now,

11:17:40 19  Your Honor.

11:17:41 20       THE COURT:  Any redirect?

11:17:42 21       MR. DIROSA:  Yes, sir.

11:17:43 22            REDIRECT EXAMINATION

11:17:44 23  BY MR. DIROSA:

11:17:44 24  Q.   Ms. Kleindorf, Mr. Beh discussed this sales tax lien of

11:18:54 25  $485,843.76.  That is from June 4th of 2014.

**OFFICIAL TRANSCRIPT**

11:19:09 1        At any time through this process, did Mr. Saed happen

11:19:10 2   to mention to you that Wagners Chef had a $485,000 sales tax

11:19:16 3   lien pending against it?

11:19:17 4   A.   I don't remember that.

11:19:17 5   Q.   But that would have been something that would have been

11:19:20 6   significant enough to put in the file, correct?

11:19:23 7   A.   Yes.

11:19:24 8   Q.   That probably would have been something significant enough

11:19:26 9   to deny Wagners Chef the loan?

11:19:29 10  A.   I can't answer that because it could have been satisfied

11:19:34 11  at the closing from loan proceeds.

11:19:37 12  Q.   Okay.  Did Mr. Saed happen to mention to the bank that

11:19:46 13  Brothers Petroleum was in the midst of a lawsuit against them?

11:19:49 14  A.   No.

11:19:49 15  Q.   Did Mr. Saed mention to the bank -- and by saying against

11:19:58 16  them, I mean, against Wagners Chef -- that there was another

11:20:00 17  company that was in the midst of a lawsuit for breach of

11:20:05 18  contract against Wagners Chef?

11:20:05 19  A.   No, sir.

11:20:06 20  Q.   Was that ever mentioned to the bank?

11:20:08 21  A.   No, sir.

11:20:09 22  Q.   Those would have been significant factors for the bank to

11:20:14 23  know?

11:20:14 24  A.   Yes.

11:20:15 25  Q.   Okay.  When Mr. Saed files this financial statement that

*OFFICIAL TRANSCRIPT*

we've looked at and says that he's got closely held investments

and securities of a million five hundred thousand --

        THE COURT:  Exhibit and page number.

        MR. DIROSA:  I'm sorry.  That's from Exhibit 7, page

00231.

        THE COURT:  Okay.

EXAMINATION BY MR. DIROSA:

Q.   -- did he tell you whether that was net after the tax lien

or whether the actual amount was something closer to one

million five hundred thousand minus the tax lien?

A.   No, sir.

Q.   Now, Mr. Beh also discussed with you the canceling of the

lease, and that it's a normal process when you go through a

loan that you would cancel the lease?

A.   Correct.  Yes.

Q.   Let's say I live in an apartment building, and I have a

lease, and it's recorded, and somebody else buys the apartment

building.  I don't lose my lease, do I?

A.   Not to my knowledge, no.  I don't know the law; but, if

it's recorded, no.  Typically, from what I understand, no.

Q.   It stays on the books?

A.   Correct.

Q.   So if Wagners Chef had a lease with an option to purchase,

and Wagners Chef, itself, had purchased the property, then it

would make sense to cancel the lease because you don't lease

<sub>11:22:23</sub> 1  property to yourself, right?

<sub>11:22:25</sub> 2       MR. BEH:  Your Honor, I'm going to object.  I think

<sub>11:22:27</sub> 3  this is beyond the scope.  Also, I think it's beyond this

<sub>11:22:27</sub> 4  witness' --

<sub>11:22:27</sub> 5       THE COURT:  Overruled.  Overruled.

<sub>11:22:31</sub> 6  EXAMINATION BY MR. DIROSA:

<sub>11:22:31</sub> 7  Q.   If Wagners Chef had purchased the property in its own

<sub>11:22:39</sub> 8  name, it would make sense to cancel the lease because

<sub>11:22:42</sub> 9  Wagners Chef is not going to lease the property to itself?

<sub>11:22:44</sub> 10  A.   Correct.

<sub>11:22:46</sub> 11       THE COURT:  Although I think that question answers

<sub>11:22:51</sub> 12  itself.  I don't think you have to be a lawyer to know that.

<sub>11:22:54</sub> 13            You can't lease property to yourself, okay.  We

<sub>11:22:57</sub> 14  know that.  So I don't think you can need to ask this witness

<sub>11:23:00</sub> 15  that.

<sub>11:23:01</sub> 16  EXAMINATION BY MR. DIROSA:

<sub>11:23:06</sub> 17  Q.   So if Jadallah Enterprises wound up acquiring this

<sub>11:23:10</sub> 18  property, there was no reason that the lease to Wagners Chef

<sub>11:23:14</sub> 19  could not just continue to go forward, to your knowledge, just

<sub>11:23:19</sub> 20  like if I'm in an apartment, my lease keeps going forward?

<sub>11:23:25</sub> 21       THE COURT:  I'm not sure that's part of this witness's

<sub>11:23:29</sub> 22  testimony here, what she's here to testify about.

<sub>11:23:33</sub> 23            This is a banking officer.  You're asking her

<sub>11:23:37</sub> 24  legal questions about leases and real estate law and so forth.

<sub>11:23:40</sub> 25  So I'm going to sustain my own objection to the question,

*OFFICIAL TRANSCRIPT*

11:23:44 1  Mr. DiRosa.

11:23:44 2  EXAMINATION BY MR. DIROSA:

11:23:52 3  Q.   Now, the lease for Wagners Chef was, in fact, recorded,

11:23:58 4  was it not -- or do you know?

11:24:01 5  A.   I don't know.

11:24:01 6       MR. BEH:  Your Honor, I'm going to ask the same

11:24:05 7  objection.

11:24:05 8       THE COURT:  Yeah, this whole line of questioning -- I

11:24:06 9  think you need to move on, Mr. DiRosa.

11:24:08 10       MR. DIROSA:  Well, I just want to correct --

11:24:10 11       THE COURT:  No, just move on to something else, okay.

11:24:14 12  EXAMINATION BY MR. DIROSA:

11:24:15 13  Q.   Then you said it's not unusual that a real estate holding

11:24:19 14  company would acquire a piece of property.

11:24:22 15  A.   Yes.

11:24:23 16  Q.   If that real estate holding company was created more than

11:24:30 17  a year prior to this sale and had done absolutely no business

11:24:42 18  whatsoever, would that be unusual?

11:24:48 19  A.   No.

11:24:48 20       MR. BEH:  Objection.

11:24:49 21       THE COURT:  Sustain it.  Sustain the objection.

11:24:51 22  EXAMINATION BY MR. DIROSA:

11:25:09 23  Q.   Okay.  Then you said, I believe, with this tax lien --

11:25:18 24  that the sale to Wagners Chef could not go forward with the

11:25:22 25  tax lien unless that tax lien was cleared, correct?

**OFFICIAL TRANSCRIPT**

A.   Yes.  That would -- we would have relied on our closing
attorney to clear all those items.

Q.   What you mean by cleared is taking the money out of the
loan to pay that tax lien off, correct?

A.   If that's -- yeah -- or -- yes.  Typically, yes.

Q.   So by moving this into Jadallah Enterprises, this tax lien
was not cleared, it was just bypassed --

        MR. BEH:  Objection, Your Honor.

        MR. DIROSA:  -- correct?

        MR. BEH:  I think that's beyond the scope of this
witness' --

        THE COURT:  Sustained.  I think it is.

EXAMINATION BY MR. DIROSA:

Q.   Now, part of this loan package was for Mr. Saed to buy his
partner out, correct?

A.   My understanding was that it was to buy out -- to exercise
his right to -- for the lease/purchase of the property.

        THE WITNESS:  Your Honor, I think that -- I'm going
back, you know, to my memory -- part of the proceeds was to pay
off some third-party finance -- it's on the credit memo, if you
can get to that.  The specific purpose of the loan is on the
credit memo.

EXAMINATION BY MR. DIROSA:

Q.   I know I saw it in here.

        On the pre-review committee -- let me show you

**OFFICIAL TRANSCRIPT**

11:27:56 1　that -- the use of the funds:  Refinance of a lease/purchase

11:28:00 2　gas station/store with a four-bay strip center located at Chef

11:28:06 3　and Louisa Street, and payoff of a third-party financing -- pay

11:28:11 4　off third-party financing used to buy out the partner for

11:28:15 5　375,000.

11:28:15 6　A.　Yes, sir.

11:28:16 7　Q.　That partner had a one-third interest in the property?

11:28:22 8　A.　I don't know what his interest was.

11:28:23 9　Q.　But it was Mr. Saed's intention to pay off his partner

11:28:28 10　$375,000?

11:28:31 11　A.　That was my understanding.

11:28:32 12　Q.　Okay.  Mr. Beh went into some detail about Mr. Saed's tax

11:29:22 13　return.  Part of what Mr. Saed submitted to you in his loan

11:29:28 14　package -- and this is Exhibit 7, pages 182 -- where are the

11:29:28 15　other ones --

11:30:27 16　　　Well, Mr. Saed submitted in connection with this

11:30:31 17　three subleases:  One to RePlay Boutique, this is Exhibit 7,

11:30:39 18　page 182 through 187; another one to SAG Beauty, this is

11:31:11 19　Exhibit 7, pages 188 to 193; and, a third one to Emad Wireless,

11:31:25 20　Exhibit 7, pages 194 through 198.

11:31:29 21　　　Based on that, as we discussed earlier, you came

11:31:33 22　up -- these all started, oddly enough, on the same day, 26th of

11:31:42 23　February -- they start on February 10, 2015, and terminate five

11:31:50 24　years later.

11:31:53 25　　　THE COURT:  You're making a lot of statements,

*OFFICIAL TRANSCRIPT*

11:31:55  1    Mr. DiRosa, but you haven't asked a single question about this

11:31:59  2    to the witness.

11:31:59  3            MR. DIROSA:  Yes, sir.

11:31:59  4    EXAMINATION BY MR. DIROSA:

11:32:00  5    Q.    As we discussed, that's $288,000 a year in income?

11:32:03  6    A.    Yes.

11:32:04  7    Q.    When we look at the tax return submitted by Mr. Saed for

11:32:14  8    Wagners Chef -- and this is Exhibit 7, page 218 -- did he

11:32:19  9    mention how come on his tax return he only shows $128,000 of

11:32:25 10    income?

11:32:26 11    A.    No.

11:32:27 12    Q.    Okay.  So, if -- now, in all fairness, this is a 2015 tax

11:32:45 13    return, and these leases don't begin until February of 2015.

11:32:49 14            So let's just say there is ten months of the lease,

11:32:52 15    March through December.  The Imad Wireless lease is for $6,000

11:32:58 16    a month in rent.  The SAG Beauty lease is for $9,000 a month in

11:33:14 17    rent.  So, for ten months, he would have received $90,000 --

11:33:17 18            THE COURT:  Wait, wait, wait.  I think we have an

11:33:19 19    objection.

11:33:19 20            MR. BEH:  Your Honor, I mean, I'm raising an objection

11:33:24 21    that this is not the proper witness to go through each of these

11:33:27 22    leases.  Yes, she had them in her file, but --

11:33:29 23            THE COURT:  I agree with that.  I sustain the

11:33:31 24    objection.

11:33:31 25            Mr. DiRosa, you're testifying, essentially,

*OFFICIAL TRANSCRIPT*

11:33:35 1  without asking the witness questions, which is improper.

11:33:47 2          Do you have another question for the witness?

11:33:53 3      MR. DIROSA:  Let's see.  No, I do not.

11:33:59 4      THE COURT:  All right.  Thank you, ma'am.  You're

11:34:02 5  released.

11:34:02 6      THE WITNESS:  Thank you.

11:34:03 7      THE COURT:  All right.  We going to take an early lunch

11:34:05 8  today.  It's about 11:35, I think, if I'm looking at that clock

11:34:10 9  correctly.  So we will back in one hour, okay, at 12:35.

11:34:14 10       So if you all will, please, again, close your

11:34:17 11  notebooks, leave them on your chair seats or under your chairs.

11:34:21 12       Remember when you're away during lunch, please do

11:34:24 13  not talk about the case with anyone, even among yourselves or

11:34:27 14  anyone else.  When you return from lunch, report first directly

11:34:30 15  back to the jury room.  As soon as everyone is here, we'll call

11:34:34 16  you in, okay.  See you in one hour.

11:34:38 17      (WHEREUPON, at 11:34 a.m., the jury panel leaves the

11:35:09 18  courtroom.)

11:35:09 19      THE COURT:  All right.  The jury is out of the

11:35:11 20  courtroom.

11:35:13 21       I just want to suggest that you all should be a

11:35:18 22  little better organized.  You're fumbling around with exhibits,

11:35:23 23  not saying what page y'all are on or looking for pages.  It

11:35:28 24  just seems to be a little disorganized, and it's distracting to

11:35:33 25  the jury, I can tell you.

*OFFICIAL TRANSCRIPT*

Also, I'm looking at your exhibit books.  This Exhibit 7 appears to be a couple hundred pages.  I know you all are referring to several pages, but I suspect you're probably not going to ultimately refer to 10 percent of those pages.

Then, the next exhibit, Exhibit 8, appears to be equally voluminous.

I don't want to send these bulky books back there to the jury room during deliberations with a couple hundred pages for all these exhibits, and the jury is not going to know what the heck to do with this.

So you all need to figure out, before this goes to the jury, how to revise these books and pull out stuff that hasn't been used, that's not relevant or whatever, before we send this to the jury.

All right.  We'll be back in an hour.

MR. DIROSA:  Thank you, sir.

(WHEREUPON, at 11:36 a.m., the Court was in luncheon recess.)

*    *    *

**P-R-O-C-E-E-D-I-N-G-S**

TUESDAY, SEPTEMBER 24, 2019

A F T E R N O O N   S E S S I O N

(COURT CALLED TO ORDER)


                THE DEPUTY CLERK:  All rise.

                THE COURT:  All right.  Everyone appears to be present.

                        It looks like you're about to say something,

Mr. DiRosa.

                MR. DIROSA:  Yes, sir.  We were just going to update

you on how we think things are progressing.

                        I will be calling Mr. Saed to testify.

                THE COURT:  Next?

                MR. DIROSA:  I can't imagine that that would go past

three o'clock.

                THE COURT:  You're going to call him next?

                MR. DIROSA:  Yes, sir.

                        Then, after that, I plan to rest, and I think

Mr. Beh has two witnesses after that.

                MR. BEH:  Two relatively short witnesses, Your Honor.

So I think there is a pretty good chance we can get done with

all the testimony today.

                        I guess, what we were thinking is maybe give us

this evening to review the charges, and come in in the morning

12:40:53  1    and do closings.

12:40:53  2          THE COURT:  Yes.  If we finish the testimony this

12:40:54  3    afternoon, that will work well.  We can have the jury come back

12:40:58  4    at the normal time and do closings and legal instructions and

12:41:02  5    all.

12:41:03  6             Okay.  All right.  Sounds good.

12:41:04  7          MR. BEH:  Thank you, Your Honor.

12:41:07  8          THE COURT:  All right.  Let's bring in the jury.

12:41:10  9          (WHEREUPON, at 12:41 p.m., the jury panel enters the

12:41:36 10    courtroom.)

12:41:36 11          THE COURT:  All right, ladies and gentlemen.  Welcome

12:41:38 12    back.  Please be seated.

12:41:39 13             We're going to continue on with the plaintiff's

12:41:42 14    case.

12:41:43 15             Mr. DiRosa, you may call your next witness.

12:41:44 16          MR. DIROSA:  Jadallah Saed.

12:41:47 17          THE COURT:  Mr. Saed.

12:41:50 18          THE DEPUTY CLERK:  Raise your right hand.  Do you

         19    solemnly swear the testimony which you are about to give will

         20    be the truth, the whole truth and nothing but the truth, so

         21    help you God?

         22          THE WITNESS:  Yes, I do.

         23                        **JADALLAH SAED**

         24     was called as a witness and, after being first duly sworn by

         25      the Clerk, was examined and testified on his oath as follows:

                              *OFFICIAL TRANSCRIPT*

1          THE DEPUTY CLERK:  Please have a seat.  State your

2    name, and spell it for the record.

12:42:15   3          THE WITNESS:  Jadallah Saed.  J-A-D-A-L-L-A-H, Saed,

12:42:19   4    S-A-E-D.

12:42:20   5                      DIRECT EXAMINATION

12:42:21   6    BY MR. DIROSA:

12:42:21   7    Q.   Mr. Saed, it was Wagners Chef that started the litigation

12:42:26   8    about this fuel contract, correct?

12:42:28   9    A.   Correct.

12:42:28  10    Q.   That was in July of 2014, correct?  I'm not trying to

12:42:39  11    trick you.  It was.

12:42:39  12    A.   Correct.

12:42:46  13    Q.   What was it that occurred -- let me see.

12:42:49  14          I'm going to show you Exhibit Number 4 -- this is

12:42:52  15    page 70 -- Mr. Beh sent to notify our client that Wagners Chef

12:43:06  16    places Brothers Petroleum on notice that Wagners Chef will no

12:43:09  17    longer accept deliveries of gasoline under the current terms

12:43:12  18    which are stated in the contract.

12:43:14  19          Now, Wagners Chef continued from July of 2014 till

12:43:21  20    the date of this notice, April 13th of 2015, to buy gas from

12:43:29  21    Brothers, correct?

12:43:30  22    A.   Correct.

12:43:30  23    Q.   What was it that happened between July of 2014 and

12:43:35  24    April 13th of 2015 that made you believe that you no longer had

12:43:41  25    to honor this contract?

12:43:47  1    MR. BEH:  Your Honor, I'm going to object just to the

12:43:49  2  extent none of the breach of contract issues are before this

12:43:54  3  Court, and I think this is going back --

12:43:55  4    THE COURT:  Well, no, but this could be relevant to the

12:44:00  5  unfair trade practice.  I'll let him answer.

12:44:01  6    Sir, pull that microphone up more directly in

12:44:05  7  front.  There you go.  Go ahead.  Okay, now.

12:44:07  8    THE WITNESS:  In 2013, when I purchased Wagners Chef,

12:44:11  9  and I don't know they have any contract is there.

12:44:16 10  EXAMINATION BY MR. DIROSA:

12:44:17 11  Q.    But my question is:  What occurred between July of 2014

12:44:21 12  and April 13th of 2015 that made you believe you no longer had

12:44:28 13  to buy fuel from Brothers Petroleum?

12:44:32 14  A.    Because Wagner World is putting me in default because

12:44:37 15  Brothers Petroleum is file a lien at the property at that time.

12:44:42 16    MR. DIROSA:  Let me object unless someone from

12:44:46 17  Wagner World is going to come testify about this.

12:44:50 18    THE COURT:  Well, I'm not totally clear on what the

12:44:53 19  answer was.  Why don't you try to clarify.  Go ahead.

12:45:00 20    Basically, you want to know what provoked you or

12:45:05 21  made you decide to have your attorney -- that letter was sent

12:45:09 22  by Mr. Beh, right?

12:45:10 23    MR. DIROSA:  Yes, sir.

12:45:10 24    THE COURT:  -- that you asked your attorney to send

12:45:13 25  that letter.  That's what he's asking you.

*OFFICIAL TRANSCRIPT*

| | |
|---|---|
| 12:45:16 | 1 |

THE WITNESS:  Because I was in default from my
landlord, from Wagner World.  They put me in default because
it's showing Brothers Petroleum filed a lien at the property at
that time.

EXAMINATION BY MR. DIROSA:

Q.   Was there any ruling in the court, in this litigation that
you began or that Wagners Chef began, was there any ruling in
the court that led you to believe that you did not have to
follow this contract?

A.   It's like what I said.  I mean, I was in default.  This is
the first issue the landlord -- the lien from Brother, they
have to be resolved.  Brother never take an action against
that.

Q.   But was there anything that happened in the litigation
Wagners Chef began, did you get any favorable ruling that told
you you no longer had to honor this contract?

A.   I mean, it's no, just because, I mean, I'm going to lose
my lease with the landlord.

Q.   When Mr. Beh sent this, you were an Exxon station,
correct?

A.   Correct.

Q.   You were branded as an Exxon station?

A.   Correct.

Q.   You had all the Exxon logo, whatever goes onto the pumps,
the canopy had Exxon written on it?

```
12:46:48  1   A.    Correct.
12:46:49  2   Q.    When you decided you were no longer going to abide by that
12:46:54  3   contract, did you tape over the Exxon logo so that your
12:47:00  4   customers would know you're no longer supplying Exxon fuel?
12:47:05  5   A.    Correct.
12:47:05  6   Q.    That was when this was sent; was it not?
12:47:08  7   A.    Correct.
12:47:08  8   Q.    Okay.  Can you tell me why you had to text this photo to
12:47:18  9   an employee of Brothers when you decided not to honor this
12:47:26 10   contract?
12:47:27 11        THE COURT:  Well, first of all, why don't you identify
12:47:29 12   the photograph.
12:47:31 13        MR. DIROSA:  Oh, I'm sorry.  This is -- I think it's
12:47:40 14   28 -- 28.
12:47:42 15        THE COURT:  Okay.  Why don't you ask him if he can
12:47:47 16   identify the photograph or --
12:47:47 17   EXAMINATION BY MR. DIROSA:
12:47:51 18   Q.    You can identify the photograph; can you not?
12:47:51 19        THE COURT:  Is that you in the photograph?
12:47:54 20        THE WITNESS:  Yes.
12:47:54 21   EXAMINATION BY MR. DIROSA:
12:47:55 22   Q.    That's you?
12:47:56 23   A.    That's me.
12:47:56 24   Q.    That taped over is the Exxon sign?
12:47:59 25   A.    Yes, sir.
```

*OFFICIAL TRANSCRIPT*

Q.   So why did you have to send that photograph to an employee of Brothers at the time you told them you were no longer honoring the contract?

A.   Okay.  When I sent him that picture, I sent a bunch of pictures with it.  I mean, he's a friend to me, and he's the one I used to be dealing with, right.  I used to be dealing with Raouf, as he's a member, I think, from Brothers Petroleum, right?

I went to Vegas with him, and I went out -- he was a friend of mine.  Okay.  I send him a bunch of pictures with that.  I tape it, because if I didn't tape that sign on that day, I'm going to lose the whole entire property.

Q.   Let me ask you not so much about the tape, but about the signal that you're sending to this employee of Brothers Petroleum.  What was the purpose of that?

A.   It's a picture.  I mean, I have it and, like -- that's for nothing.  I mean, I send it to friend of mine.  It's like -- it's a picture.

THE COURT:  I think he's asking you, sir, what was the message you were sending.

THE WITNESS:  No, that's not a message, Your Honor. That's a picture.  I took it.  I didn't mean to send it to Brothers or to anybody like --

THE COURT:  Okay.  Go ahead.

EXAMINATION BY MR. DIROSA:

**OFFICIAL TRANSCRIPT**

12:49:19 1    Q.   So it's not meant to indicate that you had any favorable

12:49:22 2    ruling in the litigation that was going on between Wagners Chef

12:49:25 3    and Brothers?

12:49:26 4    A.   No, sir.

12:49:27 5    Q.   Now, at no time between the time you took over

12:49:38 6    Wagners Chef and this did you ever complain about a delivery

12:49:45 7    not being the proper quantity?  Correct?

12:49:49 8    A.   Correct.

12:49:49 9    Q.   You never complained about any delivery not being priced

12:49:56 10   properly, correct?

12:49:57 11   A.   Correct.  Because they stopped, I mean, getting delivery

12:50:02 12   from Brothers.

12:50:02 13   Q.   So it was the proper amount was delivered, the proper fee

12:50:07 14   was charged for that delivery, correct?

12:50:11 15   A.   Correct.

12:50:12 16   Q.   Now, Mr. Beh's e-mail was April 13th.  I'm going to show

12:50:23 17   you Exhibit 20, which is from nine days later.

12:50:31 18        This is your forming Jadallah Enterprises, LLC, nine

12:50:40 19   days after you decided you were no longer going to buy motor

12:50:44 20   fuel from Brothers Petroleum, correct?

12:50:46 21   A.   Correct.

12:50:46 22   Q.   Okay.  Now, from that date through the rest of 2015, did

12:50:55 23   Jadallah Enterprises have a bank account?

12:50:58 24   A.   No.

12:50:59 25   Q.   Did it do any business?

*OFFICIAL TRANSCRIPT*

12:51:01  1    A.    No.

12:51:01  2    Q.    Did it have any source of income?

12:51:04  3    A.    No.

12:51:04  4    Q.    Did it have any expenses?

12:51:07  5    A.    No.

12:51:07  6    Q.    Did it own any property?

12:51:10  7    A.    No, sir.

12:51:10  8    Q.    It did nothing?

12:51:14  9    A.    (Witness shakes head negatively.)

12:51:14 10    Q.    From all of 2016 until the date of the act of sale on

12:51:21 11    July 8th of 2016, did Jadallah Enterprises operate any

12:51:26 12    business?

12:51:26 13    A.    No.

12:51:26 14    Q.    Have any income?

12:51:28 15    A.    No.

12:51:28 16    Q.    Have any expenses?

12:51:30 17    A.    No.

12:51:30 18    Q.    Own any property?

12:51:33 19    A.    No.

12:51:33 20    Q.    So Jadallah Enterprises was formed for what purpose?

12:51:47 21    A.    Jadallah Enterprise -- I have fuel company.  It's open at

12:51:50 22    that time.  I have Emad 1, LLC, and Ahmed 1.  I try to get --

12:52:03 23    in those days, I have an issue with the tax -- I mean, for

12:52:06 24    Wagners Chef, I have a hard time to get a beer/liquor license

12:52:10 25    renewal and operate my gas station.  I try at that time under

*OFFICIAL TRANSCRIPT*

12:52:17 1   Emad 1, LLC, to get a license, and they didn't approve me.

12:52:21 2         I have two, three different company that's open.

12:52:25 3   Jadallah Enterprises, it was one of them.

12:52:28 4   Q.   But none of those other companies you mentioned were

12:52:34 5   formed in 2015, were they?

12:52:36 6   A.   Maybe.  I'm not sure.

12:52:44 7   Q.   We'll get into that.

12:52:48 8         In November, November 5th of 2015, Fourth Circuit

12:53:04 9   Court of Appeal rendered a ruling in the Wagners Chef/Brothers

12:53:08 10   Petroleum case saying that -- in favor of Brothers Petroleum

12:53:12 11   against Wagners Chef, decreeing that the contract for sale of

12:53:16 12   Exxon branded motor fuel is binding and enforceable against

12:53:21 13   Wagners Chef?

12:53:22 14         THE COURT:  Exhibit number?

12:53:23 15         MR. DIROSA:  I'm sorry.  Exhibit Number -- I think I

12:53:25 16   just took that off of there -- 5.  Exhibit Number 5.

12:53:31 17   EXAMINATION BY MR. DIROSA:

12:53:33 18   Q.   Correct?

12:53:33 19   A.   Correct.

12:53:33 20   Q.   Okay.  Why didn't you start buying fuel after the Court of

12:53:40 21   Appeal said Wagners Chef is bound by this contract?

12:53:43 22   A.   Okay.  If you go that -- I mean, through the e-mail, I

12:53:48 23   send it to you and Eddie Hamdan and Raouf and David Hecker

12:53:54 24   (spelled phonetically )to start getting gas from Brothers, you

12:53:59 25   got to order new software from Rickner and new equipment.

*OFFICIAL TRANSCRIPT*

12:54:03 1         Since when they tell me it's bonded, I start a

12:54:07 2  process that software, to get the software, and I send you an

12:54:12 3  e-mail.  I sent Raouf, I send David Hecker.  That's, I think,

12:54:18 4  all the employee at Brother Petroleum, right?

12:54:20 5  Q.   Are you telling the jury that you sent these e-mails

12:54:23 6  sometime in 2015?

12:54:25 7  A.   It's after it's bonded in Wagners Chef.

12:54:30 8  Q.   Let's limit it then.  Between November 5th of 2015 and the

12:54:35 9  end of 2015, did you buy any gas --

12:54:38 10  A.   End of November --

12:54:40 11  Q.   -- from Brothers Petroleum?

12:54:48 12  A.   I can't remember.  No.  I think, no.

12:54:51 13  Q.   In January, February, March and April of 2016, did you

12:54:58 14  buy -- did Wagners Chef buy any gas from Brothers Petroleum?

12:55:03 15  A.   No.

12:55:03 16  Q.   Can you explain why, after the Fourth Circuit Court of

12:55:10 17  Appeal said this contract is binding, why did you not start to

12:55:14 18  buy gas again?

12:55:15 19  A.   Okay.  When they said this binding, the Wagners Chef, this

12:55:22 20  contract is binding, and I start trying to get the equipment

12:55:28 21  set up for the -- for the software and whatever Brother asking

12:55:37 22  for.  That took me time, you know.

12:55:40 23          They asked, like, around $11,000 that day -- I mean,

12:55:45 24  at that time.  I order.  They took time to bring it to me.

12:55:49 25  They took time until the installation people, they came and

*OFFICIAL TRANSCRIPT*

12:55:55  1    install.

12:55:55  2         I do have the old one.  Just you guys said, you need

12:55:59  3    the new version, to make me spend some more money.  At that

12:56:03  4    time, I was behind in cash and behind -- Wagners Chef was -- I

12:56:08  5    mean, have a lot of expense.  It did take me a little bit time,

12:56:14  6    just -- from that time they tell me it's binding, I start, I

12:56:19  7    mean, calling everybody, even Brothers' employees, through the

12:56:24  8    e-mail, text message, and calling the technician.  As soon as I

12:56:32  9    get it done, I start getting fuel from Brothers.

12:56:34 10    Q.   So this was all happening sometime between November 5th of

12:56:39 11    2015 and the end of April in 2016?

12:56:43 12    A.   Yes.

12:56:45 13    Q.   So there would presumably be documents, e-mails that would

12:56:55 14    back this up?

12:56:56 15    A.   Yes.

12:56:57 16    Q.   It wasn't just that you were refusing to buy; somehow, it

12:57:01 17    was Brothers Petroleum's fault that you weren't buying?

12:57:03 18    A.   I'm not saying their fault.  It was process until you get

12:57:10 19    the equipment through Brothers.  I think, Rickner, he work with

12:57:15 20    -- I mean, Frank -- someone -- Frank, that you guys give me his

12:57:18 21    information to call him and start dealing with him, and I did,

12:57:24 22    and that's how long they take.

12:57:27 23    Q.   Okay.  When you stopped buying fuel on April 13th of 2015,

12:57:35 24    how long did it take for you to start buying fuel from Stars

12:57:38 25    Oil Company?

*OFFICIAL TRANSCRIPT*

| | | |
|---|---|---|
| 12:57:40 | 1 | A.    It didn't take that long. |
| 12:57:41 | 2 | Q.    The next day? |
| 12:57:44 | 3 | A.    Exactly. |
| 12:57:44 | 4 | Q.    Okay.  But now you're telling the jury that somehow |
| 12:57:49 | 5 | between the 5th of November, 2015, and the end of April, almost |
| 12:57:57 | 6 | six months, there was something that was preventing you from |
| 12:58:01 | 7 | buying fuel from Brothers? |
| 12:58:04 | 8 | A.    Because, I mean, all the equipment you guys order -- I |
| 12:58:08 | 9 | mean, you want, it's a special, I mean, equipment.  I have to |
| 12:58:11 | 10 | get it through Exxon, through the Brothers, and one company.  I |
| 12:58:19 | 11 | can't just install any computer and start selling gas. |
| 12:58:22 | 12 | Q.    You don't know of any documents that are going to verify |
| 12:58:35 | 13 | this story that you just told the jury, do you? |
| 12:58:38 | 14 | A.    I do have some e-mails and some invoices that's going back |
| 12:58:45 | 15 | and forth to this company.  I think that's what I think I have. |
| 12:58:51 | 16 | Q.    Those would be between November of 2015 and April of 2016? |
| 12:59:00 | 17 | A.    I'm not sure exactly, just that -- between that time. |
| 12:59:04 | 18 | Q.    Let me show you -- this is Exhibit 6, page 75 -- a |
| 12:59:13 | 19 | judgment in that same case, where Wagners Chef has notified the |
| 12:59:18 | 20 | Court that it has no opposition to the entry of a judgment, and |
| 12:59:25 | 21 | that judgment decreed that Wagners Chef has breached the |
| 12:59:29 | 22 | contract for sale of Exxon motor fuel on file in these |
| 12:59:35 | 23 | proceedings, and ordering specific performance by Wagners Chef |
| 12:59:38 | 24 | of all of the terms and conditions of the contract.  Now, that |
| 12:59:42 | 25 | judgment was signed on May 25th of 2016. |

*OFFICIAL TRANSCRIPT*

12:59:49 1          So why would you agree to a judgment saying that you

12:59:53 2  were in breach of the contract if the fault of that breach was

01:00:00 3  somebody else's?

01:00:02 4          You're saying other people caused you not to buy

01:00:05 5  fuel.  Why would you agree to a judgment if it was other

01:00:10 6  people's fault?

01:00:13 7  A.   Other people's fault?  I mean --

01:00:14 8  Q.   You just said you couldn't buy fuel from Brothers

01:00:20 9  Petroleum because it was some other person's fault, something

01:00:24 10  about the equipment and couldn't get it installed.

01:00:29 11          So if that's true, why would you agree to a judgment

01:00:34 12  saying you had breached the contract?

01:00:40 13  A.   Because I did breach the contract.

01:00:42 14  Q.   Okay.  So you didn't go into court and try to defend

01:00:51 15  yourself by saying it's other people's fault, it's somebody

01:00:56 16  else's fault that I'm not buying gas?

01:01:00 17  A.   I mean, because they taking time.  I mean, it's not in my

01:01:05 18  hands to just start getting gas in the same day.

01:01:07 19  Q.   Do you remember if a motion was filed in that court asking

01:01:28 20  that you be held -- or that --

01:01:30 21          MR. BEH:  Objection, Your Honor.

01:01:31 22          MR. DIROSA:  -- Wagner Chef --

01:01:31 23          THE COURT:  Wait.  Wait.

01:01:32 24          MR. BEH:  Objection.  The motion that is being

01:01:35 25  referenced was one of the documents that you have excluded

01:01:39 1    based on a relevancy objection.

01:01:41 2        THE COURT: All right. If that's the case, you can't

01:01:43 3    go into it. Sustain the objection.

01:01:47 4    EXAMINATION BY MR. DIROSA:

01:01:51 5    Q. All right. Let's talk about -- you applied during this

01:01:58 6    process with First NBC for this loan, correct?

01:02:05 7    A. Correct.

01:02:06 8    Q. To buy the property from Wagner World?

01:02:10 9    A. Correct.

01:02:10 10    Q. After that loan came about, it wasn't Wagners Chef that

01:02:26 11    bought the property, it was Jadallah Enterprises that bought

01:02:29 12    the property, correct?

01:02:31 13    A. Correct.

01:02:31 14    Q. When you applied for that loan, did you tell the bank in

01:02:40 15    any way that there was a $485,000 tax lien against

01:02:45 16    Wagners Chef?

01:02:47 17    A. I did notify the attorney. He knows about the taxes. I

01:02:52 18    remember at that time -- I'm not sure if I notified, I mean,

01:03:02 19    the banks, not the attorney. Just --

01:03:08 20    Q. Did you notify the bank that Brothers Petroleum was suing

01:03:13 21    Wagners Chef?

01:03:14 22    A. No.

01:03:14 23    Q. Do you know who Payphone Connection Plus is?

01:03:22 24    A. Yeah. I know.

01:03:23 25    Q. Has Payphone Connection Plus sued Wagners Chef for breach

*OFFICIAL TRANSCRIPT*

01:03:29 1  of the contract?

01:03:29 2  A.   I never have no contract with them.  Just respond in way

01:03:29 3  like Brother bonding and in way --

01:03:29 4       THE COURT REPORTER:  Wait, I'm sorry.  Just like what?

01:03:37 5       THE WITNESS:  I never know they had contract with

01:03:40 6  Wagners Chef.  Like, same thing with Brother contract, I never

01:03:44 7  know they have a contract.

01:03:45 8  EXAMINATION BY MR. DIROSA:

01:03:48 9  Q.   Well, if they filed suit on March 20th of 2015, by the

01:04:00 10 time you're applying to the bank for the loan, you must have

01:04:02 11 known that they were suing you -- suing Wagners Chef for the

01:04:05 12 contract, right?

01:04:06 13 A.   That's correct.

01:04:06 14 Q.   Okay.  Did you tell the bank that there was another

01:04:11 15 lawsuit against Wagners Chef involving a contract?

01:04:16 16 A.   I didn't think so.  I can't remember honestly.

01:04:18 17 Q.   Now, right before the transactions on July 8th, when

01:04:33 18 Jadallah Enterprises acquired the property -- and this is

01:04:40 19 Exhibit 21 -- you formed a company called Ahmed 1, correct?  Or

01:04:49 20 you had that formed.  It was done by your attorney,

01:04:53 21 Duris Holmes?

01:04:55 22 A.   Correct.

01:04:55 23 Q.   That was July 5th of 2016.  That was three days before

01:05:01 24 this act of sale took place.

01:05:03 25 A.   Correct.

**OFFICIAL TRANSCRIPT**

01:05:03 1   Q.   What was the purpose of forming Ahmed 1?

01:05:10 2   A.   It's to manage the property.

01:05:12 3   Q.   Why couldn't Wagners Chef manage the property?

01:05:21 4   A.   Wagners Chef, they had multiple issue, so they can't, I

01:05:24 5   mean, manage the property.

01:05:26 6   Q.   Such as what?

01:05:27 7   A.   They have issue with the tax.  They have issue with the

01:05:30 8   license.  I have -- I mean, with the City, I have multiple

01:05:42 9   issue with that.  I owe taxes -- not me, I didn't owe.  The

01:05:48 10  previous owner -- I mean, your client brother, you owe the

01:05:53 11  taxes.  For that -- even that -- what they call it, the

01:05:59 12  occupation license, I can't get at that time.

01:06:01 13  Q.   All Ahmed 1 does is collect the rents and pay the rents

01:06:14 14  over to Jadallah Enterprises; that's all they do, isn't it?

01:06:18 15  A.   Obviously, yes.

01:06:23 16  Q.   What?

01:06:23 17  A.   Yes.

01:06:23 18  Q.   So why couldn't Wagners Chef, if you're having all this

01:06:28 19  trouble, get out of the fuel business, and just manage the

01:06:33 20  property, collect the rents and pay the rents on the note?

01:06:37 21  A.   How is they going to collect the rent if they owe a lot

01:06:41 22  of, I mean, tax money.  It's not my tax.  It's not my problem.

01:06:44 23  Q.   It's Wagners Chef -- I'm sorry, it's Wagners Chef's taxes?

01:06:48 24  A.   Yes.  Wagners Chef is -- it belong to your client brother

01:06:53 25  and his -- I mean, both of them.  I mean, they the only

01:06:56  1   Brothers.  They owned that -- they signed the contract between

01:06:59  2   each other, and they work together and they own -- this

01:07:03  3   tax lien.  Why I have to be responsible for this tax lien?

01:07:07  4   Q.   So, then you must have filed suit against whoever was

01:07:11  5   responsible for this tax lien?

01:07:13  6   A.   Yes, I did.

01:07:13  7   Q.   Then you dismissed that suit, didn't you?

01:07:17  8   A.   No.

01:07:17  9   Q.   You're telling me you did not dismiss Bob Harvey from this

01:07:22 10   lawsuit?

01:07:23 11   A.   I can't remember if they dismiss it.  Just, still I have

01:07:27 12   that -- I mean, I sued them in a courtroom.

01:07:29 13   Q.   So the next thing is July 8th, three days after Ahmed 1 is

01:07:40 14   formed.  This is Exhibit 9.  This is an act of cancellation of

01:07:49 15   the lease.  It's an agreement between Wagner World, who owned

01:07:54 16   and was leasing the property to Wagners Chef, saying that

01:07:59 17   Wagner World and Wagners Chef mutually terminate and cancel the

01:08:03 18   lease with the option to purchase between Wagner World and

01:08:07 19   Wagners Chef and the amendment to the triple net lease.

01:08:14 20          So why couldn't Jadallah Enterprises purchase the

01:08:18 21   property and you just keep the lease?  Why did you have to

01:08:23 22   cancel the lease?

01:08:25 23   A.   Because, I mean, it's different entity own the property.

01:08:31 24   I mean, it's automatic, Wagners Chef, they didn't have no

01:08:36 25   lease.  I mean, it's --

*OFFICIAL TRANSCRIPT*

01:08:39 1    Q.   That lease was recorded, wasn't it?  If you see, notice of

01:08:42 2    which was recorded.  So it's in the public record.

01:08:47 3          So just like -- I'm sorry, just like I discussed with

01:08:51 4    Ms. Kleindorf, if I'm in an apartment, and someone else buys

01:08:55 5    the apartment building, that doesn't mean I lose my lease or I

01:09:00 6    have to cancel it.  Why did you cancel this lease?

01:09:03 7         MR. BEH:  Your Honor, I'm going to object.  I think

01:09:05 8    he's calling for a legal conclusion.  He's asking, you know,

01:09:09 9    what's the legal requirements here.

01:09:11 10        Mr. Saed has answered the question.

01:09:12 11        THE COURT:  No, I don't think it's necessarily a legal

01:09:15 12    conclusion as to why he did what he did.

01:09:18 13        THE WITNESS:  If I can ask when that contract was

01:09:22 14    filed, filed in public record?

01:09:24 15        MR. DIROSA:  This document?  I'm sorry?

01:09:26 16        THE WITNESS:  Yes.

01:09:27 17        MR. DIROSA:  This document is from July 8th -- it was

01:09:32 18    signed on July 7th and July 8th, and notarized by

01:09:37 19    Mr. Montgomery on the 8th of July, 2016, the same day as the

01:09:42 20    act of sale.

01:09:51 21        THE WITNESS:  Can you repeat the question?

01:09:52 22        THE COURT:  Repeat the question for him.

01:09:53 23    EXAMINATION BY MR. DIROSA:

01:09:54 24    Q.   Okay.  Can you tell me why you canceled this valid lease?

01:09:59 25    A.   Because, I mean, it's canceled automatic.  I didn't cancel

*OFFICIAL TRANSCRIPT*

01:10:07 1  it.  It's canceled automatic.  I mean --

01:10:10 2  Q.  Wasn't it canceled because you were trying to move all of

01:10:13 3  your assets to another LLC that didn't have litigation against

01:10:20 4  Brothers Petroleum --

01:10:21 5  A.  No.

01:10:22 6  Q.  -- and didn't have litigation against Payphone Connection

01:10:26 7  Plus --

01:10:26 8  A.  No.

01:10:27 9  Q.  -- and didn't have a tax lien?

01:10:30 10  A.  I mean, I didn't cancel it for this reason.  I mean, I

01:10:34 11  didn't cancel it just to waive all that.

01:10:35 12  Q.  Let me ask you this.  You heard Ms. Kleindorf testify.

01:10:40 13  She said that when you came to the bank, you told them that you

01:10:44 14  had built up -- because this lease with the option to purchase,

01:10:48 15  part of the lease payment went to the purchase price, right?

01:10:52 16  A.  Correct.

01:10:52 17  Q.  That you had built up $200,000 in equity in favor of

01:11:00 18  Wagners Chef by the time you went there to apply for this loan?

01:11:03 19  A.  Correct.

01:11:03 20  Q.  Did Jadallah Enterprises or Ahmed 1 pay Wagners Chef

01:11:11 21  $200,000 when they took over the deal?

01:11:18 22  A.  No.

01:11:19 23  Q.  You just gave them $200,000?

01:11:25 24  A.  How I'm giving them $200,000?

01:11:28 25  Q.  Because you had $200,000 of equity built up in your

*OFFICIAL TRANSCRIPT*

01:11:32 1  lease/purchase agreement.  You had already paid off 200,000 of

01:11:36 2  the purchase price.  Why didn't you make one of these companies

01:11:39 3  give Wagner World $200,000 to take over?

01:11:46 4  A.    I can't get it until -- I mean, I can't get it right.

01:11:50 5  Q.    You don't understand.  Okay.

01:11:52 6        Let's say the lease/purchase is for -- you're going

01:11:57 7  to go on with your lease, and you're going to buy the building

01:12:00 8  for $2.9 million.

01:12:00 9  A.    Okay.

01:12:03 10  Q.    Through the course of your lease, part of your lease

01:12:05 11  payment goes to that $2.9 million?

01:12:08 12  A.    Okay.

01:12:08 13  Q.    Well, by the time you're coming to purchase the property,

01:12:15 14  $2.9 million, because of that little payment, has been reduced

01:12:18 15  to $2.7 million.

01:12:18 16  A.    Okay.

01:12:20 17  Q.    So Wagners Chef has $200,000 to the good.  Do you

01:12:20 18  understand?

01:12:20 19  A.    Okay.

01:12:24 20  Q.    Why didn't Jadallah Enterprises or Ahmed 1, or both of

01:12:29 21  them, pay Wagners Chef $200,000 to step out of the way and let

01:12:35 22  them take over?

01:12:36 23  A.    Wagners Chef, at that time, it was losing money.  It was

01:12:40 24  like 300,000.

01:12:42 25  Q.    So it could have used the 200,000?

**OFFICIAL TRANSCRIPT**

01:12:46 1    A.   Huh?

01:12:46 2    Q.   It could have used the 200,000?

01:12:46 3    A.   Yeah, because I was losing money in Wagners Chef.

01:12:49 4    Q.   You were losing money?

01:12:50 5    A.   Yeah.

01:12:51 6    Q.   So that's why Wagners Chef just gave this 200,000 over to

01:13:03 7    Jadallah Enterprises and Ahmed 1?

01:13:08 8    A.   What I can say, it was losing money at that time.  They

01:13:11 9    didn't give nothing to Jadallah Enterprises.

01:13:13 10   Q.   Let me show you Exhibit 10.  This is the act of cash sale

01:13:21 11   from Wagner World to Jadallah Enterprises.  This is also

01:13:30 12   July 8th of 2016.  Jadallah Enterprises purchases the property

01:13:38 13   for $2,781,764.47 on that date, correct?

01:13:47 14   A.   Correct.

01:13:48 15   Q.   On that same date -- and this is Exhibit 13 --

01:13:55 16   Jadallah Enterprises turns around and leases the property to

01:14:02 17   your other entity, Ahmed 1, 8th day of July, same time the act

01:14:08 18   of sale is being passed?

01:14:09 19   A.   Correct.

01:14:09 20   Q.   Okay.  That lease is for $18,000 a month, correct?

01:14:26 21   A.   The lease is correct.  Just the number, I think, is not

01:14:28 22   correct.

01:14:28 23   Q.   Well, that number shows $18,000 a month; does it not?

01:14:35 24   A.   They're showing 18,000, just I didn't think that's right.

01:14:39 25   I mean, it must be a wrong number.

                        *OFFICIAL TRANSCRIPT*

| | | |
|---|---|---|
| 01:14:40 | 1 | Q. That's about the same amount that Wagners Chef was paying |
| 01:14:46 | 2 | in the loan on its lease, $18,000? |
| 01:14:54 | 3 | A. It's around that, yes. |
| 01:14:56 | 4 | Q. So what prevented you from leasing -- Jadallah Enterprises |
| 01:15:09 | 5 | from leasing this property in its entirety to Wagners Chef? |
| 01:15:18 | 6 | A. The question, why I didn't lease it to Wagners Chef? |
| 01:15:22 | 7 | Q. Yes. |
| 01:15:22 | 8 | A. Because what I tell, Wagners Chef have multiple, I mean, |
| 01:15:26 | 9 | problem. The main problem, they have the tax lien. |
| 01:15:29 | 10 | Q. This property at that time had three subleases, didn't it? |
| 01:15:37 | 11 | One to SAG Beauty -- |
| 01:15:37 | 12 | A. Yes. |
| 01:15:40 | 13 | Q. -- that's you? You own that business, right? |
| 01:15:42 | 14 | A. Yes. |
| 01:15:42 | 15 | Q. That was 9,000 a month? |
| 01:15:44 | 16 | A. Correct. |
| 01:15:44 | 17 | Q. One to Emad Wireless. That was 9,000 -- 6,000 a month? |
| 01:15:51 | 18 | A. Correct. |
| 01:15:51 | 19 | Q. One was to RePlay Boutique -- |
| 01:15:51 | 20 | A. Correct. |
| 01:15:53 | 21 | Q. -- and that was 9,000 a month? |
| 01:15:55 | 22 | A. Yes, sir. |
| 01:15:56 | 23 | Q. So that's $24,000 in income coming in just from those |
| 01:16:00 | 24 | three properties -- |
| 01:16:01 | 25 | A. Correct. |

*OFFICIAL TRANSCRIPT*

01:16:02 1   Q.   -- just from those three subleases?  All you had to pay in

01:16:06 2   the loan was 18,000 back to Jadallah Enterprises?

01:16:12 3   A.   Okay.

01:16:12 4   Q.   So every month is a $6,000 profit?

01:16:16 5   A.   Okay.

01:16:17 6   Q.   That's not even counting the gas station and the

01:16:22 7   convenience store, right?

01:16:23 8   A.   Correct.

01:16:23 9   Q.   Okay.  Then -- this is Exhibit 17 -- you find

01:16:50 10  Nashat Haider, who forms an LLC.  By this document, you claim

01:16:55 11  that you sold this property -- or this business that was

01:17:00 12  selling two million gallons of gas a year and $6,000 a day in

01:17:06 13  the store for $107,000 on the 8th of November, right?

01:17:12 14        MR. BEH:  Your Honor, I'm going to object to the extent

01:17:13 15  that that's mischaracterizing this document.  It wasn't a sale

01:17:17 16  of the business.  It was a sale of the assets of the business.

01:17:24 17        THE COURT:  Why don't you ask the witness.

01:17:25 18  EXAMINATION BY MR. DIROSA:

01:17:29 19  Q.   During the course of this transaction, what did Empire

01:17:34 20  Express acquire?

01:17:37 21  A.   Empire Express, they purchased the assets -- I mean,

01:17:41 22  whatever I had left from the store.  I mean, like merchandise

01:17:46 23  or equipment.

01:17:49 24  Q.   But you can't operate a business unless you have a lease,

01:17:54 25  right?

*OFFICIAL TRANSCRIPT*

01:17:56 1   A.   Correct.

01:17:56 2   Q.   I mean, other than that, they'd just have to back up a

01:18:00 3   wagon and load it up and take the assets somewhere else you.

01:18:04 4   But that's not what happened, was it?

01:18:06 5   A.   At that time, I can't operate any business.

01:18:08 6   Q.   That's not what I'm asking.  They got a lease, Empire

01:18:15 7   Express.  They didn't have to pay for this lease.  They got a

01:18:17 8   lease on the property where Wagners Chef had formerly occupied

01:18:23 9   this occupation and run its business, correct?

01:18:25 10  A.   Because Jadallah Enterprises owned that property.

01:18:33 11  Wagners Chef, they was -- I mean, operated the gas station.

01:18:43 12  Q.   Okay.  But Empire Express got a lease where -- all of the

01:18:49 13  property where Wagners Chef formerly ran the gas station and

01:18:53 14  the convenience store, correct?

01:18:55 15  A.   Correct.

01:18:55 16  Q.   Despite the fact that they bought these assets,

01:18:59 17  supposedly, on the 8th of November, 2016, they didn't get a

01:19:03 18  lease from Ahmed 1 until a week later, on November 15th.

01:19:12 19         I'm sorry, I'm cutting it off.

01:19:17 20         On November 15th, Ahmed 1 leased the property where

01:19:22 21  the gas station and the convenience store was located to Empire

01:19:29 22  Express?

01:19:30 23  A.   Correct.

01:19:30 24  Q.   That lease started on November 15th and runs for five

01:19:37 25  years, right?

*OFFICIAL TRANSCRIPT*

01:19:39 1    A.    Correct.

01:19:39 2    Q.    The rent is 23,500?

01:19:47 3    A.    Correct.

01:19:47 4    Q.    So in addition to the $288,000 we just discussed from the

01:19:55 5    three little subleases, Ahmed 1 is now collecting an additional

01:20:01 6    $23,500 in rent --

01:20:04 7    A.    Correct.

01:20:05 8    Q.    -- per month?

01:20:06 9    A.    Yes, sir.

01:20:06 10   Q.    So it's 24,000 from those three little leases and

01:20:11 11   23,000 -- that's $47,500 every month from the leases?

01:20:16 12   A.    Correct.

01:20:17 13   Q.    They pay -- for the right to do that, they pay your other

01:20:24 14   company, Jadallah Enterprises, $18,000?

01:20:26 15   A.    Correct.

01:20:26 16   Q.    Okay.  So I ask you again, why couldn't Wagners Chef have

01:20:34 17   taken over that?  Other than you didn't want to pay -- you

01:20:38 18   didn't want to pay Brothers, you didn't want to pay your taxes,

01:20:42 19   why not?

01:20:43 20   A.    Like what I said, tax lien the first issue.  It's not my

01:20:51 21   tax problem.  That's brother -- I mean, his brother problem.  I

01:20:57 22   mean, he's the one owed the taxes.  I have been talking to him

01:21:01 23   to resolve that, so I can purchase and keep Wagners Chef.  Just

01:21:06 24   your client and his brother, they refuse to take care of it.

01:21:09 25   They want me to pay the taxes.  So I don't have nothing to do

*OFFICIAL TRANSCRIPT*

01:21:13 1    with his taxes.

01:21:15 2            I never signed no contract with the brothers.  They

01:21:18 3    signed it between each other.  They pushing me to -- I mean, to

01:21:22 4    cover the tax before I buy the property.

01:21:26 5    Q.    Brothers Petroleum was doing that?

01:21:31 6    A.    I mean, his brother.  I mean, that's the only two brothers

01:21:34 7    they have.  They work together.  They do business together.

01:21:36 8    Q.    So you must have some letter or document or something to

01:21:43 9    show the jury that indicates that you were being pushed by

01:21:47 10   someone --

01:21:47 11   A.    Yeah.

01:21:48 12   Q.    -- to pay these taxes?

01:21:49 13   A.    I mean, with them, I mean, they signed the brother

01:21:55 14   contract after I buy the -- they signed it before I bought it,

01:21:58 15   just they send it to public record after I purchase

01:22:04 16   Wagners Chef.  They signed it with his brother and his wife.  I

01:22:08 17   never know I had a contract there.

01:22:10 18           After that, they came up with tax lien under his

01:22:14 19   brother name.  I was back and forth talking to him.  They never

01:22:21 20   taking an action against it.

01:22:22 21   Q.    So my question, again, is you must have some document that

01:22:26 22   proves this, correct?

01:22:29 23   A.    Document?

01:22:30 24   Q.    Yes.

01:22:31 25   A.    Prove -- which one?

| 01:22:32 | 1 | Q.   Yes.  That somebody from Brothers was pushing you to pay |
| 01:22:37 | 2 | this lien? |
| 01:22:37 | 3 | A.   I mean, they never, I mean, resolved that.  They have |
| 01:22:46 | 4 | documents.  They supposed to be, I mean, resolve all of this |
| 01:22:49 | 5 | claim against Wagners Chef, and they never did. |
| 01:22:51 | 6 | Q.   Who was supposed to resolve the claim against -- |
| 01:22:53 | 7 | A.   His brother, the one he signed for me, his brother and his |
| 01:22:57 | 8 | wife.  I have personal guaranty from them.  They supposed to |
| 01:23:01 | 9 | resolve all this issue, all this claim against Wagners Chef, so |
| 01:23:04 | 10 | I can stay in business.  Just, they never did. |
| 01:23:06 | 11 | Q.   Again, you must have some document that proves that to the |
| 01:23:11 | 12 | jury?  Do you or do you not? |
| 01:23:14 | 13 | A.   Document? |
| 01:23:15 | 14 | Q.   A document, a piece of paper, something, a text, an |
| 01:23:20 | 15 | e-mail, something. |
| 01:23:21 | 16 | A.   I have personal guaranty from his brother, I mean, and his |
| 01:23:25 | 17 | wife.  They supposed to be resolve all claim against |
| 01:23:28 | 18 | Wagners Chef.  I do have document. |
| 01:23:37 | 19 | Q.   When you sold these assets to Empire Express and gave them |
| 01:23:44 | 20 | a lease, granted them a lease so they could operate this |
| 01:23:49 | 21 | business that's losing money, you still had the lawsuit between |
| 01:23:54 | 22 | you and Brothers Petroleum -- Wagners Chef and Brothers |
| 01:23:59 | 23 | Petroleum was still going on, right? |
| 01:24:01 | 24 | A.   Yes. |
| 01:24:01 | 25 | Q.   That was a contract lawsuit? |

*OFFICIAL TRANSCRIPT*

01:24:02  1    A.    Yes.

01:24:03  2    Q.    Okay.  Why didn't you make -- as a condition of this

01:24:07  3    purchase, why didn't you tell Empire Express, okay, you can pay

01:24:11  4    me $107,000, but you got to take over the rest of this

01:24:15  5    contract, get me out of this litigation?

01:24:17  6    A.    I mean, how I'm going to give him -- I'm going to let

01:24:22  7    him -- I mean, I give him this option.  I said, if you want to

01:24:26  8    deal with the brother, you can go ahead, and you guys start

01:24:29  9    doing business with him.

01:24:30 10          After he quit doing business with you guys, you came

01:24:34 11    back saying, you breached the contract again, and you stopped

01:24:38 12    buying gas from us, after, I mean, Empire, I mean, stopped

01:24:42 13    getting gas from Brothers.  I did that.

01:24:50 14    Q.    What were the terms of the payment of this $107,000?

01:24:54 15    A.    $50,000 in cash, and the rest he give me a thousand

01:25:00 16    dollars a month.

01:25:01 17    Q.    He gives you a note for one thousand dollars a month to

01:25:05 18    acquire this business?

01:25:08 19    A.    Yes, sir.

01:25:08 20    Q.    That was for the other $57,000, he's supposed to pay you

01:25:13 21    $1,000 per month?

01:25:15 22    A.    Correct.

01:25:15 23    Q.    So, to me, that seems like a pretty good deal.  Why didn't

01:25:20 24    you insist, okay, I'll do that; you take over this contract;

01:25:24 25    you go fulfill my obligation with Brothers -- or Wagners Chef's

**OFFICIAL TRANSCRIPT**

01:25:31 1   obligation with Brothers; you buy the gas from them; that way,

01:25:35 2   I'm out?

01:25:36 3   A.   Like what I tell you, I give him the option.  Just nobody

01:25:38 4   in this world, they're going to sign this contract with the

01:25:42 5   Brothers.  Nobody, he can sign this contract.  Beside his

01:25:47 6   brother sign for him, no one can sell gas for favor, just, I'm

01:25:52 7   doing you a favor, I'm selling you gas and fixing my pump,

01:25:56 8   fixing my tank from my pocket.  Nobody agreed to this term of

01:26:00 9   this contract.

01:26:00 10      THE COURT:  Why is that?  Why do you say no one would

01:26:05 11   sign that contract?

01:26:06 12      THE WITNESS:  Because this contract is favored for

01:26:08 13   Brothers, when two brothers sign for each other.

01:26:11 14      THE COURT:  What is it about the contract that --

01:26:15 15      THE WITNESS:  Your Honor, when you sign this contract,

01:26:17 16   they charge you two cents over rack.

01:26:17 17      THE COURT:  Over rack?

01:26:23 18      THE WITNESS:  Yeah, they charge you two cents.

01:26:25 19      THE COURT:  Rack meaning that's the price that they pay

01:26:29 20   Exxon?

01:26:30 21      THE WITNESS:  Yeah.  I just, I have to pay Brothers two

01:26:32 22   cents on each gallon.  That does not include tax, freight or

01:26:36 23   anything.

01:26:36 24       If you didn't sell the gas, if you went out of

01:26:40 25   business, you got to give him $0.04 a gallon for 15 years.

*OFFICIAL TRANSCRIPT*

01:26:44 1    Okay.

01:26:45 2            Everybody sign a contract with -- gas contract

01:26:49 3    right now, they will sign a contract and give you, like, two

01:26:53 4    cents over rack, and give you -- they give the retailer two and

01:27:00 5    a half cents on each gallon he sell.  I mean, that's -- they

01:27:04 6    gave it to him after -- I mean, he made this sale, let's say,

01:27:08 7    if the gallon two dollars, okay, I'm making ten cents,

01:27:13 8    all right.  After the ten cents, they are supposed to be giving

01:27:17 9    me back two and a half cents or three cents.

01:27:20 10           I know a lot of gas stations and a lot of people,

01:27:23 11   they sign with the Brothers, they give him this check every

01:27:25 12   month or every two months, okay.  Just, when you take over

01:27:30 13   contract, I tried to talk to Brothers to give me a new

01:27:35 14   contract, tried to make a better deal, because I can't sell gas

01:27:39 15   and -- no profit in this gas, Exxon gas, and fix the equipment

01:27:45 16   from my pocket.  I can't even fix it.  When I sold the station,

01:27:50 17   I had, like, eight to ten pumps down.  I can't fix them because

01:27:55 18   I don't make no money from this contract.

01:27:57 19           THE COURT:  I understand.  Go ahead.

01:27:58 20   EXAMINATION BY MR. DIROSA:

01:28:00 21   Q.    So, Jadallah Enterprises and Ahmed 1 take over the

01:28:10 22   property.  Ahmed 1 has the master lease.  This is July 8th of

01:28:15 23   2016, approximately five months before this.

01:28:19 24   A.    Correct.

01:28:20 25   Q.    August, September, October, November -- no, four months.

**OFFICIAL TRANSCRIPT**

01:28:24 1    Four months before this.

01:28:26 2    A.    Four months, yes.

01:28:26 3    Q.    Okay.  What efforts did you make to find a better deal

01:28:32 4    than $107,000?

01:28:34 5    A.    I can't -- I can't find nobody give me 107, I was going to

01:28:38 6    close it down.

01:28:39 7    Q.    Did you go to a broker?

01:28:42 8    A.    I mean, I went to -- a lot of people, they tried to buy

01:28:48 9    it.  Just, I can't sell it.  I can't make no sale.  I can't

01:28:52 10   sell Wagners Chef.

01:28:52 11   Q.    Who were the other people you tried to sell it to that

01:28:55 12   wouldn't buy it?

01:28:56 13   A.    It's, I mean -- it's not a friend of mine.  Like, how I

01:28:58 14   met the Brothers family, I mean, Eddie and Omar, the same

01:29:03 15   thing.  They never, I mean, agreed to buy the Wagners Chef.

01:29:06 16   Q.    That's not my question.  Who were the people that you

01:29:09 17   talked to that refused -- that wouldn't buy it for 107,000 --

01:29:13 18   for more than $107,000?

01:29:16 19   A.    I mean, I talked to -- a couple of them, they came to me

01:29:21 20   as -- to sell it, because they didn't agree for the rent, they

01:29:24 21   don't agree for, I mean, the equipment to be fixed.

01:29:30 22   Q.    Who are those people?  What are their names?

01:29:33 23   A.    It's people that came from -- I mean, some of them from

01:29:37 24   Lafayette, Louisiana.  I don't know him personally.  They came

01:29:40 25   and looked at it.  I give him, I mean, my numbers, and I show

**OFFICIAL TRANSCRIPT**

01:29:43 1  him everything.  They leave.  They never come back.

01:29:47 2  Q.    So you don't know anybody's name that refused this deal?

01:29:53 3  A.    Hey, trust me, it is five, six of them.  They walk out.

01:30:00 4  They never showed --

01:30:01 5  Q.    Five or six of them --

01:30:01 6  A.    Yes.

01:30:03 7  Q.    -- none of whom you can name today?

01:30:06 8  A.    It's -- I don't know him personally.  I know, like, some

01:30:09 9  of them moved.  Nisser, he's from Yemen, and Mahmoud (spelled

01:30:20 10  phonetically) and -- a couple of them.  I can't remember those

01:30:23 11  names at that time.

01:30:23 12  Q.    Nisser Tamimi?

01:30:27 13  A.    No, Nisser Tamimi, he used to work with me as a manager.

01:30:35 14  Q.    So then this is Exhibit 18.  Mr. Beh sends this letter on

01:30:42 15  November 15th, saying that:  Wagners Chef has sold its assets

01:30:49 16  effective today to Empire Express.  As a consequence,

01:30:52 17  Wagners Chef is no longer operating the gas station and

01:30:56 18  convenience store at Chef and Louisa.

01:30:58 19          Correct?

01:30:58 20  A.    Correct.

01:30:59 21  Q.    So as of this date, Wagners Chef has no lease, correct?

01:31:05 22  A.    Correct.

01:31:05 23  Q.    Wagners Chef has no assets?

01:31:08 24  A.    Correct.

01:31:08 25  Q.    Wagners Chef has no income?

*OFFICIAL TRANSCRIPT*

01:31:10 1    A.    Correct.

01:31:10 2    Q.    Then, in early 2017, on March 19th, you have dissolved

01:31:32 3    Wagners Chef as a limited liability company with the State of

01:31:36 4    Louisiana, correct?

01:31:38 5    A.    Correct.

01:31:38 6    Q.    It says it's no longer doing business, it owes no debts,

01:31:45 7    and owns no immovable property.  The filing of a false public

01:31:49 8    record with the knowledge of its falsity is a crime subjecting

01:31:52 9    the filer to fine or imprisonment.

01:31:58 10          Didn't it still owe the state $485,000 in the

01:32:02 11   tax lien?

01:32:02 12   A.    Yes.

01:32:03 13   Q.    Okay.  So, why are you telling them that it owes no debts?

01:32:11 14   A.    Because it's still in the courtroom.  They are fighting

01:32:14 15   it.  I mean, that's what they are saying.  I mean, Omar Hamdan

01:32:18 16   and Bob Harvey and Fatmah Hamdan, they said they are fighting.

01:32:21 17   Q.    So then, if that's correct, there must be some document,

01:32:28 18   some pleadings that show that there is some lawsuit going on

01:32:32 19   over this tax lien?

01:32:34 20   A.    We do have a lawsuit.

01:32:36 21   Q.    Okay.  So you'll show us those pleadings.

01:32:55 22          Let's talk for a minute about this company that is

01:33:00 23   losing money.  This is Exhibit 36, at page 685.  This shows, in

01:33:15 24   August of 2015, a bank balance of $26,506.54.

01:33:27 25   A.    Correct.

*OFFICIAL TRANSCRIPT*

01:33:27 1    Q.    Did you pay any of that money to any money you might have

01:33:31 2    owed to Brothers?

01:33:34 3    A.    I can't remember.

01:33:34 4    Q.    Let me show you later in that bank statement --

01:33:37 5          When you -- with your bank accounts, you move money

01:33:41 6    back and forth between accounts, don't you?

01:33:43 7    A.    Correct.

01:33:43 8    Q.    Like some money gets moved to SAG Beauty, and some money

01:33:49 9    gets moved to other accounts?

01:33:49 10    A.    It's -- I mean, that money --

01:33:51 11    Q.    Correct?

01:33:51 12    A.    Correct.

01:33:51 13    Q.    But at this time in August of 2015, Jadallah Enterprises

01:33:58 14    didn't have an account, right?

01:34:00 15    A.    Right.

01:34:02 16    Q.    There was no ability to move money to them.

01:34:05 17          Ahmed 1 didn't even exist by this time, right?

01:34:08 18    A.    Correct.

01:34:08 19    Q.    So let's skip over the moving of money back and forth

01:34:14 20    within the accounts, and let's go just to the withdrawals.

01:34:18 21          These are straight out withdrawals from August of

01:34:24 22    2015: August 6th, $8,000; August 19th, $3,000; August 19th,

01:34:33 23    again, $21,931.13; August 21st, $2,000; and, August 27th,

01:34:41 24    $5,000.

01:34:44 25    A.    Correct.

01:34:44 1   Q.  Where did that money go?

01:34:47 2   A.  That money go, they're going for expense and payments.

01:34:53 3   Q.  So didn't you have checks you write out of the account --

01:35:02 4   A.  Yes, yes.

01:35:03 5   Q.  -- for payments, for expenses?

01:35:04 6   A.  Yes.

01:35:04 7   Q.  Don't you transfer money to pay expenses?

01:35:12 8   A.  Did I -- what?

01:35:20 9       MR. DIROSA:  Judge, can I have one minute?

01:35:20 10       THE COURT:  Yes.

01:35:20 11 EXAMINATION BY MR. DIROSA:

01:35:58 12   Q.  Let me show you the whole bank statement.  This is the

01:36:02 13 first page.  Nothing.

01:36:09 14       THE COURT:  It's not focused.

01:36:18 15       MR. DIROSA:  There you go.

01:36:18 16 EXAMINATION BY MR. DIROSA:

01:36:20 17   Q.  This is 36.  This is Bates number 684.  This is Bates

01:36:30 18 number 685.  Well, let me get to this.  Deposits.  Deposits.

01:36:38 19       All right.  685.  This shows that during this month,

01:36:44 20 there were deposits of $425,400 into this account, correct?

01:36:51 21   A.  Correct.

01:36:51 22   Q.  Then these are all the checks that were written on that

01:37:08 23 account, and I'm assuming that's to pay these expenses you're

01:37:13 24 talking about.  That is page 688.  Here is page 689.  All of

01:37:20 25 those checks --

*OFFICIAL TRANSCRIPT*

01:37:22  1   A.    Correct.

01:37:22  2   Q.    -- to pay expenses.

01:37:23  3             Now, here is the electronic withdrawals.

01:37:28  4             Stars Oil, that's who you're buying your gas from,

01:37:31  5   right?  They just take the money out of the account when they

01:37:33  6   deliver gas.

01:37:35  7             American Express.

01:37:36  8             So that brings us -- that is page 6 of 8 of this bank

01:37:49  9   statement.  So that is all the payments.

01:37:52 10             So that brings me back to the question I asked

01:37:57 11   before.  If those are the payments, what are these withdrawals?

01:38:04 12   A.    It's for more expense.

01:38:07 13             Remember, at that time, I can't pay, I mean, check

01:38:12 14   for alcohol and tobacco.  We buy a lot of money order during

01:38:18 15   that time.  They had bounced check, you know, cigarette company

01:38:18 16   that time.

01:38:22 17             Like, I mean, I have a lot of expense.  I can't tell

01:38:26 18   you exactly what they are going for exact -- I mean, for who

01:38:30 19   exactly.  Just, I have a lot of expense I have to cover up.

01:38:36 20   Q.    So, there's a lot of cash that flows through here, right?

01:38:41 21   A.    Yes.

01:38:42 22   Q.    Let me show you October.  Now, this one, you have a

01:38:49 23   negative balance at the end of the month, $2,033.

01:38:54 24             But if we look again -- this is 665, page 665.  If we

01:39:02 25   look at page 671, here are some more withdrawals made that

**OFFICIAL TRANSCRIPT**

01:39:06  1    month:  $1,588, $6,000, $3,000, $8,000.  That's $18,000-plus in

01:39:23  2    withdrawals.  What does that money go to?

01:39:26  3    A.    I mean, it must be for bounced check.  It must be for

01:39:30  4    money order.  They must be for liquor or beer, when they

01:39:30  5    collect cash.

01:39:34  6         A lot of that time, I used to be bringing Brothers in

01:39:37  7    the office, bunch -- like 21,000, 24,000 in cash, and you guys

01:39:43  8    took it.

01:39:43  9    Q.    So, I assume, when you pay somebody that much in cash, you

01:39:47 10    get a receipt for it?

01:39:48 11    A.    I mean, yes, they do.

01:39:50 12    Q.    So you would have a receipt for --

01:39:51 13    A.    I can't remember because I've been gone.  Just -- I can

01:39:56 14    ask for receipt.

01:39:57 15    Q.    Okay.  Here is November, November bank statement.  41,000

01:40:09 16    in cash as the balance in the statement.

01:40:16 17         I should have let this one go.  It's only $6,000 in a

01:40:21 18    cash withdrawal.

01:40:23 19         Let's look at December.

01:40:25 20         MR. BEH:  Your Honor, this is getting repetitive.

01:40:25 21         MR. DIROSA:  Yes, it is.

01:40:29 22         MR. BEH:  We're going through and looking at these --

01:40:31 23    he said, I don't remember what they were, but they were

01:40:33 24    expenses.  Are we going to go through two years' worth of bank

01:40:37 25    statements?

*OFFICIAL TRANSCRIPT*

01:40:38 1      MR. DIROSA:  No, absolutely not.  But he said, look,

01:40:42 2 this business is fading, it's doing badly, you know, I just

01:40:45 3 can't keep up.

01:40:45 4      THE COURT:  So what's the point you're trying to make

01:40:48 5 with this?  To show that there was a lot of money coming in and

01:40:53 6 going out every month?

01:40:54 7      MR. DIROSA:  No.  There is a lot of money coming in.

01:40:56 8 There is a lot of money going out that are paid where you can

01:40:59 9 see that this money is paid to this person and that person.

01:41:02 10      The rest of the things, the only things I'm

01:41:04 11 talking about are straight withdrawals, just money taken out of

01:41:09 12 the account, without -- maybe he's got a receipt, I don't know,

01:41:12 13 but --

01:41:13 14      THE COURT:  Well, I think you've asked him that, and he

01:41:14 15 seems like he's given you whatever explanation he is going to

01:41:19 16 give you.

01:41:21 17      I'm not sure where you're heading with the rest

01:41:23 18 of it, but go ahead.

01:41:27 19 EXAMINATION BY MR. DIROSA:

01:41:33 20 Q.    Let's skip forward then.  Let's go to right before the

01:42:01 21 sale takes place.  This is that same account.  Right before

01:42:08 22 July 8th -- this is June 1st through June 30th -- right before

01:42:16 23 July 8th of 2016, there is $36,000 in money withdrawn from this

01:42:23 24 account.

01:42:24 25      THE COURT:  What exhibit are you on now?

**OFFICIAL TRANSCRIPT**

01:42:26  1          MR. DIROSA:  I'm sorry, it's still 37.  It is page 745.

01:42:36  2          THE COURT:  All right.  So your question is?

01:42:40  3  EXAMINATION BY MR. DIROSA:

01:42:41  4  Q.    Can you explain what those withdrawals are?

01:42:44  5  A.    It must be, I mean, something came back from the Star Oil

01:42:48  6  or -- it's a big number.  I mean, I'm not sure if they go for

01:42:54  7  the gas or go for cigarette check or something like that.

01:43:01  8  Q.    This is just a withdrawal.  This is not -- as I showed you

01:43:04  9  in the other account, where it shows money going to Stars Oil,

01:43:08 10  money going to this vendor, checks being written.  These are

01:43:11 11  just withdrawals from the account.

01:43:12 12  A.    Correct.  Sometime when they -- they come back

01:43:16 13  insufficient fund, I have to give it to him in cash or go wire

01:43:20 14  it, or just to go the office, give him the money.

01:43:22 15        Like, the international, if he wants a check for

01:43:25 16  30,000, 20,000 or 100,000, he need the cash.

01:43:29 17  Q.    Okay.  So, I'm assuming you get a receipt for that?

01:43:36 18  A.    I mean, I'm not sure.  I can look for it.

01:43:53 19  Q.    Let's just go right to just prior to you selling this

01:44:00 20  business for $107,000, okay?

01:44:04 21  A.    Okay.

01:44:04 22  Q.    Here is September of 2016.  $15,978.48 in withdrawals.

01:44:18 23  Can you explain that?

01:44:20 24  A.    Again, I can't remember exactly where they going, just --

01:44:25 25  Q.    This is October.  This is right before you selling on

01:44:29 1  November 8th.  $32,975.70 in withdrawals.  This is the month

01:44:41 2  before you sell everything for $107,000.

01:44:47 3  A.   Okay.

01:44:48 4  Q.   Can you explain what those withdrawals are for?

01:44:51 5  A.   Again, I can't remember exactly where they going.

01:44:55 6  Q.   Now, you had a second account.  Let's go to the month

01:45:09 7  right before Jadallah Enterprises and Ahmed 1 took over the

01:45:18 8  property.

01:45:19 9         This is June of 2016, for your other account, ends in

01:45:28 10 9269.  You got $37,159.88 in withdrawals from that account?

01:45:40 11        MR. BEH:  Joe, can you give me a page number?

01:45:40 12        MR. DIROSA:  Oh, I'm sorry.  829.

01:45:40 13 EXAMINATION BY MR. DIROSA:

01:45:40 14 Q.   Can you explain those withdrawals?

01:45:43 15 A.   If you go down to the page, you can see they got a check

01:45:46 16 right here, $26,236.  I don't know that's this check --

01:45:52 17 Q.   Wait.  I'm sorry.  I don't want to --

01:45:53 18 A.   Go down to -- go down a little bit.  Go up.

01:46:00 19        See where they said I had insufficient funds for

01:46:07 20 $3,710, insufficient funds for $2,194, insufficient funds for

01:46:15 21 $832, and insufficient fund check not paid for $26,236.

01:46:25 22        I mean, some of them -- most of them, if they come

01:46:29 23 back, I got to bring check -- I mean, cashier check or money

01:46:34 24 order or cash.  I have to withdraw cash.

01:46:39 25 Q.   Let's do August, the month -- the first full month after

**OFFICIAL TRANSCRIPT**

01:46:48  1    the sale.  July 30th through August 31st.

01:46:55  2         MR. BEH:  Your Honor, I'm going to raise the same

01:46:57  3    objection I raised before.  I think we've done this.  We're

01:47:00  4    continuing to just go month after month after month.

01:47:02  5              He's explained what the cash deposits were.  I

01:47:06  6    just think we're wasting time.

01:47:07  7         MR. DIROSA:  He said this business was going down.  The

01:47:10  8    only person I could get to buy it was for $107,000.  He can't

01:47:15  9    name anybody else who he tried to get to buy it.  But, all of a

01:47:20 10    sudden, money just keeps flowing out of the account as he

01:47:24 11    prepares, I think -- you know what our case is.

01:47:28 12         THE COURT:  I don't want argument.  I'll let you go a

01:47:32 13    little bit more, but you don't have to go through every

01:47:34 14    statement to make your point.

01:47:35 15    EXAMINATION BY MR. DIROSA:

01:47:36 16    Q.   So can you tell me what those withdrawals are?

01:47:49 17    A.   It's same thing.  I mean --

01:47:50 18    Q.   I tell you what --

01:47:53 19    A.   I can't remember that time where that cash going.

01:47:56 20    Q.   -- let's skip to October.  This is the month immediately

01:48:01 21    before you sell the business.  This is page 808.

01:48:07 22              That's $20,222 of withdrawals immediately before you

01:48:19 23    dispose of all of the assets of Wagners Chef.  Do you know what

01:48:23 24    that money went to?

01:48:24 25    A.   I'll tell you what's behind.  If you can look, they have

**OFFICIAL TRANSCRIPT**

01:48:29 1  insufficient fund checks, and they have expense.  They came

01:48:32 2  back.  I borrow the money from people to cover up.

01:48:49 3  Q.   Let's see the month during which you did sell these assets

01:48:57 4  for $107,000.  This is November of 2016.

01:49:00 5       You have an ATM withdrawal of $3,000, and another

01:49:04 6  withdrawal of 20,000.

01:49:06 7  A.   Correct.

01:49:07 8  Q.   Do you know what those funds went to?

01:49:10 9  A.   Again, this account, I made deposit, and I do withdrawal,

01:49:16 10 and I sign a check.  I can't remember where the money go and

01:49:19 11 how much made deposit that month and how much I withdraw and

01:49:23 12 where they going.

01:49:24 13 Q.   So it's still your testimony that this was the best deal

01:49:27 14 you could get was $107,000 for this business?

01:49:30 15 A.   Yes, sir.

01:49:30 16 Q.   Okay.  You went to the bank -- you heard Ms. Kleindorf

01:49:34 17 testify, right?

01:49:35 18 A.   Yes.

01:49:36 19 Q.   You go to the bank in early 2016, and you're applying for

01:49:42 20 a loan.

01:49:42 21 A.   Correct.

01:49:42 22 Q.   Now, you know it's important to be truthful to the bank,

01:49:45 23 right?

01:49:45 24 A.   Correct.

01:49:46 25 Q.   You wouldn't mislead the bank?

*OFFICIAL TRANSCRIPT*

01:49:49  1    A.    Correct.

01:49:49  2    Q.    By that time, you had had at least two years of operating

01:49:55  3    this business, correct?

01:49:56  4    A.    Correct.

01:49:56  5    Q.    So you knew what you this business did and could do?  You

01:50:01  6    knew the operation, right?

01:50:02  7    A.    I know Wagners Chef was a mess, just -- and I had bad

01:50:06  8    experience with it.  I mean, I know about it.  I know good.

01:50:10  9    Q.    Wait.  It was a mess when you applied for this loan?

01:50:14 10    A.    Wagners Chef?  Yes.  Since when I took over, Wagners Chef,

01:50:19 11    after -- after a month later, it was in a mess.

01:50:24 12    Q.    So the bank made a mistake approving you for a

01:50:28 13    $2.9 million loan?

01:50:29 14          MR. BEH:  Objection, Your Honor.  That's pure argument.

01:50:33 15          THE COURT:  I sustain the objection.

01:50:35 16    EXAMINATION BY MR. DIROSA:

01:50:41 17    Q.    Okay.  Let's talk just a little bit about how bad this

01:50:54 18    business was.  This has been identified by Ms. Kleindorf as

01:51:01 19    being provided by you.

01:51:05 20          Store sells an average of 6,000 gallons of fuel per

01:51:09 21    day on a busy highway located in New Orleans, Chef Menteur.  Of

01:51:18 22    that, you make a minimum of eight cents a gallon.  I think you

01:51:22 23    testified earlier ten cents?

01:51:23 24          MR. BEH:  Your Honor, is there a question in here?

01:51:26 25          THE COURT:  Wait a minute.  Start over.  Ask your

*OFFICIAL TRANSCRIPT*

01:51:30 1　question.

01:51:31 2　EXAMINATION BY MR. DIROSA:

01:51:32 3　Q.　You do 6,000 gallons of fuel a day.

01:51:36 4　A.　Correct.

01:51:36 5　Q.　Correct.  Okay.

01:51:39 6　　　　Let's do some easy math.  365 days a year, that means

01:51:46 7　you're selling 2,190,000 gallons of gas per year?

01:51:52 8　A.　Correct.

01:51:52 9　Q.　Eight cents per gallon you make off the gas.  That's

01:52:00 10　$175,200 profit just off the gas.  That's nobody walking in the

01:52:00 11　store and buying anything?

01:52:06 12　A.　If I was getting eight cents all the time, that's correct.

01:52:08 13　Q.　You said in your application to the bank it was a minimum,

01:52:13 14　minimum of eight cents a gallon?

01:52:15 15　A.　That's what it's supposed to be, yes.

01:52:17 16　Q.　So that's the minimum.  Okay.

01:52:32 17　　　　You said, again, same thing:  6,000 gallons of fuel a

01:52:38 18　day.  Alcohol, tobacco, deli and general grocery items are sold

01:52:44 19　at the rate of $6,000 in sales a day in the convenience store.

01:52:48 20　A.　Correct.

01:52:49 21　Q.　So if we look at $6,000 -- 6,000 gallons of gas a day,

01:53:03 22　like you told Ms. Kleindorf -- okay, like you told

01:53:17 23　Ms. Kleindorf, 6,000 gallons per day, 365 days a year,

01:53:29 24　2,190,000 gallons.  Cheapest gas is two dollars per gallon.

01:53:33 25　This doesn't count premium -- anything else.  That's $4,380,000

*OFFICIAL TRANSCRIPT*

01:53:38 1    in total sales.

01:53:40 2            If you're doing $6,000 a day inside the store, that's

01:53:49 3    another $2,190,000 in sales.

01:53:58 4            So when we add up the gas -- these are your

01:54:04 5    estimates -- that's $6,570,000 in total sales for a year.  So

01:54:14 6    can you tell me, on your 2015 tax return, why there was only

01:54:22 7    4,322,000?  What happened to the other -- you're missing about

01:54:35 8    2,200,000.  What happened to it?

01:54:41 9    A.    I'm missing how much?

01:54:48 10   Q.    6,570,000 in total sales, according to you, but your tax

01:54:54 11   return only shows $4,322,489 in total sales.  How do you

01:55:02 12   explain that difference?

01:55:02 13           MR. BEH:  Your Honor, I object to this as relevance.  I

01:55:04 14   also think it's completely mischaracterizing the two different

01:55:08 15   documents and comparing apples and oranges.  But my objection

01:55:11 16   is to relevance.

01:55:13 17           THE COURT:  All right.  Well, I'm not sure, but I'll

01:55:15 18   let him go a little farther.  Go ahead and ask your question

01:55:18 19   over again.

01:55:19 20   EXAMINATION BY MR. DIROSA:

01:55:20 21   Q.    Can you explain that difference?

01:55:23 22   A.    The difference, it was in goodwill numbers.  I give the

01:55:27 23   bank the best think Wagners Chef can do.  I mean, there is a

01:55:33 24   goodwill.  That's was, I don't have no problem, no issue, I can

01:55:37 25   do this number.

                          *OFFICIAL TRANSCRIPT*

01:55:37 1   Q.   Okay.  So what was the problem that was preventing you

01:55:42 2   from doing this number?

01:55:45 3   A.   Wagners Chef?

01:55:46 4   Q.   Yes.  Why, if you're telling the bank you're doing the

01:55:51 5   equivalent of $6,570,000, and you're telling us that there was

01:55:58 6   something going on that prevented you from achieving that, what

01:56:01 7   was it?

01:56:03 8   A.   Because, like how I said, that it was an estimate for the

01:56:06 9   bank, and that is goodwill for Wagners Chef, you know.

01:56:11 10  Q.   Wait.  They didn't ask you anything about goodwill.  They

01:56:14 11  said, how many gallons of gas are you selling?  You told them

01:56:18 12  6,000 gallons a day.  They asked you, how much do you make --

01:56:21 13  how much sales inside the store?  You said $6,000 a day.

01:56:25 14       Where does the goodwill come in?

01:56:27 15  A.   Okay.  I mean, the business, it go up and down.  I mean,

01:56:30 16  it's not always they have a good business.  If I didn't do good

01:56:34 17  inside, I'm not going to do good with sales inside and outside.

01:56:39 18       If I didn't have money to pay for the gas, I'm not

01:56:45 19  going to sell the whole number.  I mean, I can't give exact

01:56:45 20  number.

01:56:46 21       I've been sometimes stop selling gas, stop -- I mean,

01:56:50 22  inside, I can't make no sales.  It's -- it's business up and

01:56:55 23  down.

01:56:56 24  Q.   So, this is not a good -- this is only a business that's

01:57:02 25  worth $107,000, is what you're trying to tell us?

**OFFICIAL TRANSCRIPT**

A.   It's the business before I walk out.  I mean, I was walking out with nothing from Wagners Chef.  Just close the door and walk out.

Q.   Because business was so bad?

A.   Business so bad, and I have other issues I'm going through.

Q.   Well, let me ask you about a couple of those other issues.

This is another -- same document we looked at before. Exhibit 7, page 103.

It says:  The company employs several people and has a monthly payroll of about $13,000.

It says, at the bottom:  Management and labor. Wagners Chef employs two to three people year-round as needed to do the day-to-day tasks of the store.

On the assumption sheet that we've looked at before, it says, again, per management, payroll is $13,000 a month.

So can you explain why your 2015 tax return shows nothing for salaries?  Are you paying these people in cash?

A.   In 2013?

Q.   2015.

A.   2015?  I can't remember that.  Just -- they had some -- I mean, they did it for reasons, just I can't remember.

Q.   Some you don't remember why that's incorrect?

A.   No.

Q.   Now, this return is dated March 1st of 2015.  That's the

01:59:16 1 return that you gave to the bank, correct?  Ms. Kleindorf

01:59:20 2 identified it.  You remember that, right?

01:59:25 3 A.   Right.

01:59:25 4 Q.   Okay.  Why would you prepare -- or why would there be

01:59:35 5 prepared a separate return -- and this is dated July 27, 2016,

01:59:42 6 this is less than three weeks after the sale of the property to

01:59:46 7 Jadallah Enterprises -- why would there be a second return

01:59:55 8 where the cost of goods sold went up by exactly $50,000, and

02:00:01 9 your profit that you were paying taxes on -- or you were

02:00:08 10 notifying the government, went down to $5,000, after you told

02:00:12 11 the bank it was 55,000?  Can you explain that?

02:00:17 12 A.   Yes.  The time they asked me about that tax return, the

02:00:21 13 bank did need the tax return, and I went and do it, it was just

02:00:27 14 like an estimate for the bank -- like, that's best thing for

02:00:34 15 Wagners Chef to do.  I mean, that's how much they supposed to

02:00:41 16 be doing is 55.

02:00:44 17        You know, when I did that -- I mean, the final tax

02:00:49 18 return, I found a lot of expense and the debts I have to cover

02:00:53 19 up.

02:00:55 20 Q.   Cover up?  But both of these are prepared by Mr. Sewell?

02:01:01 21 A.   Yes, sir.

02:01:01 22 Q.   He's your accountant?

02:01:01 23        THE COURT:  Go back to the top of those tax returns.

02:01:09 24 The first page at the top.

02:01:11 25        MR. DIROSA:  Yes, sir.

*OFFICIAL TRANSCRIPT*

02:01:13 1          THE COURT:  So this is an LLC return, right?

02:01:15 2          MR. DIROSA:  Yes, sir.  I'm sorry.  Yes.

02:01:20 3          THE COURT:  Both of those?  Okay.

02:01:21 4          MR. DIROSA:  Both of them are the return for

02:01:23 5     Wagners Chef.

02:01:23 6          THE COURT:  So the one on the right is the one given to

02:01:27 7     the bank?

02:01:27 8          MR. DIROSA:  The one on the right is the one given to

02:01:30 9     the bank.

02:01:31 10         THE COURT:  The one on the left, where did that come

02:01:34 11    from?

02:01:34 12         MR. DIROSA:  That was prepared on July 27, 2016.

02:01:39 13    That's what I'm asking him, why are they --

02:01:42 14         THE COURT:  The other one was prepared when?

02:01:44 15         MR. DIROSA:  March 1, 2016.  So what I'm trying to find

02:01:49 16    out is why was one prepared for the bank --

02:01:52 17         THE COURT:  Well, wait a minute.  Wait a minute.

02:01:53 18              So were these returns that you actually had filed

02:01:56 19    with the Internal Revenue Service or not?

02:01:59 20         THE WITNESS:  It's -- the first one, I remember when

02:02:03 21    they asked me, the bank, they said, you have to give it to us

02:02:06 22    to process your loan.

02:02:07 23              I went to Mr. Sewell, and he did -- I gave him --

02:02:12 24    I didn't bring the whole thing with me.  I gave him the

02:02:15 25    estimate for the tax return.  Still, I'm not prepared for -- to

02:02:20 1  file the tax return.  I give that for the bank.  So --

02:02:24 2       THE COURT:  So that document on the right, the tax

02:02:28 3  return --

02:02:28 4       THE WITNESS:  It was an estimate.

02:02:30 5       THE COURT:  -- was never filed with the Internal

02:02:32 6  Revenue Service?

02:02:32 7       THE WITNESS:  No, that was an estimate.  It was an

02:02:33 8  estimate.

02:02:33 9       THE COURT:  You had that prepared especially to give to

02:02:37 10  the bank for this loan, right?

02:02:38 11       THE WITNESS:  Yes.  That's what supposed to done.

02:02:39 12       THE COURT:  I'm just trying to understand.  The one on

02:02:41 13  the left, was that prepared and actually filed the Internal

02:02:45 14  Revenue Service?

02:02:45 15       THE WITNESS:  Yes, sir.

02:02:46 16       THE COURT:  Okay.  Now, you can ask follow-up,

02:02:49 17  Mr. DiRosa, if you want to.

02:02:50 18  EXAMINATION BY MR. DIROSA:

02:02:51 19  Q.   So let's look back at the March 1st one, the one you filed

02:03:03 20  with the bank.

02:03:04 21       This March 1st return shows that in 2015, there were

02:03:22 22  distributions of cash of $135,000.  Now, there would be no

02:03:29 23  distribution to anyone but yourself, right?

02:03:34 24  A.   Correct.

02:03:34 25  Q.   Okay.  So that $135,000 went to you?

*OFFICIAL TRANSCRIPT*

02:03:40 1   A.   Again, this was an estimate for the bank when they asked

02:03:44 2   me to go get it to process my loan.  You know, that's the best

02:03:51 3   thing for Wagners Chef.

02:03:53 4   Q.   So which one, if either, of these did you file with the

02:03:58 5   federal government for your taxes?

02:04:00 6        THE COURT:  He just said that when I asked him.  He

02:04:02 7   said the one on the left.  The second one was filed.

02:04:09 8   EXAMINATION BY MR. DIROSA:

02:04:23 9   Q.   Let me show you this document.  This is from the March 1st

02:04:27 10   return.  It shows 54,000.  This is a K-1, a partner's share of

02:04:39 11   income and deductions.  This is the March 1st return.

02:04:45 12   Jadallah Saed.

02:04:45 13        MR. BEH:  Would you please show the whole document.

02:04:47 14        MR. DIROSA:  Possibly, if I can.

02:04:49 15   EXAMINATION BY MR. DIROSA:

02:04:54 16   Q.   Okay.  So this document shows distributions of $133,650.

02:05:06 17   That was your estimated return to the bank, correct?

02:05:12 18   A.   Correct.

02:05:12 19   Q.   Now, you didn't have Mr. Sewell put anything on the

02:05:16 20   document that said, well, this is just an estimated return,

02:05:17 21   we're just guessing?  No?

02:05:17 22   A.   I mean, I don't know if he can do that or he did that.  I

02:05:25 23   don't know.

02:05:25 24   Q.   Okay.  This is the one from July 27th.  Suddenly, this is

02:05:35 25   now $135,000, and the other document -- the other numbers have

been changed.

That's the one you filed with the government, right?

A.   I believe, yes.

Q.   So it's still your testimony that this $107,000 and not taking over the Brothers contract was just the best you could do, correct?

A.   Correct.

Q.   Was there any other reason you couldn't get a liquor license --

A.   Because --

Q.   -- for Wagners Chef in --

A.   Because I'm not a U.S. citizen.

Q.   That's the only reason?

A.   And tax issue, the first -- main thing.

The City changed the rule.  If not U.S. citizen, you can't have beer/liquor license.

I had the manager, he was qualified.  He catch a heart attack that day, and he just pass away.

Q.   Those are the only reasons you couldn't get a liquor license for Wagners Chef?

A.   Yes, sir.

MR. DIROSA:  Judge, may we approach the bench for a minute?

THE COURT:  Okay.

(WHEREUPON, at this point in the proceedings, a

*OFFICIAL TRANSCRIPT*

02:07:45 1     conference was held at the bench.)

02:07:45 2         MR. DIROSA:  I would like to ask him about his

02:07:47 3     conviction.

02:07:47 4         THE COURT:  You can ask him about that.  I said the

02:07:50 5     documents don't go into evidence unless he denies it.  You can

02:07:53 6     ask him if he was convicted of whatever the name of the offense

02:07:57 7     is.  If he admits it, that's the end of it.  If he denies it,

02:08:02 8     you can impeach him with it.  But we're not going into the

02:08:06 9     details of the --

02:08:07 10         MR. BEH:  Nothing beyond the name of the offense and

02:08:10 11     the one count.

02:08:12 12         THE COURT:  Right.  You wanted to introduce the factual

02:08:14 13     basis, I believe, and the plea agreement and all of that.  None

02:08:16 14     of that goes into evidence.

02:08:18 15         MR. DIROSA:  Just because the factual basis said there

02:08:20 16     was money deprived.

02:08:22 17         THE COURT:  That's what we don't go into.

02:08:22 18         MR. DIROSA:  Okay.

02:08:22 19        (WHEREUPON, at this point in the proceedings, the bench

02:08:36 20     conference concluded.)

02:08:36 21         THE COURT:  Okay.  We're back on the record.

02:08:42 22     EXAMINATION BY MR. DIROSA:

02:08:46 23     Q.  Mr. Saed, have you ever been convicted of a felony

02:08:49 24     offense?

02:08:49 25     A.  Yes.

*OFFICIAL TRANSCRIPT*

| 02:08:50 | 1 | Q. Was that felony offense -- actually, you pled guilty. |
| 02:08:55 | 2 | Pardon me.  I'm sorry.  You pled guilty? |
| 02:08:57 | 3 | A. Correct. |
| 02:08:58 | 4 | Q. That was for trafficking in contraband cigarettes, |
| 02:09:03 | 5 | correct? |
| 02:09:03 | 6 | A. Correct. |
| 02:09:04 | 7 | MR. DIROSA:  I don't have any other questions.  Thank |
| 02:09:07 | 8 | you. |
| 02:09:09 | 9 | THE COURT:  Mr. Beh. |
| 02:09:09 | 10 | CROSS-EXAMINATION |
| 02:09:13 | 11 | BY MR. BEH: |
| 02:09:13 | 12 | Q. All right.  Mr. Saed, I want to start off kind of back at |
| 02:10:28 | 13 | the beginning.  We spent a lot of time bouncing around, and I |
| 02:10:33 | 14 | would like to have some discussions about how you got into |
| 02:10:36 | 15 | this. |
| 02:10:36 | 16 | Well, first of all, where are you originally from? |
| 02:10:41 | 17 | A. From Palestine. |
| 02:10:43 | 18 | Q. When did you come to the States? |
| 02:10:45 | 19 | A. 2009. |
| 02:10:46 | 20 | Q. Why did you come to the States? |
| 02:10:48 | 21 | A. I came for, I mean, better economy, doing better business. |
| 02:10:51 | 22 | Q. Are you are married? |
| 02:10:52 | 23 | A. Yes. |
| 02:10:53 | 24 | Q. How long have you been married? |
| 02:10:56 | 25 | A. 11 years. |

*OFFICIAL TRANSCRIPT*

| | | |
|---|---|---|
| 02:10:57 | 1 | Q. Children? |
| 02:10:58 | 2 | A. Three. |
| 02:10:58 | 3 | Q. How old? |
| 02:11:00 | 4 | A. Ten and eight and one years old. |
| 02:11:05 | 5 | Q. Now, you purchased Wagners Chef in the year 2013, correct? |
| 02:11:16 | 6 | A. Correct. |
| 02:11:16 | 7 | Q. Who did you purchase Wagners Chef from? |
| 02:11:22 | 8 | A. From Robert Harvey, Omar Hamdan and Fatmah Hamdan. |
| 02:11:29 | 9 | Q. At the time that you purchased it -- |
| 02:11:42 | 10 | MR. BEH: I'm sorry, Your Honor. |
| 02:11:43 | 11 | THE COURT: Mr. Beh, you've got your head down, and |
| 02:11:48 | 12 | you're mumbling. I'm sure that microphone is not picking you |
| 02:11:51 | 13 | up. |
| 02:11:53 | 14 | MR. BEH: I need to pull this up. |
| 02:11:53 | 15 | EXAMINATION BY MR. BEH: |
| 02:12:11 | 16 | Q. Let's start off looking at this document. Do you recall |
| 02:12:13 | 17 | seeing this document before? |
| 02:12:14 | 18 | A. Yes. |
| 02:12:15 | 19 | Q. This is the acquisition of the membership interests and |
| 02:12:20 | 20 | all assets of Wagners Chef by you and -- at the time, you had a |
| 02:12:27 | 21 | partner, correct? |
| 02:12:27 | 22 | A. Correct. |
| 02:12:27 | 23 | Q. What was his name? |
| 02:12:31 | 24 | A. Nidal Jaber. |
| 02:12:32 | 25 | Q. Nidal Jaber. |

*OFFICIAL TRANSCRIPT*

02:12:33 1          So through this document, you paid $1.2 million for

02:12:40 2     Wagners Chef?

02:12:41 3     A.   Correct.

02:12:42 4     Q.   Now, 200,000 of that was withheld, and basically held in

02:12:48 5     escrow, pending the seller's resolving some outstanding issues?

02:12:53 6     A.   Correct.

02:12:53 7     Q.   If we go down and look at paragraph six here --

02:13:01 8          MR. BEH:   This is, Your Honor, Exhibit Number 51.

02:13:01 9     EXAMINATION BY MR. BEH:

02:13:04 10    Q.   This acknowledged -- the sellers are acknowledging there

02:13:12 11    are these outstanding pieces of litigation; is that correct?

02:13:14 12    A.   Correct.

02:13:15 13    Q.   So that 200,000 was to be withheld pending those -- the

02:13:21 14    resolution of those issues?

02:13:22 15    A.   Correct.

02:13:23 16    Q.   Were those issues ever resolved?

02:13:28 17    A.   Some of them, yes.

02:13:28 18    Q.   Some of them, yes.

02:13:30 19         Did you ever -- was there ever a payment of the

02:13:33 20    200,000 to the sellers of the property, of Wagners Chef?

02:13:38 21    A.   No.

02:13:38 22    Q.   That's because there were still some of those issues are

02:13:42 23    outstanding?

02:13:43 24    A.   Correct.

02:13:43 25    Q.   Now, part of the representation -- well, let me identify

*OFFICIAL TRANSCRIPT*

02:13:51 1   some more people here.

02:13:53 2           The buyers are you and Mr. Jaber, correct?

02:13:57 3   A.   Correct.

02:13:57 4   Q.   Then the sellers are Robert Harvey, Omar Hamdan,

02:14:06 5   Fatmah Hamdan and Wagners Chef, LLC and Aberta, Inc., right?

02:14:08 6   A.   Correct.

02:14:08 7   Q.   That group of people is all collectively the sellers?

02:14:12 8   A.   Yes.

02:14:14 9   Q.   If we come down and look at the representations,

02:14:20 10  representation and warranties of the sellers, it says, in (f):

02:14:25 11  There is no material liability loss, contingency, contractual

02:14:29 12  liability or obligation of the sellers related to the

02:14:34 13  gas station property of any nature, whether absolute, accrued,

02:14:38 14  contingent or otherwise, other than those specifically listed

02:14:41 15  in Section 9 of this agreement.

02:14:45 16          Did I read that correctly?

02:14:45 17  A.   Correct.

02:14:46 18  Q.   So they're saying there is no contracts, there is no

02:14:48 19  obligations, there is nothing except what's disclosed below?

02:14:53 20  A.   Correct.

02:14:53 21  Q.   Then it also says, in the next one:  Within 30 days of the

02:15:00 22  closing, sellers will have filed all tax returns and reports

02:15:05 23  required to be filed, including those with respect to income,

02:15:10 24  payroll, property, withholding, Social Security, unemployment,

02:15:14 25  franchise -- and it goes on and lists every possible taxes --

*OFFICIAL TRANSCRIPT*

02:15:17 1    and the sellers will pay in full all taxes, assessments, fees,

02:15:23 2    charges that have become due as reflected on such returns or

02:15:31 3    report and any interest and penalties will also be paid.  All

02:15:35 4    such returns shall be true and correct in all material

02:15:40 5    respects.  Sellers have no continent tax liability ink any way

02:15:44 6    related to the gas station property.

02:15:46 7         Did I read that correctly?

02:15:47 8    A.   Correct.

02:15:47 9    Q.   So at the time that you entered into this agreement, which

02:15:51 10   was November 15, 2013, it was represented to you that there was

02:15:59 11   no contractual liability, and that all taxes had been paid --

02:16:03 12   A.   Correct.

02:16:04 13   Q.   -- correct?

02:16:05 14   A.   Yes.

02:16:05 15   Q.   So that representation is made to you; and, based, in

02:16:12 16   part, on that, you paid approximately a million dollars for

02:16:16 17   Wagners Chef?

02:16:16 18   A.   Yes.

02:16:16 19   Q.   Following the purchase of Wagners Chef, did you discover

02:16:32 20   that there were several of those representations and warranties

02:16:36 21   that, in fact, weren't true?

02:16:37 22   A.   Yes.

02:16:38 23   Q.   For example, there is a representation in there that there

02:16:45 24   is no outstanding contracts or contractual liability, right?

02:16:52 25   A.   Yes.

*OFFICIAL TRANSCRIPT*

| | | |
|---|---|---|
| 02:16:52 | 1 | Q.   At the time that you bought Wagners Chef -- I've pulled up |
| 02:16:58 | 2 | what's been marked as Exhibit Number 1 -- did you know that |
| 02:17:01 | 3 | there was a contract in place between Wagners Chef and |
| 02:17:05 | 4 | Brothers? |
| 02:17:05 | 5 | A.   No. |
| 02:17:06 | 6 | Q.   Now, if we come down here a little bit -- |
| 02:17:10 | 7 |      MR. BEH:  I apologize, Your Honor. |
| 02:17:13 | 8 | EXAMINATION BY MR. BEH: |
| 02:17:17 | 9 | Q.   -- this contract is actually originally between B-Xpress |
| 02:17:24 | 10 | and Brothers, correct? |
| 02:17:26 | 11 | A.   Correct. |
| 02:17:27 | 12 | Q.   See, the original signatures are accepted by B-Xpress |
| 02:17:34 | 13 | Louisa, LLC, and that's signed by Fatmah Hamdan.  Then, it's |
| 02:17:38 | 14 | accepted by Brothers, and I can't see who that signature is. |
| 02:17:41 | 15 |      So at the beginning, those were the parties that |
| 02:17:44 | 16 | were -- the entities that were a party to this contract? |
| 02:17:48 | 17 | A.   Yes. |
| 02:17:48 | 18 | Q.   Then, if you look at the handwritten portion of it, it |
| 02:17:53 | 19 | says:  Ratified this 4th day of June, 2013.  Robert Harvey, |
| 02:18:02 | 20 | sole member, B-Xpress Louisa, LLC, Wagners Chef, LLC, and then |
| 02:18:10 | 21 | Mr. Harvey's name again? |
| 02:18:12 | 22 | A.   Correct. |
| 02:18:12 | 23 | Q.   So, at the time that you bought Wagners Chef and at the |
| 02:18:16 | 24 | time you valued it at a million dollars, you didn't know this |
| 02:18:19 | 25 | contract existed? |

*OFFICIAL TRANSCRIPT*

02:18:20  1    A.   Never knew about it.

02:18:21  2    Q.   Do you consider -- well, let me ask you this:  Do you

02:18:31  3    believe that this contract -- would you have valued

02:18:35  4    Wagners Chef the same way you did had you known this contract

02:18:39  5    existed?  Would you have paid as much as you did knowing this

02:18:43  6    contract is there?

02:18:44  7    A.   No.

02:18:44  8    Q.   Why not?

02:18:48  9    A.   It's a hard contract.  I can't -- I mean, I can't sign

02:18:53 10    this contract even more than my lease.  My lease was -- it's

02:18:59 11    five, five -- I think, for 10 years and five option.  This

02:19:03 12    contract is signed for 15 years and five option.

02:19:07 13    Q.   Does Wagners Chef get any rebates under this contract?

02:19:11 14    A.   No, sir.

02:19:12 15    Q.   In your experience, is retailers receiving rebates from

02:19:19 16    distributors or suppliers of gas pretty common?

02:19:23 17    A.   Yes, sir.

02:19:23 18    Q.   So you would not have paid what you paid for Wagners Chef

02:19:28 19    had you reviewed this contract?

02:19:29 20    A.   No, sir.

02:19:30 21    Q.   Now, we also spent a good bit of time looking at -- this

02:19:39 22    morning, looking at this tax lien.  Do you recall that?

02:19:43 23    A.   Yes.

02:19:45 24    Q.   So this is a -- it says:  Notice of Sales Tax Assessment

02:19:51 25    and Lien.  Addressed to Wagners Chef, dated June 4, 2014,

02:20:00 1  correct?

02:20:00 2  A.    Correct.

02:20:00 3  Q.    So this was dated after you purchased Wagners Chef?

02:20:05 4  A.    That's correct.

02:20:05 5  Q.    Now, if you look down where it says, kind of tax, it says:

02:20:12 6  Sales tax, tax period ended 5/31/13.  Then it's got an interest

02:20:20 7  date through the date of -- through June 4, 2014, and then an

02:20:23 8  amount of $438,161.

02:20:27 9          Did I read that correctly?

02:20:29 10  A.    Correct.

02:20:29 11  Q.    So you bought -- from the agreement we just looked at,

02:20:35 12  Exhibit 51, you purchased Wagners Chef November 15, 2013?

02:20:42 13  A.    Correct.

02:20:42 14  Q.    So this $438,000 tax liability predated your purchase of

02:20:51 15  Wagners Chef?

02:20:51 16  A.    That's correct.

02:20:51 17  Q.    The fact that this exists violates several of the

02:20:57 18  representations and warranties that were made by the sellers of

02:21:03 19  Wagners Chef to you?

02:21:05 20  A.    Correct.

02:21:05 21          MR. DIROSA:  Judge, let me just make an objection as to

02:21:09 22  relevance.  The contract has been ruled to be valid and binding

02:21:13 23  on Wagners Chef.  What happened between those two parties --

02:21:18 24          THE COURT:  All right.  Let me ask Mr. Beh.  Where are

02:21:21 25  you going with this?  What's the relevance of this?

*OFFICIAL TRANSCRIPT*

02:21:23  1      MR. BEH:  Well, the relevance of it, Your Honor, is the

02:21:26  2  valuation and how much Wagners Chef is worth.  They are using a

02:21:31  3  million dollars as the valuation and the goodwill.  That's how

02:21:35  4  much it was purchased for.  But what my point is, is he was --

02:21:38  5  he made a million dollars for it, not knowing that there was

02:21:41  6  this unfavorable contract.  He paid a million dollars not

02:21:46  7  knowing that there is a half a million dollars in taxes.

02:21:49  8      THE COURT:  All right.  Well, he's already said that,

02:21:51  9  so I think we can move on.  Let's go.  All right.

02:21:55 10  EXAMINATION BY MR. BEH:

02:22:04 11  Q.   So based on -- just a final question on that -- based on

02:22:07 12  the existence of the contract and the existence of these

02:22:11 13  tax liens, that would have had a significant reduction in the

02:22:14 14  value of Wagners Chef from what you paid?

02:22:16 15  A.   Yes.

02:22:17 16  Q.   Now, you also -- at the time you entered into this -- at

02:22:23 17  the time you bought the property -- or bought Wagners Chef's

02:22:28 18  interest, you entered into a lease of the property with

02:22:34 19  Wagner World; is that correct?

02:22:34 20  A.   Correct.

02:22:35 21  Q.   This is for the record property that's at 4301 Louisa --

02:22:43 22  the corner of the Louisa and Chef Highway?

02:22:43 23  A.   Correct.

02:22:48 24  Q.   Or Chef Menteur Highway.  Excuse me.

02:22:48 25  A.   I think it's the same thing.

*OFFICIAL TRANSCRIPT*

02:22:49 1  Q.  So what I've pulled up is the original lease signed on

02:22:56 2  November 15, 2013.  A couple points I want to raise here.

02:23:03 3       First, let's look at -- did Brothers Petroleum have

02:23:17 4  any interest in this lease?

02:23:19 5  A.  No.

02:23:19 6  Q.  In fact, if you look at section 22 here --

02:23:39 7       THE COURT:  What's the exhibit number, again?

02:23:42 8       MR. BEH:  Excuse me, Your Honor.  This is Exhibit

02:23:45 9  Number 2.  We're on page 53.

02:23:46 10      THE COURT:  Okay.  Thank you.

02:23:47 11 EXAMINATION BY MR. BEH:

02:23:49 12 Q.  It says:  Section 22:  Solely for the Benefit of Parties.

02:23:54 13 It is expressly understood and agreed that this lease and the

02:23:57 14 covenants contained in it are for the sole benefit of landlord

02:24:01 15 and tenant --

02:24:01 16      That's Wagner World and Wagners Chef, correct?

02:24:03 17 A.  Yes.

02:24:04 18 Q.  -- their successors, assigns, and that all rights of

02:24:09 19 action for any breach or any covenant contained in this lease

02:24:12 20 are reserved for those parties.

02:24:15 21      It is further expressly understood and agreed that

02:24:17 22 those parties may, by mutual agreement, alter, amend, modify or

02:24:22 23 revoke or rescind this lease or any covenant contained in it at

02:24:27 24 any time -- in writing and at any time.

02:24:31 25      Did I read that correctly?

*OFFICIAL TRANSCRIPT*

| 02:24:32 | 1 | A.   Yes. |
| 02:24:32 | 2 | Q.   So that's just confirming who the parties are that have an |
| 02:24:36 | 3 | interest under the lease, and it's Wagner World and |
| 02:24:39 | 4 | Wagners Chef? |
| 02:24:39 | 5 | A.   Correct. |
| 02:24:39 | 6 | Q.   Now, if we look at page 23, it talks about an option to |
| 02:24:48 | 7 | purchase the property. |
| 02:24:50 | 8 | A.   Correct. |
| 02:24:50 | 9 | Q.   So there was an option that was granted to Wagners Chef to |
| 02:24:54 | 10 | purchase the property -- |
| 02:24:55 | 11 | A.   Yes. |
| 02:24:55 | 12 | Q.   -- under this lease? |
| 02:24:57 | 13 |         It says:  If this option -- |
| 02:25:02 | 14 |         MR. BEH:  This is subsection C.  Your Honor, I'm on |
| 02:25:05 | 15 | page 54. |
| 02:25:06 | 16 | EXAMINATION BY MR. BEH: |
| 02:25:07 | 17 | Q.   -- if this option, the tenant purchase, is exercised by |
| 02:25:11 | 18 | tenant, the purchase price shall be $1.6 million, provided, |
| 02:25:16 | 19 | however, the tenant shall be entitled to a credit toward such |
| 02:25:19 | 20 | purchase price in the amount of the principal portion -- |
| 02:25:21 | 21 |         THE COURT:  Where are you reading from? |
| 02:25:23 | 22 |         MR. BEH:  Subsection (c), Your Honor. |
| 02:25:27 | 23 |         THE COURT:  It says 2.6 million.  You said 1.6 million. |
| 02:25:30 | 24 |         MR. BEH:  Oh, did I say 1.6?  I apologize. |
| 02:25:34 | 25 |         THE COURT:  I think you did. |

*OFFICIAL TRANSCRIPT*

02:25:34 1          MR. BEH:  2.6 million.

02:25:34 2     EXAMINATION BY MR. BEH:

02:25:36 3     Q.    -- except tenant understands and agrees that no credit

02:25:38 4     towards such purchase price shall be given any portion for the

02:25:42 5     interim rent payment.

02:25:43 6               So there was some equity buildup based on a portion

02:25:46 7     of the rentals that were paid by Wagners Chef?

02:25:50 8     A.    Yes.

02:25:51 9     Q.    So you entered into this lease the same day you bought the

02:25:55 10    property, November 15, 2013?

02:25:58 11    A.    Yes.

02:25:59 12    Q.    Did there come a time when Wagner World sent you a notice

02:26:05 13    of default?

02:26:05 14    A.    Yes.

02:26:07 15    Q.    Let's look at Exhibit Number 61.

02:26:35 16              So what I've pulled up as Exhibit Number 61, which is

02:26:40 17    a rule to evict which was filed by Wagner World in August of

02:26:49 18    2014, correct?

02:26:51 19    A.    Correct.

02:26:51 20              MR. DIROSA:  I'm going to object to this --

02:26:51 21              THE COURT:  Wait, wait, sir.

02:26:53 22              MR. DIROSA:  -- as hearsay.  It's not filed by

02:26:56 23    Wagners Chef.  It's filed by Wagner World.  No one from

02:26:59 24    Wagner World is coming here to testify.  These are just

02:27:02 25    allegations --

                         *OFFICIAL TRANSCRIPT*

THE COURT:  Well, this is a document from the court.
It seems like it's a public record, right?

MR. BEH:  It's from --

MR. DIROSA:  It is a public record, but that doesn't
mean it's not hearsay.  It's not allegations.  Whether they are
proven, unproven, we don't even know.

MR. BEH:  Your Honor, I'm not offering it --

THE COURT:  I think, if the only person -- he said he
was threatened to be evicted, right, earlier?

MR. BEH:  Yes, sir.

THE COURT:  This just shows that he was threatened to
be evicted.

He's Wagners Chef, so why is that hearsay?

MR. DIROSA:  I'm good with that.  If we go into
allegations that are made in that pleading that are
unsubstantiated or there is no one here to testify about them
except --

THE COURT:  You're talking about allegations made by
Wagner World?

MR. DIROSA:  Exactly.

THE COURT:  Yes.  Well, I'll agree with that.  I don't
think we can go any further than what you just showed right
there.  You're attempting to corroborate what he said earlier,
so we've done that.

MR. BEH:  Well, and, Your Honor, I'd also like to --

02:28:05 1    not for truth of the matter asserted, but a couple of things,

02:28:08 2    that you received this, and you received that.

02:28:10 3            THE COURT:  Well, he received the notice of a rule to

02:28:13 4    evict.  So that's -- I don't think we need to go beyond that.

02:28:16 5    Okay.

02:28:16 6    EXAMINATION BY MR. BEH:

02:28:20 7    Q.    So, Mr. Saed, as of August 2014, there was a pending

02:28:28 8    lawsuit to evict Wagners Chef by Wagner World?

02:28:38 9    A.    Yes.

02:28:39 10   Q.    An attachment to that exhibit -- attached as Exhibit B to

02:29:33 11   that petition is a letter from the Wolfe Law Group addressed to

02:29:42 12   Wagners Chef dated June 9, 2014; is that correct?

02:29:45 13           MR. DIROSA:  Same objection.  This is hearsay.

02:29:47 14           THE COURT:  Well, if he received this letter, I don't

02:29:53 15   know why it's hearsay, why he can't testify that he received it

02:29:57 16   and what it said, if he was --

02:30:02 17           MR. DIROSA:  Because, again, it's merely allegations

02:30:05 18   made --

02:30:05 19           THE COURT:  That's fine.  But he can say, these

02:30:07 20   allegations were made against me.  That's a fact, right?

02:30:11 21               Okay.  Overrule your objection.

02:30:13 22               Go ahead.  Come on.  We're wasting time.  Let's

02:30:15 23   move on.

02:30:16 24   EXAMINATION BY MR. BEH:

02:30:17 25   Q.    So attached to this is -- on behalf of Wagner World, this

*OFFICIAL TRANSCRIPT*

02:30:23 1  letter shall constitute formal notice to Wagners Chef of

02:30:26 2  numerous breaches of the lease.

02:30:28 3         So this is a letter that was putting Wagners Chef on

02:30:31 4  notice by Wagner World to what Wagner World asserted were

02:30:39 5  breaches to the lease?

02:30:40 6  A.   Correct.

02:30:41 7  Q.   One of those, if you look --

02:30:43 8         MR. BEH:  Again, Your Honor, I'm on page 4.  1251 is

02:30:52 9  the Bates number for the document.

02:30:52 10  EXAMINATION BY MR. BEH:

02:30:54 11  Q.   It says:  Unauthorized encumbrance and/or mortgage of

02:30:57 12  assets.

02:31:00 13         It says:  Wagners Chef recently provided Wagner World

02:31:03 14  with a copy of a petroleum distribution contract executed by

02:31:08 15  Brothers Petroleum and B-Xpress.  The Brothers contract was

02:31:13 16  also signed and ratified by Mr. Harvey on June 4, 2013.

02:31:20 17         It says:  While it is unclear whether Wagners Chef is

02:31:23 18  a party to the Brothers contract, Brothers remains the gas

02:31:27 19  supplier on the property and is currently doing business with

02:31:30 20  Wagners Chef, presumably under the terms of the relevant

02:31:33 21  contract.  Brothers contract provides for the --

02:31:36 22         THE COURT:  Okay.  This is going way down in the weeds.

02:31:40 23  This is exactly why I first said you can't do this.

02:31:44 24         So if you want to show -- he got a letter saying

02:31:47 25  you were in default of the lease.  That's it.  Let's move on.

*OFFICIAL TRANSCRIPT*

02:31:49  1      MR. BEH:  Well, Your Honor --

02:31:50  2      THE COURT:  No, let's move on.

02:31:51  3      MR. BEH:  Yes, sir.  Okay.

02:31:52  4  EXAMINATION BY MR. BEH:

02:31:59  5  Q.   So after you received that -- so you're in -- there was a

02:32:05  6  lawsuit filed by Wagner World trying to evict Wagners Chef.

02:32:10  7      Did you also at some point come up where you were

02:32:14  8  having problems with Mr. Jaber?

02:32:15  9  A.   Yes.

02:32:15 10  Q.   Can you explain what those problems were?

02:32:18 11  A.   Mr. Jaber, he used to be manager at company.  He managed

02:32:24 12  Wagners Chef.  He missed -- I mean, he bounced a lot of check

02:32:32 13  and send a lot of ACH draft for gas back.

02:32:37 14      I went to that company.  He was behind almost

02:32:41 15  $300,000 at this company.  I file a suit against him because

02:32:46 16  missing a lot of money.  At end of the day, I mean, I bought

02:32:53 17  out his interest, and I bought him out.

02:32:55 18  Q.   So, by 2014, you -- Wagners Chef is now in litigation with

02:33:03 19  Wagner World over the lease, and you just indicated you were in

02:33:06 20  litigation with Mr. Jaber about the ownership and management of

02:33:12 21  Wagners Chef?

02:33:12 22  A.   Right, yes.

02:33:12 23  Q.   At some point in late 2015, early 2016, did you resolve

02:33:22 24  the litigation with Mr. Jaber?

02:33:24 25  A.   Yes.

*OFFICIAL TRANSCRIPT*

02:33:26  1   Q.   You ended up agreeing to buy him out of his portion of the

02:33:30  2   business?

02:33:30  3   A.   Yes.

02:33:31  4   Q.   Second of all, you resolved the outstanding claims with

02:33:38  5   Wagner World?

02:33:38  6   A.   Yes.

02:33:38  7   Q.   As part of those claims, you entered into an amended lease

02:33:44  8   with Wagner World, correct?

02:33:46  9   A.   Correct.

02:33:46 10   Q.   You signed that amended lease, which has been previously

02:33:52 11   marked as Exhibit 3, which is an amendment to the triple net

02:33:58 12   lease that was signed on February 10, 2015?

02:34:01 13   A.   Yes.

02:34:02 14   Q.   Now, if we look at the terms of this amended lease, it

02:34:06 15   also, in subsection 4, gives you -- it reaffirms the option to

02:34:12 16   purchase the property, correct?

02:34:14 17   A.   Correct.

02:34:14 18   Q.   Then it talks about the purchase price is now 2.8 million,

02:34:24 19   where it was previously 2.6 million, correct?

02:34:27 20   A.   Yes.

02:34:27 21   Q.   It also says:  All monthly payments made between

02:34:31 22   August 10th, 2015, and February 9, 2018, shall be credited

02:34:39 23   toward the principal and interest of the purchase price.

02:34:41 24        So you were, again, potentially building up equity in

02:34:45 25   the property?

**OFFICIAL TRANSCRIPT**

02:34:45 1    A.    Yes.

02:34:46 2    Q.    This was granted in favor of Wagners Chef?

02:34:49 3    A.    Yes.

02:34:49 4    Q.    But then it says -- again, we're in subsection 4 -- if

02:34:57 5    Wagners Chef does not purchase the property on or before

02:35:00 6    February 9, 2018, the option to purchase shall terminate

02:35:05 7    immediately.  In that event, the monthly payments made between

02:35:10 8    August 10, 2015, and February 9, 2018, shall be treated

02:35:16 9    exclusively as rent, and Wagner World shall not be required to

02:35:20 10   refund or credit any such funds to Wagners Chef in any respect.

02:35:25 11          Did I read that correctly?

02:35:26 12   A.    Correct.

02:35:27 13   Q.    So Wagners Chef did have an option to purchase it; but, if

02:35:32 14   Wagners Chef didn't exercise that option by a certain

02:35:35 15   timeframe, it both lost the option, and it lost any equity it

02:35:40 16   had in the property?

02:35:41 17   A.    Yes.

02:35:41 18   Q.    Okay.  So we're now up to February of 2015.  You've

02:35:58 19   resolved these claims.  At that point, the only outstanding

02:36:03 20   issue -- well, you've resolved the claims, you thought, with

02:36:07 21   Wagner World, and you'd purchased the interest of Mr. Jaber?

02:36:10 22   A.    Yes.

02:36:10 23   Q.    Now, you were still dealing with the tax lien and the

02:36:16 24   contract?

02:36:16 25   A.    Correct.

**OFFICIAL TRANSCRIPT**

Q.   Did there come a time when Wagner World asserted, again, that Wagners Chef was in breach of its lease?

A.   Yes.

Q.   I'm showing you a document which we've previously marked as Exhibit 62, which is a second rule to evict filed by Wagner World against Wagners Chef dated April 18, 2016; is that correct?

A.   Yes.

Q.   So despite the fact that you previously settled this, you were now facing yet another eviction suit by Wagner World?

A.   Yes.

Q.   If the lease -- if they had prevailed in this -- well, let me ask you this:  Wagner World was seeking to terminate its lease with Wagners Chef, correct?

A.   Yes.

Q.   If that lease had been terminated, the option would have been terminated as well?

A.   Correct.

Q.   At about this time -- do you remember when we were talking to Ms. Kleindorf this morning -- you had gone to First NBC and inquired into potentially getting a loan to purchase the property at issue?

A.   Yes.

Q.   You were -- at the time that you were served with this second eviction proceeding in April of 2016, you had already

02:38:04 1    initiated that process?

02:38:05 2    A.    Yes.

02:38:06 3    Q.    Did this spur it along or give you an additional reason to

02:38:11 4    want to purchase the property?

02:38:12 5    A.    Yes.

02:38:14 6    Q.    Why?

02:38:15 7    A.    I mean, because I'm going to lose everything.  If I don't

02:38:21 8    purchase the property, I can't -- I mean, I'm going to lose --

02:38:25 9    I mean, I'm going to lose the whole thing.

02:38:29 10   Q.    Now, we also looked through, and one of the other issues

02:38:34 11   we looked at was the tax lien which was filed, and which was

02:38:40 12   based on the timeframe prior to your purchase of Wagners Chef.

02:38:45 13   A.    Yes.

02:38:46 14   Q.    Had that tax lien been resolved by this point?

02:38:50 15   A.    No.

02:38:50 16   Q.    So you were faced with the potential for losing the

02:39:02 17   property, losing the lease, but your -- did you -- your ability

02:39:09 18   to borrow the money from First Bank in the name of Wagners Chef

02:39:15 19   was adversely impacted, if not precluded, by the existence of

02:39:19 20   that tax lien?

02:39:20 21   A.    Yes.

02:39:20 22   Q.    As we went through this morning, we looked at the

02:39:24 23   mortgage.  Part of the mortgage is that there can't be any

02:39:27 24   outstanding tax liability for either the property or the

02:39:31 25   mortgage-issuing entity, correct?

*OFFICIAL TRANSCRIPT*

02:39:33 1    A.    Correct.

02:39:33 2    Q.    Right.  That was all in Exhibit 11.

02:39:37 3          Also, there were certain representations and

02:39:40 4    warranties that the mortgagor had to make that Wagners Chef

02:39:43 5    couldn't make anymore?

02:39:45 6    A.    Correct.

02:39:45 7    Q.    So, as a result of that, did you make a determination as

02:39:56 8    to whether Wagners Chef could, in fact, exercise the option and

02:40:00 9    buy the property?

02:40:01 10    A.    That's correct.

02:40:01 11    Q.    Could it do so?

02:40:03 12    A.    No.

02:40:03 13    Q.    Because it couldn't provide the representations that the

02:40:07 14    bank needed?

02:40:08 15    A.    Yes.  I can't -- I mean, I can't exercise the option with

02:40:13 16    Wagners Chef.

02:40:13 17    Q.    Okay.  So, you decide -- once you made that determination,

02:40:18 18    what did you decide to do?

02:40:21 19    A.    To just use different entity to --

02:40:26 20    Q.    So you decided to have the property purchased by

02:40:31 21    Jadallah Enterprises?

02:40:35 22    A.    Jadallah Enterprises.

02:40:36 23    Q.    Was the motivation behind that to try to keep the property

02:40:40 24    out of Wagners Chef's hands, or was the motivation for that to

02:40:44 25    be able to pursue and exercise the option?

*OFFICIAL TRANSCRIPT*

A.    No.  I want to exercise the option.  At that time, even
under Jadallah Enterprises, when I went to Wagner World, they
didn't agree at first.  I mean, they wanted me to get --
exercise the option.  4.

I try a couple of times.  I mean, I can't get it
under Wagners Chef.  Because I went to different, I mean,
brokers and bank, and I can't get it because the tax lien, and
I never going to have, I mean, clear tax from the city and the
state under Wagners Chef.

When I went to Fidelity Bank, they just said, the
only thing -- I mean, you have to resolve the tax lien, and you
can come back after being done.  That's before Wagner World
raised the price from 2.6 to 2.8.

Q.  So, at that point, you decided to basically assign
Wagners Chef's rights to Jadallah Enterprises --

MR. DIROSA:  I object to the leading nature of the
question.

THE COURT:  It is leading.  Even though you're
technically on cross-examination, he's your witness.

MR. BEH:  I understand, Your Honor.

THE COURT:  Go ahead.

EXAMINATION BY MR. BEH:

Q.  So what was the decision that was made at that point, to
proceed with the sale under whose name?

A.    It's under Jadallah Enterprises, just a new entity.

*OFFICIAL TRANSCRIPT*

Q.   Okay.  Now, was -- when we looked at Exhibit 7 this
morning, originally, the approved buyer -- borrower was going
to be Wagners Chef, LLC, and the guarantor was going to be you
individually, correct?

A.   Correct.

Q.   But was it as a result of the tax lien and other problems
that you made an amendment to that agreement?

A.   It's the tax lien.

Q.   Right.  So then, after that, the amendment is that the
guarantors will be Wagners Chef, LLC, Jadallah Saed, new entity
to be formed for real estate holding company, and then the
borrower will be yet another new entity, correct?

A.   Correct.

Q.   Did that transaction come to completion?  Did you -- did
Jadallah Enterprises end up buying the property?

A.   Yes.

Q.   What date did they buy the property?

A.   It's July 8, 2016.

Q.   We've looked at the cash sale documents previously today.
I can pull them up, and we can look at them, again.  But that
is the date of that?

A.   Correct.

Q.   Now, in your discussion with Mr. DiRosa, we also looked at
the cancellation of the lease.

        So this is an act of cancellation of the lease.  It

*OFFICIAL TRANSCRIPT*

02:44:18 1  references that there was an original lease that was filed

02:44:22 2  between Wagner World and Wagners Chef that was dated

02:44:26 3  November 15, 2013, notice of which was recorded, and then it

02:44:32 4  gives the instrument number.

02:44:33 5        Then it talks about an amendment to the triple net

02:44:37 6  lease, notice of which was recorded, and then it gives, again,

02:44:41 7  the instrument number, correct?

02:44:43 8  A.   Correct.

02:44:43 9  Q.   So what this is saying is -- and request the clerk to

02:44:49 10  evidence these cancellation in the records of the conveyance

02:44:54 11  office.

02:44:54 12        So Wagner World and Wagners Chef, through this

02:44:56 13  document, are simply going into the public record and saying,

02:45:02 14  cancel the notices of lease?

02:45:03 15  A.   Yes.

02:45:04 16  Q.   Because that's all it says.  It says:  Request the clerk

02:45:12 17  of court to evidence these cancellation in the records of the

02:45:16 18  conveyance office.

02:45:17 19        So that's what was done through this document?

02:45:19 20  A.   Yes.

02:45:20 21  Q.   Then, we also -- we looked at the mortgage exhibit.  Then

02:45:26 22  we looked at a lease between Ahmed 1 and Jadallah Enterprises.

02:45:36 23        Now, during your conversation with Mr. DiRosa, he

02:45:39 24  brought up this document, which is a triple net lease between

02:45:47 25  Jadallah Enterprises and Ahmed 1, correct?

*OFFICIAL TRANSCRIPT*

02:45:49  1  A.   Correct.

02:45:50  2  Q.   Now, if we look at the bottom of this document, go all the

02:45:54  3  way down to the end, it's not signed; is that correct?

02:46:14  4  A.   Correct.

02:46:15  5  Q.   Do you believe that this is the final lease between

02:46:23  6  Jadallah Enterprises and Ahmed 1?

02:46:25  7  A.   No.

02:46:26  8  Q.   You identified, in this version of the lease, that the

02:46:32  9  rental amount is $18,000?

02:46:37  10  A.   It's not correct.  Yes.

02:46:37  11      MR. DIROSA:  Judge, let me make this objection.  This

02:46:39  12  is an uncontested exhibit.  Now, he's going to contradict --

02:46:43  13      THE COURT:  This exhibit is in the book as an

02:46:45  14  unobjected-to exhibit?

02:46:47  15      MR. DIROSA:  Yes.

02:46:48  16      MR. BEH:  As an unsigned document, Your Honor.

02:46:55  17      MR. DIROSA:  He's both parties to the document.  If he

02:46:57  18  can't come up with a signed copy --

02:47:01  19      THE COURT:  Well, I'll let him testify, but -- it's in

02:47:05  20  evidence as an unobjected-to document.

02:47:08  21      MR. BEH:  I understand, Your Honor.

02:47:10  22  EXAMINATION BY MR. BEH:

02:47:11  23  Q.   So this indicates that there is a rent for the lease of

02:47:15  24  $18,000.  Is it your belief that that's the correct amount?

02:47:19  25  A.   No.

*OFFICIAL TRANSCRIPT*

Q.   What is the correct amount, in your understanding?

THE COURT:  So wait a minute.  I'm confused.  There is an uncontested document stating what the lease amount is.  Is there another lease?

MR. DIROSA:  No.

THE COURT:  A signed document or another version of this lease with a different amount in it?

MR. BEH:  No, sir.  We've never been able to find another document.  But a lease can be an oral document.  It can be an oral agreement.  All we're doing is indicating --

THE COURT:  I don't think you can amend a written lease with an oral agreement.

MR. BEH:  But, Your Honor, this lease --

THE COURT:  I'm not going to let him contest his own document that has a number in it.  Okay.

EXAMINATION BY MR. BEH:

Q.   All right.  So, we are now -- on July 8, 2016, the property has been purchased by Jadallah Enterprises, correct?

A.   Yes.

Q.   The lease between -- recordation of the lease between -- between Wagner World and Wagners Chef has now been canceled?

A.   Yes.

Q.   A lease has been entered into between Jadallah Enterprises and Ahmed 1?

A.   Correct.

*OFFICIAL TRANSCRIPT*

02:48:37 1  Q.   Where is Wagners Chef operating on the day after that

02:48:46 2  transaction?

02:48:47 3  A.   Yes.

02:48:47 4  Q.   Where are they operating?  On the same property?

02:48:53 5  A.   Yeah, on the same property.

02:48:54 6  Q.   So Wagners Chef is still buying gasoline and selling

02:48:58 7  gasoline?

02:48:58 8  A.   Yes, sir.

02:48:59 9  Q.   It's still operating its convenience store?

02:49:03 10 A.   Yes.

02:49:03 11 Q.   So, the transactions, the sale, the cancellation of the

02:49:09 12 lease, and the lease from Jadallah Enterprises to Ahmed 1, have

02:49:14 13 not impacted Wagners Chef's operations at all?

02:49:17 14 A.   No.

02:49:18 15 Q.   All right.  So, right after that, you were continuing to

02:49:40 16 operate.  In July and August of 2016, were you -- was

02:49:48 17 Wagners Chef taking any action to try to comply with the

02:49:54 18 outstanding judgment of the state court with respect to

02:50:00 19 purchasing gas from Brothers again?

02:50:02 20 A.   Yes.

02:50:04 21 Q.   What were they doing?

02:50:05 22 A.   I mean -- you mean, did I stay purchasing gas and

02:50:11 23 cooperate with the Brothers?

02:50:13 24 Q.   In your discussions with Mr. DiRosa, you talked about

02:50:17 25 needing to get some additional equipment.  Tell me

**OFFICIAL TRANSCRIPT**

02:50:20 1 specifically, what were you talking about?

02:50:22 2 A.    It was -- they have special software for Exxon.  They come

02:50:30 3 through one company.  They call it Rittner.  I notify the

02:50:51 4 company I need the software to get back with Exxon, because

02:50:57 5 their credit card go through Exxon.  It's not through Brothers;

02:51:02 6 they go through Exxon.

02:51:05 7      The Brothers say -- they came back, they said you

02:51:07 8 have to update your version.  You have version 8.  You have to

02:51:12 9 go to version 11.  You have to update it.

02:51:16 10      At that time, it's -- they send me an estimate --

02:51:20 11 like, a week later or two week later, they send me an estimate

02:51:23 12 for new equipment, the whole new equipment, for 11,000 and some

02:51:28 13 change.

02:51:29 14      I tried to find it's cheaper than that.  I can't find

02:51:33 15 it.  Finally, I order that equipment from Rittner.  They took

02:51:38 16 some time to send it to the location.  The Brothers Petroleum,

02:51:44 17 they supposed to send someone to hook it up and do their work,

02:51:48 18 I mean, because that's a new system.

02:51:54 19      After that, I mean, I went back with get delivery

02:51:59 20 from Brothers.  That took me a little while, until they

02:52:02 21 answered the phone and send me gas too.

02:52:04 22 Q.    But by September of 2016, Wagners Chef is purchasing gas

02:52:10 23 from Brothers?

02:52:11 24 A.    Yes.

02:52:14 25 Q.    Now, is the tax lien issue still out there?  That's never

*OFFICIAL TRANSCRIPT*

02:52:18 1   been resolved?

02:52:19 2   A.   Never.

02:52:19 3   Q.   Again, that's an amount, approximately $500,000?

02:52:25 4   A.   Yes.

02:52:25 5   Q.   Did there also arise an issue with your alcohol and

02:52:33 6   tobacco licensing?

02:52:34 7   A.   Correct.

02:52:34 8   Q.   First of all, tell me, did Wagners Chef have an alcohol

02:52:39 9   and tobacco license?

02:52:41 10  A.   I used to be have -- yes, I do have the alcohol -- tobacco

02:52:44 11  and alcohol.  When I went to renew it -- I mean, to get the

02:52:50 12  renewed license, they stopped me for the -- for the tax lien.

02:53:00 13       I mean, later on -- it took him, like, a month or two

02:53:06 14  month, through the lawyer -- I had to send my lawyer to

02:53:08 15  Baton Rouge and show him everything, document they have from

02:53:12 16  the previous owner, and they gave it to me.  Okay.  Finally,

02:53:16 17  they gave it to me.

02:53:18 18       When I went to the city, the Levee Board hold in my

02:53:22 19  account, an old bank account, and take the money for the tax

02:53:27 20  issue, which belonged to the previous owner.  When I went to

02:53:32 21  get it back, they refused to give me the occupation license.

02:53:34 22       After, like, a month later, I get the occupation

02:53:43 23  license through an attorney and all this -- I mean, a lot of

02:53:49 24  things -- I didn't have nothing to do with it.  It's under Bob

02:53:54 25  Harvey's name and Hamdans' family's name, Fatmah and Omar.

*OFFICIAL TRANSCRIPT*

| 02:53:58 | 1 | Finally, they give me the occupation license. I have |
| 02:54:01 | 2 | the manager, he used to be a qualifying man at the beer/liquor |
| 02:54:07 | 3 | license. He catch a heart attack and die. |
| 02:54:09 | 4 | Q. Let me just stop you right there. So you got the |
| 02:54:12 | 5 | occupational license. Then you went back to try to get the |
| 02:54:15 | 6 | alcohol and tobacco license. |
| 02:54:15 | 7 | A. Right. |
| 02:54:18 | 8 | Q. Am I correct that what you said was that the City of |
| 02:54:21 | 9 | New Orleans had changed its policy, and it now required the |
| 02:54:25 | 10 | qualifying person to be a citizen of the U.S.? |
| 02:54:28 | 11 | A. Yes. |
| 02:54:28 | 12 | Q. You are not a citizen of the U.S.? |
| 02:54:30 | 13 | A. No. |
| 02:54:31 | 14 | Q. You've got a green card, you're a resident alien? |
| 02:54:31 | 15 | A. Yes. |
| 02:54:31 | 16 | Q. -- correct? |
| 02:54:31 | 17 | A. Yes. |
| 02:54:37 | 18 | Q. But you had gentleman named -- |
| 02:54:38 | 19 | THE COURT: Mr. Beh, we've heard all of this already. |
| 02:54:41 | 20 | You ask him a question, he gives an answer, and then you're |
| 02:54:45 | 21 | repeating his answer. That's why this is taking twice as long. |
| 02:54:48 | 22 | So let's try not to do that, okay. |
| 02:54:52 | 23 | MR. BEH: Okay. |
| 02:54:52 | 24 | EXAMINATION BY MR. BEH: |
| 02:54:53 | 25 | Q. Were you able to get a license in the name of |

*OFFICIAL TRANSCRIPT*

02:54:58  1    Wagners Chef?

02:54:59  2    A.    No.

02:54:59  3    Q.    Did you then make an attempt to have a license issued in

02:55:05  4    the name of another entity?

02:55:06  5    A.    I tried, and I can't get it.

02:55:09  6    Q.    Were you able to get a license issued in that other

02:55:14  7    entity's name?

02:55:17  8    A.    As Emad 1, no, I can't get it.

02:55:18  9    Q.    I'm going to show you an exhibit that's marked as

02:55:30 10    Exhibit 54, which is a letter from the New Orleans to Emad 1,

02:55:34 11    which is your company?

02:55:35 12    A.    Yes.

02:55:36 13    Q.    That's the company you tried to get a separate liquor

02:55:40 14    license?

02:55:40 15    A.    Yes.

02:55:41 16    Q.    They indicated that:  The application has -- the applicant

02:55:46 17    has to be a citizen of the United States and this state

02:55:50 18    continuously for a period of not less than two years, and,

02:55:53 19    because you were not, they denied the license?

02:55:55 20    A.    Yes.

02:55:55 21    Q.    Were you ever, after that denial, able to get a renewal of

02:56:01 22    your alcohol and tobacco license?

02:56:03 23    A.    No.

02:56:04 24    Q.    What percentage of sales does -- at Wagners Chef, was made

02:56:13 25    up by alcohol and tobacco sales?

*OFFICIAL TRANSCRIPT*

02:56:16 1    A.    It's between -- alcohol and tobacco is 50, 60 percent.

02:56:22 2    I'm not sure exactly.  That's most important.

02:56:26 3    Q.    But does it also impact your sales in general?

02:56:31 4    A.    Yes.

02:56:32 5    Q.    How does it do that?

02:56:33 6    A.    Okay.  I mean, when you have, I mean, the beer and liquor

02:56:36 7    license, you know, I have that, that's a convenience store.

02:56:39 8    When they went to buy beer or liquor, they buy cigarettes, they

02:56:44 9    buy food.

02:56:45 10          If you don't have it -- I mean, if you wasn't making

02:56:48 11   a sale -- like 40, 50 percent is alcohol and tobacco.  If you

02:56:53 12   don't have it, I mean, your business is going to go down to

02:56:56 13   80 percent.  Because the customer, they didn't buy just alcohol

02:57:00 14   or they're buying gas.  They are buying food.  They're buying

02:57:05 15   drink.  They're buying -- you know.  If you don't have the

02:57:09 16   license, I mean, your business -- they go all the way -- that's

02:57:14 17   how the business in the -- in this location.

02:57:18 18   Q.    What you're saying is that, without the alcohol land

02:57:21 19   liquor license, that --

02:57:21 20          MR. DIROSA:  I'm going to object.  Any question that

02:57:24 21   begins, so, what you're saying, that's a leading question.

02:57:26 22          THE COURT:  Right.  Well, that was the point I was just

02:57:28 23   making a little while ago.

02:57:28 24          MR. BEH:  Yes, sir.

02:57:30 25          THE COURT:  You're just repeating his answer over and

*OFFICIAL TRANSCRIPT*

02:57:34  1   asking him to agree that that's what he said, so.

02:57:36  2   EXAMINATION BY MR. BEH:

02:57:36  3   Q.   So we're now into the fall of 2016.  What was the cash

02:57:42  4   flow situation at Wagners Chef in the fall of 2016?

02:57:48  5   A.   2016, Wagners Chef is really behind in cash flow.  I do

02:57:57  6   borrow some money from people just to cover up.

02:58:01  7   Q.   Just to cover expenses?

02:58:03  8   A.   Yes.  Yes.  Equipment is down.  We have a lot of problem,

02:58:14  9   yes.

02:58:14 10   Q.   Now, we looked -- during the time that you were talking to

02:58:17 11   Mr. DiRosa, we looked originally at tax returns for

02:58:23 12   Wagners Chef for the year of 2014.  Do you remember that?

02:58:26 13   A.   Yes.

02:58:27 14   Q.   So, sir, I'm going to show you what's been previously

02:59:20 15   marked as part of Exhibit 7.  It starts on Bates numbered

02:59:27 16   page 219.  The tax returns for Wagners Chef for the year

02:59:32 17   2014 --

02:59:33 18   A.   Yes.

02:59:33 19   Q.   -- okay?

02:59:34 20        This shows gross receipts of $4,761,000, right?

02:59:34 21   A.   Right.

02:59:42 22   Q.   But it also shows expenses in an amount of $4,085,000,

02:59:50 23   correct?

02:59:50 24   A.   Correct.

02:59:51 25   Q.   So you've got a total income of $675,000.

*OFFICIAL TRANSCRIPT*

02:59:57  1    A.    Correct.

02:59:58  2    Q.    Then -- well, I should also say, the deduction there is

03:00:02  3    not expenses.  It's cost of goods sold.  That's the basic cost

03:00:05  4    for your inventory, your gasoline, whatever you're

03:00:09  5    purchasing --

03:00:09  6    A.    Yes.

03:00:10  7    Q.    -- and then what you're selling.

03:00:11  8          So then you look at the other expenses.  That takes

03:00:15  9    you -- the total deductions takes you down to an ordinary

03:00:19 10    business income of $34,000; is that correct?

03:00:22 11    A.    Yes.

03:00:22 12    Q.    So, for year of 2014, Wagners Chef made a profit of

03:00:32 13    $34,000 --

03:00:32 14    A.    Yes.

03:00:33 15    Q.    -- correct?

03:00:35 16          Then we looked --

03:00:36 17          THE COURT:  Was that one of the two tax returns we

03:00:41 18    talked about a few minutes ago?

03:00:43 19          MR. BEH:  No, sir, those were both 2015.  This is 2014.

03:00:47 20          THE COURT:  All right.  Go ahead.

03:00:49 21    EXAMINATION BY MR. BEH:

03:00:49 22    Q.    Now, if we look at 2015, which is the two tax returns you

03:00:53 23    spent some time discussing with Mr. DiRosa, you have one -- the

03:01:03 24    first one, which was dated March 1, 2016, again, it shows gross

03:01:12 25    receipts of 4.3 million, expenses or cost of goods sold of

03:01:18  1   3.8 million, and then we get down to an ordinary business

03:01:23  2   income of $50,000?

03:01:23  3   A.    Yes.

03:01:24  4   Q.    Then, if we look at Exhibit 34.

03:01:27  5          That document that we just looked at was dated

03:01:41  6   March 1, 2016, correct?

03:01:43  7   A.    Yes.

03:01:43  8   Q.    Was that document filed with the IRS?

03:01:48  9          THE COURT:  Now, I asked him that myself, so we went

03:01:50 10   over that.

03:01:51 11          MR. BEH:  You didn't ask him.  I apologize, Your Honor.

03:01:54 12   EXAMINATION BY MR. BEH:

03:01:54 13   Q.    So this is a second document that was created on

03:02:04 14   July 27th, 2016.  It shows an ordinary business income of

03:02:09 15   $5,000, correct?

03:02:10 16   A.    Yes.

03:02:10 17   Q.    So we have gone from 34 in 2014, between 50 and 5 for

03:02:18 18   2015?

03:02:19 19   A.    Yes.

03:02:19 20   Q.    So, now, let's look at Exhibit Number 34.  Because all of

03:02:34 21   those -- that is what was 2014 and 2015.

03:02:39 22          This is your personal tax return for the year 2016,

03:02:45 23   correct?

03:02:45 24   A.    Yes.

03:02:50 25          MR. BEH:  This is, Your Honor, Exhibit Number 34.

*OFFICIAL TRANSCRIPT*

EXAMINATION BY MR. BEH:

Q.   If we go to page 607, it's the profit and loss statement,
Schedule C, for your tax return related to Wagners Chef,
correct?

A.   Yes.

Q.   This shows gross receipts of $2,800,000, to almost
$2,900,000.  What's the tentative profit or loss in line 29 of
that document?

A.   311,000.

Q.   Now, is that a profit, or is that loss?

A.   Loss.

Q.   So for 2016, Wagners Chef had a loss of $311,000?

A.   Yes.

Q.   Was that an operating loss or a capital loss, if you know?

A.   It's a capital loss, I think.

Q.   Well, let me ask you this --

A.   I mean, capital owes --

Q.   Because you've got -- that's the --

     THE COURT:  Excuse me.  Is this gentleman who came in a
witness?

     MR. BEH:  Yes, that's Mr. Sewell.

          Can you wait outside.

EXAMINATION BY MR. BEH:

Q.   Let's look through this.  So you've got -- again, we're on
Exhibit 34.  We've got gross receipts.  Then you've got cost of

*OFFICIAL TRANSCRIPT*

03:04:29 1    goods sold.

03:04:30 2            So then you've got gross income of $162,000, you see

03:04:35 3    that, in line 7?

03:04:37 4    A.    Yes.

03:04:37 5    Q.    Then you've got expenses.  If you look in line 17, you've

03:04:43 6    got expenses for legal and professional services of $100,000.

03:04:48 7    A.    Yes.

03:04:49 8    Q.    Then you've also got rent of 172,000.

03:04:54 9            That comes up with a total expense, in line 28, of

03:05:00 10   $473,000.

03:05:01 11   A.    Yes.

03:05:02 12   Q.    Then, so for the operations of that year, you had a loss

03:05:07 13   of $311,000?

03:05:09 14   A.    Yes.  That's correct.

03:05:11 15   Q.    That's for Wagners Chef?

03:05:12 16   A.    Yes.

03:05:13 17   Q.    If we go back -- and this -- you sold Wagners Chef during

03:05:20 18   this timeframe, correct, during 2016?

03:05:24 19   A.    Yes.

03:05:24 20   Q.    So you also take -- if you look at other gains and losses

03:05:32 21   from Form 4797, you've got a loss of $1.292 million; is that

03:05:41 22   correct?

03:05:41 23   A.    Yes.

03:05:41 24   Q.    So does that represent the capital loss you took when you

03:05:44 25   sold Wagners Chef?

*OFFICIAL TRANSCRIPT*

03:05:48  1  A.    Yes.

03:05:48  2  Q.    So this is what Wagners Chef's finances were looking like

03:05:59  3  in 2016?  You were losing $300,000?

03:06:03  4  A.    Yes, sir.

03:06:03  5  Q.    Now, in September of 2016, you got hit with another

03:06:13  6  problem; isn't that correct?

03:06:14  7  A.    Yes.

03:06:15  8  Q.    Tell the jury about that problem.

03:06:19  9  A.    I had been indictment.

03:06:22 10  Q.    So you were charged with --

03:06:23 11  A.    Facing federal charges.

03:06:27 12  Q.    Facing federal charges for what?

03:06:29 13  A.    For trafficking tobacco.

03:06:32 14  Q.    For trafficking in untaxed tobacco products?

03:06:37 15  A.    Yes.

03:06:38 16  Q.    So were you looking at incarceration?  Were you looking at

03:06:43 17  jail time?

03:06:44 18  A.    Yes.

03:06:44 19  Q.    So we now look at this.  You've got no beer or liquor

03:06:48 20  license?

03:06:48 21  A.    Yes.

03:06:49 22  Q.    Did you have any options left to try another avenue to get

03:06:55 23  your beer or liquor license?

03:06:57 24  A.    No, sir.

03:06:58 25  Q.    You've got Wagners Chef is losing money --

*OFFICIAL TRANSCRIPT*

| | | |
|---|---|---|
| 03:07:01 | 1 | A.   Yes. |
| 03:07:01 | 2 | Q.   -- as shown by its tax returns? |
| 03:07:03 | 3 | A.   Yes. |
| 03:07:03 | 4 | Q.   You're now facing potential incarceration as a result of |
| 03:07:08 | 5 | these federal charges? |
| 03:07:09 | 6 | A.   Yes. |
| 03:07:10 | 7 | Q.   What did you decide?  What were you going to do with |
| 03:07:16 | 8 | Wagners Chef? |
| 03:07:18 | 9 | A.   At that time, I mean, I don't have nobody to manage |
| 03:07:24 | 10 | Wagners Chef.  It's the operation of the business.  Because |
| 03:07:31 | 11 | Nisser Tamimi, the one who used to be manager, he pass away.  I |
| 03:07:38 | 12 | was facing jail time for 20 months, and nobody -- I mean, I |
| 03:07:44 | 13 | didn't have nobody from my family to stay in the business. |
| 03:07:50 | 14 | I wasn't going to just walk away.  I was looking for |
| 03:07:53 | 15 | somebody just to take over.  End up, just I need somebody to |
| 03:07:59 | 16 | take over. |
| 03:07:59 | 17 | Q.   You were marketing, you were looking for somebody to sell |
| 03:08:03 | 18 | Wagners Chef to? |
| 03:08:03 | 19 | A.   Yes.  Yes. |
| 03:08:04 | 20 | Q.   In the end, did you find somebody to sell the business of |
| 03:08:08 | 21 | Wagners Chef to? |
| 03:08:09 | 22 | A.   Yes.  I mean, I sell the assets of Wagners Chef.  Nobody |
| 03:08:16 | 23 | can buy Wagners Chef as a company. |
| 03:08:18 | 24 | Q.   So, enter Nashat Haider.  Mr. Haider is somebody that you |
| 03:08:31 | 25 | had known from where? |

*OFFICIAL TRANSCRIPT*

03:08:31 1    A.   He was -- I mean, worked with the gas company.

03:08:33 2    Q.   I believe you indicated previously he had actually loaned

03:08:38 3  Wagners Chef about $30,000?

03:08:39 4    A.   Yes.

03:08:39 5    Q.   Did Mr. Haider make an offer to you pertaining to the

03:08:48 6  assets of Wagners Chef?

03:08:49 7    A.   Yes.

03:08:50 8    Q.   What was the offer?

03:08:52 9    A.   It's end up with 1.7 -- I mean, I'm sorry, it's $107,000.

03:08:59 10    Q.   So you agreed to sell to Empire Express the assets of

03:09:06 11  Wagners Chef?

03:09:07 12    A.   Yes.

03:09:07 13    Q.   This document, which we previously looked at as

03:09:29 14  Exhibit 17, is the bill of sale showing what was sold by

03:09:31 15  Wagners Chef to Empire Express, correct?

03:09:33 16    A.   Yes.

03:09:34 17    Q.   That was signed -- bill of sale was signed on the 8th of

03:09:43 18  November, 2016?

03:09:44 19    A.   Yes.

03:09:44 20    Q.   Let me show you another document, which is the asset

03:10:04 21  purchase agreement between Wagners Chef and Empire Express,

03:10:04 22  right?

03:10:08 23    A.   Yes.

03:10:08 24    Q.   This says:  Subject to the terms and conditions -- and I'm

03:10:18 25  in Section 1.1 -- of this agreement, purchaser agrees to

*OFFICIAL TRANSCRIPT*

03:10:22 1    purchase from seller and seller agrees to sell to purchaser all

03:10:26 2    of the assets of the business to allow it to continue to

03:10:28 3    operate as a going concern.

03:10:31 4         But it did not include -- you weren't selling the

03:10:35 5    business; you were just selling the assets, correct?

03:10:37 6    A.   Yes.

03:10:37 7    Q.   So, after that, did you believe that that was the best

03:10:49 8    deal you could get for the assets of Wagners Chef?

03:10:51 9    A.   Yes, sir.

03:10:52 10   Q.   All right.  We've spent a lot of time talking about a lot

03:10:59 11   of transactions today.  Did you engage in any of those

03:11:08 12   transactions with the intent of avoiding your obligations to

03:11:14 13   Brothers Petroleum?

03:11:14 14   A.   No.

03:11:15 15   Q.   Did Jadallah Enterprises purchase the property somehow

03:11:22 16   hoping to get around an obligation to Brothers?

03:11:25 17   A.   No.

03:11:25 18   Q.   Did Wagners Chef terminate the lease with a landlord who

03:11:33 19   no longer owned the property in any way associated with trying

03:11:38 20   to get around an obligation to Brothers?

03:11:40 21   A.   No.

03:11:40 22   Q.   Did Jadallah Enterprises lease the property to Ahmed 1 in

03:11:45 23   any way trying to get around an obligation to Brothers?

03:11:47 24   A.   No.

03:11:47 25   Q.   Did Wagners Chef sell its assets to Empire Express in a

03:11:57 1    way to try to get around your obligation to Brothers?

03:12:00 2    A.    No.

03:12:00 3    Q.    Did Ahmed 1 enter into a lease with Empire Express in a

03:12:08 4    way to try to get around your obligations to Brothers?

03:12:10 5    A.    No.

03:12:21 6          MR. BEH:  I've got no further questions, Your Honor.

03:12:24 7          THE COURT:  Mr. DiRosa, any follow-up questions?

03:12:27 8          MR. DIROSA:  I do.

03:12:34 9          THE COURT:  How long are you going to be?

03:12:36 10          MR. DIROSA:  I'll be a few minutes.  Might be a good

03:12:39 11    time for a break.

03:12:39 12          THE COURT:  Let's take a recess.  Let's take a 10 or

03:12:42 13    15-minute recess.

03:12:43 14          Ladies and gentlemen, again, leave your notebooks

03:12:45 15    on your chairs or under your chairs.  Don't discuss the case,

03:12:47 16    please, while you're way.  We'll be back in about 10 or

03:12:51 17    15 minutes.

03:12:51 18          THE DEPUTY CLERK:  All rise.

03:12:53 19          (WHEREUPON, at 3:12 p.m. the jury panel leaves the

03:14:47 20    courtroom and then a brief recess was taken.)

03:27:39 21          THE DEPUTY CLERK:  All rise.

03:27:40 22          THE COURT:  So, Mr. DiRosa, you're going to finish this

03:27:55 23    witness, then you're going to rest?

03:27:56 24          MR. DIROSA:  Yes, sir.

03:27:57 25          MR. BEH:  I have two witnesses.  They are both here,

03:28:00 1    Your Honor.

03:28:00 2         THE COURT:  Sewell and who else?

03:28:01 3         MR. BEH:  Sewell and a guy named Nashat Haider.

03:28:07 4         THE COURT:  You still think we can finish this

03:28:07 5    afternoon?

03:28:07 6         MR. BEH:  Oh, yeah.

03:28:07 7         THE COURT:  Okay.

03:28:08 8              All right.  Bring in the jury.

03:28:13 9         (WHEREUPON, at 3:28 p.m., the jury panel enters the

03:28:33 10   courtroom.)

03:28:33 11        THE COURT:  All right.  Ladies and gentlemen, please be

03:28:35 12   seated.

03:28:35 13             All right, Mr. DiRosa.  Do you have any follow-up

03:28:41 14   questions?

03:28:41 15                   REDIRECT EXAMINATION

03:28:42 16   BY MR. DIROSA:

03:28:42 17   Q.   You told Mr. Beh that it was common to receive rebates

03:29:11 18   when you purchase gas, and you weren't receiving rebates.

03:29:18 19             What other contracts have you ever entered into for

03:29:21 20   the purchase of -- written contracts for the purchase of

03:29:24 21   gasoline?

03:29:26 22   A.   I never, I mean, entered into any contract.  Just, I asked

03:29:33 23   people who owned a gas station, and I know the gas price.

03:29:42 24   That's how I know, from people own gas stations.

03:29:47 25   Q.   I'm going to show you the product schedule.  This is

                              *OFFICIAL TRANSCRIPT*

03:30:04 1     Exhibit 1.  It's page 27.

03:30:20 2                 Doesn't that say that the retailer shall not receive

03:30:24 3     the benefit of any discounts, allowances, rebates or other

03:30:29 4     similar deductions credited to the distributor by seller?

03:30:33 5     Correct?

03:30:34 6     A.    That's what their contract said, yes.

03:30:35 7     Q.    So the only thing that we have rely on -- you have no

03:30:42 8     other contracts to show us where it's any different from this,

03:30:48 9     no other written contracts to show us, correct?

03:30:50 10    A.    I don't have one with me, yes.

03:30:55 11    Q.    In fact, you said you've never signed another written

03:30:57 12    contract.  You've never entered into a written contract to be

03:31:01 13    provided gasoline?

03:31:03 14    A.    No.

03:31:03 15    Q.    So the only thing you have to back up that statement is

03:31:08 16    these unspecified people who will not testify here in this

03:31:12 17    trial, correct?

03:31:14 18    A.    Yes.  Just I've been offered -- I have offer from other

03:31:19 19    company.

03:31:22 20    Q.    What company was that?

03:31:24 21    A.    It's some company, they offer me, I mean, to be branded,

03:31:28 22    and --

03:31:29 23    Q.    What company?

03:31:33 24    A.    It's Valero.

03:31:33 25    Q.    Valero?

                        *OFFICIAL TRANSCRIPT*

03:31:35 1   A.   Again, another company -- yes.

03:31:35 2   Q.   Okay.  They offered you these rebates?

03:31:39 3   A.   They offered me new contract, rebate, and new pumps.  They

03:31:45 4   offer me -- everything, they offered me.

03:31:47 5   Q.   Aren't you really mad because at some point in 2014 or

03:31:55 6   '15, you asked Mr. Hamdan to loan you $300,000?

03:32:01 7   A.   No, I never asked him for $300,000.  He offered me.

03:32:04 8   Q.   He offered you 300,000?

03:32:06 9   A.   He offered me three million dollars to buy the property.

03:32:06 10  Q.   No, no, no, no.

03:32:09 11  A.   He didn't offer me no 300,000.  He offered me --

03:32:12 12  Q.   You asked him for a loan for 300,000, and he told you no?

03:32:16 13  You don't remember this?

03:32:17 14  A.   I can't remember that.  I didn't have a good relationship

03:32:22 15  with those people.

03:32:23 16  Q.   You had your attorney, Jimmy Casteix, there at the same

03:32:27 17  time?  You don't remember that?

03:32:29 18  A.   Oh, when I went in front of Jimmy.  You can call Jimmy and

03:32:33 19  let him testify.  I never asked him for 300,000.

03:32:36 20       He promised me to give me a new contract, better

03:32:39 21  contract.  He never did.

03:32:42 22  Q.   Let me ask you this:  You said that when you purchased

03:32:45 23  this for -- what was it -- a million two, 1,200,000 --

03:32:45 24  A.   Yes.

03:32:50 25  Q.   -- back in November of 2013, I assume you went to the

**OFFICIAL TRANSCRIPT**

03:32:54 1   gas station and looked it over, you saw the operation, correct?

03:32:58 2   A.   Who?

03:32:58 3   Q.   You did.

03:32:59 4   A.   Yes.

03:32:59 5   Q.   When you and Nidal Jaber paid 1.2 million to buy this

03:33:07 6   gas station --

03:33:08 7   A.   Yes.

03:33:08 8   Q.   -- you went and looked the property over?

03:33:10 9   A.   Yes.

03:33:10 10   Q.   Did you see the Exxon signs?

03:33:12 11   A.   Yes.

03:33:12 12   Q.   Did you see the Exxon logos on the gas pumps?

03:33:17 13   A.   Yes.

03:33:18 14   Q.   Was there any question in your mind that Exxon -- this

03:33:22 15   station was branded Exxon?

03:33:24 16   A.   Yes, it was branded.

03:33:25 17   Q.   Okay. You've owned a gas station before this, didn't you,

03:33:30 18   overseas?

03:33:31 19   A.   Yes.

03:33:32 20   Q.   So was it your belief when you went there that anybody

03:33:37 21   could just put Exxon up?

03:33:39 22   A.   Yes, they own Exxon. Eddie Hamdan and Omar Hamdan, they

03:33:47 23   own the Exxon, right? That's the only two brothers. They have

03:33:47 24   a third brother?

03:33:49 25   Q.   They own Exxon?

*OFFICIAL TRANSCRIPT*

A.   Yeah.  That's what they -- what they telling me, both of them.  They own Exxon.

Q.   Exxon is a multinational company.  It's all over the world.  You're not telling us that you think Mr. Hamdan owns Exxon, are you?

A.   Who own the distributor in Louisiana?  The Brothers, right?

Q.   You know there is more than one Exxon distributor in Louisiana.

A.   Nobody can bring in New Orleans Exxon.  He have to go through Brothers, right?

Q.   But they don't own the company.  You know that.

A.   That's what they saying.  When we went to his office, he said, you don't have to worry about it.  They ask for my brothers, and I bought Exxon.  If you don't want it, I will take it off.

     If you need people to come testify, there was a witness in Eddie's office.  I mean, I will bring all of them, and he know that.

Q.   Is this before you bought the business?

A.   That's when we buy the business.  The same time when Mr. Hamdan, he came by the gas station walking.  Eddie, he came to the station.  Omar came to the station, walk inside the store.  You guys don't have to worry about it.  If you don't want Exxon -- I said, I want to be Exxon.  I said, I need a new

03:35:00 1   contract.

03:35:00 2   Q.   You know for a fact that Omar Hamdan does not own one

03:35:04 3   percent and has never owned one percent of Brothers Petroleum,

03:35:07 4   and you know that, don't you?

03:35:09 5   A.   I can't say that when they be talking to me, they own the

03:35:12 6   city.  That's what they said.  They own the company, they own

03:35:15 7   the stores, they own everything.

03:35:16 8   Q.   I'm getting back to my other question.  You're looking at

03:35:19 9   this gas station.  How do you think they came to be allowed to

03:35:26 10   put Exxon signs all over the station with no contract?

03:35:33 11   A.   Okay.  When you buy a gas station, you went to the public

03:35:36 12   record.  The previous owner, he tell you, you didn't have no

03:35:39 13   contract.  You go to public record, you didn't see Wagners Chef

03:35:43 14   own any contract over there.  They didn't have no Exxon, no

03:35:43 15   Marathon, no Valero.

03:35:49 16         After I buy the gas station, later on, one month, you

03:35:53 17   guys went and put it in public record, right.  That's the true

03:35:58 18   story.  I went to the public record.  They didn't have nothing

03:36:01 19   under Wagners Chef.

03:36:02 20   Q.   So that led you to believe --

03:36:03 21   A.   If I know, I never bought it.

03:36:05 22   Q.   So that led you to believe that there was no contract at

03:36:09 23   this gas station that allowed whoever was operating that

03:36:12 24   gas station to put Exxon all over the place?

03:36:15 25   A.   When I buy the gas station, at the time I buy the

*OFFICIAL TRANSCRIPT*

03:36:18 1   gas station, no.

03:36:20 2   Q.   You didn't think that was --

03:36:22 3   A.   I mean --

03:36:23 4   Q.   So how did you think that worked?  I mean, come on.

03:36:25 5   You're getting involved in a $1.2 million deal to buy a

03:36:30 6   gas station.  How did you think that gas station had Exxon

03:36:33 7   logos and Exxon pumps and advertising itself as Exxon?

03:36:38 8   A.   When I bought it from the same distributor with his

03:36:40 9   brother, and they -- I went to public record to find if they

03:36:44 10  have a contract or no.  They didn't have no contract.  I'm

03:36:48 11  not going -- I mean, follow the Exxon sign.

03:36:51 12  Q.   So you just assumed that that meant it couldn't be done

03:36:54 13  with -- it could be done without a contract?

03:36:57 14  A.   I mean, done in a contract when they went home, after

03:37:02 15  they -- they signed the agreement, took the money and went

03:37:05 16  home.

03:37:05 17  Q.   Okay.  You talked about a lawsuit against you, a rule to

03:37:12 18  evict.  Wagner World attempted to evict you from the

03:37:17 19  gas station.

03:37:17 20  A.   Right.

03:37:19 21  Q.   Brothers Petroleum was not a part of that litigation at

03:37:22 22  all, was it?

03:37:24 23  A.   Yes.

03:37:24 24  Q.   Correct?

03:37:28 25  A.   It was a problem.  Yes, it is a problem.

*OFFICIAL TRANSCRIPT*

Q.   No.  Was Brothers Petroleum a part of that litigation at all?

A.   Is Brothers Petroleum -- it was in the eviction notice for the lien.

Q.   Was Brothers Petroleum a part of that eviction process against Wagners Chef?

A.   Yes.

Q.   What part did it play in that eviction process?

A.   Because it's shown on the lien.  In my lease agreement, I can't have no lien at that location or at that property.

Q.   What lien was being shown?

A.   I mean, they show on the lien -- I mean, mortgage lien at 4301 Louisa.

Q.   Isn't it a fact that that eviction was because you were about $85,000 behind in rent?

A.   No, sir.

Q.   That's not the case?

A.   No.

Q.   You're sure?

A.   I mean, I owe the rent because he don't want to take it from me because he is evicting me.

Q.   I'm talking about the first eviction process.  It was not because you were $85,000 behind in rent?

A.   No.

Q.   Let me show you the amendment to the triple net lease.

*OFFICIAL TRANSCRIPT*

This is Exhibit Number 3.  This is between Wagner World and
Wagners Chef.  Do you see that?

A.    Yes.

Q.    Does it say Brothers Petroleum anywhere in that?

A.    No.

Q.    Okay.  Let's look on the second page.  Back rent.
Wagners Chef owes Wagner World back rent in the amount of
$85,794.25.  Wagners Chef shall pay $85,794.25 to Wagner World
via certified funds upon execution of this amendment.

You just told us you didn't owe them $85,000 in back
rent.  Why did you pay it?

A.    I mean, because I was sending the check to the landlord,
and they refused to take it.  He wanted to evict me.

When you want to evict somebody, they give you the
check, and you send it back.  You know, he send it back and put
it in on hold until I give it to him.

Q.    So the only (speaking simultaneously) --

A.    -- telling me.

Q.    I'm sorry.  I didn't mean to cut you off.

The only one we have to verify that statement is you?

A.    Yes.

Q.    Then, in the amendment, you -- this amendment ran
through -- seven years, to February 9th of 2022, and a
seven-year renewal, till midnight on February 9th of 2029.

So you had another 14 years to go on this lease.

*OFFICIAL TRANSCRIPT*

03:40:48  1    A.    Okay.

03:40:48  2    Q.    Almost as long as you had with the contract with Brothers.

03:40:53  3    A.    With the Brothers, I had 15 years and 5 years as an option

03:40:57  4    to Brother, in favor of Brother.  He can exercise the option.

03:41:00  5    Q.    Right.  That would expire -- the first part would expire

03:41:04  6    in 2026, and this lease would still be valid, right?

03:41:08  7    A.    Yes.

03:41:08  8    Q.    Okay.  So you didn't have to give up this lease, did you?

03:41:17  9    There was no reason you had to terminate this lease?

03:41:24 10    A.    Wagners Chef lease?

03:41:25 11    Q.    Yes.

03:41:27 12    A.    I do.

03:41:27 13    Q.    Why?

03:41:32 14    A.    If I don't have to -- just because Brothers -- I mean,

03:41:35 15    contract?  I mean -- I tell you, I had multiple problem.  With

03:41:43 16    the landlord, I mean, they didn't give me no break.  Every

03:41:47 17    year, I been an eviction notice.

03:41:49 18    Q.    On July 8th of 2016, there was no reason why Wagners Chef

03:41:55 19    had to give up this lease.  It had another 13 years to run.

03:42:01 20    A.    Okay.

03:42:01 21    Q.    Is that correct?

03:42:05 22    A.    I mean, I have to give up a lease because I'm going out of

03:42:10 23    business with Wagners Chef.

03:42:11 24    Q.    You knew you were going out of business?

03:42:13 25    A.    I mean, I'm behind.  I'm going to jail, they tell me.  Do

03:42:18 1   you want me to give it to someone, run it for me?

03:42:22 2   Q.   You didn't even know you had been indicted on that day.

03:42:27 3           You're telling me that on July 8, 2016, you knew you

03:42:33 4   were going to jail?

03:42:34 5   A.   No.  I got my indictment in September, right.  End of

03:42:41 6   2016, yeah.

03:42:41 7   Q.   But you were already planning --

03:42:43 8   A.   It was at that time -- that time --

03:42:45 9   Q.   -- you were already planning to get rid of Wagners Chef?

03:42:48 10  A.   No.  I mean, I didn't get rid of Wagners Chef because of

03:42:51 11  your contract.  I mean, I try my best just to get away with my

03:42:55 12  landlord and the problem with the city and the state, because

03:43:00 13  they didn't give me no chance.  I can't afford it.  I mean --

03:43:04 14  Q.   So you didn't need to get rid of Wagners Chef because of

03:43:11 15  our contract, or you did need to get rid of it because of the

03:43:15 16  Brothers contract?

03:43:15 17  A.   No.  It's not because of Brother contract.

03:43:19 18  Q.   That's not why you needed to get rid of it?

03:43:22 19  A.   No.

03:43:22 20  Q.   Is that why you did not require, as part of this supposed

03:43:30 21  purchase by Empire Express, that they take over the contract?

03:43:33 22  A.   I'm sorry, say that again.

03:43:37 23  Q.   Is that why -- why is it, again, that you did not require

03:43:43 24  Empire Express to take over this contract?

03:43:45 25  A.   I mean, I can't let them.  I gave him the option, if he

03:43:51 1  want to stay with the Brothers Petroleum.  You guys did stay

03:43:54 2  together and do business.

03:43:55 3  Q.    Didn't you, in fact, tell him not to buy from Brothers

03:44:01 4  Petroleum?

03:44:01 5  A.    No.  I mean, I said, I don't like the relationship with

03:44:02 6  the Brothers.  I meant, I can't force him to stop buying gas.

03:44:06 7  Q.    You also have described for Mr. Beh that you made a

03:44:15 8  deal -- let me show you this.

03:44:16 9        You told me that at some point -- or you told the

03:44:19 10 jury that at some point you discovered that the 1.2 million

03:44:26 11 wasn't worth as much as you thought it was because of --

03:44:31 12 whatever -- the Brothers contract, the tax lien.

03:44:34 13       So why -- so you would think 1.2 million, let's say,

03:44:43 14 less whatever the tax lien is, less the 500,000, $700,000, in

03:44:52 15 March -- I'm sorry, February of 2016, why are you telling the

03:44:58 16 bank the business is worth a million five?

03:45:01 17 A.    It's a goodwill worth million five.

03:45:04 18 Q.    It's what?

03:45:05 19 A.    If Wagners Chef didn't have no problem, resolve

03:45:10 20 everything, it's worth that much.

03:45:11 21 Q.    So it is worth that much?

03:45:15 22 A.    I mean, goodwill company, it's worth.

03:45:19 23 Q.    But you couldn't get more than $107,000 for it, even

03:45:24 24 though it's worth 1.5 million?

03:45:26 25 A.    I came to the point to close the door.  I'm not getting --

*OFFICIAL TRANSCRIPT*

1     I mean, 1 -- well, I mean, 107.  I was going to close the door

2     and walk out.

3         THE COURT:  Mr. DiRosa, we're kind of going round and

4     round here on the same stuff.

5     EXAMINATION BY MR. DIROSA:

6     Q.  After you found out about the tax lien and the contract,

7     you bought Mr. Jaber out of his one-third share, correct?

8     A.  Correct.

9     Q.  $375,000 --

10     A.  Correct.

11     Q.  -- for one-third?

12     A.  Correct.

13     Q.  So the total value would have been $1.125 million --

14     A.  Yes.

15     Q.  -- for everything?

16         Okay.  Isn't it a fact that after you made that deal

17     with Mr. Jaber, he had to sue you to get the money?

18     A.  Yes.

19     Q.  He did?

20     A.  Yes.

21     Q.  After July 8th of 2016, you had given up your lease, the

22     lease that had 14 years left to run on it -- or 13 years left

23     to run on it.

24         Did you have a written lease after that point?

25     Wagners Chef, did it have a written lease?

03:46:44  1  A.    I can't remember if they have a written lease.

03:46:46  2  Q.    You don't remember whether you gave yourself a written

03:46:51  3  lease?

03:46:52  4  A.    No, I can't.

03:46:53  5  Q.    Let's talk about the special equipment from Exxon that you

03:47:05  6  claim took you so long to get and so long to put back into the

03:47:10  7  station.

03:47:11  8        Who took the equipment out in the first place?

03:47:13  9  A.    I did.

03:47:14 10  Q.    Because you decided in April of 2015 that you were not

03:47:19 11  going to honor this contract, right?

03:47:22 12  A.    Yes.

03:47:23 13  Q.    So you pulled all the equipment out?

03:47:25 14  A.    Yes.

03:47:26 15  Q.    Now, that's your excuse for having trouble getting it back

03:47:29 16  in?

03:47:29 17  A.    No.

03:47:30 18  Q.    That's not your excuse?

03:47:31 19  A.    No.  Because you guys pushed me to install the top system

03:47:37 20  you wanted, I mean, and I had to pay for it.  Exxon never paid

03:47:44 21  for it.

03:47:44 22  Q.    The tax lien.  Do you have a lawsuit that you can show

03:47:56 23  this jury that's pending right now against either Mr. Harvey,

03:48:03 24  Omar Hamdan or Fatmah Hamdan for the payment of that tax lien,

03:48:06 25  that Wagners Chef has pending against any of those people for

03:48:09 1   the payment of this tax lien?

03:48:13 2   A.   I think I can -- I can bring it to you.  I think we have a

03:48:18 3   claim.  It's pending in -- in a courtroom.  Just it's not going

03:48:25 4   yet.  I mean --

03:48:26 5   Q.   Isn't it a fact that Wagners Chef voluntarily dismissed

03:48:31 6   that claim against Mr. Harvey?

03:48:33 7        MR. BEH:  Objection, Your Honor.

03:48:33 8        THE WITNESS:  I don't know that.

03:48:34 9        MR. BEH:  That's calling for a legal conclusion about

03:48:37 10   what the implications of a voluntarily dismissal are.  That's a

03:48:41 11   completely improper question to ask this witness.

03:48:44 12        THE COURT:  I agree.  I sustain the objection.  Strike

03:48:47 13   the question.

03:48:48 14        MR. DIROSA:  Okay.

03:48:49 15   EXAMINATION BY MR. DIROSA:

03:48:50 16   Q.   You were behind in your cash flow, and you said you had to

03:49:01 17   borrow money.

03:49:03 18   A.   Yes.

03:49:03 19   Q.   Now, normally, when people -- was it substantial amounts

03:49:06 20   of money?

03:49:08 21   A.   I borrowed money from some guy.  He work in the Star Oil.

03:49:16 22   Q.   So do you know who this is?

03:49:18 23   A.   Yes.

03:49:18 24   Q.   What's his name?

03:49:20 25   A.   Mohammed.

*OFFICIAL TRANSCRIPT*

03:49:22 1    Q.   Mohammed?

03:49:22 2    A.   Yes.

03:49:24 3    Q.   From Stars Oil?

03:49:24 4    A.   Yes.

03:49:24 5    Q.   Did you sign a note?

03:49:25 6    A.   Yes.

03:49:26 7    Q.   So you would have that available?

03:49:28 8    A.   I do have it.  I don't have it with me right now.  Just I

03:49:35 9    do have it in my file.  I don't know if my attorney has it.

03:49:37 10    Q.   When did you borrow that 200,000?

03:49:47 11    A.   I can't remember.  In 2015, end of 2015, I think.

03:49:52 12    Q.   It was 200,000?

03:49:55 13    A.   Yes.  We signed by his attorney, though.

03:50:04 14    Q.   You said you were trafficking in untaxed tobacco, and that

03:50:11 15    resulted in avoiding taxes?

03:50:15 16        MR. BEH:  Objection, Your Honor.  This is getting into

03:50:16 17    the details of that.  We're not allowed to do that.

03:50:21 18        THE COURT:  Okay, okay.  I sustain the objection.

03:50:23 19         Move on to something else Mr. DiRosa.

03:50:26 20         Mr. Beh, you can be seated.

03:50:28 21    EXAMINATION BY MR. DIROSA:

03:50:36 22    Q.   Then you said you had trouble getting a license.

03:50:42 23         Emad 1, you tried to get a license from the City?

03:50:45 24    A.   Yes, sir.

03:50:45 25    Q.   When you get a license, an ABO license from the city, you

03:50:52  1   have to submit a lease to the city, don't you?

03:50:57  2   A.    Yes.

03:50:58  3   Q.    Either owner of the property, or you have to show them a

03:51:01  4   lease?

03:51:03  5   A.    Yes.

03:51:03  6   Q.    This is page 1170 from Exhibit 55.  This is the commercial

03:51:14  7   lease that's attached to that application.

03:51:17  8          It says:  The lease is made on August 18, 2016,

03:51:20  9   between Jadallah Enterprises, landlord, and Ahmed 1, tenant.

03:51:27 10          Well, on April 18th, Jadallah Enterprises might have

03:51:33 11   owned the property, but they had leased the entire part of the

03:51:40 12   property to Ahmed 1.  So how could you give yourself a lease?

03:51:44 13   Ahmed 1 had control of the entire property.

03:51:46 14          THE COURT:  I think it actually reads August 18th.

03:51:49 15          MR. DIROSA:  August 18th.  I'm sorry.  August 18, 2016.

03:51:53 16   This is a month and a half after the transactions.

03:51:55 17   EXAMINATION BY MR. DIROSA:

03:51:57 18   Q.    How -- if Jadallah Enterprises leased the whole property

03:52:02 19   to Ahmed 1, how could they be giving out another lease to your

03:52:07 20   company?

03:52:07 21   A.    It must be a mistake.

03:52:09 22   Q.    Must be a mistake?

03:52:10 23   A.    I had no reason to do it like that.

03:52:12 24   Q.    Isn't it a fact that after you made the deal to buy your

03:52:22 25   partner out for $375,000, you still went back to the City and

told them, in order to get an alcohol license, that he was still your partner?

A.   I can't remember that.  I can't tell them that -- if he's not -- he's not a member at that time.

Q.   Let me show you.  Affidavit for renewal of alcohol beverage permit.  Wagners Chef.

     MR. BEH:  Is this a document that's included in the exhibit book?

     MR. DIROSA:  No.

     MR. BEH:  Then I object --

     MR. DIROSA:  This is for impeachment.  He just said he didn't do this.

     THE COURT:  This is not in the exhibit book?

     MR. DIROSA:  No, sir.

     THE COURT:  I sustain the objection.

     MR. DIROSA:  I don't have any other questions.

     THE COURT:  All right, sir.  You can step down.  Thank you.

     MR. DIROSA:  Brothers Petroleum rests.

     THE COURT:  Okay.  Thank you.

          Ladies and gentlemen, we're now moving on to the defense side of the case.  Okay.

     MR. BEH:  Your Honor, I know it's probably a formality, but I would like to make a Rule 50(a) --

     THE COURT:  I'll let you reserve that motion, okay.

*OFFICIAL TRANSCRIPT*

03:53:48  1        MR. BEH:  Thank you, sir.

03:53:51  2        THE COURT:  Okay.  Go ahead and call your witness.

03:53:52  3        MR. BEH:  I call Nashat Haider.  He's in the hallway.

03:54:08  4        THE COURT:  Just for the benefit of the jury, I think

03:54:11  5  you all were told yesterday by Judge van Meerveld, we thought

03:54:15  6  this would be a three or four-day trial.  It looks like it's

03:54:19  7  more likely to be a two-day trial, so that's the good news.

03:54:21  8  Two days -- not counting yesterday.  I mean, two days of the

03:54:25  9  trial itself.

03:54:25 10        Come forward, sir.

03:54:37 11        THE DEPUTY CLERK:  Raise your right hand, please, Do

12  you solemnly swear the testimony you are about to give will be

13  the truth, the whole truth and nothing but the truth, so help

14  you God?

15        THE WITNESS:  Yes.

16                  **NASHAT HAIDER**

17  was called as a witness and, after being first duly sworn by

18  the Clerk, was examined and testified on his oath as follows:

19        THE DEPUTY CLERK:  Please have a seat.  State your

20  name, and spell it for the record.

03:54:45 21        THE WITNESS:  My name is Nashat Haider.  It's

03:54:48 22  N-A-S-H-A-T, Haider, H-A-I-D-E-R.

03:54:51 23                DIRECT EXAMINATION

03:54:54 24  BY MR. BEH:

03:54:54 25  Q.   Mr. Haider, tell me, when did you first come -- where are

                                ***OFFICIAL TRANSCRIPT***

03:55:03 1    you from originally?

03:55:04 2    A.    I'm from Israel.

03:55:06 3    Q.    When did you come to the States?

03:55:07 4    A.    In 2000.

03:55:08 5    Q.    Since that time, have you been working in the retail oil

03:55:13 6    business?

03:55:14 7    A.    Yes, I start end of 2002, 2003.

03:55:18 8    Q.    Doing what kind of work?

03:55:21 9    A.    Start with truck driver for fuel company.  Then start

03:55:26 10   doing dispatch for the fuel company.

03:55:28 11   Q.    Is that Stars Oil?

03:55:30 12   A.    Stars Oil, yes.

03:55:30 13   Q.    When did you first meet Jadallah Saed?

03:55:41 14   A.    I think -- in 2016.

03:55:47 15   Q.    Did you meet him through your work with Stars?

03:55:50 16   A.    Yes.

03:55:50 17   Q.    Do you recall at any time did you loan money to

03:56:01 18   Wagners Chef?

03:56:01 19   A.    Yes.

03:56:01 20   Q.    Tell me about the circumstances leading up to that loan.

03:56:05 21   A.    He was facing financial problems.  So he asked me for a

03:56:12 22   loan to pay some bills, so I give him a loan of $30,000.

03:56:16 23   Q.    So you loaned him $30,000?

03:56:18 24   A.    Yes.

03:56:18 25   Q.    Was that in 2016?

*OFFICIAL TRANSCRIPT*

03:56:22  1   A.   Correct.

03:56:22  2   Q.   Do you have any understanding of what the financial

03:56:31  3   hurdles that Wagners Chef was facing at that time?

03:56:33  4   A.   Yes.  I'm pretty sure with the Exxon issue.  He has

03:56:42  5   something -- issue with the liquor license.  What I know, he

03:56:45  6   couldn't renew the liquor license.

03:56:47  7   Q.   Anything else that you remember?

03:56:55  8   A.   That's it.

03:56:55  9   Q.   Did it come to a point that you believed that Wagners Chef

03:57:01  10  was going to a hard time paying back the $30,000 loan?

03:57:05  11  A.   Yes.

03:57:06  12  Q.   What did you decide to do then?  I mean, what was the next

03:57:09  13  step after you came to that realization?

03:57:13  14  A.   I asked him, like, if he cannot pay me -- I wait five, six

03:57:17  15  months.  He promised, like, it's going to be in 30 days, he's

03:57:21  16  going to give me the money back.  He couldn't pay me the money

03:57:21  17  back.

03:57:24  18       So I asked him, like, I see, like, he has financial

03:57:27  19  problem, so I ask him can I buy the assets of the Wagners Chef.

03:57:32  20  Q.   Do you know -- were you aware that Mr. Saed had been

03:57:40  21  previously trying to sell Wagners Chef as an ongoing business?

03:57:50  22  A.   What do you mean with your question?  I don't understand.

03:57:52  23  Q.   Well, I mean, do you know if -- because you were

03:57:53  24  talking -- you had come to him and asked him about buying the

03:57:55  25  assets.

**OFFICIAL TRANSCRIPT**

| | | |
|---|---|---|
| 03:57:57 | 1 | A.   Yes. |
| 03:57:57 | 2 | Q.   Had he talked to you previously or told you that he was |
| 03:58:00 | 3 | trying to sell Wagners Chef as a complete entity during the |
| 03:58:06 | 4 | time before then? |
| 03:58:07 | 5 | A.   No. |
| 03:58:07 | 6 | Q.   He didn't mention that? |
| 03:58:08 | 7 | A.   No. |
| 03:58:09 | 8 | Q.   So who first -- you first raised the issue, the |
| 03:58:14 | 9 | possibility of buying the assets from Wagners Chef? |
| 03:58:19 | 10 | A.   Correct. |
| 03:58:19 | 11 | Q.   Did you form a company to do that?  Did you form -- is |
| 03:58:27 | 12 | Empire Express a limited liability company that you formed? |
| 03:58:29 | 13 | A.   Yes. |
| 03:58:30 | 14 | Q.   Did you form that for the purpose of buying the assets |
| 03:58:35 | 15 | from Wagners Chef? |
| 03:58:36 | 16 | A.   Correct. |
| 03:58:37 | 17 | Q.   How did you determine the value of -- or how much you were |
| 03:58:45 | 18 | going to pay for the assets of Wagners Chef? |
| 03:58:48 | 19 | A.   I pay 107. |
| 03:58:51 | 20 | Q.   How did you and Wagners Chef come up with that number? |
| 03:58:56 | 21 | A.   Well, in the best, like, what was an inventory, |
| 03:59:00 | 22 | whatever -- it was so much -- like, you know, problem there |
| 03:59:05 | 23 | with the pumps, with the walk-in cooler is not working, |
| 03:59:09 | 24 | freezer.  They have a lot of issue with the lights inside the |
| 03:59:12 | 25 | store. |

*OFFICIAL TRANSCRIPT*

Q.    So there were problems with some of the equipment that was
on site?

A.    Yes, which is not working.

Q.    Tell me about the problems that were there in the fall of
2016 with regard to the gasoline pumps.

A.    Well, many of them, they were -- they need some repair, a
lot of repairs for -- they don't read right.  The meters of the
pumps sometimes would give over, all of them.  They have some
six or seven pumps broken.

Q.    Had Wagners Chef been able to repair those pumps?

A.    No.

Q.    How about the -- you said the walk-in freezer.  What was
the problem with the walk-in freezer?

A.    They need some compressor.  AC unit, they need some
compressor.  The same things.

Q.    Wagners Chef had not been able to do that?

A.    No.

Q.    So, in -- on November 15, 2016, Empire Express purchased
the assets from Wagners Chef, correct?

A.    Correct.

Q.    I'm going to show you a document.  This is the bill of
sale between Wagners Chef and Empire Express, correct?

A.    Correct.

Q.    This shows that there was a payment of $107,000?

A.    Yes.

*OFFICIAL TRANSCRIPT*

04:00:40 1  Q.   Was the payment of that, did that include a forgiveness by

04:00:45 2  you or by Empire Express of the $30,000 outstanding loan?

04:00:49 3  A.   Yes.  The $30,000 was forgiven.

04:00:53 4  Q.   So you forgave that, then wrote a check for $20,000?

04:00:56 5  A.   Correct.

04:00:57 6  Q.   Then the rest of it was on a note?

04:01:00 7  A.   Yes.

04:01:00 8  Q.   Let me show you another document, which is called Asset

04:01:13 9  Purchase Agreement, which is marked as Exhibit 47.  Which is,

04:01:17 10  again, between Wagners Chef and Empire Express, correct?

04:01:20 11  A.   Correct.

04:01:20 12  Q.   This tells you what you were purchasing.  Subparagraph

04:01:28 13  Number 2 says:  No Assumption of Liabilities.

04:01:34 14       Did Empire Express assume or pick up any of the

04:01:40 15  outstanding liabilities that Wagners Chef had?

04:01:43 16  A.   No.

04:01:43 17  Q.   It just bought its assets?

04:01:46 18  A.   Just I bought the assets.

04:01:47 19  Q.   So after the purchase of the assets, did Empire Express

04:02:11 20  purchase gasoline from Brothers Petroleum?

04:02:13 21  A.   Yes.

04:02:13 22  Q.   That relationship continued from mid-November of 2016

04:02:21 23  through February of 2017?

04:02:24 24  A.   Correct.

04:02:24 25  Q.   Can you tell me the circumstances around when the -- when

*OFFICIAL TRANSCRIPT*

04:02:32 1  Empire Express made the determination to stop buying gas from

04:02:35 2  Brothers?

04:02:37 3  A.    After when I bought it, you know, the store, I get in

04:02:42 4  touch with Brothers Petroleum about to buy from them the fuel,

04:02:49 5  which they want me to sign some contract, which I didn't agree

04:02:53 6  to it.

04:02:54 7          So they start giving me, like, you know, load by

04:02:59 8  load, which I have to pay for it load by load.  They will get

04:03:03 9  some agreement for a new contract, which we didn't get an

04:03:07 10 agreement about -- like, you know, for rebate issue, about the

04:03:16 11 overcharge -- you know, like they want me to buy -- let's see,

04:03:20 12 I have to sell every month 150,000 gallon.  If I don't sell

04:03:24 13 150,000 gallons, it's going to be like four cents penalty, they

04:03:31 14 are going to charge me if I don't sell -- let's say, if I sell,

04:03:32 15 let's say, only a hundred thousand, so there is 50,000 gallons,

04:03:36 16 I have to pay four cents for each gallon I didn't sell, which

04:03:40 17 that was kind of the two main things with this contract they

04:03:44 18 give me.

04:03:44 19 Q.    The two main things being lack of a rebate and the

04:03:49 20 requirement to buy 150 gallons a month?

04:03:51 21 A.    A month, yes.

04:03:52 22 Q.    150,000 gallons a month?

04:03:55 23 A.    150,000 gallons.

04:03:56 24 Q.    Let me stop you there.  We had a little bit of a

04:04:00 25 discussion earlier about the concept of rebates and how that

04:04:03  1    applies between distributors and retailers of gasoline.

04:04:10  2              How many -- or do you own other gas stations besides

04:04:14  3    the Empire Express station on Louisa?

04:04:17  4    A.    Yes, I do.

04:04:17  5    Q.    How many other gas station do you own?

04:04:20  6    A.    Four gas stations.

04:04:22  7    Q.    Four gas stations.  Are you aware if -- in those other

04:04:25  8    gas stations, do you receive any benefit of the rebates that

04:04:30  9    the distributors receive?

04:04:32 10              MR. DIROSA:  Let me object.

04:04:32 11              THE COURT:  Wait a second, sir.

04:04:33 12              MR. DIROSA:  Object.  If he's going to testify to some

04:04:36 13    contract that provides for this, without the contract being in

04:04:40 14    evidence, and all we have --

04:04:42 15              THE COURT:  Overrule the objection.  He can testify to

04:04:45 16    that.

04:04:45 17              Go ahead, sir.

04:04:46 18              Ask your question again.  I don't know if he

04:04:48 19    answered it.

04:04:49 20    EXAMINATION BY MR. BEH:

04:04:49 21    Q.    My question is, in any of your other gas stations, do

04:04:53 22    you -- does -- do you, as the retailer, receive any benefit of

04:04:58 23    rebates that are given to the distributor?

04:05:00 24    A.    Yes.

04:05:01 25    Q.    Tell the jury what those benefits are.

                              *OFFICIAL TRANSCRIPT*

04:05:05 1  A.    Those benefits, they give some percent, like cent,

04:05:10 2  whatever -- you know, let's say if I have a contract for -- I

04:05:12 3  have to sell every month, let's say, 50,000 gallons every

04:05:15 4  month.  So just every month, if I sell the 50,000, I get -- at

04:05:20 5  the end of the month, I got four cents or three cents per

04:05:25 6  gallon I sell.  All the branded gas station, they do it this

04:05:29 7  way.  Unless if it's not branded, so they don't have the

04:05:32 8  rebate.

04:05:33 9          So that's why one of the reason I want to be Exxon

04:05:36 10  brand, so I can get the benefit of the rebate, which we didn't

04:05:40 11  get an agreement for the rebate.

04:05:42 12  Q.    Okay.  But you were not able to come to an agreement with

04:05:45 13  Brothers about any rebates?

04:05:46 14  A.    No.

04:05:47 15  Q.    In your experience, especially operating Empire Express,

04:06:04 16  how much of a factor is having an alcohol and tobacco license?

04:06:11 17  How much does that impact your sales?

04:06:13 18  A.    It's between about 40 percent.

04:06:16 19  Q.    As much as 40 percent of your retail sales?

04:06:20 20  A.    Mostly, yes.

04:06:20 21  Q.    So if you don't have a liquor license, it could have a --

04:06:26 22  tobacco and liquor license, it could have a substantial impact

04:06:31 23  in reduction on your revenue?

04:06:32 24  A.    It's going to be more than 40 percent.  Because a lot of

04:06:35 25  people stop to buy a bottle of wine or a bottle of liquor, so

| 04:06:40 | 1 | they will buy cigarette, buy stack, they buy candy. |

Q.   Gas?

A.   Gas.  So if I don't have the liquor license, so it's going to affect, like, on the whole impact of the store.

          MR. BEH:  One second, Your Honor.

               I've got no further questions, Your Honor.

          THE COURT:  Okay.  Thank you.

               Mr. DiRosa.

                         CROSS-EXAMINATION

BY MR. DIROSA:

Q.   Mr. Jaber -- I mean, I'm sorry, Mr. Haider --

A.   Yes.

Q.   -- didn't you testify just three weeks ago that your problem with Brothers was that they were overcharging you?

A.   Yes.

Q.   So, why didn't you testify to that today?

A.   What you mean?

Q.   Why didn't you say they were overcharging -- why didn't you tell the jury they were overcharging you?  Why did you give them this other story?

A.   They didn't ask me.  If you ask me, I would tell them.

          Yes, I stopped buying the fuel from Brothers because they were charging over price for the gallon.  So they were giving me, like, every day -- I receive the price per gallon every day.  So when I get the invoice, it didn't match what

04:08:18 1    they send me.

04:08:20 2          Let's say if they send me today the price for two

04:08:22 3    dollars a gallon.  When I would get the invoice, I will be,

04:08:26 4    like, 2.04.  So that's the reason I stopped buying fuel from

04:08:29 5    the Brothers fuel.

04:08:31 6          The last two load I got from you, before when I

04:08:34 7    stopped buying it, it was -- one of them was $185 difference,

04:08:38 8    and the other one was $500 difference you're charging me.

04:08:44 9          With the fuel business, we barely -- we make, like,

04:08:47 10   one cents, two cents per gallon profit.  Sometimes two, three.

04:08:53 11   But when I'm losing, like, five, six cents a gallon difference

04:09:00 12   you're charging me, how am I going to do business with you?

04:09:01 13   Q.   That's the only reason?

04:09:02 14   A.   Yes, to me, that's the only reason.

04:09:04 15   Q.   Okay.  So, in mid-February of 2017, you cut off the

04:09:13 16   business with Brothers?

04:09:14 17   A.   Correct.

04:09:15 18   Q.   Did you immediately take down the Exxon signs and Exxon

04:09:20 19   logo?

04:09:22 20   A.   Yes.

04:09:22 21   Q.   Because you were no longer Exxon?  You were no longer

04:09:27 22   buying Exxon fuel, correct?

04:09:28 23   A.   Yeah.  I cannot buy Exxon from you, so I cannot keep the

04:09:32 24   sign Exxon.

04:09:33 25   Q.   We were the only ones you could buy Exxon fuel from in

*OFFICIAL TRANSCRIPT*

04:09:38 1    this area, right?

04:09:40 2    A.    Only from Brothers.  Right.

04:09:41 3    Q.    Because you went to Lard Oil and asked them if you could

04:09:48 4    buy from them, right?

04:09:49 5    A.    Well, I talked to the salesman, if can get some Exxon.

04:09:54 6    They said I have to get only from Brothers.

04:09:57 7    Q.    Okay.  In fact, you asked them for money to sign a

04:09:59 8    contract to buy from them?

04:10:00 9    A.    It's the same salesman I dealing with in Hammond.  I have

04:10:03 10   another store, Exxon gas station in Hammond.  It was the same

04:10:06 11   salesman.  Like, every day, I talk to him.

04:10:07 12   Q.    Isn't it a fact that the problem was with Brothers is that

04:10:12 13   you were buying Exxon fuel from Brothers and showing the Exxon

04:10:18 14   sign at the same time you were buying fuel from Stars Oil and

04:10:22 15   mixing that fuel in and selling it to customers as Brothers?

04:10:26 16   A.    That's not correct.

04:10:27 17   Q.    That's not correct?

04:10:28 18   A.    That's not.

04:10:30 19   Q.    Let me show you these invoices.  You just told us that you

04:10:35 20   stopped selling in mid-February of 2016 -- I mean, I'm sorry,

04:10:44 21   2017.  Let me show you these invoices from Stars Oil --

04:10:53 22         MR. BEH:  What's the exhibit number?  Is it 29?

04:11:34 23         MR. DIROSA:  Yes, it is 29.

04:11:35 24         MR. BEH:  Your Honor, those have been excluded pursuant

04:11:40 25   to your ruling.

*OFFICIAL TRANSCRIPT*

04:11:41 1          THE COURT:  That's correct.  So I sustain the

04:11:43 2    objection.

04:11:43 3          MR. DIROSA:  Not even as to rebuttal from something --

04:11:46 4          THE COURT:  Sustain the objection.

04:11:56 5    EXAMINATION BY MR. DIROSA:

04:11:56 6    Q.    So, once again, that's not true, right?  You didn't do

04:11:58 7    that?

04:11:58 8    A.    I didn't do that, no.

04:12:01 9    Q.    All right.  What was the -- what kind of shape was this

04:12:05 10   station in when you purchased it?

04:12:07 11   A.    Poor condition.

04:12:11 12   Q.    Poor condition.  What was the matter with it?

04:12:16 13   A.    Pumps didn't work properly outside.  They were in good --

04:12:23 14   actually in good condition.  The store is no inventory.  The

04:12:23 15   walk-in cooler, fryers in the kitchen stopped working.  Even

04:12:23 16   though the hood, which they need the fan, which wasn't working.

04:12:40 17   Lights.

04:12:40 18   Q.    So let's talk about the pumps.  What was wrong the pumps?

04:12:46 19   A.    So many different things.  Some of them, the meter.  Some

04:12:50 20   of them, credit card readers.  Some of them, they have to

04:12:53 21   change all kind of parts on them, some electronics stuff.

04:12:59 22   Q.    So that would have been a very important thing to take

04:13:02 23   care of right away, correct?

04:13:06 24   A.    Well, he didn't have the money to fix it.  So it's not

04:13:09 25   working.  Just he has sandbags on it.

                         *OFFICIAL TRANSCRIPT*

04:13:11 1    Q.   No, you.  That would have been important for you to take

04:13:13 2    care of right away, wouldn't it?

04:13:15 3    A.   To take care of what?

04:13:16 4    Q.   Of the pumps.

04:13:21 5    A.   Well, the pumps, yeah, they cost money to fix the pumps.

04:13:25 6    Q.   Okay.  What, you didn't have the money to fix the pumps?

04:13:42 7    A.   I fixed the pumps.

04:13:43 8    Q.   You fixed them.  How long did it take you to fix them?

04:13:46 9    A.   It depends.  Some of them, I have to replace it.  Some of

04:13:49 10   them, I have to just change parts on it.

04:13:52 11   Q.   Okay.  You told us -- well, who fixed the pumps for you?

04:13:58 12   A.   I have several people.

04:13:59 13   Q.   Okay.  Raoul Sanchez?

04:14:03 14   A.   Some with Raoul, some with Joel.

04:14:03 15   Q.   Joel?

04:14:06 16   A.   Some of it -- like, some stuff I can do by myself.

04:14:15 17   Q.   This is your November checking account.

04:14:18 18        MR. BEH:  Objection, Your Honor.

04:14:20 19            First of all, they've been excluded except for

04:14:25 20   impeachment, and he has offered nothing that he's trying to

04:14:28 21   impeach.

04:14:28 22            He can't testify by putting the document down.

04:14:30 23   He's got to ask him if there is something different.  Then he

04:14:34 24   can use it.

04:14:35 25   EXAMINATION BY MR. DIROSA:

*OFFICIAL TRANSCRIPT*

| | |
|---|---|
| 04:14:35 1 | Q.   If these people fixed the pumps, you would have paid them |
| 04:14:39 2 | from your checking account, right? |
| 04:14:43 3 | A.   Yes. |
| 04:14:43 4 | Q.   We would find checks in here to show that you paid them to |
| 04:14:48 5 | fix these pumps? |
| 04:14:49 6 | A.   Not necessarily.  I used, like, different account to pay. |
| 04:14:52 7 | Like, from my pocket, I pay. |
| 04:14:53 8 | Q.   You paid it out of your pocket? |
| 04:14:55 9 | A.   Yes. |
| 04:14:55 10 | Q.   So we just have to trust you for that, correct? |
| 04:14:59 11 | A.   It's a new business.  I have to invest money from my |
| 04:15:02 12 | pocket. |
| 04:15:06 13 | The pump I have replaced over there, I took them |
| 04:15:09 14 | from -- I brought them from another store. |
| 04:15:12 15 | Q.   Well, this one shows an ending balance of $18,000.  Why |
| 04:15:17 16 | couldn't you pay it out of there? |
| 04:15:18 17 | A.   What's this? |
| 04:15:19 18 | Q.   Your checking account with First NBC. |
| 04:15:22 19 | MR. BEH:  I'm going to object, Your Honor.  He's using |
| 04:15:25 20 | the checking account -- |
| 04:15:26 21 | THE COURT:  I agree.  I sustain the objection. |
| 04:15:29 22 | EXAMINATION BY MR. DIROSA: |
| 04:15:30 23 | Q.   What about December?  Would we find any checks in here |
| 04:15:34 24 | from December to pay this? |
| 04:15:35 25 | MR. BEH:  Same objection, Your Honor. |

*OFFICIAL TRANSCRIPT*

04:15:36 1          THE COURT:  Sustained.  Sustained.

04:15:38 2     EXAMINATION BY MR. DIROSA:

04:15:42 3     Q.   So what we have is your word for it, correct, that this

04:15:54 4     took place?

04:15:54 5     A.   Sorry.  Because I changed the pump in the Hammond store,

04:15:58 6     the gas station in Hammond.  I brought those pumps to Louisa,

04:16:03 7     to that location, where I can just use those pumps on some of

04:16:07 8     them and install and change the pumps.

04:16:17 9     Q.   Didn't you pay back out of your checking account $200,000

04:16:25 10    to Stars Oil?

04:16:27 11         MR. BEH:  Objection, Your Honor.  Again, we're

04:16:30 12    referencing the documents that have been excluded.

04:16:35 13         THE COURT:  I'm not even sure where all of this is

04:16:38 14    going, frankly, at this point.

04:16:38 15         MR. DIROSA:  Well, Mr. --

04:16:41 16         THE COURT:  No, just ask your question.  What's your

04:16:41 17    question?

04:16:45 18    EXAMINATION BY MR. DIROSA:

04:16:45 19    Q.   Didn't you pay back out of your checking account a

04:16:49 20    $200,000 loan from Stars Oil?

04:16:51 21         THE COURT:  A loan to him or to --

04:16:54 22         MR. DIROSA:  That's what I'm asking.  That's

04:16:55 23    exactly the point.

04:16:56 24         THE COURT:  Well, no, that wasn't your question.  You

04:16:58 25    said did he pay a loan.

                              *OFFICIAL TRANSCRIPT*

EXAMINATION BY MR. DIROSA:

Q.   Did you pay back a loan --

        THE COURT:  Well, I don't know if that's relevant to anything, if it's a loan to him.

        Are you asking him did he pay back a loan for Mr. Saed, or just any loan?

EXAMINATION BY MR. DIROSA:

Q.   Did you make --

        THE COURT:  No.  Answer my question.

        MR. DIROSA:  Well, that's what -- I don't know.

        THE COURT:  Well, I'll sustain the objection if you don't even know what your question is.  Okay.

        Ask another one.

        MR. DIROSA:  I don't have any other questions.

        THE COURT:  Any redirect?

        MR. BEH:  No, Your Honor.

        Thank you, Mr. Haider.

        THE COURT:  You may step down, sir.  Thank you.

        Call your next witness.

        MR. BEH:  I call David Sewell, who I believe is in the hallway.

        David Sewell.  Thank you, sir.

        THE DEPUTY CLERK:  Raise your right hand, please.  Do you solemnly swear the testimony which you are about to give will be the truth, the whole truth and nothing but the truth,

**OFFICIAL TRANSCRIPT**

so help you God?

THE WITNESS:  Yes, yes.

**DAVID SEWELL**

was called as a witness and, after being first duly sworn by the Clerk, was examined and testified on his oath as follows:

THE DEPUTY CLERK:  Please have a seat.  State your name, and spell it for the record.

THE WITNESS:  David Sewell.  D-A-V-I-D, S-E-W-E-L-L.

DIRECT EXAMINATION

BY MR. BEH:

Q.    Good afternoon, Mr. Sewell.  What's your occupation?

A.    I'm a CPA.

Q.    Have you worked with Wagners Chef on doing its accounting work?

A.    Yes.

Q.    Can you tell me, what's been the scope of your involvement?  Do you do the day-to-day accounting or something more limited?

A.    No.  Generally, we do, like, once a month, prepare sales tax returns, if -- licensing, making sure licenses are kept up to date, and tax return at the end of the year.

Q.    So when did you start working with Wagners Chef?

A.    I believe it was 2015.

Q.    I'm going to show you a document which is a 2015 tax return that's dated March 1, 2016, for Wagners Chef.  Do you

04:20:10 1   recall that exhibit?

04:20:11 2   A.    Yes.

04:20:12 3   Q.    Okay.  Do you know -- well, let me ask you this:  Did you

04:20:17 4   prepare this exhibit?

04:20:18 5   A.    Yes.

04:20:20 6   Q.    Okay.  If you look down at the bottom, it indicates you

04:20:24 7   were the preparer.

04:20:25 8   A.    My name, yes.

04:20:26 9   Q.    What was the purpose of preparing this exhibit in March of

04:20:32 10   2016?

04:20:32 11   A.    Generally, at the beginning of the year, I prepare a

04:20:37 12   return for each business that I do based upon all the

04:20:41 13   information that I have.  These returns are generally due on

04:20:44 14   March 15th -- some are due April 15th, depending upon the type

04:20:49 15   of entity it is -- but I try and have it all done before those

04:20:52 16   dates, for in case a client comes in, I'm not saying, oh, I

04:20:56 17   haven't looked at your work yet.

04:20:58 18         So I have, like, a preliminary done prior to the

04:21:03 19   client coming in to actually do the return.

04:21:05 20   Q.    So is it your belief that this is a preliminary return

04:21:08 21   based on the information you had as of that date?

04:21:10 22   A.    Yes.

04:21:12 23   Q.    Okay.  Do you know if this document was provided to any

04:21:21 24   lenders by Wagners Chef for potential loans?

04:21:26 25   A.    I don't know, but I know at that time there was a lot of

04:21:31 1    documentation being requested from banks -- or a bank.

04:21:35 2    Q.   Okay.  So there was a lot of stuff being requested by

04:21:39 3    banks if you were trying to get a loan?

04:21:41 4    A.   Yes.

04:21:41 5    Q.   Is there -- are you familiar with whether there is a

04:21:45 6    methodology that a bank can -- if somebody gives them a tax

04:21:50 7    return or a draft tax return, whether they can determine

04:21:53 8    whether that's been filed with the IRS or not?

04:21:57 9    A.   Generally, if a bank is going to rely upon a tax return,

04:22:00 10   you have to provide them proof that it's been filed.

04:22:03 11          You can go over to 1555 Poydras, to the IRS, actually

04:22:09 12   turn it in and hand file it, and they will hand you back a

04:22:12 13   stamped copy that says, this has been filed.

04:22:14 14          Or the bank, generally, will ask for -- it's called

04:22:18 15   a -- it's a Form 4506-T.  It is giving the bank authorization

04:22:24 16   to verify with the IRS that the return has been filed.

04:22:28 17   Q.   So if the bank has any questions, they can verify it

04:22:31 18   with the bank (sic) through getting that form executed?

04:22:36 19   A.   Yes.

04:22:36 20   Q.   Do you recall whether -- well, let's look at this exhibit,

04:22:41 21   which is part of Exhibit 7, starting at page 205.

04:22:45 22          This indicates that there is an ordinary business

04:22:49 23   income of $55,000; is that correct?

04:22:53 24   A.   Yes.

04:22:53 25   Q.   When you prepared this document, was that the best

04:22:56 1    information that you had as of that date?

04:22:58 2    A.    Yes.

04:22:58 3    Q.    Now, if we go down.  This is on page 209 of Exhibit 7.

04:23:22 4    It's talking about -- this is a balance sheet of the books of

04:23:26 5    Wagners Chef, correct?

04:23:26 6    A.    Yes.

04:23:27 7    Q.    So as of the date that this was done, line three -- or row

04:23:31 8    three, I guess it would be, would show what the inventories

04:23:34 9    are?

04:23:35 10   A.    It's for December 31st, 2018.  It's a year-end balance

04:23:39 11   sheet.

04:23:41 12   Q.    Well, not '18.  This would be '15, correct?

04:23:44 13   A.    I'm sorry, '15.

04:23:44 14   Q.    Right.

04:23:44 15   A.    But not from the date on the front of the return.

04:23:47 16   Q.    So this a calendar year?

04:23:49 17   A.    Got you.

04:23:50 18   Q.    So it would be at the beginning of the tax year it was

04:23:54 19   120, and the end of the tax year it was 125 --

04:23:57 20   A.    Yes.

04:23:58 21   Q.    -- is that correct?  Okay.

04:24:07 22        Then I wanted to talk to you about this schedule.

04:24:22 23   This is the Form 4562 statement, again, for the end of the year

04:24:30 24   2015 for Wagners Chef.  This shows a goodwill value at

04:24:39 25   $1.5 million, approximately.  It's 1,500,540.

*OFFICIAL TRANSCRIPT*

04:24:46 1  A.   That's the beginning balance of the goodwill, yes.

04:24:51 2  Q.   Right.  Then, it's the same at the end, is it not?  Or

04:24:55 3  actually -- yes, it's the same at the recovery basis?

04:25:00 4  A.   Right.  Again, that's just the basis in it.

04:25:02 5  Q.   So that's just the basis.

04:25:04 6  A.   Keep going over.  The 2015 depreciation is the second to

04:25:13 7  last column.  That $100,000 --

04:25:13 8  Q.   Yes.

04:25:16 9  A.   -- would be the depreciation for the year 2015.

04:25:20 10  Q.   Then you've got accumulated depreciation?

04:25:23 11  A.   It's the same -- well, I would have to look back, but it

04:25:28 12  looks like there is two years of depreciation there, meaning

04:25:32 13  it's not going to be the same at the end of the year.  It will

04:25:35 14  be reduced by that amount.

04:25:36 15  Q.   But tell me, when the term "goodwill" is used on this

04:25:44 16  form, can you describe to me what you mean by goodwill?

04:25:48 17  A.   It's the value of a business that's not a tangible asset.

04:25:52 18  So it's -- if you went and bought -- let's say you went and

04:25:57 19  bought a business for $1.5 million, and it had tangible assets

04:26:02 20  of $200,000.  The difference would be goodwill.

04:26:06 21       It's the value that has been built up by having the

04:26:12 22  business operating and running, your client base, your name

04:26:19 23  recognition, is goodwill.

04:26:21 24  Q.   Got you.  So that's something that's -- it's difficult to

04:26:25 25  measure that, I would presume?

*OFFICIAL TRANSCRIPT*

04:26:28 1    A.   It's generally, you take the purchase price of a business,

04:26:31 2    and you subtract out the tangible assets.  The difference is

04:26:36 3    goodwill.

04:26:36 4    Q.   Then what's left is goodwill.  Okay.

04:26:42 5          Now, turning to Exhibit 33, which is also a 2015 tax

04:26:50 6    return for Wagners Chef.  Again, it appears that you were the

04:26:55 7    tax preparer on this document; is that correct?

04:26:58 8    A.   Yes.

04:26:59 9    Q.   What was the date that you prepared this?

04:27:00 10   A.   It says 7/27/16.

04:27:05 11   Q.   Do you recall why you did a second tax return for

04:27:20 12   Wagners Chef in that year?

04:27:22 13   A.   This is -- when it's time to file the return, this is the

04:27:27 14   final return.

04:27:27 15         I can tell you, generally, what happens with these

04:27:31 16   businesses, is when it's time to file the final return, and I

04:27:35 17   have the owner in front of me, I say, okay, based upon my

04:27:38 18   calculations, I show you earned this much money.  They always

04:27:43 19   say, that's not right.  You're missing a lot of the cash

04:27:48 20   expenses I have during the year.

04:27:50 21         Like, apparently, a lot of vendors, like produce

04:27:54 22   vendors or t-shirt vendors, they just pay them cash when that

04:27:59 23   item is purchased.  So I don't have the actual number for cost

04:28:03 24   of goods.  That's what they'll tell me, I'm missing some cost

04:28:07 25   of goods.

Q.   Then you will adjust this -- the tax forms based on the additional information you get from the client?

A.   Correct.

Q.   Is it -- to your understanding, this is -- Exhibit 33 is the only one of these exhibits -- or of these two tax returns that was actually filed the IRS?

A.   Yes.

Q.   Now, I want to turn now to Exhibit 34, which is the individual tax return for Mr. Saed and his wife for the year -- tax year 2016.

      When you're dealing with a limited liability company, is it typical that the member -- the owner of the limited liability company includes the income from the LLC on his personal tax returns?

A.   Yes.

Q.   Then they'll attach -- or do you often prepare an informational or supplemental tax return or balance sheet for the business itself?

A.   I'm not sure what you're asking there.  If an LLC, a limited liability company, has multiple members, it files a separate tax return.  The one that we just looked at, that Form 1065, that's what it would file.

Q.   Because there were two members of Wagners Chef at that time?

A.   More than one.

*OFFICIAL TRANSCRIPT*

| | | |
|---|---|---|
| 04:29:52 | 1 | Q. Right. |
| 04:29:52 | 2 | A. More than one member. |
| 04:29:52 | 3 | Q. More than one. |
| 04:29:53 | 4 | A. Each member would get what's called a K-1. It's their |
| 04:29:58 | 5 | distributive share of the income from the LLC. |
| 04:30:01 | 6 | Is that what the question was? |
| 04:30:03 | 7 | Q. Yes. But then, when you've got a single-member LLC -- |
| 04:30:06 | 8 | A. When you have a single member, you don't file it -- you |
| 04:30:10 | 9 | can't file a 1065. It's not allowed. It has to go onto the |
| 04:30:14 | 10 | individual's personal tax return. |
| 04:30:15 | 11 | Let me just -- before I say you can't do it, you can |
| 04:30:18 | 12 | make a request with the Internal Revenue Service for a |
| 04:30:23 | 13 | single-member LLC to be treated as a corporation or something |
| 04:30:26 | 14 | and -- ask to be treated; but, if you don't, this is the -- |
| 04:30:30 | 15 | this is the standard form -- method of handling it. |
| 04:30:33 | 16 | Q. Okay. Well, if we look at this, then we go down to |
| 04:30:41 | 17 | page 604 -- no, that's the wrong page -- there we go -- 607, |
| 04:30:52 | 18 | we've got a Profit and Loss From Business form. |
| 04:30:55 | 19 | Is this the supplemental schedule that you fill out |
| 04:30:59 | 20 | related to the LLC's financial tracking, for lack of a better |
| 04:31:05 | 21 | word? |
| 04:31:05 | 22 | A. Their income and expenses, basically, yes. |
| 04:31:08 | 23 | Q. Right. So this is -- this document, page -- Exhibit 34, |
| 04:31:15 | 24 | page 607, shows the profit and loss for Wagners Chef in the |
| 04:31:22 | 25 | year 2016, correct? |

*OFFICIAL TRANSCRIPT*

04:31:24 1    A.    Yes.

04:31:25 2    Q.    This shows a gross income of $162,000; is that correct?

04:31:32 3    A.    Yes.

04:31:33 4    Q.    That's basically taking the gross receipts and subtracting

04:31:39 5    out the cost of goods sold?

04:31:42 6    A.    Correct.

04:31:42 7    Q.    Then, below that, in part two, is expenses that are offset

04:31:50 8    against that income?

04:31:51 9    A.    Yes.

04:31:51 10   Q.    In this, the general -- the overall result is an

04:32:01 11   operational loss for Wagners Chef of $311,000 --

04:32:06 12   A.    Correct.

04:32:07 13   Q.    -- is that correct?

04:32:07 14         Now, this does show other income in the amount of

04:32:16 15   $90,000 in item 6.  Do you see that?

04:32:20 16   A.    Yes.

04:32:25 17   Q.    That's additional income for Wagners Chef, correct?

04:32:28 18   A.    Yes.

04:32:28 19   Q.    So we would have to look at --

04:32:31 20   A.    There should be a schedule.

04:32:33 21   Q.    Well, that was going to be my next question.  Can you

04:32:38 22   identify the schedule where that number is based on?

04:32:44 23         Is that the supplemental income and loss schedule?

04:32:52 24   A.    No.  It shouldn't be.  Can we keep going down?

04:33:11 25   Q.    I think we're past --

*OFFICIAL TRANSCRIPT*

04:33:12 1    A.    It should be -- it's not going to look like an IRS form.

04:33:16 2    It's just going to be a sheet that says -- like, see -- it may

04:33:21 3    not have printed.

04:33:26 4    Q.    Rather than spend the time looking through that, that

04:33:31 5    would be additional income that would come in?

04:33:32 6    A.    Yes.

04:33:36 7    Q.    Then, this -- so based on your work and the information

04:33:47 8    that was provided to you, for 2016, Wagners Chef's total loss

04:33:55 9    of $311,000 for its operations?

04:33:57 10   A.    Yes.

04:33:58 11   Q.    Now, also, if we look back to the original -- the front

04:34:02 12   page of this return, it shows a loss in item number 14 of

04:34:14 13   $1.292 million?

04:34:15 14   A.    Yes.

04:34:15 15   Q.    Is that what's referred to as a capital loss?

04:34:18 16   A.    Absolutely, yes.

04:34:19 17   Q.    Is that from -- stemming from, in large part, the

04:34:23 18   difference between the basis that was had in Wagners Chef's

04:34:28 19   assets and for what it was sold for?

04:34:31 20   A.    Correct.

04:34:31 21   Q.    So, when you take those together, the 311 is the

04:34:36 22   operational loss.  That's what Wagners Chef lost through its

04:34:40 23   operations.

04:34:41 24   A.    Correct.

04:34:41 25   Q.    Then the other 1.3, almost, million dollars is the loss

*OFFICIAL TRANSCRIPT*

04:34:46  1    due to the difference between what was received for it and its

04:34:51  2    goodwill.

04:34:51  3    A.    Correct.

04:34:52  4    Q.    Do you recall, during the fall of 2016, any efforts by

04:35:01  5    Wagners Chef to sell the company, either as a going concern or

04:35:07  6    through just its assets?

04:35:09  7    A.    Yes.

04:35:09  8    Q.    Tell me about those efforts.

04:35:11  9    A.    I don't know specifically what they were, but I know

04:35:17 10    Jadallah had been trying to find a buyer.

04:35:20 11          At one point, he told me that he had a buyer.  Then,

04:35:23 12    a few weeks later, he said, no, it fell through.  Then, it

04:35:27 13    happened again, and another one fell through.  I know he was

04:35:30 14    actively pursuing that.

04:35:31 15    Q.    In the end, he was not able to sell it as a going concern,

04:35:35 16    correct?

04:35:35 17    A.    I'm not sure when you say as a going concern.  He ended up

04:35:42 18    selling it for a very reduced amount money based upon what he

04:35:46 19    paid for it.

04:35:47 20    Q.    Right.  Do you know if that was just an asset sale, or if

04:35:49 21    it was more than that?

04:35:50 22    A.    It was basically -- if I remember correctly, it was the

04:35:54 23    purchase of the inventory.

04:35:57 24          MR. BEH:  All right.  Thank you.  I have no further

04:36:00 25    questions at this time.

*OFFICIAL TRANSCRIPT*

CROSS-EXAMINATION

BY MR. DIROSA:

Q.   Mr. Sewell, this March 1st return that we've discussed,
Ms. Kleindorf -- you weren't here, but she testified that they
used this return to -- I keep pushing the wrong button here --
evaluate the loan application of Wagners Chef.  But you're
saying she shouldn't have used that?

A.   I'm not saying she shouldn't have used it.  I don't know
exactly what they mean by used it to evaluate the loan
application.

I think what I would mean is, if they are relying on
this to make a determination, I think they would have verified
that this return had actually been filed.

Q.   Did you have anything to do with the preparation of a
business plan that Mr. Saed submitted to the bank?

A.   No.

Q.   Okay.  So, how do you get -- do you know if Wagners Chef
has a general ledger?

A.   I'm going to say no, it does not have a general ledger.

Q.   What is a general ledger?

A.   It's more of an accounting of every specific transaction
that takes place during the year, income and expenses.

Q.   So, how does Wagners Chef give you the information that
goes on this tax return?

A.   Generally, I would see a client once a month.  We go over

04:37:59  1   the sales, and I go over the expenses for that month.

04:38:04  2   If there is something extraordinary, they have to

04:38:06  3   tell me it's unusual.  But I would write down or keep track of

04:38:12  4   utility bills, make sure the rent is paid, etcetera, and keep

04:38:17  5   track of that until the end of the year.

04:38:18  6   Q.   Okay.  So, does he bring you, here are all my invoices for

04:38:25  7   the month, please add these up, and tell me what the cost of

04:38:30  8   goods sold are?

04:38:30  9   A.   No.  I would say that that happened on occasion.  In

04:38:34 10   general, he tells me a number for that.

04:38:36 11   Q.   What about sales?  Does he bring you the tapes from the

04:38:41 12   registers, Z tapes, and says, okay, here's all the Z tapes for

04:38:47 13   the months, you add this up, figure out my sales for the month?

04:38:50 14   A.   No.  Again, those are provided directly from the store, I

04:38:54 15   would guess.

04:38:54 16   Q.   So as we look at -- let's look at this one to begin

04:38:58 17   with -- that $4,322,489 in gross sales is a number that

04:39:08 18   Mr. Saed provided to you to put on this tax return?

04:39:13 19   A.   It's basically, yes, but what I do is I take the 12 months

04:39:17 20   of sales tax returns.  But that's -- I mean, basically, yes.

04:39:22 21   The numbers from the sales tax return come from Mr. Saed.  At

04:39:27 22   the end of the year, I add up the sales tax returns.

04:39:30 23   Q.   So in order to -- you file sales tax returns monthly?

04:39:32 24   A.   Correct.

04:39:33 25   Q.   Mr. Saed gives you a number, these are my sales?

*OFFICIAL TRANSCRIPT*

04:39:36  1    A.    Correct.

04:39:36  2    Q.    You prepare a sales tax return?

04:39:38  3    A.    Yes.

04:39:39  4    Q.    Then, next month, Mr. Saed comes in empty-handed, says,

04:39:47  5    these are my numbers, you prepare another sales tax return?

04:39:49  6    A.    Yes.

04:39:50  7    Q.    At the end of the year, you add all of those sales tax

04:39:53  8    returns that Mr. Saed has been telling you is his sales, and

04:39:56  9    that's what you put as total sales?

04:39:57 10    A.    Yes.

04:39:58 11    Q.    Cost of goods sold, pretty much the same process?

04:40:02 12    A.    Yes.

04:40:02 13    Q.    So all of these numbers come out of Mr. Saed's mouth?

04:40:06 14    A.    Well, yes, they come from Mr. Saed; but, frequently, those

04:40:10 15    are backed up with something.  Not every single sale.  I'm not

04:40:16 16    trying to say that he comes in every single month, but, that --

04:40:19 17    the clients will come in with a ledger or a Z tape on occasion.

04:40:26 18    Q.    But you said he doesn't have a ledger?

04:40:29 19    A.    I'm just saying -- when I say general ledger, some of my

04:40:34 20    clients keep, like, just a notebook of all their sales.

04:40:36 21    Q.    Let's just talk about Mr. Saed and Wagners Chef.

04:40:40 22    A.    Okay.

04:40:40 23    Q.    Does he have a ledger of his sales?

04:40:43 24    A.    I can't tell you specifically no, that I've never seen

04:40:46 25    one, but I would say, in general, those were verbal numbers.

04:40:48 1    Q.    Okay.  The same for cost of goods sold?

04:40:52 2    A.    Yes.

04:40:53 3    Q.    All right.  What about salaries?  He's open 24/7, correct,

04:41:03 4    365 days a year?

04:41:04 5    A.    Uh-huh (affirmative response).

04:41:05 6    Q.    Okay.  That's 8,760 hours a year.  3.

04:41:15 7          He's got two workers a shift.  That's 17,520 hours.

04:41:21 8          So let's look at the tax return that was filed:  This

04:41:29 9    is the one dated 7/27/16.  How much does he show on this tax

04:41:37 10   return for salaries?

04:41:38 11   A.    Zero.

04:41:38 12   Q.    How can that be?

04:41:40 13   A.    I would have to look and see if under other deductions, if

04:41:44 14   he issued 1099s to people for that year.  But that is something

04:41:48 15   that he and I had discussed more than once is that payroll

04:41:51 16   should be provided for this business.

04:41:53 17   Q.    Okay.  So if you're not doing payroll, then you don't have

04:41:58 18   to pay the 17 percent payroll taxes, the FICA, the Medicare --

04:42:05 19   A.    Correct.  You save that.

04:42:06 20   Q.    You don't pay that?

04:42:07 21   A.    Correct.

04:42:07 22   Q.    That's not legit, is it?

04:42:11 23   A.    You're not --

04:42:11 24         MR. BEH:  Objection, Your Honor.

04:42:13 25         THE COURT:  Sustained.

*OFFICIAL TRANSCRIPT*

EXAMINATION BY MR. DIROSA:

Q.   Is there a law that deals with that, that you're aware of?

        MR. BEH:  Objection.

        THE COURT:  That's another way to say is it illegal.
Sustained.

EXAMINATION BY MR. DIROSA:

Q.   People who are cashiers are not -- they are hourly
employees, are they not?

        MR. BEH:  Objection, Your Honor.  I think that's a
legal conclusion.

        THE COURT:  It sounds like you're getting into wage and
hour laws, which, you know, we're not going to try that in this
case.  So sustained.

EXAMINATION BY MR. DIROSA:

Q.   Wagners Chef, to your knowledge, was open for 10 months in
2016, roughly, ten and a half months, correct?

A.   Correct.

Q.   So given the fact that there are 8,760 hours in a year,
how were the wages for that ten months only $7,650?

A.   Same thing.  I would have to see where it says other
expenses, and if people were paid on a 1099.  That wouldn't go
on the wage line.

Q.   Then, when we see gross profit or gross receipts from
sales, 2,871,125, that is a number provided to you by Mr. Saed?

A.   Correct.

04:44:21 1    Q.    Just like he provides you a number every month --

04:44:26 2    A.    Correct.

04:44:27 3    Q.    -- for sales tax returns?

04:44:29 4    A.    Yes.

04:44:29 5    Q.    Okay.  Cost of goods sold, that number, $2,798,784, is

04:44:39 6    also a number Mr. Saed gives to you?

04:44:43 7    A.    Correct.

04:44:43 8    Q.    Okay.  So, if we went to your office, there would be no

04:44:47 9    files with copies of receipts or ledgers that would back up

04:44:52 10   these amounts, that would verify these amounts?

04:44:55 11   A.    No.  The most we would have would be my notes or

04:44:59 12   handwritten notes.

04:45:00 13   Q.    Then that would be also true for repairs and maintenance,

04:45:13 14   supplies?  Same thing?

04:45:16 15   A.    I mean, basically, yes.

04:45:17 16   Q.    Okay.  So other than you putting these numbers on the

04:45:21 17   paper, the numbers really come from Mr. Saed?

04:45:24 18   A.    Correct.

04:45:24 19   Q.    He could tell you, pretty much, whatever he wants to tell

04:45:28 20   you, and you put it on the paper?

04:45:30 21   A.    Yes.

04:45:30 22   Q.    In 2016, Wagners Chef owned -- or had the master lease up

04:45:47 23   until at least through the end of June.  That's six months.

04:45:52 24   They were getting $24,000 a month in rents from the three

04:45:56 25   subleases they had.

*OFFICIAL TRANSCRIPT*

04:45:58  1      Where would that 144,000 appear on this tax return?

04:46:02  2  A.   I believe that that $90,000 of other income is the rental

04:46:07  3  income.  But if you would -- can we scroll like we did before?

04:46:10  4  I thought I saw --

04:46:11  5  Q.   I can't scroll.

04:46:13  6  A.   I thought there was a schedule E.

04:46:17  7  Q.   Let me see.  Yes, I do have one.

04:46:30  8  A.   That is rents received.

04:46:31  9  Q.   Okay.  But that says for Mr. and Mrs. Saed.  So that would

04:46:39 10  include --

04:46:40 11  A.   When it's a single-member LLC, rental income goes on a

04:46:45 12  schedule E on the personal tax return.

04:46:47 13      If you look on line A, that's the address of the

04:46:51 14  property where the rental is.

04:46:53 15  Q.   So that would include rentals received by

04:46:57 16  Jadallah Enterprises after it -- or Ahmed 1 after it purchased

04:47:01 17  the property?

04:47:02 18  A.   Correct.

04:47:02 19  Q.   So $24,000 a month over 12 months is $288,000.  What

04:47:16 20  happened to the rest of the money?

04:47:19 21  A.   Well, I think that that is the 185 there, plus the 90 on

04:47:23 22  the other schedule, on Schedule C.

04:47:25 23  Q.   Where do these two numbers come from?

04:47:29 24  A.   You mean as far as -- from Mr. Saed, yes.

04:47:33 25  Q.   That's true for that -- that the numbers come from

*OFFICIAL TRANSCRIPT*

04:47:51 1  Mr. Saed, that's true for the March 1st return -- March 1st --
04:47:56 2  the 2015 return that's dated March 1st, same thing?
04:47:59 3  A.    Yes.
04:48:00 4  Q.    Okay.
04:48:01 5        MR. DIROSA:  I don't have any other questions.
04:48:03 6        THE COURT:  All right.  Redirect?
04:48:07 7        MR. BEH:  Yes, sir.
04:48:08 8                    REDIRECT EXAMINATION
04:48:09 9  BY MR. BEH:
04:48:09 10 Q.    Mr. Sewell, how many gas stations do you do this type of
04:48:16 11 accounting work for?
04:48:16 12 A.    About a hundred.
04:48:18 13 Q.    Is the process that was used by Mr. Saed with Wagners Chef
04:48:26 14 pretty typical for those businesses?
04:48:27 15 A.    Yes.
04:48:28 16 Q.    So that's not an unusual circumstance or an unusual
04:48:33 17 arrangement for how you are provided information?
04:48:36 18 A.    No.
04:48:36 19 Q.    In your experience with other gas stations, that's pretty
04:48:42 20 much how it goes?
04:48:43 21 A.    I would say more than half, yes.
04:48:47 22        MR. BEH:  No other questions, Your Honor.
04:48:49 23        THE COURT:  Okay, sir, you can step down.  You're done.
04:48:52 24 Thank you.
04:49:08 25        Mr. Beh, do the defendants have any further

04:49:10 1  witnesses or evidence?

04:49:11 2        MR. BEH:  No, sir.  The defense rests.

04:49:13 3        THE COURT:  Any rebuttal evidence?

04:49:14 4        MR. DIROSA:  We would call Mr. Hamdan.

04:49:18 5        THE COURT:  This has got to be truly rebuttal now, not

04:49:21 6  something you could have put on before.

04:49:23 7        MR. DIROSA:  Truly rebuttal.

04:49:26 8        THE COURT:  You're still under oath, sir.  Go ahead.

9                  **IMAD "EDDIE" HAMDAN**

10  was called as a witness and, after being previously duly sworn

11  by the Clerk, was examined and testified on his oath as

12  follows:

13              DIRECT REBUTTAL EXAMINATION

14  BY MR. DIROSA:

04:49:35 15  Q.    Mr. Hamdan, at any time, any time, was Omar Hamdan a part

04:49:43 16  owner or had any interest in Brothers Petroleum?

04:49:45 17  A.    No.

04:49:46 18  Q.    At any time, did Fatmah Hamdan have any interest in

04:49:49 19  Brothers Petroleum, whatsoever?

04:49:50 20  A.    No.

04:49:50 21  Q.    At any time, did Bob Harvey with have any interest in

04:49:56 22  Brothers Petroleum at all?

04:49:57 23  A.    Never.

04:49:58 24        MR. DIROSA:  I don't have any other questions.

04:50:02 25        THE COURT:  Any questions?

*OFFICIAL TRANSCRIPT*

04:50:03 1        MR. BEH:  No, sir.

04:50:04 2        THE COURT:  Okay.  Thank you, sir.

04:50:07 3        Okay.  Ladies and gentlemen, we've moved along

04:50:09 4  more quickly than we anticipated, so we're done with all the

04:50:14 5  evidence in the case.  It's almost five o'clock.  So what I'm

04:50:17 6  going to do now is recess for today, ask you to come back at

04:50:20 7  the same time tomorrow.

04:50:21 8        When you return for 8:30 -- and I would suggest

04:50:25 9  you get here a little early -- again, we'll have some breakfast

04:50:29 10 stuff in the room for you, again -- but we'll try to start

04:50:33 11 promptly at 8:30.

04:50:34 12       The last part of the trial will be closing

04:50:36 13 arguments by the attorneys.  Once that's done, I will give

04:50:40 14 you -- I will give you my legal instructions.  Remember, you

04:50:44 15 are the judges of the facts of the case.  My role is to preside

04:50:49 16 over the trial and then instruct you on the law that you should

04:50:51 17 apply to this type of case.

04:50:54 18       I'll give you those legal instructions.  I'm

04:50:58 19 required to read them to you, but I'll give you written copies

04:51:01 20 also, so you can take those with you back in the jury room.

04:51:05 21       As soon as I finish my legal instructions, I'll

04:51:07 22 send you back into the jury room.  We'll send the exhibits in.

04:51:15 23 We'll see if we can get -- there is a screen in the jury room,

04:51:19 24 you might have noticed.  So I'm going to try to get the lawyers

04:51:25 25 to get you the exhibits that they've talked about on a thumb

**OFFICIAL TRANSCRIPT**

04:51:28 1 drive or something that you all can try to use in there, but

04:51:32 2 we'll also send some hard copies in.

04:51:37 3 Anyway, I'll give you further instructions at

04:51:39 4 that time when you go to deliberate. So you'll be deliberating

04:51:42 5 by midmorning for sure, okay.

04:51:45 6 Okay. Again, leave your notebooks closed and on

04:51:49 7 your chairs or under your chairs. They will be there in

04:51:53 8 morning when you come back.

04:51:54 9 Have a good evening. Remember not to discuss the

04:51:57 10 case with anyone when you go home this evening. Again, I

04:52:02 11 appreciate your effort to get here on time in the morning,

04:52:05 12 okay. Thank you. Have a good evening.

04:52:07 13 THE DEPUTY CLERK: All rise.

04:52:10 14 (WHEREUPON, at 4:52 p.m., the jury panel leaves the

04:52:37 15 courtroom.)

04:52:37 16 THE COURT: All right. The jury has exited the

04:52:39 17 courtroom.

04:52:39 18 Mr. Beh, I'll allow you to briefly state your

04:52:42 19 Rule 50 motion, without any argument. Just state your motion,

04:52:46 20 because I'm going to defer it until after the jury returns its

04:52:51 21 verdict, okay. State it for the record.

04:52:52 22 MR. BEH: Do you want me to go to the podium?

04:52:58 23 THE COURT: Yes, yes.

04:52:58 24 Everyone can be seated.

04:53:00 25 MR. BEH: Your Honor, I make a motion pursuant to

*OFFICIAL TRANSCRIPT*

Rule 50(a) of the Federal Rules of Civil Procedure for a motion for judgment as a matter of law.

I believe that, you know, when a party has been fully heard, and there is no legally sufficient evidentiary basis for a reasonable jury to find in Brothers' favor on this claim.

We have the five transactions:  The sale of the property by Wagner World to Jadallah Enterprises; the cancellation -- or filing of the notice of cancellation of lease; the lease of the property from Jadallah Enterprises to Ahmed 1; the asset sale of Wagners Chef's assets to Empire Express; and, the lease of the property from Ahmed 1 to Empire Express.

I don't think the plaintiffs have made a showing that any of those transactions meet the standard required for an unfair trade practice.

I could go on into the evidence, but that's the basis.

THE COURT:  No, I have your motion.  Okay.  Thank you.

MR. BEH:  Thank you, sir.

THE COURT:  The way I do this is I defer the ruling. Sometimes the jury verdict moots that motion.  If it doesn't moot the motion, I will consider it, and I'll allow briefing on it, if necessary, from both sides, obviously.

MR. BEH:  Thank you.

***OFFICIAL TRANSCRIPT***

04:54:45  1          THE COURT:  All right.  Closing arguments, how much

04:54:51  2    time do you want, Mr. DiRosa?

04:54:53  3          MR. DIROSA:  Half hour.

04:54:55  4          THE COURT:  Each side will get 30 minutes.

04:54:58  5               Mr. DiRosa, you can reserve a portion of your

04:55:02  6    time for rebuttal, of the 30 minutes.  How much time do you

04:55:05  7    want?

04:55:06  8          MR. DIROSA:  Ten.

04:55:07  9          THE COURT:  Okay, 20 and 10.

04:55:08 10               So Gail will keep track of your time.  If you

04:55:14 11    want a reminder, like when you've got five minutes left, three

04:55:18 12    minutes or two minutes, whatever reminders you want, let Gail

04:55:21 13    know, and she'll give you a gentle reminder.

04:55:24 14               When your time is really up, she'll alert me, and

04:55:28 15    I'll tell you to wind it down or wind it up, whatever.

04:55:31 16               Exhibits, are you all going to be able to get a

04:55:38 17    thumb drive with the exhibits?

04:55:39 18          MR. BEH:  Yes.

04:55:40 19          THE COURT:  These books have voluminous stuff in it

04:55:42 20    that you all didn't even talk about in the case.  You realize

04:55:45 21    that.

04:55:45 22          MR. DIROSA:  We do.

04:55:46 23          MR. BEH:  We do.

04:55:47 24          MR. DIROSA:  We knew that coming in.

04:55:50 25          THE COURT:  My general practice is not to burden the

04:55:52 1   jury with voluminous books, because they don't know what the

04:55:56 2   hell to do with them.  If I send these back, they'll want to

04:56:01 3   know -- some of them will want to know, do we have to read

04:56:03 4   these or what?

04:56:04 5              So I would hope you all could try to agree to

04:56:07 6   what was actually used during the trial or what's necessary,

04:56:13 7   and take out the rest of the stuff.

04:56:15 8        MR. DIROSA:  Just, as an example, a lot of the leases,

04:56:18 9   we only looked at one or two pages.  Do you just want those one

04:56:22 10  or two pages, or do you want a lease?

04:56:24 11       MR. BEH:  I think we need the whole lease, don't we,

04:56:26 12  Your Honor?

04:56:26 13       THE COURT:  If it's a lease, I guess you could leave in

04:56:29 14  it.  But there is some other stuff like --

04:56:30 15       MR. BEH:  Well, there are two huge exhibits, 7 and 8.

04:56:35 16       THE COURT:  7 and 8, I'll pretty sure you don't need

04:56:38 17  all of those pages in there.

04:56:39 18       MR. DIROSA:  Absolutely not.

04:56:40 19       MR. BEH:  Your Honor, a lot of that stuff has been --

04:56:42 20  you resolved the issue when you excluded it through your

04:56:49 21  ruling.

04:56:49 22       THE COURT:  Correct.

04:56:49 23       MR. BEH:  So I can pull out a lot of --

04:56:51 24       THE COURT:  Then the other thing, that we didn't really

04:56:53 25  talk about yet, but there are stipulations or uncontested facts

*OFFICIAL TRANSCRIPT*

1    in the pretrial order, which sometimes we read during the

2    trial, or sometimes we just give them to the jury, either in

3    the legal instructions, or I could give it to them printed out

4    or whatever.

5          But in this case, some of the stipulated facts

6    are not really relevant to what they are going to have to

7    decide.  Would you all want to see if you all could agree on

8    which ones are relevant, and we can --

9       MR. DIROSA:  We could do that.

10      MR. BEH:  Yes.

11      THE COURT:  -- you can give that to us?  Just eliminate

12    the ones that aren't relevant?

13        Okay.  The next thing is the legal instructions

14    and verdict form.  Any remaining objections to those or issues

15    with those?

16      MR. BEH:  Your Honor, I've reviewed them very quickly

17    on my phone.  I have not had a chance --

18      MR. DIROSA:  I haven't even had a chance --

19      THE COURT:  Well, you need to go back to your offices

20    or whatever and e-mail Perry this evening, because I want to

21    have those ready first thing in morning, okay.

22      MR. DIROSA:  Okay.

23      THE COURT:  All right.

24      MR. BEH:  I will.

25      THE COURT:  Okay.  Anything else?

*OFFICIAL TRANSCRIPT*

04:58:21 1          MR. DIROSA:  Can we remain in the courtroom while we --

04:58:25 2          THE COURT:  You can remain here.

04:58:28 3          MR. DIROSA:  -- resolve these books?

04:58:38 4          THE COURT:  What time do they close the doors

04:58:41 5     downstairs?  6:00 now?  Well, somebody could always let you

04:58:41 6     out, if need be.  There's a button down there you can push, and

04:58:41 7     somebody will let you out.

04:58:47 8               All right.  Okay.  Court will stand adjourned

04:58:52 9     until tomorrow morning.

10               (WHEREUPON, at 4:58 p.m., the proceedings were

11     concluded.)

12                              *   *   *

13

14                        REPORTER'S CERTIFICATE

15

16          I, Cathy Pepper, Certified Realtime Reporter, Registered
       Merit Reporter, Certified Court Reporter in and for the State
       of Louisiana, Official Court Reporter for the United States
17     District Court, Eastern District of Louisiana, do hereby
       certify that the foregoing is a true and correct transcript to
18     the best of my ability and understanding from the record of the
       proceedings in the above-entitled and numbered matter.

19
                              s/Cathy Pepper
20                            Cathy Pepper, CRR, RMR, CCR
                              Certified Realtime Reporter
21                            Registered Merit Reporter
                              Official Court Reporter
22                            United States District Court
                              Cathy_Pepper@laed.uscourts.gov
23

24

25


                        *OFFICIAL TRANSCRIPT*