1               UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF LOUISIANA

2

3   ****************************************************************

4   BROTHERS PETROLEUM, LLC

5                      CIVIL ACTION NO. 17-6713 "J"
    VERSUS               NEW ORLEANS, LOUISIANA

08:22:59 6                    WEDNESDAY, SEPTEMBER 25, 2019, 8:30 A.M.

7

8   WAGNERS CHEF, LLC,
   JADALLAH ENTERPRISES, LLC,
   AHMED 1, LLC, WAGNER WORLD,

9   LLC, EMPIRE EXPRESS, LLC,
   AND LNV CORPORATION

10   ****************************************************************

11                       **DAY 3**

12           TRANSCRIPT OF JURY TRIAL PROCEEDINGS
        HEARD BEFORE THE HONORABLE CARL J. BARBIER

13             UNITED STATES DISTRICT JUDGE

14

15   APPEARANCES:

16   FOR THE PLAINTIFF:       JOSEPH VINCENT DIROSA, JR.
                      ATTORNEY AT LAW

17                      329 NORTH WOODLAWN AVENUE
                      METAIRIE, LA 70001

18

19   FOR THE DEFENDANTS:      ELKINS, PLC
                      BY:  THOMAS M. BEH, ESQUIRE

20                      201 ST. CHARLES AVENUE, SUITE 4400
                      NEW ORLEANS, LA 70170

21

22   OFFICIAL COURT REPORTER:    CATHY PEPPER, CRR, RMR, CCR
                      500 POYDRAS STREET, ROOM B-275

23                      NEW ORLEANS, LA 70130
                      (504) 589-7779

24                      Cathy_Pepper@laed.uscourts.gov

25   PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.  TRANSCRIPT
   PRODUCED BY COMPUTER-AIDED TRANSCRIPTION.

                    *OFFICIAL TRANSCRIPT*

1                           **I N D E X**

2

3                                                              <u>PAGE</u>

4

5   CLOSING ARGUMENTS BY MR. DIROSA...................... 323

6   CLOSING ARGUMENTS BY MR. BEH......................... 334

7   REBUTTAL CLOSING ARGUMENTS BY MR. DIROSA............. 351

8   LEGAL INSTRUCTIONS READ TO THE JURY.................. 356

9   DELIBERATIONS........................................ 369

10  VERDICT.............................................. 371

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | **P-R-O-C-E-E-D-I-N-G-S** |
| 2 | M O R N I N G   S E S S I O N |
| 08:22:59  3 | WEDNESDAY, SEPTEMBER 25, 2019 |
| 08:22:59  4 | (COURT CALLED TO ORDER) |
| 08:22:59  5 | |
| 08:22:59  6 | |
| 08:29:57  7 | THE DEPUTY CLERK:  All rise. |
| 08:29:57  8 | THE COURT:  Have a seat. |
| 08:30:07  9 | The jury is not in the courtroom yet.  We're back |
| 08:30:10 10 | in court with counsel and the parties on the record. |
| 08:30:14 11 | You all received the final version of the legal |
| 08:30:21 12 | instructions and the verdict form.  The only feedback we got |
| 08:30:29 13 | was from Mr. DiRosa, I believe. |
| 08:30:30 14 | MR. DIROSA:  Yes, sir. |
| 08:30:37 15 | THE COURT:  I'm not sure that that's necessary at all, |
| 08:30:41 16 | but, to try to address your concern, I gave a modified version |
| 08:30:48 17 | of what you requested. |
| 08:30:54 18 | So if you have any remaining issue, concern or |
| 08:31:01 19 | objection, I'll give you a chance to put it on the record right |
| 08:31:03 20 | now. |
| 08:31:03 21 | MR. DIROSA:  I just would like to make an objection |
| 08:31:06 22 | because I submitted what was labeled as proposed Jury |
| 08:31:11 23 | Instruction Number 8 -- |
| 08:31:12 24 | THE COURT:  Right. |
| 08:31:13 25 | MR. DIROSA:  -- which was taken directly from the |

*OFFICIAL TRANSCRIPT*

08:31:16 1   ruling of this Court in -- I forget exactly what the date is,

08:31:21 2   but it was on page 13 of Record Document 46.  So that's why I

08:31:27 3   suggested that it be used.

08:31:29 4         THE COURT:  Right.  Well, two things.  Number one, not

08:31:33 5   everything that comes from any case, my case or any other

08:31:41 6   court, needs to be necessarily in a jury instruction.  Lawyers

08:31:46 7   tell me all the time, they say, Judge, that comes right out of

08:31:49 8   such and such case.  I said, okay, so what, you know.

08:31:52 9          I understand your point.  So your objection is

08:31:53 10   noted.  Okay?

08:31:54 11         MR. DIROSA:  Thank you.

08:31:59 12         THE COURT:  Any other objections?

08:32:00 13         MR. DIROSA:  No, sir.

08:32:01 14         MR. BEH:  No, sir, Your Honor.

08:32:01 15         THE COURT:  The verdict form is okay?

08:32:03 16         MR. DIROSA:  Yes, sir.

08:32:04 17         MR. BEH:  Yes, sir.

08:32:05 18         THE COURT:  All right.  I understand that you all agree

08:32:14 19   that it's not necessary to get in to figuring out which of the

08:32:22 20   uncontested material facts from the pretrial order would have

08:32:27 21   to be read to the jury or anything.

08:32:28 22         MR. DIROSA:  It doesn't matter to me.  I think we've

08:32:31 23   pointed out pounded those --

08:32:32 24         THE COURT:  I think you have gone over everything

08:32:34 25   that --

*OFFICIAL TRANSCRIPT*

08:32:34 1  MR. BEH: I think you're right, Your Honor. I

08:32:37 2  certainly have no objection to your reading them, but I don't

08:32:39 3  think it's necessary.

08:32:39 4  THE COURT: Well, the problem is, I didn't think it was

08:32:43 5  my place to figure out what you all would agree to in terms of

08:32:49 6  what's relevant in this case and uncontested. But I think, you

08:32:55 7  know, we'll just say, the evidence is closed, so we'll go to

08:33:00 8  the jury with what we have, okay?

08:33:01 9  MR. DIROSA: That's fine.

08:33:02 10  MR. BEH: That's fine, Your Honor.

08:33:04 11  THE COURT: Okay. Anything else before we bring the

08:33:13 12  jury in?

08:33:13 13  MR. DIROSA: Not that I can think.

08:33:14 14  MR. BEH: Not from us, Your Honor.

08:33:17 15  THE COURT: Okay. We'll bring the jury in. Each side

08:33:18 16  will have 30 minutes.

08:33:20 17  Mr. DiRosa, you want to save ten? Do I recall

08:33:22 18  right?

08:33:22 19  MR. DIROSA: If I'm going a little bit over --

08:33:25 20  THE COURT: Well, if you go over, we just subtract it

08:33:27 21  from your ten.

08:33:28 22  MR. DIROSA: That would be fine. Exactly.

08:33:30 23  THE COURT: We'll tell you when your 20 minutes are up.

08:33:33 24  If you keep going a little bit, I'll just subtract it from your

08:33:37 25  ten, okay?

*OFFICIAL TRANSCRIPT*

| | |
|---|---|
| 08:33:37 1 | MR. DIROSA:  That's fine.  Perfect. |
| 08:33:38 2 | THE COURT:  You all worked through the exhibit books? |
| 08:33:40 3 | You got that all fixed? |
| 08:33:42 4 | MR. BEH:  Yes, sir.  We've got it reduced down to a |
| 08:33:46 5 | single binder. |
| 08:33:46 6 | THE COURT:  Perfect.  What about do we have a thumb |
| 08:33:49 7 | drive, a disc that it's in? |
| 08:33:50 8 | MR. BEH:  Yes, sir.  It's all right there. |
| 08:33:53 9 | THE COURT:  Perfect.  I've got somebody from our IT |
| 08:33:55 10 | section that's supposed to come up here and set it up for the |
| 08:33:59 11 | jurors, so that they -- if they want it -- I'll give them the |
| 08:34:01 12 | option, you use the book, they can use the electronic, or some |
| 08:34:06 13 | combination.  It's totally up to them.  Okay? |
| 08:34:09 14 | MR. BEH:  Thank you, sir. |
| 08:34:10 15 | THE COURT:  I don't know, where is our CSO? |
| 08:34:12 16 | Gail, go find our court security officer. |
| 08:34:17 17 | I know our jurors were here on time.  Yesterday, |
| 08:35:19 18 | the court security officer wanted to bring them in before I |
| 08:35:30 19 | told him to, and, today, we can't get him to bring them in. |
| 08:35:30 20 | THE DEPUTY CLERK:  All rise. |
| 08:35:31 21 | (WHEREUPON, at 8:35 a.m., the jury panel enters the |
| 08:35:55 22 | courtroom.) |
| 08:35:55 23 | THE COURT:  All right.  Good morning, again, ladies and |
| 08:35:55 24 | gentlemen. |
| 08:35:55 25 | THE JURORS:  Good morning. |

*OFFICIAL TRANSCRIPT*

08:35:57 1    THE COURT:  Please be seated.

08:35:58 2         Thank you for being on time again.  I apologize

08:36:02 3    to those of you who were sitting out in the hall.  I'm here at

08:36:06 4    6:00 in the morning.  So, usually, I walk by and make sure that

08:36:09 5    door is open.  I guess I didn't walk by or didn't pay attention

08:36:13 6    this morning, and didn't realize the door wasn't open.

08:36:16 7         Okay.  We're into the last phase of this trial.

08:36:19 8    As I said yesterday afternoon, the lawyers will now each get

08:36:23 9    30 minutes to say address you in what's called closing

08:36:28 10   arguments.

08:36:28 11        Following those closing arguments, I'll read and

08:36:31 12   we'll also give you a written copy of our legal instructions.

08:36:35 13   Then we'll send you off to deliberate, okay.

08:36:37 14        All right, Mr. DiRosa.

08:36:38 15              CLOSING ARGUMENTS

08:36:38 16   BY MR. DIROSA:

08:36:52 17        First of all, thank you all for your attention

08:36:55 18   during this proceeding.  You know, as this is going on, we have

08:36:59 19   little breaks in the action, and we kind of watch over and see

08:37:02 20   who is paying attention and who is not paying attention.  It

08:37:06 21   was really -- all of you all were all attentive to taking notes

08:37:10 22   and paying attention to everything that was going on.  So thank

08:37:13 23   you.

08:37:14 24        Let me start off by saying that before --

08:37:21 25   overnight, the Judge gives out these instructions.  These are

08:37:24  1   the instructions that he will read to you as a jury to tell you

08:37:29  2   what the law is and what your duty is to resolve this case.  So

08:37:36  3   I'm going to use that during my closing arguments.

08:37:38  4            Let me say, first of all, that this is not a

08:37:42  5   breach of contract case.  We're not suing Jadallah Enterprises,

08:37:46  6   we're not suing Ahmed 1 for breach of contract.  We're not even

08:37:50  7   suing Wagners Chef for breach of contract in this litigation.

08:37:54  8            The Wagners Chef litigation for breach of

08:37:58  9   contract went on up the street in Civil District Court.  You've

08:38:01 10   seen some of those rulings that we've presented to you during

08:38:05 11   the course of this litigation.  That's over with.

08:38:08 12            As the Judge will tell you, our claims in this

08:38:11 13   case, plaintiff claims that these transactions -- you know the

08:38:15 14   transactions we're talking about -- were designated -- were

08:38:19 15   designed to insulate Wagners Chef from its liability to the

08:38:23 16   plaintiff, and to prevent the plaintiff from collecting damages

08:38:26 17   from Wagners Chef by depleting Wagners Chef's assets.

08:38:32 18            Now, I don't think there is any doubt that, at

08:38:34 19   the end of all of these transactions, Wagners Chef -- even

08:38:40 20   Mr. Saed testified -- Wagners Chef has no income.  They have no

08:38:43 21   assets.  They have no lease.  They have nothing.  They have

08:38:51 22   been dissolved.

08:38:52 23            So, one of the things the Judge will tell you is

08:38:56 24   that what constitutes an unfair and deceptive practice is not

08:39:03 25   specifically defined by the law, but is determined on a

*OFFICIAL TRANSCRIPT*

case-by-case basis, which means you all listen to the facts that go on, and you all decide if what you've heard is an unfair trade practice. You all make the decision.

The motivation of the defendant is a critical factor. We will talk about that in a second.

The elements of this Unfair Trade Practices Act is we must -- the plaintiff must prove that: The defendant engaged in an unfair or deceptive trade practice; the defendant intended to harm the plaintiff by engaging in that trade practice; the unfair or deceptive trade practice caused injury to the plaintiff; and, the plaintiff suffered an ascertainable loss as a result of that trade practice.

So let's talk for a minute about motivation. We know that Mr. Saed started this lawsuit -- or Wagners Chef started this lawsuit in the middle of 2014. For some reason, in April of 2015, he just decides, I don't care about that litigation, I'm not going to honor this contract anymore. So Mr. Beh sends an e-mail saying: I'm not honoring the contract.

I asked him, well, what was it about -- that went on in the litigation that told you this was a good idea, this was something you should be doing? He couldn't answer the question.

So then, in connection with that, he decides to send this kind of little poke at Brothers Petroleum when he decides not to honor the contract anymore. I'll show you. I

08:40:54 1  don't care about the litigation.  I'll show you who is in

08:40:56 2  charge here.

08:40:57 3          Nine days after this, he forms

08:41:02 4  Jadallah Enterprises.  Jadallah Enterprises does nothing for

08:41:07 5  well over a year.  It is like an actor who is waiting for the

08:41:13 6  third act.  He's sitting in the wings waiting for his turn to

08:41:17 7  come on stage.  That turn to come on stage comes later, but

08:41:22 8  Mr. Saed is already thinking ahead.  He knows what the plan is.

08:41:25 9          As we went through the litigation, the Fourth

08:41:32 10  Circuit Court of Appeals tells Wagners Chef, you are bound by

08:41:36 11  this contract.  You have to honor this contract.  So I

08:41:41 12  expected -- this is November of 2015 -- I expected, well, okay,

08:41:45 13  they'll start buying fuel.  Of course, not.

08:41:47 14          They don't buy fuel in November, December, all

08:41:50 15  the way through up until, in May, we go back to court.

08:41:58 16  Wagners Chef agrees to a judgment that says, we have breached

08:42:03 17  the contract, and agrees to have the Court issue an order

08:42:07 18  saying, you are to honor and perform all of the terms and

08:42:12 19  conditions of the contract.

08:42:14 20          But they still don't buy fuel, not in May, not in

08:42:17 21  June, not in July, not in August.  I'm thinking to myself, what

08:42:21 22  am I missing here?  What's going on?  Why is -- why are they

08:42:26 23  just ignoring what's going on in court?

08:42:28 24          The reason is because the plan was in motion.  He

08:42:33 25  knew what the end result was going to be.  He didn't care about

*OFFICIAL TRANSCRIPT*

08:42:38 1     Wagners Chef at that time. Let the judge rule. Let all of

08:42:42 2     those judges rule. Whatever they want, I don't care. I know

08:42:46 3     where I'm heading.

08:42:47 4             So he goes to the bank. He applies for the loan.

08:42:51 5     Now, he doesn't tell the bank that there is this tax lien. He

08:42:55 6     doesn't tell the bank that Brothers has sued him. He doesn't

08:42:59 7     tell the bank that Brothers has a judgment for a breach of

08:43:05 8     contract. He doesn't take tell the bank that Payphone

08:43:09 9     Communications has sued Wagners Chef. He doesn't tell the bank

08:43:13 10     that his ex-partner, Nidal Jaber, has sued him because he

08:43:17 11     didn't pay him the $375,000 he agreed to pay him to buy his

08:43:23 12     one-third interest.

08:43:25 13             He didn't tell the bank that the tax return

08:43:28 14     wasn't real. Not only was the tax return not supposed to be

08:43:32 15     real, the numbers on the tax return weren't even real. The

08:43:35 16     numbers on the tax return were whatever numbers Mr. Saed

08:43:40 17     happened to give to Mr. Sewell. That was it. That's the

08:43:44 18     extent of it. This tax return existed in Mr. Saed's head.

08:43:48 19             The bank issues this letter on June 1. It says:

08:43:57 20     Wagners Chef is the borrower, up to 2.9 million dollars, and a

08:44:03 21     real estate entity to be formed.

08:44:06 22             Well, what the bank didn't realize was, by

08:44:08 23     June 1, that real estate entity was already a year old. It had

08:44:12 24     been formed the year before, all in accordance with this plan.

08:44:16 25             Ms. Kleindorf says, well, what was the main

08:44:27 1   source that you determined would be used to repay this

08:44:32 2   2.9 million dollar loan?  Well, it was the income from

08:44:35 3   Wagners Chef.  Now, had she known that four months down the

08:44:37 4   loan there would be no more Wagners Chef, do you think they

08:44:41 5   would have approved this loan?  Of course, not.

08:44:43 6          Apparently -- although Mr. Saed wants to tell

08:44:47 7   you, oh, this business was struggling, we were just down on our

08:44:52 8   knees, we couldn't go forward anymore -- apparently, the bank

08:44:55 9   didn't see that.  They looked through the documents provided by

08:44:58 10  Mr. Saed to the bank, and they said, okay, we'll loan you

08:45:02 11  $2.9 million.

08:45:04 12         The option to purchase that belonged to

08:45:10 13  Wagners Chef.  Wagners Chef already had $200,000 towards that

08:45:14 14  purchase price.  When Jadallah Enterprises steps in, do they

08:45:18 15  pay anything for that 200,000?  No.  Mr. Saed takes it out of

08:45:22 16  this pocket, and he puts it in this pocket, and everything is

08:45:26 17  okay.

08:45:27 18         Had Jadallah Enterprises applied for this loan,

08:45:33 19  or Ahmed 1, which didn't even exist at that time, applied for

08:45:37 20  this loan, would that loan have been granted by the bank?  Of

08:45:40 21  course, not.  They had no income.  They had nothing to show the

08:45:43 22  bank.

08:45:44 23         Let's talk about credibility, Mr. Saed's in

08:45:55 24  particular.  You've seen this before:  6,000 gallons of fuel a

08:46:00 25  day, more than $6,000 in sales a day.  That converts to, as we

OFFICIAL TRANSCRIPT

discussed, six and a half million dollars in yearly sales out
of this -- out of Wagners Chef.  Not what's shown on the -- not
even close to what's shown on any of the tax returns.

So let's give Mr. Saed a break.  Let's say he's
overstated his case.  It's only 5,000 gallons of gas a day, and
it's only $5,000 of sales inside the store.  That's $3,650,000
of gasoline sales, $1,825,000 of gross income from sales inside
the store.  That adds up to $5.5 million.  Still not even close
to what's on these tax returns.  That's because the tax returns
are in Mr. Saed's head.

So we heard from Mr. Sewell.  He said, well, I
put that March 1st return together, but that was just practice.
We just -- now, nobody told the bank it was just practice.
They submitted it.  You know from Connie Kleindorf, she used
those numbers, particularly the 55,000 in profit, in her
calculations for whether they would be able to pay the loan
back.

But then, Mr. Saed comes in.  They have this
little pow-wow, and they straighten out any discrepancies that
might have.  Well, if we look at them, these are the ones side
by side.  The one on the left is March 1st.  The one on the
right is September -- I'm sorry, it's July 27th.

The only number that is different is number two
has -- cost of goods sold has increased by exactly $50,000, on
the nose.  The bottom line, the amount you're going to pay

08:48:07 1　　taxes on, has exactly decreased by $50,000.

08:48:11 2　　　　　　Now, maybe you think that Mr. Saed was going

08:48:16 3　　through all of his receipts, and he said, oh, look, it added up

08:48:21 4　　to exactly $50,000.  Maybe you believe that, maybe you don't.

08:48:27 5　　But he either told the bank something that was false, or he's

08:48:31 6　　telling the IRS something that was false.  Now, I know what I

08:48:35 7　　think, but you all are the jury.  You all decide which one is

08:48:41 8　　false.  And only $4.3 million in sales.  Every other number is

08:48:52 9　　identical.  Nothing has changed.

08:48:54 10　　　　　　We go on to -- and, of course -- let me get back

08:49:00 11　　here -- salaries remain -- line 9, salaries remain at zero.

08:49:06 12　　Now, why do salaries remain at zero?  He's telling the bank

08:49:11 13　　it's 13,000 a month, and you got to pay 17 percent of payroll

08:49:16 14　　taxes.  13,000 a month is $156,000 a year.  Payroll taxes of

08:49:22 15　　17 percent of that is over $26,000.  So, that's another 26,000

08:49:31 16　　Mr. Saed just saved.

08:49:34 17　　　　　　The idea that you can operate this store with no

08:49:39 18　　salary just, I don't know, boggles my mind.

08:49:43 19　　　　　　These are the two returns side by side.  Another

08:49:48 20　　part of the return.  Again, none of the numbers are different.

08:49:53 21　　　　　　Mr. Saed, from this bad business, receives

08:49:57 22　　$135,000, this business that's going down the tubes.

08:50:03 23　　　　　　The rental income, we know he had $24,000 a month

08:50:08 24　　from three different entities:  Two $9,000-a-month rents and a

08:50:12 25　　$6,000-a-month rent.  That's $288,000.  But Mr. Saed told

*OFFICIAL TRANSCRIPT*

08:50:21 1  Mr. Sewell that it was 120, so that's what goes on the tax

08:50:24 2  return.

08:50:25 3          So, let's talk about how bad this business was.

08:50:33 4  Things were terrible.  He couldn't find a buyer.  He's looking

08:50:37 5  all over the place.  He can't name anybody that he looked to.

08:50:39 6  He was asked two or three times, who were you talking to?

08:50:43 7  Couldn't name anybody.

08:50:44 8          These are the account withdrawals that we went

08:50:48 9  through, just between June, right when -- right, the month

08:50:56 10 before the transactions take place, and the end of 2016.  A

08:51:03 11 total of $226,496.55 taken out of this failing business that

08:51:15 12 nobody would want to buy.  No explanation for where that went.

08:51:21 13 Well, it went to -- you know, we had to pay some people in

08:51:25 14 cash.  And so where are those receipts?  What is it that backs

08:51:29 15 up anything you're telling us?  What proof do you have?  Is it

08:51:35 16 just we have to believe you?  Which it seems to be.

08:51:48 17         This is his K-1, which is partner's share of

08:51:52 18 income, deductions and credits, before, what he gave to the

08:51:56 19 bank, and after.  You can see the differences.

08:52:03 20         This business is so bad -- I feel like a

08:52:10 21 comedian, where the audience -- how bad is it -- the business

08:52:13 22 is so bad, he pays his partner $375,000 to buy a one-third

08:52:20 23 share.  That means he's valuing the business at $1,125,000.

08:52:24 24 He's using the money from this loan to pay that 325,000, just

08:52:30 25 four months before he says nobody will buy this, and I'm going

out of business.

The business is so bad, he takes 135,000 in 2015. He takes all this money out that I've shown you from these withdrawals, but still manages to stick Brothers for NSF accounts four times in November, for the tune of -- I didn't add it up, but it's 60, $70,000 in NSF that they couldn't -- when they put in the ACH, the cash withdrawal, they couldn't get the money out because there wasn't enough money in. Well, probably because Mr. Saed is depleting the accounts.

Everything is so bad, he can only sell it to one guy. That's his friend, Nashat Haider. The deal is, you give me $50,000, and the other $57,000, I'll take a thousand dollars a month for the next -- what is that -- four and a half years, a thousand dollars a month.

Now, I submit to you, that bill of sale is about as phony as these tax returns are.

One other thing, I'll sell it to you for $107,000, but I won't make you take over the Brothers contract and get Brothers off my back.

Now, why would you do that, other than you just don't want Brothers to get anything? You want to make sure Brothers gets nothing. Why wouldn't you say, you take over the contract? I'm giving it to you for $107,000. Take over the contract. Then, we're not even here. We never meet. Because they are selling gas to a new guy at the same location.

08:54:45 1   Suddenly, there is no breach for 2017, 2018, 2019, on through

08:54:54 2   the end of the contract.  There is somebody to take over that

08:54:57 3   contract.

08:55:02 4          Then, everything somehow happens to be somebody

08:55:05 5   else's fault.  The tax lien, that's somebody else's fault.

08:55:09 6   They didn't tell us about that.  Mr. Harvey's fault,

08:55:19 7   Omar Hamdan's fault.  It's somebody else's fault.

08:55:19 8          But it's a half-a-million-dollar tax lien,

08:55:22 9   supposedly.  Wouldn't you sue somebody?  He's obviously not shy

08:55:28 10  about suing or, apparently, being sued.  So wouldn't you be

08:55:31 11  suing somebody, and wouldn't you come into court and present to

08:55:36 12  the jury, look, here is the lawsuit.  We've been suing these

08:55:39 13  guys for that $485,000 for these many years, and we have a

08:55:43 14  judgment; or, we don't have a judgment, but we're pursuing it.

08:55:46 15         They did manage to bring in the two eviction

08:55:49 16  proceedings.  Well, why wouldn't you bring evidence of this?

08:55:54 17  Because you have to take Mr. Saed's word for this, just like

08:55:59 18  you have to take Mr. Saed's word that the business is going to

08:56:04 19  bad, that is taxes are accurate, that we have no salary for any

08:56:12 20  employees.

08:56:15 21         THE DEPUTY CLERK:  One minute.

08:56:18 22         MR. DIROSA:  Then he dissolves Wagners Chef.

08:56:22 23  Wagners Chef is no longer a limited liability company.

08:56:25 24         What does he say in connection with the affidavit

08:56:27 25  filed the secretary of state?  They have no debts.  Well, if

**OFFICIAL TRANSCRIPT**

08:56:32 1    this $485,000 tax lien exists, I think that's a debt.  If it

08:56:41 2    exists, if it's still unpaid, it's a debt.  But you're

08:56:44 3    telling -- you're signing an affidavit under penalty of perjury

08:56:49 4    that there are no debts.

08:56:53 5            What Mr. Saed did was exactly what this claim is.

08:57:02 6    He depleted the assets.  It was designed to insulate

08:57:12 7    Wagners Chef from its liability to the plaintiff and to prevent

08:57:14 8    the plaintiff from collecting damages from Wagners Chef by

08:57:18 9    depleting Wagners Chef's assets.

08:57:20 10           So far, he's fooled the bank.  He ignored court

08:57:26 11   rulings.  He's done whatever he's done with the IRS, whatever

08:57:31 12   he told Mr. Sewell.  But his last hurdle is you eight people.

08:57:38 13   He's got to get past you, and, if he can get past you, then

08:57:44 14   he's done.

08:57:45 15           Thank you.

08:57:53 16       THE COURT:  All right, Mr. Beh.

08:57:54 17       MR. BEH:  Thank you, Your Honor.

08:57:56 18                     CLOSING ARGUMENTS

08:57:56 19   BY MR. BEH:

08:58:06 20       Good morning, ladies and gentlemen.  I also want to

08:58:08 21   thank you for your attention and your service in this process

08:58:13 22   the last couple days.

08:58:15 23           You all are the finders of fact.  You all are the

08:58:18 24   ones who have listened to the evidence and who apply the law,

08:58:22 25   as the Court will instruct you on what it is.

                         *OFFICIAL TRANSCRIPT*

08:58:25  1          Now, you just heard Mr. DiRosa say a whole lot

08:58:28  2     about everything that in his opinion supports his case.  What

08:58:35  3     he didn't talk about is any of the five transactions that are

08:58:40  4     the subject matter of this litigation.  He didn't mention a

08:58:45  5     single one of them.

08:58:46  6          He didn't mention anything that

08:58:51  7     Jadallah Enterprises did that could be claimed as an unfair

08:58:55  8     trade practice.  He didn't mention a single thing that Ahmed 1

08:59:00  9     could have done that could be an unfair trade practice.

08:59:06 10          He mentioned a whole lot about how Wagners Chef

08:59:14 11     didn't breach -- or did breach the contract, but then he said

08:59:14 12     that's not before you.  He's correct on that.  Whether Wagners

08:59:15 13     Chef breached the contract or not is not before this Court or

08:59:17 14     not part of your decisionmaking.

08:59:21 15          What you have before you is whether

08:59:23 16     Jadallah Enterprises, Ahmed 1, or Wagners Chef committed an

08:59:32 17     unfair trade practice.

08:59:33 18          Now, the Court is going to instruct you on

08:59:36 19     exactly what an unfair trade practice is.  It's going to read

08:59:41 20     you this.  It says:  The Louisiana Unfair Trade Practice Act

08:59:46 21     prohibits the use of unfair methods of competition and unfair

08:59:50 22     or deceptive acts or practices in the conduct of any trade or

08:59:54 23     commerce.

08:59:55 24          Then it says:  The law does not prohibit sound

08:59:59 25     business practices, the exercise of permissible business

09:00:03 1    judgment, or appropriate free enterprise transactions.

09:00:09 2    Finally, the statute does not provide an alternate remedy for

09:00:14 3    simple breaches of contract.

09:00:15 4            Again, it's not a contract case.  This is not

09:00:19 5    about whether Wagners Chef went out of business and breached

09:00:23 6    its contract.  That's been decided.  The action here is whether

09:00:28 7    any of my clients, Jadallah Enterprises, Ahmed 1, or

09:00:33 8    Wagners Chef, did something that could be deemed an unfair

09:00:37 9    trade practice.

09:00:38 10           And the Court will go on and instruct you that:

09:00:41 11   A trade practice is unfair when it offends public policy and is

09:00:46 12   immoral, unethical, oppressive, unscrupulous or substantially

09:00:51 13   injurious to competitors.

09:00:53 14           Again, Mr. DiRosa has not -- in his discussion

09:00:57 15   this morning, has not indicated any of that.

09:01:00 16           Then, the Court will further instruct you:  Only

09:01:04 17   egregious actions involving fraud, misrepresentations,

09:01:09 18   deception or other unethical conduct may be sanctioned under

09:01:14 19   the Unfair Trade Practices Act.  Mere negligence is not

09:01:21 20   sufficient.

09:01:21 21           That's the standard that you all are being asked

09:01:24 22   to apply in this case.

09:01:25 23           Now, Mr. DiRosa did go through the four elements

09:01:27 24   that you will need to prove to find that any of my clients

09:01:32 25   committed these agents, which they did not.

*OFFICIAL TRANSCRIPT*

09:01:34 1    That the defendant engaged in an unfair or
09:01:37 2  deceptive trade practice -- we've just discussed what those
09:01:41 3  are -- that the defendant intended to harm plaintiff by
09:01:44 4  engaging in the trade practice; that the unfair or deceptive
09:01:48 5  trade practice caused an injury to the plaintiff; and, that the
09:01:51 6  plaintiff suffered an ascertainable loss.
09:01:54 7    So those are what Brothers has to prove.
09:02:01 8  Brothers has the burden of proof in the case.  They have to
09:02:06 9  prove to you, by the evidence that was put on through the
09:02:10 10  witnesses and by the documents, that any of my clients
09:02:13 11  committed an egregious act against competition.  I submit to
09:02:19 12  you, that just simply didn't happen.
09:02:21 13    Now, he's made many allegations of, well, this
09:02:25 14  wasn't correct, and that wasn't correct.  We reject all of
09:02:29 15  those.  We think the evidence that's been put on shows what the
09:02:32 16  facts are.
09:02:33 17    But, also, look at who those statements were made
09:02:35 18  to.  Well, this was made to the bank.  We reject -- we say that
09:02:39 19  everything that the bank received was the best information
09:02:42 20  available at the time.  Further, the bank made the loans.  The
09:02:48 21  bank made the loans in its own way and based on its own
09:02:54 22  decisionmaking.
09:02:55 23    Well, what it did not do is bring a claim against
09:03:04 24  Wagners Chef, Jadallah Enterprises, or Ahmed 1.  The bank is
09:03:07 25  not here before us, Brothers is.  But none of this stuff was

*OFFICIAL TRANSCRIPT*

said to Brothers.  None of the tax returns were given to
Brothers.  They've got to show how they were damaged by an
unfair trade practice.  I'm saying that all of the statements
that Mr. DiRosa just incorrectly said were false are all --
well, they were all correct.

So let's look now at the five transactions.  This
is what you all need to focus on, the five transactions which
are the underlying basis of this claim.

Three of those transactions happened in July of
2016.  That was when Jadallah Enterprises purchased the
property from Wagner World.  That's the first transaction.

Second transaction is the filing of the notice of
cancellation of the lease between Wagner World, who was no
longer owner of the property, and Wagners Chef.

The third transaction is a lease by
Jadallah Enterprises to Ahmed 1.

Brothers has to prove to you that those
transactions constituted an unfair trade practice.

Now, first of all, to this continued theme of he
was hiding assets.  The property was never an asset of
Wagners Chef.  Let me say that again.  The property was never
an asset of Wagners Chef.  It wasn't owned by Wagners Chef.
The only interest that Wagners Chef had in the property was as
a tenant.  It leased the property and had to pay rent, and it
had a potential option to buy the property, if it could.  But

*OFFICIAL TRANSCRIPT*

09:05:07 1    an option to buy something that you can't buy has no value.

09:05:13 2             So, the tenant is -- in 2016, as the evidence

09:05:25 3    showed, in April, Wagners Chef -- not Jadallah Enterprises, not

09:05:30 4    Ahmed 1 -- Wagners Chef went to the bank to apply for a loan to

09:05:35 5    buy the property.  They went through that process.

09:05:39 6             About the same time, Wagners Chef faces yet

09:05:43 7    another eviction suit by its landlord.  So now it's facing

09:05:47 8    having the lease terminated and it not being able to do any

09:05:51 9    business.  So it goes forward, and it continues its discussions

09:05:56 10   with the bank.  Then, on June 1st, this proposal is issued.

09:06:01 11            First of all, this is a proposal for discussion.

09:06:06 12   It says:  The following terms and conditions are not limited to

09:06:14 13   be exhaustive or all inclusive.  So what they are saying is,

09:06:17 14   here is a discussion, but these are the things you have to do.

09:06:21 15            One of those is they've got, you know, the type

09:06:23 16   of loan.  It's a real estate term loan.  Then you've also --

09:06:29 17   you have to be able to provide collateral.  The collateral

09:06:33 18   would be a first mortgage of -- a first multiple indebtedness

09:06:44 19   mortgage on the property being purchased.

09:06:46 20            So they say, okay, that's fine.  But then when

09:06:49 21   they look at the actual mortgage, in light of the tax lien,

09:06:53 22   they can't provide the mortgage.  They, being Wagners Chef,

09:06:57 23   cannot provide the mortgage.  Because down here it says:  The

09:07:00 24   security rights and interest granted under this mortgage will

09:07:04 25   at no time became subordinate or junior to any security rights,

*OFFICIAL TRANSCRIPT*

09:07:09 1    interests, liens or claim of, or in favor of any other party.

09:07:14 2             Well, there is this tax lien that's out there

09:07:20 3    that's already been filed.  So Wagners Chef cannot make that

09:07:25 4    representation, and so they can't get a mortgage.  You heard

09:07:30 5    Ms. Kleindorf say that.  She said, well, if you can't do that,

09:07:31 6    you're not going to get the mortgage.  If you're not going to

09:07:33 7    get the mortgage, you're not going to get the loan.

09:07:36 8             So that's why Wagners Chef couldn't buy this

09:07:39 9    property.  It's because it couldn't qualify under the terms

09:07:42 10   that were being provided by the bank.

09:07:44 11            Now, Mr. DiRosa wants to say, well, you know, we

09:07:49 12   don't know if this tax lien exists.  It does exist.  He's

09:07:54 13   offered no evidence that this has been resolved.

09:07:57 14            Also, this tax lien is for a period that predates

09:08:01 15   Mr. Saed's ownership of Wagners Chef.  It directly violates the

09:08:07 16   terms of the representations that were made by the sellers of

09:08:12 17   Wagners Chef when he bought it.  So this had a direct impact on

09:08:16 18   the value of Wagners Chef, as Mr. Saed testified.

09:08:22 19            Again, also on the mortgage -- this is another

09:08:26 20   term and condition on the mortgage that has to be -- it says,

09:08:31 21   again:  The following provisions relating to taxes and liens on

09:08:34 22   the property are part of the mortgage.

09:08:36 23            It says:  Mortgagor -- in the case, that would be

09:08:39 24   Wagners Chef, at the time that it was thinking about being the

09:08:42 25   mortgagor, the borrower -- shall promptly pay or cause to be

09:08:46 1  paid when due, all taxes, local and special assessments,

09:08:52 2  governmental and other charges, as well as all public and/or

09:08:56 3  private utility charges, of every type and description, that

09:09:01 4  may from time to time to be imposed, assessed or levied against

09:09:06 5  the mortgaged property or against the mortgagor.

09:09:11 6        Again, we've got a tax lien that's out there that

09:09:15 7  is for half a million dollars that predates my client's

09:09:17 8  ownership -- or Mr. Saed's ownership of Wagners Chef.  That's

09:09:20 9  why they didn't buy the property.  It's not some grand scheme

09:09:24 10  to defraud or to preclude Brothers from purchasing the

09:09:31 11  property -- or from collecting on some debt.

09:09:36 12        Wagners Chef went to the bank.  It intended to

09:09:39 13  buy it; but, then, this issue came up, and they couldn't buy

09:09:39 14  it.

09:09:43 15        So Jadallah Enterprises -- which, yes, it was a

09:09:46 16  company that was formed by Mr. Saed.  You heard Mr. Hamdan say

09:09:52 17  he's got over a hundred limited liability companies that he is

09:09:55 18  involved in.  That, in itself, is nothing wrong.  There is

09:09:59 19  nothing wrong with having different companies.

09:10:01 20        You heard Ms. Kleindorf testify that that's very

09:10:05 21  common in the real estate industry, to have a single entity, a

09:10:09 22  new entity, purchase real estate, as a real estate holding

09:10:11 23  company.  That is the way business is done.

09:10:14 24        So, again, so, why did Jadallah Enterprises

09:10:18 25  purchase this property?  Because Wagners Chef couldn't.  It

*OFFICIAL TRANSCRIPT*

09:10:23 1    couldn't qualify for the loan.  But Wagners Chef -- as the

09:10:26 2    documents that I showed you, Wagners Chef guaranteed the loan.

09:10:29 3    Ahmed 1 guaranteed the loan.  Jadallah Enterprises guaranteed

09:10:35 4    the loan.

09:10:36 5             But what's the primary security that the bank was

09:10:41 6    requiring was the value of the property.  That's what

09:10:46 7    Jadallah Enterprises purchased.

09:10:48 8             So, again, we've looked at this.  That's why the

09:10:56 9    property was purchased by Jadallah Enterprises.  It's not some

09:10:58 10   grand scheme.  They have to prove that it was a grand scheme.

09:11:02 11            So that's transaction number one.  There is no

09:11:11 12   unfair trade practice involved in that.

09:11:13 13            Transaction number two is the cancellation of --

09:11:17 14   what they have deemed a cancellation of the lease.  They cite

09:11:26 15   to this document.  All this document does, as its own terms

09:11:31 16   say, is request that the clerk of court evidence these

09:11:36 17   cancellation in the conveyance office records.  That's

09:11:40 18   cancelling the lease between Wagner World and Wagners Chef,

09:11:45 19   both the original lease and the amended lease.  That's it.

09:11:50 20            Also, you got to remember, at the time this was

09:11:52 21   filed, this was filed after the bill of sale -- or after the

09:11:56 22   act of cash sale.  So when this was done, when the lease was

09:11:59 23   canceled, Wagner World didn't own the property anymore.  That's

09:12:03 24   why this document was filed, and that's why that lease was

09:12:08 25   canceled.

**OFFICIAL TRANSCRIPT**

09:12:15  1          So, again, we've now gone through two of the

09:12:17  2    three transactions that occurred in July, and there is no

09:12:19  3    unfair trade practice.

09:12:20  4          The third transaction that happened in July of

09:12:24  5    2016 is that Jadallah Enterprises, who now owns the property,

09:12:28  6    leases the property to Ahmed 1, which, as Mr. Saed said, was

09:12:34  7    set up to be the property manager.  Again, that had no impact

09:12:37  8    on Brothers.  It had no -- there was no falsehood.  There was

09:12:42  9    no egregious action.  That was simply a lease.

09:12:49 10          So now we're in July of 2016.  Who is operating

09:12:57 11    the gas station on that property?  Wagners Chef.  Wagners Chef

09:13:02 12    had been operating it previously.  Wagners Chef is continuing

09:13:05 13    to operate on that property.  It operated in July.  It operated

09:13:10 14    in August.  It operated in September, October, and half of

09:13:15 15    November.  In fact, during September and October and half of

09:13:19 16    November, it was buying gas from Brothers.  They've

09:13:25 17    acknowledged that it was operating.  They've acknowledged that

09:13:27 18    it was operating, buying gas and performing under the contract.

09:13:33 19          So how did those transactions in any way damage

09:13:39 20    Brothers if Wagners Chef before those transactions is operating

09:13:44 21    its gas station, and after those transactions is operating its

09:13:48 22    gas station.  The simple question is -- there was no unfair

09:13:53 23    trade practice stemming out of any of those three transactions.

09:13:56 24          Now, what was Wagners Chef facing after those

09:14:00 25    transactions?  Well, as Mr. Saed testified, they were having

significant problems renewing their liquor and tobacco license. They couldn't do it. Mr. Saed indicated that that had a significant impact on their bottom line. That had a significant impact on their sales.

Mr. Haider testified it was even a higher number, what the impact on the sales was. So, now, you've got, you know, 30, 40 percent reduction in sales because of they didn't have a liquor license. Mr. Saed -- they tried to -- they originally had the liquor license. There was a requirement that the qualifying party for the liquor license be a U.S. citizen. Mr. Saed is not a U.S. citizen. He's a legal resident alien with a green card.

But they had a manager, a gentleman by the name of Nisser Tamimi, who is a U.S. citizen, was the qualifying person. Mr. Tamimi died. Is that part of the grand scheme to harm Brothers? No. That happened. Because of that, they were not able to get the liquor license.

The second thing, despite Mr. DiRosa's disbelief, everything else shows that they were having significant financial problems. Both Mr. Saed and Mr. Haider testified that Wagners Chef borrowed $30,000. Both of them testified that there was significant deferred maintenance. There were pumps that needed repair or recalibration. There was other equipment, including the walk-in for the convenience store, that were not properly working. Wagners Chef did not have the

assets to restore those.

Now -- and this is all in 2016.  At that time, as shown by the tax return that was filed by -- this is the personal tax return for Mr. Saed and his wife.  As Mr. Sewell testified, because this is a single-member LLC, all of the income from the LLC goes through onto the personal tax returns.  This shows a loss in his operations of $304,000.  Now, that's for all of his operations.

When you look at just Wagners Chef, in 2016, they lost $311,000.  Think about that.  That's $311,000.  More money went out than came in.

Now, Mr. DiRosa showed you a bunch of numbers.  Well, these are cash transactions.  We don't know where this is, and he doesn't have any receipts.

Mr. Saed testified that a lot of the -- he testified what a majority of those withdrawals were for.  They were for covering returned checks.  They were for expenses.  He had -- he said, that's what it is.

But, also, if you look at those numbers, that's like 5 percent of the income of the company.  The company was making approximately four million dollars, over four million dollars, and these cash withdrawals were about five percent of that.  A significant portion, if not all of it, was for legitimate expenses, as Mr. Saed testified.

Has Brothers produced a single shred of evidence

to contradict that statement?  No, they have not.

So, the final challenge faced by Mr. Saed is, unfortunately, he was indicted on federal charges in September of 2016 for trafficking in untaxed cigarettes, contraband cigarettes.  So he was facing prison time, and, in fact, did serve prison time as a result of that.

So he's looking at all of this.  He's looking at a company whose sales are about to plummet because of loss of its liquor license, who is already in financial straits.  The manager of the company, Mr. Tamimi, has passed away, so he's no longer available.  So Mr. Saed is faced with new issues that had not arisen prior to the July sale, so he -- all of which are severe challenges to the operation of Wagners Chef.

Both Mr. Saed testified and Mr. Sewell testified that Mr. Saed was actively marketing Wagners Chef trying to sell it.  He did identify, he said there were several people from Lafayette, during his testimony, who had inquired, looked at it, and said, no, thank you.  So that's what he was facing.

He was even considering just closing the doors, just closing the doors and walking away.  But he didn't do that.  Because later, in the fall of 2016, Mr. Haider came.  Mr. Saed didn't go to Mr. Haider.  Mr. Haider went to Mr. Saed and said, look, I don't think you're going to be able to pay back the $30,000 loan, so why don't I buy the assets of the company.

09:20:05 1        So he did, bought the assets of the company,

09:20:07 2    which had been valued on the tax returns at $120,000 for 2015.

09:20:15 3    Now, he buys it for 107.

09:20:18 4        Now, we're into the next two transactions, one of

09:20:22 5    which is a sale of the assets of Wagners Chef.  As I just said,

09:20:30 6    Mr. Saed had been trying to sell Wagners Chef as an ongoing

09:20:34 7    concern, as a business.  Couldn't do it.  So he had to get out,

09:20:38 8    and so he sold the assets for $107,000, which was the inventory

09:20:43 9    and the equipment.  But the equipment, as we already talked

09:20:46 10   about, was in dire need of some significant and expensive

09:20:50 11   renovations.

09:20:51 12       So, that is the next transaction is the asset

09:21:02 13   sale.  It was all aboveboard.  In fact, at no time was any of

09:21:06 14   this hidden from Brothers.  As Mr. DiRosa pointed out, on the

09:21:12 15   day of the sale, November 15th, Mr. Saed asked that I send a

09:21:20 16   letter to Mr. DiRosa and Brothers saying, we're placing you on

09:21:23 17   notice that Wagners Chef has sold its assets.  Then, it also

09:21:29 18   offers that, if Brothers Petroleum has an interest in

09:21:31 19   discussing a commercial relationship with Empire Express, who

09:21:36 20   bought the assets, we can put you in contact with them.

09:21:39 21       Now, they did, in fact, get in contact with them.

09:21:43 22   In fact, Brothers sold gasoline to Empire Express in November

09:21:48 23   of 2016, December of 2016, January of 2016 (sic), and February

09:21:54 24   of 2016 (sic).

09:21:57 25       During that time, they were -- as Mr. Haider

*OFFICIAL TRANSCRIPT*

testified, they were in discussions about possibly entering into a new contract between Brothers and Empire Express. Empire Express wouldn't do it because Brothers insisted on putting forward the same contract terms that were in place with Wagners Chef, the prior contract that was signed between Brothers and Wagners Chef's prior owner, Fatmah Hamdan. That wasn't good enough. That wasn't within a reasonable standard that Mr. Haider felt he could do.

But, from that perspective, that asset sale, which is the fourth of the five transactions that's at issue, didn't involve Jadallah Enterprises. It wasn't a party to it. Didn't involve Ahmed 1. It wasn't a party to it. That was between Wagners Chef and Empire Express. It was an arm's length transaction for a reasonable value. That's what it was. It was a business transaction.

Was it a fire sale? Was Mr. Saed facing some significant problems and had to sell it? Yes, he was. He was facing jail time, and he was losing money. But that doesn't mean that it's an unfair trade practice, that it's an egregious action. He got the best deal he could.

THE DEPUTY CLERK: Five minutes.

MR. BEH: Excuse me?

THE DEPUTY CLERK: Five minutes.

MR. BEH: Thank you.

Last of the transactions is the sale -- or,

*OFFICIAL TRANSCRIPT*

09:23:34 1   excuse me, the lease by Ahmed 1 to Empire Express.  Again,

09:23:39 2   Wagners Chef is not involved in this.  Jadallah Enterprises

09:23:42 3   isn't involved in this.  This is between Ahmed 1 and the

09:23:46 4   company that just bought the assets of Wagners Chef.

09:23:50 5          Well, Ahmed 1 is looking for a tenant for its

09:23:52 6   space.  Empire Express comes in and agrees to be that tenant,

09:23:59 7   to operate the gas station, operate the convenience store, and

09:24:03 8   to pay rent.  Again, there is no egregious, unscrupulous or

09:24:09 9   unethical aspect to that.  That's a lease.  That's what Ahmed 1

09:24:13 10   was set up to do, was to manage the property.

09:24:16 11          So, again, there is simply no evidence of the

09:24:21 12   egregious action needed, nor to be an unfair trade practice,

09:24:27 13   nor is there evidence of this grand conspiracy that Mr. DiRosa

09:24:31 14   would have you believe, that this all was a plan that was laid

09:24:36 15   down years beforehand.  It's simply not true.

09:24:39 16          So, at the end of the day, ladies and gentlemen,

09:24:46 17   what you are going to be given when you go back and deliberate

09:24:54 18   is this verdict form.  You're going to be asked three simple

09:25:00 19   questions.

09:25:00 20          Do you find by a preponderance of the evidence

09:25:03 21   that Wagners Chef, LLC has violated the Louisiana Unfair Trade

09:25:11 22   Practices Act?

09:25:11 23          The answer to that question is no.  Because what

09:25:13 24   you've -- to find a violation of the Unfair Trade Practices

09:25:17 25   Act, you're going to have to find an egregious action involving

09:25:25 1    fraud, misrepresentation, deception or other unethical conduct

09:25:29 2    that damaged Brothers.

09:25:32 3                Next question is going to be the same question:

09:25:35 4    Do you find by a preponderance of the evidence that

09:25:37 5    Jadallah Enterprises, LLC has violated the Louisiana Unfair

09:25:37 6    Trade Practices Act?

09:25:44 7                All Jadallah Enterprises did was buy a piece of

09:25:46 8    property, that's all it did, and lease that property to a

09:25:53 9    property manager.

09:25:55 10               The third question is:  Do you find by a

09:25:57 11   preponderance of the evidence that Ahmed 1, LLC has violated

09:26:01 12   the Louisiana Unfair Trade Practices Act?

09:26:05 13               All Ahmed 1 did was become the lessee of the

09:26:10 14   property from Jadallah Enterprises, and then lease it to other

09:26:14 15   people, including Empire Express.  That's it.

09:26:20 16               Now, Mr. DiRosa is going to come back and say,

09:26:23 17   well, there is this, and there is that, there is the other

09:26:26 18   thing.  But look at the transactions.  It is only those five

09:26:30 19   transactions that are at issue in this case, and only those

09:26:34 20   five transactions that can be the basis for an award.  None of

09:26:41 21   those transactions meet the requirements of Louisiana law to be

09:26:46 22   an unfair trade practice.

09:26:48 23               Now, as the Judge is going to instruct you, an

09:26:54 24   unfair trade practice does not include -- the law does not

09:27:00 25   prohibit sound business practices, exercise of permissible

09:27:04 1  business judgment, or appropriate free enterprise transactions.
09:27:10 2  The statute does not forbid a business to do what everyone
09:27:16 3  knows a business must do, to make money.
09:27:20 4          I would add one thing to that.  To stop losing
09:27:24 5  money is also not prohibited.  That's the -- so, only focus on
09:27:29 6  those five transactions.  I think, when you do that, based on
09:27:33 7  the evidence presented, you're going to have to answer no to
09:27:36 8  all three of those questions.
09:27:38 9          Thank you very much.
09:27:41 10         THE COURT:  All right, Mr. DiRosa, you have nine
09:27:43 11 minutes left.
09:27:44 12         MR. DIROSA:  Thank you.
09:27:45 13                  REBUTTAL CLOSING ARGUMENTS
09:27:45 14 BY MR. DIROSA:
09:27:52 15         The Judge will instruct you, you may make
09:27:56 16 deductions and reach conclusions that reason and common sense
09:27:57 17 lead you to make from the facts that have been established by
09:27:59 18 the testimony and the evidence.
09:28:02 19         Now, Mr. Beh talks about Jadallah Enterprises,
09:28:05 20 Wagners Chef, and Ahmed 1 as if one of them has an office on
09:28:11 21 Canal Street, another one has an office on Poydras, and the
09:28:15 22 other one has an office across the river.  When these three
09:28:19 23 entities meet at the same time, they are meeting in the exactly
09:28:22 24 the same place, Mr. Saed's head.
09:28:27 25         The right hand knows what the left hand is doing

*OFFICIAL TRANSCRIPT*

at all times.  Mr. Saed is guiding each of these companies through this process.

That's why, when he formed Jadallah Enterprises back in 2015, he could feel fairly comfortable ignoring the rulings of the court that were coming out, because he knew where Jadallah Enterprises was going.  It was a plan.

The cancellation of the lease, Mr. Beh wants to tell you that the only part was this bottom part, request the clerk of court to evidence the cancellation.  No.  Wagner World and Wagners Chef mutually terminate and cancel the lease with option to purchase and the amendment to the triple net lease.

So, again, if I live in an apartment complex. Somebody else buys -- a new owner buys the apartment complex. I don't lose my lease.  I don't have to cancel my lease and get out.  You cancel your lease because you want to -- you're trying to have Wagners Chef step out of the way, so these other two entities can come and step in.  That's the only purpose to cancel the lease.  Because if you don't cancel the lease, then when, let's say, Jadallah Enterprises purchases the property, Wagners Chef still has the right to occupy the property as a tenant until midnight on February 9, 2022, and has a seven-year renewal term that ends at midnight on February 9, 2029.

So, if they don't cancel the lease, they still can occupy the premises.  They still can conduct business. Now, they may have conducted business, but they were just

*OFFICIAL TRANSCRIPT*

09:30:32 1  waiting to be pushed aside.  That was all that was going on.

09:30:35 2  That's why they didn't have a lease.  They could have given up

09:30:38 3  the option to purchase and said, but I want to retain my lease.

09:30:41 4  After all, this is all within Mr. Saed's province.  He owns all

09:30:48 5  of these companies.

09:30:49 6         So, when you come along to buy a business, you

09:30:53 7  want to buy the lease and the business.  You want to buy the

09:30:56 8  whole business.  That's where the value is.  The value is in

09:31:01 9  the lease.  That gives you the right to operate a business.

09:31:20 10        Mr. Beh wants to talk about what the mortgage

09:31:22 11 says.  Before this ever got to the attorneys, to the mortgage,

09:31:25 12 to looking at anything, Mr. Saed was already telling the bank,

09:31:34 13 I'm going to form a real estate holding company, which already

09:31:38 14 existed.

09:31:41 15        But what he doesn't tell the bank, he doesn't

09:31:43 16 tell the bank about the litigation against him, he doesn't tell

09:31:47 17 the bank about the judgment, he doesn't tell the bank about the

09:31:50 18 tax lien, because he cannot afford to have the bank turn down

09:31:56 19 Wagners Chef's loan.  So he is holding information back from

09:32:02 20 the bank.  I mean, it's absolutely clear that he's doing that

09:32:06 21 because he needs to get that loan.

09:32:08 22        Now, if he doesn't get that loan, he might not be

09:32:12 23 able to exercise his option to purchase, but he still has this

09:32:17 24 lease.  He can still occupy the property for -- until 2029, and

09:32:24 25 still operate his business, and still collect $288,000 a year

*OFFICIAL TRANSCRIPT*

09:32:30 1    on subleases to tenants at that location.

09:32:37 2            The Judge will also tell you, as jurors, you are

09:32:46 3    the sole judges of the credibility or believability of each

09:32:51 4    witness and the weight to be given to his or her testimony and

09:32:55 5    the extent to which he has been supported or contradicted by

09:33:00 6    other credible evidence.

09:33:04 7            Other than what Mr. Saed tells you, what else --

09:33:11 8    what else is there?  Almost everything he tells you is not

09:33:18 9    true.  Just like what he told the bank, it's not true.  It's

09:33:21 10   half true.  It's part true.  It's whatever he wants to be true.

09:33:27 11           That's why his tax returns are the way they are,

09:33:31 12   because that's what he wants to tell the government.  I didn't

09:33:36 13   make 55,000, like I will told the bank; I only made 5,000 out

09:33:41 14   of this business.  Yes, we sold $4,300,000 worth of goods, but

09:33:47 15   we only made $5,000.  God, we just -- I don't know where the

09:33:51 16   money went.

09:33:52 17           So, you are the judge of whether you find

09:33:59 18   Mr. Saed's explanations credible.  I will submit to you that I

09:34:07 19   don't think there has been any evidence really put forward to

09:34:11 20   support what he says.  You have to believe him.  That's the

09:34:17 21   only way he gets home is if you believe him.  Just like the

09:34:23 22   bank believed him.  Just like Mr. Sewell believes him when he

09:34:28 23   gives him whatever numbers he gives him; when he tells him, I

09:34:31 24   didn't have any salaries; when he tells him, I only had

09:34:34 25   $120,000 in rental income this year.  Just like Mr. Sewell

**OFFICIAL TRANSCRIPT**

believes him, just like the bank believed there was no problems with Wagners Chef, he's asking you, yes, believe me, too.  You believe me.

THE DEPUTY CLERK:  Two minutes.

MR. DIROSA:  Again, the claim is this, that these transactions were designated or designed to insulate Wagners Chef from its liability to the plaintiff, and to prevent the plaintiff from collecting damages from Wagners Chef by depleting Wagners Chef's assets.  That's exactly what he accomplished.  That is what he wanted to do, that is what he was planning to do, and that is what he accomplished.

The notion that somehow Jadallah Enterprises is divorced from Ahmed 1, is divorced from Wagners Chef, is not the case.  It's just Mr. Saed.  He's the only one.

Four things to prove.  Defendant engaged in an unfair or deceptive trade practice.  That's up to you, based on the testimony.

The defendant intended to harm the plaintiff by engaging in that trade practice.  I would say submit to you, the evidence shows that this was the plan all along, and it was followed through to the end.

The unfair or deceptive trade practice caused injury to the plaintiff.  It emptied Wagners Chef's cup.  There is nothing.  They have damages.  They have substantial damages. They have an empty cup.

*OFFICIAL TRANSCRIPT*

09:36:32 1          The plaintiff suffered an ascertainable loss as a

09:36:37 2  result.  Again, just an empty cup.  That's all they have after

09:36:42 3  they've been chasing after Wagners Chef for these many years,

09:36:47 4  following the law, following their case through, not ignoring

09:36:51 5  rulings of the court, proceeding ahead.  But there was always a

09:36:58 6  plan in Mr. Saed's head.  He knew where he was going.

09:37:07 7          Thank you.  We think we've proven our case and

09:37:12 8  established it by a preponderance of the evidence.  Thank you.

09:37:16 9        THE COURT:  All right.  Let's hand out the legal

09:37:20 10  instructions.

09:37:26 11         Ladies and gentlemen, we're passing out copies of

09:37:28 12  the written legal instructions.  I invite you to follow along

09:37:31 13  as I read them.  Please don't get ahead of me.  That way, it

09:37:35 14  will all make sense to you, okay.

09:37:44 15         The attorneys have the final copies?  You need to

09:37:48 16  give one to Gail and one to Cathy, too, Perry.

09:37:48 17        LEGAL INSTRUCTIONS READ TO THE JURY

09:38:09 18        THE COURT:  Ladies and Gentlemen, Members of the Jury,

09:38:10 19  you have heard the evidence in this case.  I will now instruct

09:38:13 20  you on the law that you must apply.

09:38:14 21         It is your duty to follow the law as I give it to

09:38:17 22  you.  On the other hand, you, the jury, are the judges of the

09:38:20 23  facts.  Do not consider any statement that I have made in the

09:38:24 24  course of the trial or make in these instructions as an

09:38:28 25  indication that I have any opinion about the facts of the case.

You have heard the closing arguments of the attorneys.  Statements and arguments of the attorneys are not evidence and are not instructions on the law.  They are intended only to assist the jury in understanding the evidence and the parties' contentions.

You must answer all questions under a preponderance of the evidence standard.  By this is meant the greater weight and degree of credible evidence before you.  In other words, a preponderance of the evidence just means the amount of evidence that persuades you that a claim is more likely so than not so.

In determining whether any fact has been proved by a preponderance of the evidence in the case, you may, unless otherwise instructed, consider the testimony of all witnesses, regardless of who may have called them, and all exhibits received in evidence, regardless of who may have produced them.

You must consider only the evidence in the case. However, you may draw such reasonable inferences from the testimony and the exhibits as you feel are justified in light of common experience.  You may make deductions and reach conclusions that reason and common sense lead you to make from the facts have been established by the testimony and evidence in this case.

The testimony of a single witness may be sufficient to prove any fact, even if a greater number of

09:39:59 1  witnesses may have testified to the contrary, if, after

09:40:03 2  considering all the other evidence, you believe that single

09:40:06 3  witness.

09:40:06 4      Now, there are two types of evidence you may

09:40:11 5  consider.  One is called direct evidence, such as the testimony

09:40:15 6  of an eyewitness.  The other is sometimes called indirect or

09:40:20 7  circumstantial evidence.  Circumstantial evidence is the proof

09:40:24 8  of circumstances that tend to prove or disprove the existence

09:40:28 9  or nonexistence of certain other facts.

09:40:32 10     As a general rule, the law makes no distinction

09:40:35 11 between direct and circumstantial evidence, but simply requires

09:40:39 12 that you find the facts from a preponderance of all the

09:40:43 13 evidence, both direct and circumstantial.

09:40:52 14     In deciding this case, you are expected to use

09:40:55 15 your good sense.  Give the evidence and the testimony of each

09:40:58 16 witness a reasonable and fair interpretation in light of your

09:41:00 17 own knowledge of the natural tendencies of human beings.

09:41:04 18     Now, I've said you must consider all the evidence

09:41:07 19 in the case.  This does not mean, however, that you must accept

09:41:10 20 all of the evidence as true or accurate.  As jurors, you are

09:41:13 21 the sole judges of the credibility or believability of each

09:41:18 22 witness and the weight to be given to his or her testimony.

09:41:22 23     In weighing the testimony of a witness, you

09:41:25 24 should consider his or her relationship to a party; his

09:41:29 25 interest, if any, in the outcome of the case; his manner of

*OFFICIAL TRANSCRIPT*

testifying; his opportunity to observe and acquire knowledge concerning the facts about which he testified; his candor, fairness and intelligence; and, the extent to which he has been supported or contradicted by other credible evidence.  You may, in short, accept or reject the testimony of any witness in whole or in part.

Also, the weight of the evidence is not necessarily determined by the number of witnesses testifying as to the existence or nonexistence of any fact.  You may find that the testimony of a smaller number of witnesses as to any fact is more credible than the testimony of a larger number of witnesses to the contrary.

In determining the weight to give to the testimony of a witness, you should ask yourself whether there was evidence tending to prove that the witness testified falsely concerning some important fact, or whether there was evidence that at some other time the witness said or did something or failed to say or do something that was different from the testimony the witness gave before you during the trial.

You should keep in mind, of course, that a simple mistake by a witness does not necessarily mean that the witness was not telling the truth as he or she remembers it, because people may forget some things or remember other things inaccurately.  So, if a witness has made a misstatement, you

09:43:01 1  need to consider whether that misstatement was an intentional

09:43:04 2  falsehood or simply an innocent lapse of memory, and the

09:43:08 3  significance of that may depend on whether it has to do with an

09:43:12 4  important fact or with only an unimportant detail.

09:43:18 5          At various points during the trial, I have been

09:43:21 6  called upon to pass judgment on the admissibility of evidence.

09:43:25 7  Whether evidence is admissible is purely a question of law for

09:43:27 8  me to decide, and with which you should have no concern.  You

09:43:30 9  are not to draw any inference as to what weight should be given

09:43:33 10 to the evidence or as to the credibility of the witness from my

09:43:37 11 ruling on these questions.

09:43:39 12         In admitting evidence to which there was an

09:43:43 13 objection, I do not determine what weight should be given it;

09:43:46 14 that is a matter for you to determine as jurors.  As to say any

09:43:50 15 evidence rejected by me, you, of course, must not consider it

09:43:54 16 at all.  Likewise, as to any question to which an objection was

09:43:59 17 sustained, you must not conjecture as to what the answer might

09:44:03 18 have been or as to the reason for the objection or for my

09:44:07 19 ruling.

09:44:10 20         Now, in this case, the plaintiff has the burden

09:44:13 21 of proving its case by a preponderance of the evidence.  To

09:44:17 22 establish by a preponderance of the evidence means to prove

09:44:19 23 something is more likely so than not so.  If you find that the

09:44:22 24 plaintiff has failed to prove any element of its claim by a

09:44:27 25 preponderance of the evidence, then it may not recover on that

claim.

In deciding whether any fact has been proven by a preponderance of the evidence, you may, unless otherwise instructed, consider the testimony of all witnesses, regardless of who may have called them, and all exhibits received in evidence, regardless of who may have produced them.

If the proof fails to establish any essential element of the plaintiff's claim by a preponderance of the evidence, you should find for the defendant as to that claim.

Also, do not let bias, prejudice or sympathy play any part in your deliberations.

Now, up to now, these legal instructions I've been giving you are what we call general instructions that apply pretty much in every civil case. Now, we're getting to the particular claims in this case, okay.

Now, Ladies and Gentlemen, the plaintiff in this case, Brothers Petroleum, LLC, has asserted claims against the defendants, Wagners Chef, LLC, Jadallah Enterprises, LLC, and Ahmed 1, LLC, for violations of the Louisiana Unfair Trade Practices Act.

Plaintiff claims that the defendants entered into a series of five transactions pertaining to the purchase and lease of the property where Wagners Chef operated its gas station and the sale of Wagners Chef's assets.

Plaintiff claims that these transactions were

designed to insulate Wagners Chef from its liability to plaintiff, and to be prevent plaintiff was collecting damages from Wagners Chef by depleting Wagners Chef's assets.

As a result of these actions, plaintiff claims that each defendant should be liable for plaintiff's losses under the Louisiana Unfair Trade Practices Act.

Now, defendants deny any violation of the Louisiana Unfair Trade Practices Act, and contend that these transactions were valid, economically reasonable transactions undertaken for legitimate business purposes.

I will now instruct you concerning the law applicable on the Louisiana Unfair Trade Practices Act.

First, the parties in this case, as you have heard, are all what we call LLCs, or limited liability companies, organized under Louisiana law. Under Louisiana law, a limited liability company is a distinct and separate legal entity, wholly separate from its members. As a result, shareholders, members and officers of a limited liability company are generally not individually responsible for the debts or obligations of the limited liability company.

Now, as I said, Brothers brings its claim against the defendants under this statute, the Louisiana Unfair Trade Practices Act, and defendants deny that claim.

Let me explain that act to you. The Louisiana Unfair Trade Practices Act prohibits the use of unfair methods

of competition and unfair or deceptive practices in the conduct of any trade or commerce. What constitutes unfair and deceptive practices is not specifically defined by the law, but it is determined on a case-by-case basis. The law does not prohibit sound business practices, the exercise of permissible business judgment or appropriate free enterprise transactions. The statute does not forbid a business to do what everyone knows a business must do: Make money. Finally, the statute does not provide an alternate remedy for simple breaches of contract.

A trade practice is unfair when it offends public policy and is immoral, unethical, oppressive, unscrupulous or substantially injurious to competitors. Only egregious actions involving fraud, misrepresentation, deception, or other unethical conduct may be sanctioned under the Louisiana Unfair Trade Practices Act. Mere negligence is not sufficient. Conduct that is not otherwise illegal may constitute an unfair trade practice if it is undertaken with the unscrupulous purpose of harming competition rather than helping one's self.

So the motivation of the defendant is the critical factor here. The alleged actions must have been taken with the specific purpose of harming competition. Conduct does not violate the Louisiana Unfair Trade Practices Act unless it is undertaken with the specific intent to harm competition.

To succeed in proving a violation of the

*OFFICIAL TRANSCRIPT*

09:49:34  1  Louisiana Unfair Trade Practices Act, therefore, the plaintiff
09:49:36  2  must prove four things:  First, that the defendant engaged in
09:49:40  3  an unfair or deceptive trade practice; second, that defendant
09:49:47  4  intended to harm the plaintiff by engaging in such trade
09:49:51  5  practice; third, the unfair or deceptive trade practice caused
09:49:55  6  injury to plaintiff; and, fourth, the plaintiff suffered an
09:49:58  7  ascertainable loss as a result of the trade practice.
09:50:02  8          So you should not find, however, that a defendant
09:50:06  9  violated the Louisiana Unfair Trade Practices Act unless all
09:50:11 10  four elements are met as to each of the defendants.
09:50:15 11          Now, however, in this case -- I want to explain
09:50:19 12  this a little bit because it's a little bit unusual -- you're
09:50:22 13  not being asked to assign -- if you find that any of the
09:50:25 14  defendants did violate the Louisiana Unfair Trade Practices
09:50:30 15  Act, you are not being asked in this case, in this Court, to
09:50:33 16  calculate damages of any sort.  That's because you've heard the
09:50:38 17  testimony and the lawyers talking about that there has been
09:50:43 18  related litigation already in state court on a breach of
09:50:48 19  contract claim, and there is a certain amount of damages that
09:50:50 20  have been determined.
09:50:52 21          The parties in the case have agreed to -- that if
09:50:56 22  you find a judgment in favor of the plaintiff, they will be --
09:51:00 23  the parties will be bound by whatever amount the state court
09:51:04 24  awards or has awarded.  So you don't have to worry about
09:51:08 25  setting the damage amount.  You just have to decide if there's

*OFFICIAL TRANSCRIPT*

liability as to any of these three defendants under the statute
that I just explained to you.

Now, in closing, I want to give you a few more
general instructions, Ladies and Gentlemen. I know some of you
may have taken notes. Some of you may not have taken notes.
That's fine. It's certainly your prerogative.

Any notes that you may have taken during the
trial are only aids to your own memory. If your memory differs
from your notes, in the end you should rely on your memory, not
on the notes. The notes themselves are not evidence. In fact,
I will let you take them into the jury room during your
deliberations, but, at the end of your deliberations, I'm going
to ask you to just leave your notebooks. Don't take them out
of the jury room. Gail, our case manager here, will destroy
the notes. No one sees them other than you, okay. So the
notes are not evidence.

Of course, if you are not taking notes, you
should rely on your independent recollection of the evidence.
You should not be unduly influenced by the notes of other
jurors. Notes are not entitled to any greater weight than the
recollection or impression of each juror about the testimony.

Now, when you go into the jury room in a few
minutes, it will be your sworn duty as jurors to discuss the
case with one another in an effort to reach agreement, if you
can do so. Each of you must decide the case for yourself, but

09:52:32 1  only after a full and impartial consideration of the evidence

09:52:35 2  with other members of the jury.

09:52:37 3          While you are discussing the case, do not

09:52:40 4  hesitate to re-examine your own opinion and change your mind if

09:52:45 5  you become convinced that you are wrong.  However, do not give

09:52:49 6  up your honest beliefs solely because the others may think

09:52:54 7  differently or merely to finish the case.  Remember that in a

09:52:59 8  very real way, you are the judges, judges of the facts.  Your

09:53:01 9  only interest is to seek the truth from the evidence in this

09:53:05 10  case.

09:53:05 11          When you retire to the jury room to deliberate,

09:53:08 12  you may take with you these legal instructions.  We're going to

09:53:12 13  send the exhibits in in a few minutes.  They'll come in a few

09:53:17 14  minutes after you get back there.  You'll have a binder with

09:53:19 15  hard copies of the exhibits that have been used during the

09:53:22 16  trial, but we'll also send in a thumb drive, and we'll send in

09:53:27 17  a person from our IT section to set that up for you and show

09:53:34 18  someone how to operate it.  It's your choice.  You can look at

09:53:38 19  any or all of it or none of it, if you need to.  It's there if

09:53:42 20  you need to refer to any of this.  Okay?

09:53:44 21          The first thing you should do when you get back

09:53:49 22  in the jury room in a few minutes is select one of your number

09:53:53 23  to serve as the foreperson of the jury.  The duties of the

09:53:56 24  foreperson will be to preside over the deliberations and to

09:54:02 25  communicate with the Court, should there be a need to.

**OFFICIAL TRANSCRIPT**

09:54:05 1           Once you go back in the jury room, the way to
09:54:08 2 communicate with me, with the Court, will generally be -- there
09:54:12 3 is a form, in fact, where you can write out -- any juror -- no
09:54:17 4 juror is prohibited from sending a question, but, generally, on
09:54:21 5 behalf of the entire jury, the foreperson does that.
09:54:24 6           Write out the question, if you have a question.
09:54:26 7 Sign it, whoever is writing.  Put the time on it.  Let the
09:54:31 8 court security officer, who will be outside the door of your
09:54:34 9 deliberation -- while you're deliberating, that is.  No one
09:54:38 10 will be in the jury room with the jury during your
09:54:41 11 deliberations.  The court security officer will be outside.
09:54:43 12           So if you have a question, let him know, hand him
09:54:46 13 the note.  He will bring it to me, I'll read it and look at it
09:54:50 14 first.  I am required to share it with the attorneys, allow
09:54:55 15 them input as to how I should respond to you.  Generally, I'll
09:55:00 16 respond by writing whatever my response is right below your
09:55:03 17 question and sending the note back in.
09:55:05 18           On rare occasions, it's sometimes necessary to
09:55:10 19 bring a jury actually back into the courtroom for further
09:55:14 20 instructions.  I'm in no way predicting that's going to be
09:55:18 21 necessary here.  But my point in telling you that, whether
09:55:22 22 you're back in the courtroom for additional instructions, or
09:55:25 23 whether you're sending me a note out, until you've reached a
09:55:29 24 final verdict, you should in no way tell us or tell me if there
09:55:32 25 is a numerical division of the court, like the vote is X to X,

*OFFICIAL TRANSCRIPT*

| | |
|---|---|
| 09:55:40 1 | or X to Y.  We don't want to know that until you've reached a |
| 09:55:45 2 | final verdict. |
| 09:55:45 3 | Your vote must be unanimous as to each of the |
| 09:55:49 4 | three questions.  So all eight jurors must agree before you |
| 09:55:53 5 | answer that.  Once you've completed the verdict form -- and |
| 09:55:57 6 | you've seen the verdict form.  It's pretty simple and |
| 09:56:00 7 | straightforward.  Three questions.  You just answer yes or no. |
| 09:56:04 8 | Then, once it's completed, the foreperson signs it and puts the |
| 09:56:08 9 | date.  Again, today is the 25th, I believe, of September. |
| 09:56:14 10 | Again, once you've completed the verdict form, |
| 09:56:16 11 | you've reached a verdict, you alert the court security officer |
| 09:56:20 12 | that you've reached a verdict.  He'll alert me.  We'll gather |
| 09:56:23 13 | the parties and the lawyers.  As soon as we're all back in the |
| 09:56:27 14 | courtroom, we'll bring you in and accept your verdict, okay. |
| 09:56:30 15 | So that's pretty much it. |
| 09:56:31 16 | Again, we'll send you out now.  Even though each |
| 09:56:37 17 | of you will have your own notes, each of you will have your own |
| 09:56:41 18 | legal instructions, I'm going to send in only one verdict form. |
| 09:56:46 19 | Why is that?  Because we need one unanimous verdict.  I don't |
| 09:56:50 20 | want each of you giving separate verdicts.  Okay.  That doesn't |
| 09:56:53 21 | work. |
| 09:56:54 22 | So, right now, I'm going to ask the jury to be |
| 09:57:01 23 | led into the jury room.  Pick your foreperson.  Gather your |
| 09:57:06 24 | stuff and bring it there. |
| 09:57:09 25 | Gail, we have their cell phones already, okay? |

*OFFICIAL TRANSCRIPT*

We cannot allow you to use your cell phones because you're not supposed to communicate with anybody while you're deliberating.  But if there is some emergency or something happens, you can certainly let us know.

In a few minutes, we'll send in the exhibits, okay.

THE COURT SECURITY OFFICER:  All rise.

(WHEREUPON, at 9:57 a.m., the jury panel leaves the courtroom for deliberations.)

THE COURT:  The jury has retired to begin their deliberations.

Gail, you have the verdict form and the envelope? There should be a manila envelope.  Gail, you can bring that in, send that in.

Then, if you all are not going to be in the courtroom or right outside, you need to give Gail your cell numbers, where she can reach you.  I wouldn't wander too far away, you know, so we can get you back here in a little bit.

If the jury -- I'm going to wait about another at least 30 minutes or so and see how they're doing.  If they are still deliberating, we will ask them if they want to order lunch.  We'll just order sandwiches and bring them in.  But it takes about 45 minutes or so to get the sandwiches here, so that is why I ask that early.  But we'll let you know if they decide to eat lunch.  If that's the case, you could probably

```
09:58:53   1   sneak away for 30 minutes or so, okay.
09:58:55   2              MR. DIROSA:  Thank you, Judge.
09:58:57   3              MR. BEH:  Thank you.
09:58:57   4              THE COURT:  Thank you, counsel.
09:58:57   5              (WHEREUPON, the Court was in recess while the jury
10:33:55   6   deliberates.)
10:40:16   7                              *     *     *
           8
           9
          10
          11
          12
          13
          14
          15
          16
          17
          18
          19
          20
          21
          22
          23
          24
          25
```

*OFFICIAL TRANSCRIPT*

1        **P-R-O-C-E-E-D-I-N-G-S**

2            WEDNESDAY, SEPTEMBER 25, 2019

3            A F T E R N O O N   S E S S I O N

4            (COURT CALLED TO ORDER)

5

12:30:49  6

12:30:49  7                        VERDICT

12:37:20  8        THE DEPUTY CLERK:  All rise.

12:37:30  9        THE COURT:  I've gotten word from the jury that they

12:37:32 10  have a verdict.  It looks like counsel and the parties are

12:37:35 11  present.  I guess we got the verdict -- I mean, the message

12:37:39 12  about five or ten minutes ago.

12:37:41 13            Okay.  So bring in the jury.

12:37:46 14        (WHEREUPON, at 12:37 p.m., the jury panel enters the

12:38:12 15  courtroom.)

12:38:12 16        THE COURT:  All right, ladies and gentlemen, please be

12:38:14 17  seated.

12:38:17 18            All right.  Mr. Bordelon, I'm guessing that you

12:38:21 19  were elected foreperson, since you have that envelope in your

12:38:23 20  hand?

12:38:25 21        THE FOREPERSON:  Yes, Your Honor.

12:38:26 22        THE COURT:  Thank you.

12:38:26 23            Before you hand it up, has the jury reached a

12:38:31 24  verdict?

12:38:31 25        THE FOREPERSON:  Yes, Your Honor, we have.

                    *OFFICIAL TRANSCRIPT*

| | |
|---|---|
| 12:38:32 1 | THE COURT: Is the verdict unanimous on each question? |
| 12:38:35 2 | THE FOREPERSON: Yes, it is, Your Honor. |
| 12:38:36 3 | THE COURT: Please hand the envelope to our case |
| 12:38:39 4 | manager. |
| 12:39:03 5 | All right. I'll have our case manager publish |
| 12:39:06 6 | the jury's verdict. |
| 12:39:14 7 | THE DEPUTY CLERK: Question Number 1: Do you find by a |
| 12:39:18 8 | preponderance of the evidence that Wagners Chef, LLC, has |
| 12:39:22 9 | violated Louisiana Unfair Trade Practices Act? |
| 12:39:25 10 | Yes. |
| 12:39:26 11 | Number 2: Do you find by a preponderance of the |
| 12:39:29 12 | evidence that Jadallah Enterprises, LLC, has violated the |
| 12:39:34 13 | Louisiana Unfair Trade Practices Act? |
| 12:39:37 14 | Yes. |
| 12:39:37 15 | Number 3: Do you find by a preponderance of the |
| 12:39:40 16 | evidence that Ahmed 1, LLC, has violated the Louisiana Unfair |
| 12:39:46 17 | Trade Practices Act? |
| 12:39:47 18 | Yes. |
| 12:39:48 19 | Ladies and Gentlemen of the Jury, is this your |
| 12:39:51 20 | verdict? |
| 12:39:52 21 | VOICES: Yes, it is. |
| 12:39:54 22 | THE COURT: Anybody wish to poll the jury? |
| 12:39:57 23 | MR. BEH: No, sir. |
| 12:39:58 24 | MR. DIROSA: No, sir. |
| 12:39:58 25 | THE COURT: Let the jury verdict be recorded on the |

**OFFICIAL TRANSCRIPT**

12:40:02 1     minutes of the Court.

12:40:03 2           Ladies and gentlemen, thank you for your service

12:40:04 3     here the last two and a half days, three days.  Even though it

12:40:09 4     was a relatively short trial, nonetheless, I realize and the

12:40:14 5     Court recognizes that it is, nonetheless, an imposition on your

12:40:18 6     time, pulling you away from your jobs, your life, your family

12:40:22 7     and so forth.  So we do appreciate your undertaking the

12:40:27 8     service.

12:40:27 9           I'm going to advise you about a rule of Court we

12:40:35 10     have here, that unless they get permission from me first, the

12:40:39 11     parties and the lawyers are not allowed to contact you or make

12:40:43 12     any effort to contact you, to interview you or anything like

12:40:47 13     that.  When you go home, when you leave here, you are free to

12:40:51 14     talk about the case now, with, you know, your family, your

12:40:54 15     friends, whatever, if you care to.  You don't have to.  You

12:40:57 16     don't have to talk to anybody, if you don't want.

12:41:00 17           But if you do end up talking to anybody about the

12:41:03 18     case, other than the lawyers and the party, you shouldn't --

12:41:06 19     the one thing you should not do is talk about what other people

12:41:11 20     said during your deliberations.  That's not proper.

12:41:15 21           So, with that said, I'm going to release you to

12:41:19 22     report down to the first floor, where you started Monday

12:41:22 23     morning.  They will give you instructions about how to get paid

12:41:26 24     for your three days here, plus your parking and so forth.

12:41:31 25           Again, thank you so much for your service.  Okay.

*OFFICIAL TRANSCRIPT*

12:41:34 1  Thank you.

12:41:38 2              Court stands adjourned.

12:41:38 3          THE DEPUTY CLERK:  All rise.

12:41:43 4          THE COURT:  We'll get you your cell phones before you

12:41:45 5  leave.

12:41:46 6              Remember, leave the notes and all in the jury

12:41:50 7  room.  Gail is going to destroy them, okay?

12:41:53 8              All right.  Thank you.

12:41:55 9          (WHEREUPON, at 12:41 p.m., the jury panel leaves the

12:42:18 10 courtroom.)

12:42:18 11         THE COURT:  I'll just note, Gail put a yellow sticker

12:42:22 12 on it.  Here's the jury verdict, but -- one little technical

12:42:24 13 error, but it wasn't worth worrying about -- they put the wrong

12:42:28 14 date.  They put 9/24.  Today is 9/25.

12:42:32 15             But, in any event, I'm going to need your

12:42:37 16 suggestions as to how to confect a judgment in this case.  It's

12:42:41 17 a little bit unusual because the verdict doesn't award a sum of

12:42:44 18 money.

12:42:47 19             I was thinking about this earlier, that we issue

12:42:50 20 some kind of judgment saying, based on the jury verdict, these

12:42:54 21 parties are found to have violated whatever; and, that based on

12:43:01 22 the parties' stipulation, the amount of damages will be as

12:43:07 23 determined, and then we can refer to the state court

12:43:10 24 litigation.  But you all can see if you all can agree on the

12:43:13 25 form of the judgment, okay?

                        *OFFICIAL TRANSCRIPT*

```
12:43:14  1        MR. DIROSA:  That would be fine.

12:43:16  2        THE COURT:  Anybody have anything else?

12:43:19  3            Now, there is one other thing.  It just occurred

12:43:23  4   to me.  There is a claim for attorney's fees in this case?

12:43:27  5        MR. DIROSA:  Yes.

12:43:28  6        THE COURT:  As I recall at the pretrial conference, you

12:43:31  7   all had reserved that to the Court, right?

12:43:33  8        MR. DIROSA:  Yes, sir.

12:43:33  9        THE COURT:  You're going to be asking for attorney's

12:43:41 10   fees, I'm assuming?

12:43:41 11        MR. DIROSA:  Yes, sir.

12:43:42 12        THE COURT:  AND so how much time do you need -- you

12:43:44 13   need to file a motion for fees and costs, and you have to

12:43:49 14   support it with, like, some record of your time, the time you

12:43:57 15   spent and what you believe is a reasonable hourly fee, and

12:44:03 16   support that.

12:44:03 17            Then, is 15 days enough time for you to do that?

12:44:10 18        MR. DIROSA:  That would than fine.

12:44:11 19        THE COURT:  Then the other side, Mr. Beh, you'll have

12:44:14 20   seven days to file any opposition to his motion?

12:44:17 21        MR. BEH:  That's fine, sir.

12:44:19 22        MR. DIROSA:  I'll be out of town from the --

12:44:22 23        THE COURT:  You want more time?  I'll give you more

12:44:24 24   time, if you want.

12:44:25 25        MR. DIROSA:  I'll be out of town from the 9th through
```

*OFFICIAL TRANSCRIPT*

the 16th.

THE COURT:  Of October.

MR. DIROSA:  Yes.  So I can certainly file within that.
It's just whether I would have time to reply to anything that
Mr. Beh files.

MR. BEH:  Do you want to do 30 days for yours?

MR. DIROSA:  Is 30 days okay?  Is that acceptable?

THE COURT:  That's fine.  It's a little more time than
I usually give, but that's all right.

I'll give you 30 days to file your motion for
attorney's fees and costs.  I'll give the defendant 15 days to
file any response or opposition.  I'll give you seven details
to reply.

MR. DIROSA:  Thank you.

THE COURT:  At which time, we'll just take that under
advisement.

MR. DIROSA:  That would be great.

THE COURT:  Meanwhile, you all can see if you can agree
on the form of a final judgment, excluding attorney's fees.  We
can deal with the attorney's fees afterwards.  Okay.

Gail, here.

Again, I put on the record that the jurors put
the wrong date.  I think I can take judicial notice, today is
September 25th, not September 24th.

Anything else?

*OFFICIAL TRANSCRIPT*

12:45:29  1          MR. DIROSA:  No, sir.

12:45:30  2          MR. BEH:  That will do it.

12:45:30  3          MR. DIROSA:  Thank you.

12:45:31  4          THE COURT:  Have a good day, everyone.  Thank you.

5          (WHEREUPON, at 12:45 p.m., the proceedings were

6   concluded.)

7                               *     *     *

8

9

10

11                      REPORTER'S CERTIFICATE

12

13          I, Cathy Pepper, Certified Realtime Reporter, Registered

14   Merit Reporter, Certified Court Reporter in and for the State

15   of Louisiana, Official Court Reporter for the United States

16   District Court, Eastern District of Louisiana, do hereby

17   certify that the foregoing is a true and correct transcript to

18   the best of my ability and understanding from the record of the

19   proceedings in the above-entitled and numbered matter.

20

21                      _s/Cathy Pepper_____

22                      Cathy Pepper, CRR, RMR, CCR
                         Certified Realtime Reporter
23                      Registered Merit Reporter
                         Official Court Reporter
24                      United States District Court
                         Cathy_Pepper@laed.uscourts.gov
25

                              *OFFICIAL TRANSCRIPT*